# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

### Civil Action No. 9:18-cv-80086-DMM

CHARLES WILDES, individually; FRANCISCO DORIA, individually;
AKIVA KATZ, individually; JAMES GURRY, individually;
RONALD NELSON, individually; and JUSTIN PERRY, individually;
and on behalf of All Others Similarly Situated;

    Plaintiffs,

v.

BITCONNECT INTERNATIONAL PLC, a foreign corporation;
BITCONNECT LTD., a foreign corporation;
BITCONNECT TRADING LTD., a foreign corporation;
JOSHUA JEPPESEN, an individual; GLENN ARCARO, an individual;
TREVON BROWN a/k/a TREVON JAMES, an individual;
RYAN HILDRETH, an individual; CRAIG GRANT, an individual;
JOHN DOE NO. 1 a/k/a NICHOLAS TROVATO a/k/a CRYPTONICK, an individual;
RYAN MAASEN, an individual; and JOHN DOE NOS. 2-10, individuals;

    Defendants.
_____/

### EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiffs CHARLES WILDES, FRANCISCO DORIA, AKIVA KATZ, JAMES GURRY, RONALD NELSON, and JUSTIN PERRY ("Plaintiffs"), individually and on behalf of all other persons similarly situated as defined herein, by and through undersigned counsel and pursuant to Federal Rule of Civil Procedure 65(b), hereby respectfully request that this Court enter a Temporary Restraining Order (TRO) against Defendants BITCONNECT INTERNATIONAL PLC, a foreign corporation; BITCONNECT LTD., a foreign corporation; BITCONNECT TRADING LTD., a foreign corporation (the business entities collectively referred to herein as "BITCONNECT"); JOSHUA JEPPESEN, an individual; GLENN ARCARO, an individual; TREVON BROWN a/k/a TREVON JAMES, an individual ("TREVON JAMES"); RYAN HILDRETH, an individual; CRAIG GRANT, an individual; JOHN DOE NO. 1 a/k/a NICHOLAS TROVATO a/k/a CRYPTONICK,

an individual ("CRYPTONICK"); and RYAN MAASEN, an individual (collectively referred to as "Defendants") to freeze Defendants' assets and require Defendants to disclose the bitcoin and other cryptocurrency wallet addresses so their assets can be monitored.  **A fellow U.S. District Court has already entered a TRO against some of the Defendants in a parallel lawsuit filed subsequently to the instant matter.**[1]  In support of the request for a TRO herein, Plaintiffs allege as follows:

## FACTUAL BACKGROUND

BITCONNECT INTERNATIONAL PLC; BITCONNECT LTD.; and BITCONNECT TRADING LTD. (collectively "BITCONNECT") are all parts of the same foreign technology organization that conducted its business on the internet, principally by means of websites accessible at www.bitconnect.co and www.bitconnectcoin.co.  BITCONNECT described itself as "an open source all-in-one bitcoin and crypto community platform designed to provide multiple investment opportunities with cryptocurrency education where it is entirely possible to find the independence we all desire, in a community of like-minded, freedom-loving individuals who, like you, are seeking the possibility of income stability in a very unstable world."  When BITCONNECT referred to "all-in-one bitcoin and crypto community platform," it was referring to the ability to trade and profit from cryptocurrencies, including bitcoin, and to gain access to Initial Coin Offerings ("ICOs").

At the heart of its business, BITCONNECT purported to offer investment opportunities that allow individuals to profit from: (1) BITCONNECT's trading of digital tokens through a proprietary, secret automated trading system it called its "volatility software," (2) its digital token (the BitConnect Coin [BCC]), and (3) its referral program.  BITCONNECT offered investments (the "BitConnect

---

[1] *See*, *Paige v. BitConnect International PLC, BitConnect Ltd., BitConnect Trading Ltd., and Ryan Maasen*, U.S. District Court - Western District of Kentucky, Case No. 3:18-cv-00058-JHM-DW at Docket Entry No. (DE 7) (Dated: January 30, 2018).

Investments") to the general public, including the residents of Florida.  The BitConnect Investments, as described below, were the BitConnect Lending Program and the BitConnect Staking Program.

BITCONNECT offered and sold to the public an investment it called the "BitConnect Lending Program."  BITCONNECT represented that its investors in the program would earn up to forty percent (40%) interest per month over a specified term and an additional rate of interest calculated on a daily basis.  BITCONNECT indicated that the interest was earned through the profits generated by its proprietary, secret trading system (the "volatility software").  BITCONNECT published statements on its website and elsewhere that suggested that investors were **guaranteed** the return of their principal investment in as soon as one-hundred twenty (120) days.  To take part in the BitConnect Lending Program, investors first had to purchase bitcoin with their fiat currency, such as the U.S. Dollar or Euro.  BITCONNECT then directed investors to deposit their bitcoin into the BitConnect BCC Exchange platform.  Once deposited, BITCONNECT instructed each investor to sell his/her/its bitcoin to BITCONNECT in exchange for its own digital token (BCC).  Investors then "loaned" their BCC back to BITCONNECT; and BITCONNECT claimed to use the BCC that it borrowed from investors to fund the trading activities of the "volatility software."

BITCONNECT also offered and sold to the general public an investment it called the "BitConnect Staking Program."  BITCONNECT represented that investors in this program would earn interest of up to ten percent (10%) per month over a specified term.  In the BitConnect Staking Program, investors first had to purchase bitcoin with their fiat currency, such as the U.S. Dollar or Euro.  BITCONNECT then directed investors to deposit their bitcoin into the BitConnect BCC Exchange platform.  Once deposited, BITCONNECT instructed each investor to sell his/her/its bitcoin to BITCONNECT in exchange for BCC.  Investors then had to download and install on their computers the BitConnect-QT wallet software and hold the BCC in the BitConnect-QT wallet for more than fifteen (15) days.  The funds that BITCONNECT paid to investors were purportedly based

on the number of BCC, or "stake," each investor held in the BitConnect-QT wallet installed on the investor's computer. The amount of interest paid to investors was purportedly contingent upon the dates of the investors' investments.

BITCONNECT used sales agents, which it refers to as "affiliates," to direct investors to the BitConnect Websites for the purpose of purchasing BitConnect Investments. In return for funneling additional investors to BITCONNECT, the affiliates were paid sizeable commissions. Defendants GLENN ARCARO, TREVON JAMES, RYAN HILDRETH, CRAIG GRANT, CRYPTONICK, and RYAN MAASEN were among the most influential, and most successful, of those affiliates.

In mid-January 2018, BITCONNECT boasted a market cap of over $2.5 billion. On January 17, 2018 -- as the unsustainable growth of BITCONNECT's scheme grew larger, and the sound of government regulators coming to take a closer look into BITCONNECT's operations grew louder -- BITCONNECT suddenly shut down its trading platform and lending program, a maneuver that precipitated an almost immediate ninety percent (90%) plummet in the value of BITCONNECT's investors' $2.5+ billion holdings.

Although BITCONNECT contended, in the wake of terminating its trading and lending functions, that it would continue to support the proprietary cryptocurrency token it had created and required its investors to purchase, that promise was hollow; as the only true value the token held was on BITCONNECT's own platform. The damage was already done, and investors holding BCC have suffered 95+% losses on their investments at BITCONNECT.

As a result of the foregoing scheme, the risk of asset dissipation and dispersion now falls squarely on Plaintiffs' and the potential Class' shoulders, while Defendants reap the benefits of their fraud and theft. Given these facts, Plaintiffs commenced this action and are entitled to a Temporary Restraining Order freezing Defendants' assets and requiring Defendants to disclose their cryptocurrency wallet addresses to preserve the *status quo ante* pending the outcome of this litigation.

- 4 -

**SILVER MILLER**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

# LEGAL ARGUMENT

## I. The Court Can Issue an Injunction to Freeze Assets in this Action for Equitable Relief.

1. Under the general rule, federal courts lack the authority to freeze assets of a defendant before the claims have been brought to judgment. *See*, *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 322 (1999). "However, when the plaintiff is seeking equitable relief, as opposed to merely legal damages, the federal courts have the authority to issue a preliminary injunction in order to freeze the assets of a defendant if the requirements for a preliminary injunction are otherwise satisfied." *Clayton v. Heartland Resources, Inc.*, 2008 WL 5046806, at *4 (W.D. Ky. Nov. 21, 2008) (citing *Grupo*, 527 U.S. at 324-325); *see also*, *In re Focus Media, Inc.*, 387 F.3d 1077, 1084 (9th Cir. 2004) (citations omitted). In *Focus Media*, the Ninth Circuit specifically noted that the rule against injunctive relief as articulated in *Grupo Mexicano* did not apply to the underlying claims for fraudulent conveyance and constructive trust, ultimately concluding that the trial court's entry of a preliminary injunction had been proper. *Id.* at 1085.

2. Moreover, Rule 64 of the Federal Rules of Civil Procedure provides that when state law authorizes a prejudgment remedy to secure assets subject to a plaintiff's state law claims, state law governs such relief. Rule 64, Fed.R.Civ.P.; *Granny Goose Foods, Inc. v. Bhd. of Teamsters Local 70*, 415 U.S. 423, 436 n. 10 (1974).

3. Here, Plaintiffs and the Class seek equitable relief in addition to their legal remedies and are entitled to an injunction to maintain the *status quo* until the claims in the Amended Class Action Complaint can be resolved. Amongst other claims and remedies sought, Plaintiffs allege violations of federal securities laws, Florida securities laws, numerous common law torts (conversion, civil conspiracy); and request relief in the following forms of equity:

- **An Order enjoining Defendants** from making further transfers or dissipations of the investment funds and assets raised in connection with the

SILVER MILLER
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

- promoted BitConnect Investments, or using such funds and assets in any further purchases or transactions;

- A judgment awarding Plaintiffs and the Class Members **equitable restitution**, including, without limitation, **rescission of their investments** in BITCONNECT, **restoration of the *status quo ante***, and return to Plaintiffs and the Class Members all cryptocurrency or fiat currency paid to Defendants in connection with the BitConnect Investments as a result of Defendants' unlawful and unfair business practices and conduct;

- An Order requiring **an accounting** of the remaining funds and assets raised from Plaintiffs and the Class in connection with the BitConnect Investments; and

- An Order imposing **a constructive trust** over the funds and assets rightfully belonging to Plaintiffs and the Class.

*See*, Amended Class Action Complaint at "Prayer for Relief" [Docket Entry No. ("DE") 5] at Pg. 53.

4.  In *Deckert v. Independence Shares Corp.*, the United States Supreme Court held that a claim by a purchaser of a security to rescind a fraudulent sale and obtain restitution of the consideration paid is a claim for equitable relief and that a preliminary injunction was appropriate to maintain the status quo where there was real risk of insolvency and dissipation. 311 U.S. 282, 288-289 (1940).

5.  Additionally, with regard to the claim for imposition of a constructive trust, Florida courts have authorized equitable injunctive relief to secure the assets subject to the claim. *Friedman v. Heart Institute of Port St. Lucie, Inc.*, 863 So.2d 189, 192 (Fla. 2003); *Briceño v. Bryden Investments, Ltd.*, 973 So.2d 614, 617 (Fla. 3d DCA 2008) (and cases cited therein).

6.  **In a similar class action lawsuit filed against BITCONNECT and Defendant RYAN MAASEN just days after the instant lawsuit was commenced, the U.S. District Court for the Western District of Kentucky has already entered against each of the defendants in that case a Temporary Restraining Order providing the very relief sought herein.**[2]

---

[2] *See*, *Paige v. BitConnect International PLC, BitConnect Ltd., BitConnect Trading Ltd., and Ryan Maasen*, U.S. District Court - Western District of Kentucky, Case No. 3:18-cv-00058-JHM-DW at Docket Entry No. (DE 7) (Dated: January 30, 2018).

- 6 -

**SILVER MILLER**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

7.     Accordingly, Plaintiffs are entitled to a Temporary Restraining Order if the other requirements for a Temporary Restraining Order have been met.  For the reasons described below, Plaintiffs are entitled to such relief.

**II.**     **A Temporary Restraining Order Is Appropriate to Prevent Immediate and Irreparable Harm**

8.     In considering a Temporary Restraining Order, the Court must consider the following: (1) the likelihood of irreparable harm; (2) the unavailability of an adequate remedy at law; (3) the substantial likelihood of success on the merits; (4) the threatened injury to the petitioner outweighs the possible harm to the respondent; and (5) a temporary injunction will not disserve the public interest. *City of Miami Beach v. Kuoni Destination Mgmt., Inc.*, 81 So. 3d 530, 532 (Fla. 3d DCA 2012); *see also Siegel v. LePore,* 234 F.3d 1163, 1179 (11th Cir. 2000), *cert. denied*, 531 U.S. 1005, 121 S. Ct. 510, 148 L. Ed. 2d 478 (2000) (citations omitted).  As shown below, Plaintiffs satisfy each element of that standard.

**III.**     **Plaintiffs Have a Substantial Likelihood of Success on the Merits of Their Claims**

9.     The harms alleged in the Amended Class Action Complaint make clear that BITCONNECT, made up of several British entities, was both a pyramid scheme and a Ponzi scheme. In essence, Defendants participated in a so-called "investment" scheme in which it lured in users through affiliates/promoters -- such as Defendants GLENN ARCARO, TREVON JAMES, RYAN HILDRETH, CRAIG GRANT, CRYPTONICK, and RYAN MAASEN -- who endorsed the extraordinary results they had received from BITCONNECT.  These promoters received sizeable bonus payments from BITCONNECT for each user recruited to BITCONNECT.

10.     Defendants GLENN ARCARO, TREVON JAMES, RYAN HILDRETH, CRAIG GRANT, CRYPTONICK, and RYAN MAASEN encouraged their YouTube viewers and social media followers -- including Plaintiffs and the Class -- not to keep their investment returns; but instead to re-invest the daily interest earnings back into BITCONNECT.

- 7 -

**SILVER MILLER**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

11. As a result, the typical user never actually made money; while the money generated by the "program" kept getting re-circulated into BITCONNECT.

12. On January 4, 2018, the Texas State Securities Board issued to BITCONNECT an Emergency Cease and Desist Order in which the Securities Commissioner of the State of Texas presented his office's conclusion that, *inter alia*:

> (a) the BitConnect Investments are securities;
>
> (b) BITCONNECT had violated numerous securities regulations by offering the BitConnect Investments for sale in Texas;
>
> (c) BITCONNECT had engaged in fraud and made materially misleading statements about the BitConnect Investments that were likely to deceive the public; and
>
> (d) BITCONNECT's conduct, acts, and practices threaten an immediate and irreparable public harm.

13. On January 12, 2018, the State of North Carolina's Department of the Secretary of State - Securities Division issued to BITCONNECT a Temporary Cease and Desist Order in which the State presented its conclusion that the BitConnect Investments were unregistered securities being offered to the residents of the State and that those investments posed an immediate and irreparable harm to the residents of North Carolina.

14. On January 13, 2018, BITCONNECT's website went down. At first, BITCONNECT claimed to its users that it had been experiencing "server issues." On the morning of January 17, 2018, however -- amidst increased scrutiny from government regulators and watchful cryptocurrency industry experts -- BITCONNECT abruptly closed its cryptocurrency lending and exchange platform.

15. In the wake of BITCONNECT's abrupt closure of its lending and exchange operations, many of BITCONNECT's promoters -- including Defendants GLENN ARCARO, TREVON JAMES, RYAN HILDRETH, CRAIG GRANT, CRYPTONICK, and RYAN MAASEN -- furiously deleted their promotional videos and materials from the internet.

- 8 -

**SILVER MILLER**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

16. When the BITCONNECT lending program closed, the value of BCC plummeted from approximately $440 per BCC to approximately $11 per BCC; and that value -- as of the filing of this motion -- has since further dropped to approximately $4.50 per BCC.

17. At this point, Plaintiffs and the Class, many of whom had invested thousands if not hundreds of thousands of dollars in BITCONNECT, have been left with valueless digital tokens.

18. These allegations rely extensively on information provided on BITCONNECT's websites (http://bitconnect.co and http://bitconnectcoin.co)[3], and are bolstered by remaining, and newly-published, videos from Defendants GLENN ARCARO, TREVON JAMES, RYAN HILDRETH, CRAIG GRANT, CRYPTONICK, and RYAN MAASEN, who claim to have benefitted from the fraudulent scheme and urged others to "invest" with BITCONNECT.

19. BITCONNECT and its well-compensated recruiters willfully failed to disclose and misrepresented material facts when offering the BitConnect Investments, including, but not limited to, the following:

   (a) The identity of the principals of BITCONNECT and the true location of BITCONNECT's operations and management;

   (b) Information about the assets and liabilities of BITCONNECT and any other information that indicates the means by which BITCONNECT will provide investors with a guaranteed daily return, regardless of the value of bitcoin;

   (c) Information about the proprietary, secret trading system (the "volatility software"), details of its trading records and historical performance, proof of its existence, and the risk factors associated with its use;

   (d) That the BitConnect Investments are securities and are not registered with any government regulator, as required by state and federal law;

---

[3] Upon information and belief, Defendant JOSHUA JEPPESEN -- the Development Director for BITCONNECT's operations in the United States and Europe -- played an integral role in developing and promoting the BitConnect websites. Without his vital contributions, the BitConnect websites would not have functioned as well as they did and would not have ensnared as many victims who fell prey to Defendants' promotion of the BitConnect Investments.

    (e) That only registered dealers or agents can be paid commissions for referrals or sales of securities; and

    (f) That BITCONNECT affiliates who receive such commissions for their sale of BitConnect Investments without being properly registered are doing so in violation of state and federal securities laws.

20. To the contrary, BITCONNECT touted its "lending program" as a "safe way to earn a high rate of return on . . . investment[s] without having to undergo a significant amount of risk."

21. Based on that fraudulent behavior, Plaintiffs and the Class have asserted claims for: (1) violations of federal securities laws, (2) violation of Florida securities laws, (3) violation of Florida's Deceptive and Unfair Trade Practices Act, and (4) multiple common law claims, including rescission of contract, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, conversion, and civil conspiracy.

22. After Texas and North Carolina recognized the dangerous nature of BITCONNECT's online operation and took action to protect their citizens, Defendants saw the writing on the wall and quickly shut down their operations. Federal and Florida securities law do not materially differ from the regulation of securities in Texas and North Carolina; and therefore, it is very likely that Plaintiffs and the Class' claims arising from violations of federal and Florida securities laws have a very high likelihood of success. *Compare* Tex. Rev. Civ. Stat. Ann. Art. §§ 581-1, *et seq.* (requiring registration before sale of securities, defined to include share, stock, investment contracts, or "any other instrument commonly known as a security," and allowing Commissioner to intervene to prevent fraud in the sale or offer of securities); N.C. Gen. Stat. §§ 78A-1, *et seq.* (requiring registration and honest disclosure when engaging in the sale of any "security," defined to include a note, stock, transferrable share, investment contract, or "any interest or instrument commonly known as a security"); 15 U.S.C. §§ 77a, et seq. (requiring registration and honest disclosure when engaging in the sale or offer of any "security," defined to include any note, transferrable share, investment contract, or "any interest or interest commonly known as a security"); and Fla. Stat. §§ 517.07, *et seq.* (requiring registration and

- 10 -

**SILVER MILLER**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

honest disclosure when engaging in the sale or offer of any "security," defined to include any note, transferrable share, investment contract, or "any other instrument commonly known as a security").

23. In light of the foregoing, there is a high likelihood that Plaintiffs and the proposed Class will succeed on their under federal and Florida securities laws.

24. As for Plaintiffs' request that a constructive trust be applied, Florida law provides that a constructive trust is appropriately imposed as follows:

> [A] court of equity will raise a constructive trust and compel restoration where one through actual fraud, abuse of confidence reposed and accepted, or through order questionable means gains something for himself which equity and good conscience he should not be permitted to hold.

*Quinn v. Phipps*, 93 Fla. 803, 113 So. 419, 422 (Fla. 1930) (citations omitted). A constructive trust is "created by law to do equity under the circumstances without regard to intent." *Palmland Villas I Condo. Ass'n, Inc. v. Taylor*, 390 So.2d 123, 125 (Fla. 4th DCA 1980). A constructive trust is therefore appropriately established "to right a wrong committed and to prevent unjust enrichment of one person at the expense of another either as a result of fraud, undue influence, abuse of confidence or mistake in the transaction." *In re Fin. Federated Title and Trust, Inc.*, 347 F.3d 880, 891 (11th Cir. 2003) (applying Florida law).

25. As explained above, Defendants solicited and/or accepted from Plaintiffs and the Class Members large sums of funds, assets, and cryptocurrency while withholding from Plaintiffs and the Class Members certain material facts that, if disclosed, would have prevented Defendants' fraudulent scheme from perpetuating itself to the detriment of Plaintiffs and the Class. BITCONNECT conducted no legitimate business -- something of which Defendants JOSHUA JEPPESEN, GLENN ARCARO, TREVON JAMES, RYAN HILDRETH, CRAIG GRANT, CRYPTONICK, and RYAN MASSEN were aware and which they accepted as part of the scheme to defraud BITCONNECT investors and accountholders, including Plaintiffs and the Class Members.

26. As shown above, success on the merits of Plaintiffs' and the Class' common law claims is very likely.

- 11 -

**SILVER MILLER**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

### IV. Plaintiffs Will Suffer Irreparable Harm if Defendants Are Not Enjoined

27.     There is a significant risk that BITCONNECT and its promoters, including Defendants GLENN ARCARO, TREVON JAMES, RYAN HILDRETH, CRAIG GRANT, CRYPTONICK, and RYAN MASSEN, may dissipate money generated from Plaintiffs and the Class or simply transfer those funds into another financial scam.

28.     For example, just days after BITCONNECT imploded, several of the promoter Defendants have posted videos on their YouTube accounts promoting other "lending" sites, such as Davor, which operate exactly like BITCONNECT did.[4]  Davor, however, has already been issued an Emergency Cease and Desist Order by the Texas State Securities Board for all the same reasons BITCONNECT was issued a similar order a few weeks prior: securities registration violations, fraud in connection with the offer of investments, and promotion of misleading and deceptive statements that threaten immediate and irreparable public harm.[5]

29.     Moreover, available evidence makes clear that BITCONNECT has been far from transparent with its users since it came under scrutiny from the securities regulators in Texas and North Carolina.  After the Cease and Desist Orders were issued, BITCONNECT advised its members it would be temporarily shut down to address a "server issue."  Within days of that announcement, BITCONNECT closed its trading and lending operations, promising repayment of its BCC at $363 per coin.  However, the price of BCC has dropped dramatically since then, leaving users with a 99+% loss on their original investments:

---

[4] *See, e.g.*, RYAN MAASEN (https://www.youtube.com/watch?v=mw317F5fkag), TREVON JAMES (https://www.youtube.com/watch?v=ogVkuwWPtF40).  Additional videos made by the promoter Defendants have since been deleted from YouTube.

[5] *See*, https://www.ssb.texas.gov/sites/default/files/ENF-18-CDO-1757_0.pdf.



30. Considering the unreliability and past fraudulent tactics Defendants have displayed, it is imperative to freeze Defendants' assets to maintain the status quo to avoid dissipation of the money illegally taken from Plaintiffs and the Class. Requiring Defendants to produce their digital wallet

addresses will allow the parties to monitor the funds to track any attempts by Defendants to dissipate funds in those wallets.

### V. There Is Little Prejudice to Defendants If the Temporary Restraining Order Is Entered

31. While Plaintiffs and the Class would be severely prejudiced if Defendants dissipate the funds wrongfully taken from Plaintiffs and the Class, Defendants face no such prejudice. BITCONNECT has already shut down its website and lending platform, presumably the only business purpose for which they had been created. Accordingly, BITCONNECT is -- for all intents and purposes -- a non-operational business entity which has exposure to significant liabilities to Plaintiffs and the Class. An order forbidding BITCONNECT from moving its assets will, at worst, delay BITCONNECT from winding-up its affairs; and at best, will help maintain the status quo for Plaintiffs and the Class to recover the billions of dollars illegally obtained through Defendants' fraudulent scheme.

32. With respect to the individual defendants, the restraining order would prevent them from using some of their cryptocurrency assets. However, given the significant likelihood that they engaged in illegal promotion and sale of securities by participating in BITCONNECT's pyramid and Ponzi scheme, any perceived injury to the individual defendants is greatly outweighed by protecting the thousands upon thousands of BITCONNECT accountholders worldwide who relied on the individual promoters' representations when investing in BITCONNECT. In addition, as several of the BITCONNECT promoters are already promoting other lending sites similar to BITCONNECT, it is likely they are still actively trading and investing cryptocurrency and not converting those assets to cash to pay for living expenses.

### VI. Plaintiffs Have No Adequate Remedy at Law

33. Plaintiffs' and the Class' only remedy to recover the billions of dollars of assets fraudulently taken from them is through their right to equitable relief in the form of an injunction to

asset dissipation by the Defendants, through imposition of a constructive trust to prevent the dissipation of the Property, and by receiving from Defendants an accounting that adequately tracks the funds and assets raised from Plaintiffs and the Class in connection with the BitConnect Investments. A legal remedy for monetary relief alone will not adequately protect Plaintiffs' equitable ownership interest in those funds and assets that -- in the unregulated world of cryptocurrency -- can disappear with the click of a computer mouse.

## VII.   Entering a Temporary Restraining Order Is In the Public Interest

34. The public interest strongly supports entry of a temporary restraining order here.

35. Based on available information, tens of thousands of Americans -- and an equal number of victims, if not larger worldwide -- have invested in BITCONNECT and have lost money in its fraudulent scheme. There may be several billion dollars implicated in this litigation, and the public will be best protected by maintaining the status quo of a non-operational business and a small group of promoters who continue to recklessly promote risky cryptocurrencies without providing full or truthful disclosures to their audience.

36. Moreover, entering a temporary restraining order would serve the public interest by preserving and stabilizing the worldwide use of cryptocurrencies and by promoting the objectives of the Financial Crimes Enforcement Network [FinCEN] (a division of the U.S. Department of the Treasury) by providing assurance that courts will protect investors' assets from theft and will aid investors in their recovery of stolen assets when they can be readily located and traced to specific locations, like the purloined investor assets in this action.

## VIII.   A Temporary Restraining Order Without Notice to Defendants Is Appropriate.

37. This Court may issue a Temporary Restraining Order without written or oral notice to the adverse parties if: (1) specific facts in an affidavit or a verified complaint demonstrating immediate and irreparable injury, loss, or damage will result before the adverse party can be heard in opposition;

and (2) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.  *See*, Fed. R. Civ. P. 65(b)(1).

38.As described above, failure to freeze Defendants' assets and allow for monitoring of their digital wallets may preclude Plaintiffs and the Class from obtaining the equitable relief available. Upon receiving news that its investment scheme had come under the watch of regulators in America, BITCONNECT quickly shuttered its operations and refused to provide any value for the useless BCC its users were left holding.  The Amended Class Action Complaint filed in this Court is but one of four class action lawsuits currently pending in the United States, with many more anticipated to follow. With the known fraudulent tactics of these fraudulent corporations -- which have failed to provide any reasonable assurances that the money stolen may still be available -- and the inherently ephemeral and unregulated nature of cryptocurrency, the risk of dissipation is both immediate and irreparable.

39.Because BITCONNECT consists of a series of British entities, service will be difficult and time consuming.  Moreover, BITCONNECT's officers and Directors -- with the exception of Defendants JEPESSEN and ARCARO -- are believed to all be foreign nationals; and therefore it is difficult to inform the appropriate individuals of the relief sought.[6]

40.Counsel has no contact information available to it other than the BITCONNECT addresses listed in the Complaint and the addresses for the individual defendants at which service of process has yet proven to be unsuccessful.

41.In sum, the import of protecting the equitable relief available to Plaintiffs and the Class is too important to wait for Defendants and perhaps would only serve to give Defendants additional time to dispose of their assets.

42.A Declaration in support of the relief sought herein has been filed simultaneously herewith.

---

[6] Upon information and belief, both Defendant JEPESSEN and Defendant ARCARO are travelling indefinitely through Europe and Asia.

- 16 -

**SILVER MILLER**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

Civil Action No. 9:18-cv-80086-DMM

## CONCLUSION

For the foregoing reasons, Plaintiffs CHARLES WILDES, FRANCISCO DORIA, AKIVA KATZ, JAMES GURRY, RONALD NELSON, and JUSTIN PERRY, individually and on behalf of all others similarly situated, respectfully request that the Court find that Plaintiffs have satisfied the elements of their claim for preliminary injunctive relief and that the Court enter a Temporary Restraining Order preventing and prohibiting the transfer, sale, encumbrance or other disposition of Defendants' assets and requiring Defendants to provide the Court and Plaintiffs' counsel tracking information of Defendants' addresses for their bitcoin and other digital cryptocurrency wallets to preserve the *status quo ante* pending the full adjudication of Plaintiffs' claims.

                                              Respectfully submitted,

                                              **SILVER MILLER**
                                              11780 W. Sample Road
                                              Coral Springs, Florida 33065
                                              Telephone:     (954) 516-6000

By: _/s/ David C. Silver_
                                              DAVID C. SILVER
                                              Florida Bar No. 572764
                                              E-mail: DSilver@SilverMillerLaw.com
                                              JASON S. MILLER
                                              Florida Bar No. 072206
                                              E-mail: JMiller@SilverMillerLaw.com

                                              *Counsel for Plaintiffs*

Dated: _February 5, 2018_