# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

### Civil Action No. 9:18-cv-80086-DMM

CHARLES WILDES, individually; FRANCISCO DORIA, individually;
AKIVA KATZ, individually; JAMES GURRY, individually;
RONALD NELSON, individually; and JUSTIN PERRY, individually;
and on behalf of All Others Similarly Situated;

       Plaintiffs,

v.

BITCONNECT INTERNATIONAL PLC, a foreign corporation;
BITCONNECT LTD., a foreign corporation;
BITCONNECT TRADING LTD., a foreign corporation;
JOSHUA JEPPESEN, an individual; GLENN ARCARO, an individual;
TREVON BROWN a/k/a TREVON JAMES, an individual;
RYAN HILDRETH, an individual; CRAIG GRANT, an individual;
JOHN DOE NO. 1 a/k/a NICHOLAS TROVATO a/k/a CRYPTONICK, an individual;
RYAN MAASEN, an individual; and JOHN DOE NOS. 2-10, individuals;

       Defendants.

_____/

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs CHARLES WILDES, FRANCISCO DORIA, AKIVA KATZ, JAMES GURRY,

RONALD NELSON, and JUSTIN PERRY ("Plaintiffs"), individually and on behalf of all other

persons similarly situated as defined herein, by and through undersigned counsel, hereby sue

BITCONNECT INTERNATIONAL PLC, a foreign corporation; BITCONNECT LTD., a foreign

corporation; BITCONNECT TRADING LTD., a foreign corporation (the business entities

collectively referred to herein as "BITCONNECT"); JOSHUA JEPPESEN, an individual; GLENN

ARCARO, an individual; TREVON BROWN a/k/a TREVON JAMES, an individual; RYAN

HILDRETH, an individual; CRAIG GRANT, an individual; JOHN DOE NO. 1 a/k/a NICHOLAS

TROVATO a/k/a CRYPTONICK, an individual; RYAN MAASEN, an individual; and JOHN DOE

NOS. 2-10, individuals; for damages and for equitable relief.

Plaintiffs allege in this Second Amended Complaint violations of Sections 12 and 15 of the Securities Act of 1933 (the "Securities Act"), Fla. Stat. §§ 501.211, *et seq.* (the "Florida Deceptive and Unfair Trade Practices Act" [FDUTPA]), breach/rescission of contract, unjust enrichment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, conversion, and civil conspiracy.  Plaintiffs make these allegations based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: documents and solicitation materials released by Defendants (defined below), in connection with the BitConnect Investment Programs (defined below), and public statements made by Defendants concerning the BitConnect Investment Programs.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## NATURE AND SUMMARY OF THE ACTION

1.     Plaintiffs bring this action on behalf of themselves and all other individuals and entities similarly situated against BITCONNECT INTERNATIONAL PLC; BITCONNECT LTD.; BITCONNECT TRADING LTD.; JOSHUA JEPPESEN; GLENN ARCARO; TREVON BROWN a/k/a TREVON JAMES; RYAN HILDRETH; CRAIG GRANT; JOHN DOE NO. 1 a/k/a NICHOLAS TROVATO a/k/a CRYPTONICK; RYAN MAASEN; and JOHN DOE NOS. 2-10 for violation of Sections 12(a)(1) and 15(a), 15 U.S.C. §§ 77l(a)(1), 77o(a), of the Securities Act, Fla. Stat. §§ 501.211, *et seq.*, breach/rescission of contract,[1] unjust enrichment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, conversion, and civil conspiracy.

---

[1] Plaintiffs' breach/rescission of contract claim is only alleged against Defendant BITCONNECT.

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

2.     Specifically, Defendant BITCONNECT created and operated fraudulent Ponzi/pyramid schemes in the form of the BitConnect Lending Program and the BitConnect Staking Program (the "BitConnect Investment Programs").  To participate in the BitConnect Investment Programs, investors were required to purchase BITCONNECT-created cryptocurrency called BitConnect Coins ("BCC") on the BITCONNECT BCC Exchange with bitcoin ("BTC")[2] or fiat currency.

3.     The BitConnect Lending Program was marketed and sold on the internet as an opportunity for investors to "lend" their BCCs back to BITCONNECT, which BITCONNECT would then purportedly use to generate profits by purchasing BTC when its price was low and selling BTC when its price was high -- a "buy low, sell high" strategy that was purportedly effectuated by a BITCONNECT-designed "trading bot" implementing a proprietary trading algorithm: the "Volatility Software."  In exchange for "lending" BCCs to BITCONNECT, investors were "guaranteed" lucrative returns on their investments.

4.     The BitConnect Staking Program was marketed and sold on the internet as an opportunity for investors to "stake" their BCCs by holding their BCCs in the BitConnect-QT wallet (a software and/or online wallet created by BITCONNECT).  In exchange for "staking" BCCs in the BitConnect-QT Wallet, investors were "guaranteed" lucrative returns on their investments.

5.     As part of their solicitation efforts, BITCONNECT enlisted multi-level affiliate marketers (the "Referral Program" or the "Affiliate Program") to further propagate the reach of the BitConnect Investment Programs.  Under the Referral Program, BITCONNECT paid commissions

---

[2] Bitcoin is a type of "digital currency" – also commonly referred to as a "cryptocurrency."  The Financial Action Task Force, an inter-governmental agency that promotes laws combating anti-money laundering and in which the United States is a member, describes digital currency as a "digital representation of value that can be digitally traded and functions as: (1) a medium of exchange; and/or (2) a unit of account; and/or (3) a store of value, but does not have legal tender status . . . in any jurisdiction."

to affiliates who successfully solicited additional investments in the BitConnect Investment Programs. Additionally, affiliate promoters would receive a percentage of any investments made by the investors they referred as well as a portion of investments made by subsequent investors recruited by their referrals, and so forth – a standard multi-level-marketing scheme. Several of the individual Defendants were highly influential affiliate marketers.

6.      Despite being cloaked in technological sophistication and jargon, Defendants operated a century-old fraud that was simple at its core: Defendants paid existing investors with new money from new investors, who were in turn expected and incentivized to get more new investors to produce more new money.

7.      As noted above, to participate in the BitConnect Investment Programs, investors were required to purchase BCCs. BCCs constitute "investment contract" securities as defined under the Securities Act. As discussed herein, BCCs are investment contracts because, *inter alia*, Defendants explicitly referred to BCCs as an "investment option" under which investors could "buy BitConnect Coin at a lower price and sell[] them at [a] higher price," and Plaintiffs and other BITCONNECT investors were led to believe, and expected, that the BCCs they purchased would be worth more than the BTC or fiat currency they invested with BITCONNECT.

8.      Similarly, the BitConnect Investment Programs constitute "investment contract" securities as defined under the Securities Act. As discussed herein, the BitConnect Investment Programs qualify as investment contracts because, *inter alia*, Defendants have explicitly referred to the programs as lucrative investment opportunities that would lead to "financial freedom" and repeatedly stressed the profit potential from merely holding and "staking" BCCs. The BitConnect Investment Programs were the clear offer and sale of investment contract securities because, *inter alia*, Defendants touted, and Plaintiffs and other BitConnect Investment Program participants reasonably expected, that investors would receive substantial returns and a steady stream of income on their investments.

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

9.      With respect to the BitConnect Lending Program, a stream of income would purportedly come in the form of a daily interest rate and a bonus interest percentage, each of which were tied to BITCONNECT's creation and implementation of the Volatility Software, which BITCONNECT claimed would produce returns sufficient to cover these payments.  In addition to the fixed returns that were promised, BITCONNECT also guaranteed that the principal investment amount would be paid in full on a specified date.

10.     Similarly, with respect to the BitConnect Staking Program, BITCONNECT "guaranteed" it would provide returns of "up to 10% per month" which would result from merely holding BCCs in the BitConnect-QT Wallet.

11.     In reality, BitConnect Investment Programs were nothing more than pyramid/Ponzi schemes.  After operating for less than a year, BITCONNECT abruptly shut down its platform and stripped the value from all of Plaintiffs' and the Class' (defined below) investments, leaving them with nearly worthless BCCs.[3]

12.     In short, Defendants defrauded tens of thousands of investors by capitalizing on the general public's excitement for digital currencies and by luring unsuspecting investors into purchasing unregistered securities and participating in pyramid/Ponzi schemes.

13.     The registration requirements contained within the Securities Act are designed to protect investors by ensuring they are provided adequate information upon which to base their investment decisions.  The two basic objectives of registration are: (i) to require that investors receive necessary financial and other significant information concerning securities being offered for public sale; and (ii) to prohibit deceit, misrepresentations, and other fraud in the sale of securities.  Absent registration and the protections of the federal securities laws, issuers of securities could seek to market

---

[3] For example, the value of BCC has fallen from over $430.00 in early-January 2018 to $3.00 as of February 26, 2018.

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

their investment opportunities without disclosing information that might make a potential investor think twice before investing (*e.g.*, conflicts of interest or major setbacks to core product lines) or peddle their securities using unbounded exaggerations regarding the progress of their products, business plan, business strategies, or even fabricate the existence of relationships with vendors or other business partners.

14.     Accordingly, Plaintiffs bring this action for violations of Sections 12 and 15 of the Securities Act, Florida's Deceptive and Unfair Trade Practices Act, breach/rescission of contract,[4] unjust enrichment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, conversion, and civil conspiracy against Defendants for their offer and sale of investment contract securities in violation of the federal securities laws' registration requirements and participation in effectuating a fraudulent Ponzi/pyramid scheme.

15.     Due to the varied and innumerable ways in which investors can be, and are likely to be, manipulated and harmed absent any of the protections under the federal securities laws, Sections 5 and 12(a)(1) of the Securities Act provide for strict liability against any person who offers or sells an unregistered security.  As detailed herein, the BitConnect Investment Programs have at all times constituted an offer and sale of unregistered securities; and thus, Defendants are strictly liable under Section 12(a)(1) of the Securities Act.  Similarly, Defendants' unlawful, immoral, and fraudulent conduct has caused, and is continuing to cause, significant financial harm to Plaintiffs and the Class (defined below).  Absent judicial intervention, Plaintiffs and the Class are unlikely to ever recover their investments.  Accordingly, judicial intervention is required and requested to rectify the existing and future harm facing Plaintiffs and the Class – harm that is likely to be irreparable.  For these reasons, Plaintiffs on behalf of themselves, and all similarly situated individuals and entities that invested in

---

[4] Plaintiffs' breach/rescission of contract claim is only alleged against Defendant BITCONNECT.

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

BCC and/or the BitConnect Investment Programs, seeks compensatory, exemplary, punitive, injunctive, and rescissory relief, providing rescission and repayment of all investments into BCCs and/or the BitConnect Investment Programs and securing and conserving such funds until repayment.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1367 (supplemental jurisdiction), 28 U.S.C. § 1331 (federal question jurisdiction) and Section 22 of the Securities Act (15 U.S.C. § 77v) because Plaintiffs allege violations of Sections 12(a)(1) and 15(a) of the Securities Act.

17.     This Court has personal jurisdiction over each of the Defendants because each has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, as well as under 28 U.S.C. § 1391, because: (a) the conduct at issue took place and had an effect in this District; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District.

### PARTIES AND RELEVANT NON-PARTIES

#### PLAINTIFFS

19.     Plaintiff CHARLES WILDES ("WILDES") is an individual domiciled in Boynton Beach, Florida and is *sui juris*. Beginning on or about December 14, 2017, Plaintiff WILDES funded his BITCONNECT account, through BITCONNECT's website, by investing assets valued at approximately $11,500.00. On January 17, 2018, when BITCONNECT closed its lending and trading platforms, Plaintiff WILDES's holdings at BITCONNECT included 32.34426551 BCCs, which were believed to be valued at the time at approximately $11,500.00.

20.     Plaintiff FRANCISCO DORIA ("DORIA") is an individual domiciled in Miami, Florida and is *sui juris*.  Beginning on or about June 17, 2017, Plaintiff DORIA funded his BITCONNECT account, through BITCONNECT's website, by investing assets valued at approximately $110,000.00.  On January 17, 2018, when BITCONNECT closed its lending and trading platforms, Plaintiff DORIA's holdings at BITCONNECT included 405.19 BCCs, which were believed to be valued at approximately $141,500.00.

21.     Plaintiff AKIVA KATZ ("KATZ") is an individual domiciled in Chicago, Illinois and is *sui juris*.  Beginning on or about January 2, 2018, Plaintiff KATZ funded his BITCONNECT account, through BITCONNECT's website, by investing assets valued at approximately $200,000.00.   On January 17, 2018, when BITCONNECT closed its lending and trading platforms, Plaintiff KATZ's holdings at BITCONNECT included 637.78683937 BCCs, which were believed to be valued at approximately $200,000.00.

22.     Plaintiff JAMES GURRY ("GURRY") is an individual domiciled in Covina, California and is *sui juris*.  Beginning on or about October 17, 2017, Plaintiff GURRY funded his BITCONNECT account, through BITCONNECT's website, by investing assets valued at approximately $75,000.00. On January 17, 2018, when BITCONNECT closed its lending and trading platforms, Plaintiff GURRY's holdings at BITCONNECT included 410 BCCs, which were believed to be valued at approximately $150,000.00.

23.     Plaintiff RONALD NELSON ("NELSON") is an individual domiciled in Sacramento, California and is *sui juris*.  Beginning on or about October 24, 2017, Plaintiff NELSON funded his BITCONNECT account, through BITCONNECT's website, by investing assets valued at approximately $5,000.00.  On January 17, 2018, when BITCONNECT closed its lending and trading platforms, Plaintiff NELSON's holdings at BITCONNECT included 391.76429999 BCCs, which were believed to be valued at approximately $140,000.00.

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

24.     Plaintiff JUSTIN PERRY ("PERRY") is an individual domiciled in Boston, Massachusetts and is *sui juris*.  Beginning on or about November 21, 2017, Plaintiff PERRY funded his BITCONNECT account, through BITCONNECT's website, by investing assets valued at approximately $242,000.  On January 17, 2018, when BITCONNECT closed its lending and trading platforms, Plaintiff PERRY's holdings at BITCONNECT included 841 BCCs, which were believed to be valued at approximately $242,000.00.

<u>DEFENDANTS</u>

**The Corporate Defendants**

25.     Defendant BITCONNECT INTERNATIONAL PLC, is a foreign for-profit company organized in England and Wales and incorporated under the Companies Act 2006 as a private company limited by shares.  BITCONNECT INTERNATIONAL PLC lists its principal place of business at Grant Thornton House, 22 Melton Street, Kings Cross, London, United Kingdom NW 1 2EP.

26.     Defendant BITCONNECT LTD. is a foreign for-profit company organized in England and Wales and incorporated under the Companies Act 2006 as a private company limited by shares.  BITCONNECT INTERNATIONAL PLC lists its principal place of business at The Panorama, Park Street, Ashford, United Kingdom TN24 8EZ.

27.     Defendant BITCONNECT TRADING LTD., is a foreign for-profit company organized in England and Wales and incorporated under the Companies Act 2006 as a private company limited by shares.  BITCONNECT TRADING LTD. lists its principal place of business at 23 St. Elizabeth Avenue, Bootle, United Kingdom L20 6FA.

28.     Upon information and belief, the BITCONNECT entities are wholly interrelated and are used interchangeably as instrumentalities for the fraud and unlawful schemes described herein.

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

## The Director and Affiliate/Recruiter Defendants

29.     Defendant JOSHUA JEPPESEN is an individual believed to be domiciled in the United States and is *sui juris*.  According to published information, JOSHUA JEPPESEN held the title of a Director at BITCONNECT, serving as the Development Director for BITCONNECT's operations in the United States and Europe.

30.     Defendant GLENN ARCARO is an individual domiciled in Moorpark, California and is *sui juris*.  According to paperwork filed with the corporate registry office in the United Kingdom, GLENN ARCARO is an active Director of BITCONNECT INTERNATIONAL PLC.  GLENN ARCARO not only served BITCONNECT by managing a team of U.S.-based affiliates/recruiters; he also served as one of the most successful affiliate/recruiters for BITCONNECT himself, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YouTube and Facebook.

31.     Defendant TREVON BROWN a/k/a TREVON JAMES ("TREVON JAMES") is an individual believed to be domiciled in the United States and is *sui juris*.  TREVON JAMES served as an affiliate/recruiter for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YouTube and Facebook.

32.     Defendant RYAN HILDRETH is an individual domiciled in Laguna Nigel, California and is *sui juris*.  RYAN HILDRETH served as an affiliate/recruiter for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YouTube and Facebook.

33.     Defendant CRAIG GRANT is an individual believed to be domiciled in Miami, Florida and is *sui juris*.  CRAIG GRANT served as an affiliate/recruiter for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YouTube and Facebook.

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

34.     Defendant JOHN DOE NO. 1 a/k/a NICHOLAS TROVATO a/k/a CRYPTONICK is an individual believed to be domiciled in the United States and is *sui juris*. His true name is unknown at this time, as is the state of his domicile. CRYPTONICK served as an affiliate/recruiter for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YouTube and Facebook.

35.     Defendant RYAN MAASEN is an individual believed to be domiciled in Tulsa, Oklahoma and is *sui juris*. RYAN MAASEN served as an affiliate/recruiter for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YouTube and Facebook.

36.     JOHN DOE NOS. 2-10 are individuals located in the United States and abroad who served as affiliates/recruiters for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YouTube and Facebook.

### Other Liable Persons/Entities

37.     In addition to those persons and entities set forth as Defendants herein, there are likely other parties who may well be liable to Plaintiffs and the Class (defined below), but respecting whom Plaintiffs currently lack specific facts to permit them to name such person or persons as a party defendant. By not naming such persons or entities at this time, Plaintiffs are not waiving their right to amend this pleading to add such parties, should the facts warrant adding such parties.

### CLASS ACTION ALLEGATIONS

38.     Plaintiffs bring this action individually and as a class action on behalf of all individuals and entities who transferred to BITCONNECT any fiat currency or cryptocurrency to invest in BCC and/or the BitConnect Investment Programs and who suffered financial injury as a result thereof (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or

other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the individual Defendants.

39.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

40.     While the exact number of Class members is presently unknown to Plaintiffs and can only be ascertained through discovery, Plaintiffs believe that there are thousands of members in this Class.  All members of the Class may be identified by records maintained by Defendants and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

41.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following: (i) whether Defendants offered and sold unregistered securities in violation of the federal securities laws; (ii) whether Defendants engaged in unlawful business practices in violation of Florida's Deceptive and Unfair Trade Practices Act; (iii) whether Defendant BITCONNECT breached its contracts with Plaintiffs and the Class; (iv) whether Defendants fraudulently solicited investments from Plaintiffs and the Class; (v) whether Defendants have been unjustly enriched by the unlawful conduct alleged herein; (vi) whether Plaintiffs and the Class will suffer irreparable harm if such unlawful activities are not remedied; and (vii) whether Plaintiffs and the Class are entitled to compensatory, exemplary, punitive, injunctive, or rescissory relief as a result of Defendants' wrongful conduct alleged herein, and the measure of such damages.

42.     Plaintiffs' claims are typical of the claims of the other members of the Class, and Plaintiffs do not have any interests adverse to the Class.  Additionally, Plaintiffs and the other members of the Class have all sustained harm in a substantially identical manner as a result of Defendants' wrongful conduct as alleged herein.

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

43.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained competent counsel experienced in litigation of this nature.

44.     Separate actions prosecuted by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

45.     Plaintiffs anticipate that there will be no difficulty in managing this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

46.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

47.     Accordingly, Plaintiffs seek compensatory, exemplary, punitive, rescissory, injunctive and other equitable relief on behalf of themselves and the Class to prevent the irreparable injury they will continue to suffer absent judicial intervention.

## SUBSTANTIVE ALLEGATIONS

### Background on BitConnect

48.     BITCONNECT   INTERNATIONAL   PLC;   BITCONNECT   LTD.;   and BITCONNECT TRADING LTD. (collectively "BITCONNECT") are all parts of the same foreign technology organization that conducted its business on the internet, principally by means of a website accessible at www.bitconnect.co.

49.     BITCONNECT describes itself as "an opensource all-in-one bitcoin and crypto community platform designed to provide multiple investment opportunities with cryptocurrency education where it is entirely possible to find the independence we all desire, in a community of like-minded, freedom-loving individuals who, like you, are seeking the possibility of income stability in a very unstable world."

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

50.     BITCONNECT launched in late-2016 by conducting an initial coin offering (ICO),[5] which ran from November 15, 2016 through early-January 2017 (the "BITCONNECT ICO").

51.     The BITCONNECT ICO introduced BCC into the marketplace.  BITCONNECT describes BCC as "an open source, peer-to-peer, community driven decentralized cryptocurrency that allow [sic] people to store and invest their wealth in a non-government controlled currency, and even earn a substantial interest on investment [sic].  This means anyone holding BitConnect Coin in their wallet will receive interest on their balance in return for helping maintain security on the network." Similarly, BCC was described as not just "an investment tool; [but as] the investment tool you need to jump start your financial security."

52.     Shortly following the BITCONNECT ICO, BITCONNECT launched the BitConnect Exchange – a cryptocurrency exchange where investors could use BTC or fiat currency to purchase BCC.

53.     Over the following year, BITCONNECT implemented various investment programs, including the BitConnect Lending Program, the BitConnect Staking Program, and the Referral/Affiliate Program.  BITCONNECT marketed various uses for BCC:

---

[5] An "initial coin offering" (ICO) is a capital raising event in which an entity offers participants a unique, newly-created "coin" or "token" in exchange for consideration (often in the form of digital currency -- most commonly BTC and Ether -- or fiat currency).   These tokens are issued on a blockchain and are oftentimes listed on online platforms, called virtual currency exchanges, where they are tradable for digital or fiat currencies.

To participate in an ICO, investors are required to transfer digital currencies to the issuer's address, online wallet, or other account.  After the completion of an ICO, the issuer will typically distribute its unique, newly-created "tokens" to the participants' unique address on the blockchain.  Similar to stockholders in an initial public offering ("IPO"), holders of these tokens are then entitled to certain rights related to a venture underlying the ICO, such as profits, shares of assets, use of certain services provided by the issuer, and/or voting rights.

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com



### The BitConnect Websites

54.     BITCONNECT maintained a website accessible at http://bitconnect.co and a website accessible at http://bitconnectcoin.co (the "BitConnect Websites").  The BitConnect Websites were accessible worldwide to the general public, including residents of United States.

55.     The BitConnect Investment Programs were available for purchase by individuals in the United States and worldwide through the BitConnect Websites and affiliated websites rendered in foreign languages.  The investments were promoted on social media pages including, but not limited to, Facebook, YouTube, Twitter, Reddit, Instagram, and Craigslist.

56.     BITCONNECT promoted its Investment Programs on the BitConnect Websites by making the following representations:

> (a) "There are multiple ways to invest in the BitConnect platform with different level of earning opportunity associated";
>
> (b) "You can invest BitConnect Coin in BitConnect lending platform exclusively from the BitConnect Dashboard.  This investment option involved profiting from BitConnect trading bot and volatility software.  You will receive daily profit based on your investment option.  Upon investment term completion, you will receive your capital back to take out

from the BitConnect lending platform or optionally reinvest back in lending platform to continue receiving daily profit"; and

(c) "Invest your wealth in community-driven decentralized cryptocurrency. Using BitConnect public exchanges, you can buy, sell and trade BitConnect Coin (BCC) directly to and from each other with no central organization involved."

57.     Upon information and belief, JOSHUA JEPPESEN played an integral role in developing and promoting the BitConnect Websites.  Without his vital contributions, the BitConnect Websites would not have functioned as well as they did and would not have ensnared as many victims who fell prey to Defendants' promotion of BCCs and the BitConnect Investment Programs.

**Trading BCC**

58.     Trading BCC was marketed as an "investment option" that could be "used to profit on **price fluctuation**" in that investors could "buy BitConnect coin at a lower price and sell[ ] them at [a] higher price."  Additionally, investors could "profit[ ] from downward movements in [BCC] price by selling them at a higher price and buy[ing] them again at a lower price and pocketing the price difference."

59.     In addition to trading BCC, the two primary investment opportunities Defendants touted were the BitConnect Lending Program and the BitConnect Staking Program.  To participate in either investment opportunity, investors were required to expend BTC or fiat currency to purchase BCC on the BitConnect Exchange.

**The BitConnect Lending Program**

60.     The BitConnect Lending Program was described as an "investment option [that] involves profiting from [the] Bitconnect trading bot and volatility software" under which investors would "receive daily profit based on [their] investment option."  Following the "term completion, [investors] [would] receive [their] **CAPITAL BACK** to take out from [the] Bitconnect lending platform or optionally [*sic*] reinvest back in lending platform to **continue receiving daily profit**."

61.     The BitConnect Lending Program offered up to forty percent (40%) interest per month as well as additional interest on a daily basis.  The general mechanics of the program are demonstrated in the following graphic BITCONNECT published:



62.     In soliciting investors for the BitConnect Lending Program, BITCONNECT used online banner ads such as the following:

     

63.     Under the BitConnect Lending Program investors would "lend" their BCCs to BITCONNECT – "with no risk" – as part of an investment scheme whereby BITCONNECT ostensibly used these BCC tokens to fund the trading activities using its Volatility Software.

64.     Once the funds were deposited into the BitConnect Lending Program, trading bots using the Volatility Software purportedly managed those funds, generating a guaranteed return using its volatility predictions for the price of BTC.  In exchange, investors receive income in the form of a

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

daily fixed interest rate, and a bonus interest percentage, before eventually receiving the return of the principal amount invested.

65.     In short, investors were sold the promise of profit merely through "lending" BCCs and enjoying the guaranteed returns provided by trading bots and the Volatility Software.  These returns were allegedly backed by the earnings promised by BITCONNECT's development and implementation of the trading algorithms, which would purportedly produce returns sufficient to pay the following rates and bonuses:

**BitConnect Coin Lending Profits Interest**

| Lending Amount | Interest (Accrued Daily) | Capital Back |
|---|---|---|
| $100 - $1000 | Volatility Software Interest (up to 40 % Per Month) | After 299 Days |
| $1010 - $5000 | Volatility Software Interest + 0.10% Daily (up to 40 % Per Month) | After 239 Days |
| $5010 - $10000 | Volatility Software Interest + 0.20% Daily (up to 40 % Per Month) | After 179 Days |
| $10010 - $100000 | Volatility Software Interest + 0.25% Daily (up to 40 % Per Month) | After 120 Days |

**The BitConnect Staking Program**

66.     The BitConnect Staking Program incentivized investors to purchase and hold BCCs by offering "guaranteed" interest paid in BCC.  The BitConnect Staking Program was sold to the public as an investment program that promised investors could earn interest of up to ten percent (10%) per month over a specified term through a process called "Proof of Stake Minting."  In essence, the BitConnect Staking Program and BCCs in general were sold as "interest bearing asset[s] with **120% return per year**.  It is that simple."

67.     The general mechanics of the BitConnect Staking Program are demonstrated in the following graphic BITCONNECT published:

- 18 -

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

Civil Action No. 9:18-cv-80086-DMM



68.    To participate in the BitConnect Staking Program, investors were required to download and install the BitConnect-QT wallet software to hold their BCCs; eventually BITCONNECT also released an online version of the BitConnect-QT Wallet.  After holding their BCCs in the BitConnect-QT Wallet for fifteen (15) days, an investor's BCCs would accrue interest. The amount of interest paid to investors was purportedly contingent upon the dates of the investors' investments:

| Duration | Interest |
| --- | --- |
| 1st 6 months<br>Jan 2017 to June 2017 | 60% (10%per month) |
| 2nd 6 months<br>July 2017 to Dec 2017 | 50% (8%per month) |
| 3rd 6 months<br>Jan 2018 to June 2018 | 40% (7%per month) |
| 4th 6 months<br>July 2018 to Dec 2018 | 30% (5%per month) |
| 5th 6 months<br>Jan 2019 to June 2019 | 20% (3%per month) |
| 6th 6 months<br>July 2019 to Dec 2019 | 10% (1.4%per month) |

69.    BITCONNECT further represented that the BitConnect Staking Program was an opportunity for investors to: (i) "[s]ecure [their] future by gaining quick profit growth for tomorrow

that is practical and attainable;" (ii) achieve "financial freedom;" (iii) "begin staking or holding BitConnect Coin and watch [their] interest grow;" and (iv) that "the more [ BCC investors] hold, the more [they] earn."

### The BitConnect Referral Program

70.     In connection with the BitConnect Investment Programs, BITCONNECT operated the Referral Program, pursuant to which "affiliates" would earn additional income for referring additional investors to investing in BITCONNECT.  The Referral Program was a run-of-the-mill pyramid scheme.  Initially, the program extended "to Infinity" in that after the tenth (10) level was reached in the pyramid, 0.01% of all investments made by subsequent investors in the pyramid would siphon upwards to the top affiliate.  The concept is more plainly visible in the following graphic:

**BitConnect's Referral Program**

| Level | Referral Bonus |
|---|---|
| Level 1 | 7 % |
| Level 2 | 3 % |
| Level 3 | 1 % |
| Level 4 | 1 % |
| Level 5 | 0.5 % |
| Level 6 | 0.3 % |
| Level 7 | 0.2 % |
| Level 8 | 0.1 % |
| Level 9 | 0.05 % |
| Level 10 | 0.03 % |

0.01 % to Infinity

71.     Eventually, BITCONNECT modified the Referral Program to "7 levels of earning potential to" investors based on the number of referrals that signed up for BITCONNECT.  However, the core concept and fraudulent pyramid scheme remained in essence.  Indeed, BITCONNECT encouraged investors to "[i]nvite [their] friends and family to join BitConnect via [their] unique **referral link** to start earning a serious income from [BITCONNECT's] affiliate program" and to "[s]pread the word on **social media** and other **online platforms** to help" make BITCONNECT a success.

72.     Defendants GLENN ARCARO; TREVON JAMES; RYAN HILDRETH; CRAIG GRANT; CRYPTONICK; RYAN MAASEN; and JOHN DOE NOS. 2-10 were some of BITCONNECT's most successful "affiliate" marketers.

73.     For example, upon information and belief, Defendant ARCARO was responsible for managing a large team of affiliate markets for BITCONNECT; and he personally assisted affiliates with preparing sales presentations and honing their sales pitches to potential investors in the BitConnect Investment Programs.

74.     Evidently, Defendant ARCARO was so successful as an affiliate marketer and organizer that he received a Porsche Carrera 911 S as a reward during a live broadcast of the BitConnect Conference in October 2017.

75.     Defendant ARCARO is also believed to have created and orchestrated the "BCC School" – an online training program to "teach" the unsuspecting public how to participate in cryptocurrency investment opportunities, including the BitConnect Investment Programs.  For example, on Defendant ARCARO's website, Futuremoney.io, "lessons" eight, nine, and ten in the course named "Cryptocurrency 101" were entitled, respectively, "Buying Your First Bitcoin," "Creating Your Bitconnect Account," and "Bitcoin to Bitconnect: Transfer and Start Earning!" Unsurprisingly, the "graduates" of "BCC School" were directed to open BITCONNECT accounts using Defendant ARCARO's and his team's referral links.

76.     In essence, the BCC School was little more than a conduit to get BCC School "graduates" to open up accounts at BITCONNECT, for which GLENN ARCARO and his team of affiliates reaped from BITCONNECT the riches of each client referral.

77.     Among the BITCONNECT "affiliate" marketers, Defendant JAMES has been a particularly active affiliate promoter, primarily by using videos he posted on YouTube wherein he solicited investments for the BitConnect Investment Programs.

78.     Shockingly, after the State of Texas issued an Emergency Cease and Desist Order against BITCONNECT in early-January 2018, Defendant JAMES encouraged the public to use a Virtual Private Network ("VPN") to simulate an IP address outside of Texas and continue using BITCONNECT: "Load you [*sic*] a VPN, they all are good, and keep using BitConnect.  Don't let Texas, don't let them government shut you down . . . they haters [*sic*], they mad cus [*sic*] we making money."

79.     Rather than exhibit even a semblance of remorse for his involvement propagating the BITCONNECT pyramid scheme, Defendant JAMES has opted to deem investors who were cheated by Defendants' fraudulent schemes – some of whom lost their life savings – "crybabies."

80.     Similarly, upon information and belief, Defendant HILDRETH marketed the BitConnect Investment Programs through his website (ryanhildreth.com), which was touted as teaching "how to make an extra $1,000 - $5,000+ per month" and targeted "ENTREPRENEURS WHO WANT THE FREEDOM TO MAKE MONEY FROM ANYWHERE IN THE WORLD, TRAVEL, AND CHOOSE THE LIFESTYLE [THEY] WANT TO LIVE!" (emphasis in original).

81.     With respect to Defendant GRANT, upon information and belief, has been hailed as a "godfather" of BITCONNECT and has promoted the BitConnect Investment Programs since April 2017.  Additionally, Defendant GRANT has been alleged to have been involved in numerous other financial scams.[6]

82.     Similarly, Defendant CRYPTONICK was an extremely influential affiliate marketer who claimed to have become a millionaire as a result of his cryptocurrency investments.  Defendant CRYPTONICK's participation and culpability in furthering the BITCONNECT pyramid/Ponzi scheme is evidenced by the fact that almost immediately after BITCONNECT closed its lending and

---

[6] *See, e.g.*, http://www.davinsden.com/avalos/ (research compiled by a podcast team on Defendant GRANT's various schemes).

exchange platforms, he deleted all of his YouTube videos promoting the BitConnect Investment Programs and shut down all of his popular social media channels.

83.     Defendant MAASEN also published dozens of YouTube videos promoting the BitConnect Investment Programs.

### The BitConnect Investments Were a Ponzi Scheme

84.     Contrary to the allegations of fantastic investment returns through the power of its proprietary, secret trading Volatility Software and the communal power of the BitConnect Staking Program, BITCONNECT was actually operating a Ponzi scheme.

85.     Any investment returns provided to BITCONNECT investors were not legitimately generated; rather, BITCONNECT simply used new BITCONNECT investors' money to pay the promised returns on outstanding BITCONNECT investors' investments.

86.     In addition, BITCONNECT used new BITCONNECT investors' funds to pay the BITCONNECT Directors and affiliates -- including, but not limited to, Defendants JOSHUA JEPPESEN, GLENN ARCARO, TREVON JAMES, RYAN HILDRETH, CRAIG GRANT, CRYPTONICK, and RYAN MAASEN -- salary and commissions for their role in bringing additional victims into the scheme.

### BCCs and the BitConnect Investment Programs Are Investment Contract Securities

87.     Moreover, BITCONNECT and its affiliates engaged in the offer and sale of unregistered securities.

88.     Under the Securities Act, a "security" is defined as including any "note," "investment contract," or "instrument commonly known as a 'security.'" *See* 15 U.S.C. §§ 77b(a)(1).  Here, the BCCs, the BitConnect Lending Program, and the BitConnect Staking Program each constitute an investment contract.  In *SEC v. W.J. Howey Co.*, the United States Supreme Court established a three-part test to determine whether an offering, contract, transaction, or scheme constitutes an investment

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

contract.[7]  Under the test articulated in *Howey*, a contract, transaction, or scheme is an "investment contract" if it involves: (i) the investment of money; (ii) in a common enterprise; (iii) with the expectation of profits to come solely from the efforts of others.

89.     When determining whether a security has been offered and sold, the focus must be on the economic realities underlying the transaction.  Here, the economic realities are that Plaintiffs and the Class invested funds to trade BCCs, "lend" BCCs and/or "stake" BCCs -- each of which they expected would lead to "financial freedom" and "guaranteed" lucrative returns.  Investors in the BitConnect Investment Programs used BTC or fiat currency to purchase the BCC required to make their investments.  Accordingly, Plaintiffs' and the Class' investment of BTC or fiat currency constitutes an investment of money for the purposes of determining whether an investment involved a security.

90.     Plaintiffs and the Class were investing in a common enterprise with Defendants, as the BTC and fiat currency were pooled under the control of Defendant BITCONNECT, and the success of the BITCONNECT platform -- and thus potential profits stemming from the future valuation of the BCC -- was entirely reliant on Defendants' actions, primarily BITCONNECT's implementation of its proprietary, secret trading system, which BITCONNECT claimed would produce returns sufficient to cover interest payments to the BCC holders.  With respect to the BitConnect Lending Program, investors were promised substantial fixed returns and a complete return of principal at a fixed time in the future.[8]  BITCONNECT provided a Daily Interest Chart on its websites that showed the daily interest that it purported to have paid to its investors in the three

---

[7] *See SEC v. W.J. Howey, Co.*, 328 U.S. 293 (1946); *see also Intern. Bhd. of Teamsters v. Daniel*, 421 U.S. 837, 852 (1979) (noting that the *Howey* test is not the only test for determining a security, but has been held to embody "all the attributes that run through all of the Court's decisions defining a security").

[8] As relates to the BitConnect Staking Program, BITCONNECT failed to ever explain where the funds would come from to provide up to "120%" returns per year; thus, it can only be presumed that such funds were meant to also result from Defendants' actions, through the trading bots, or otherwise.

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

months prior to that date.  Although the daily interest rate for BITCONNECT investments varied on a daily basis, on average BITCONNECT guaranteed a return of 1% per day.[9]



91.     In short, it is indisputable that Defendants were selling investment contracts and that any success from BITCONNECT's implementation of its Volatility Software – enabling payment of the interests and bonuses that were to be distributed – as well as any future potential increases to the value of the BCCs were entirely dependent on Defendants' actions.

### BitConnect Failed to Register the Securities

92.     The reality is, BITCONNECT was not offering a revolutionary technology, but was instead selling a new take on a century-old scam.  Specifically, BITCONNECT used cryptocurrency to coat its Ponzi/pyramid scheme with the thinnest veneer of legitimacy.  Despite such efforts, it is abundantly clear that Defendants were conducting and/or supporting a Ponzi/pyramid scheme.  Indeed, the BitConnect Investment Programs exhibit numerous characteristics of such schemes, including:

---

[9] Theoretically, if investors chose to reinvest the interest earned, this daily interest would potentially add up to significant returns as a result of daily compounding. For example, a one-hundred-dollar investment compounded at 1% daily interest would be worth $134.77 after one month, $599.58 after six months, and $3,778.02 by the end of the year – representing an outlandish 3,678.02% net profit.

(a)  providing daily interest on an investment that had no income other than new investor money;

(b)  artificially increasing the value of its cryptocurrency by having new investors in the Ponzi scheme purchase BCC to invest;

(c)  obfuscating the identities of BITCONNECT's owners by using an offshore company created through a company called Companies Made Simple; and

(d)  expanding the amount of people in this Ponzi scheme by implementing a pyramid scheme that paid a commission 7-levels deep for recruits.

93.    While the SEC has yet to involve itself – at least publicly – in the present matter, state regulators have displayed no such hesitancy.  By late-2017, it was apparent to BITCONNECT that the Ponzi scheme it had constructed was on the verge of toppling.  Not content with riding off into the sunset with its ill-gotten gains, BITCONNECT decided to take another bite at the apple and orchestrated a second BITCONNECT ICO to take place in January 2018 (the "BitConnectx ICO"). The Bitconnectx.co domain was registered in late-December 2017, and a crowdsale commenced less than two weeks later.  The company was seeking to sell 11.76 million of a new digital currency ("BCCX"), which would earn BITCONNECT $588 million.  Additionally, BITCONNECT planned to retain another $145 million in BCCXs for itself, bringing its total expected income from the BitConnectx ICO to $733 million.

94.    On January 4, 2018, the Texas State Securities Board issued an Emergency Cease And Desist Order against BITCONNECT in which the Securities Commissioner of the State of Texas presented his office's conclusion that, *inter alia*:

(a)  the BitConnect Investments are securities;

(b)  BITCONNECT had violated numerous securities regulations by offering the BitConnect Investments for sale in Texas;

(c)  BITCONNECT had engaged in fraud and made materially misleading statements about the BitConnect Investments that were likely to deceive the public; and

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

(d)   BITCONNECT's conduct, acts, and practices threaten an immediate and irreparable public harm.

95.    Soon thereafter, on January 9, 2018, the Secretary of State of North Carolina - Securities Division issued Temporary Cease and Desist Order against BITCONNECT to prevent BITCONNECT from further violating state securities laws and restrain it from conducting the second ICO, because the State had concluded that the BITCONNECT's investment offerings were unregistered securities being offered to the residents of the State and that those investments posed an immediate and irreparable harm to the residents of North Carolina.

### BitConnect Abruptly Closed Its Operations

96.    On January 13, 2018, BITCONNECT's website went down.  Although the website was back up just a few days later, on January 16, 2018, BITCONNECT posted an anonymous announcement declaring that BITCONNECT had closed the trading platform:

> This is to inform all community members that we are closing the BitConnect lending and exchange platform. We are closing the lending operation immediately with the release of all outstanding loans. With release of your entire active loan in the lending wallet we are transferring all your lending wallet balance to your BitConnect wallet balance at 363.62 USD. This rate has been calculated based on last 15 days averages of the closing price registered on coinmarketcap.com. You are free to withdraw your BitConnect coin currently in QT wallets that was used for staking as well. We are also closing BCC exchange platform in 5 days.  In short, we are closing lending service and exchange service while BitConnect.co website will operate for wallet service, news and educational purposes.
>
> The reason for halt of lending and exchange platform has many reasons as follow:
>
> The continuous bad press has made community members uneasy and created a lack of confidence in the platform.
>
> We have received two Cease and Desist letters, one from the Texas State Securities Board, and one from the North Carolina Secretary of State Securities Division. These actions have become a hindrance for the legal continuation of the platform.

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

Outside forces have performed DDoS attacks on platform several times and have made it clear that these will continue. These interruptions in service have made the platform unstable and have created more panic inside the community.

Closing the lending and exchange platform doesn't mean that we will stop supporting BitConnect coin. Closing the lending platform will allow Bitconnect to be listed on outside exchanges giving more options for trading.

We will keep working to make BitConnect coin available to merchant websites providing them API access to accept BitConnect Coins on their platforms.

BitConnect X ICO is still functional and we are building an exchange platform on the BitConnect X website. With BitConnect X operating as an exchange platform, BitConnect Coin (BCC) will be listed there.

This is not the end of this community, but we are closing some of the services on the website platform and we will continue offering other cyptocurrency services in the future.

97.     Evidently, the lending program was shut down entirely; and BITCONNECT no longer honored its promise to pay interest thereon nor return the principal investments made into the lending program.  Moreover, BITCONNECT determined to move forward with the BitConnectx ICO – which is still ongoing as of February 27, 2018.

98.     Within moments of BITCONNECT shutting down its trading and lending platforms, the price of BCC plummeted nearly ninety percent (90%) in value; and the token is believed to be effectively useless now.

99.     As a result of Defendants' fraudulent and misleading activities -- as well as their violation of multiple securities laws -- Plaintiffs and the Class have suffered damages believed to be greater than $2 billion.

<u>**Necessity for Judicial Intervention**</u>

100.     In 2013, the SEC issued an investor alert on "Ponzi Schemes Using Virtual Currencies," warning investors to be wary of investment opportunities offering "high investment

returns with little or no risk" and explaining that "Ponzi schemes typically involve investments that have not been registered with the SEC or with state securities regulators." Here, Defendants have conducted and propagated precisely such a scheme.

101.    On July 25, 2017, the SEC issued a report on "the DAO," which offered tokens for sale online, in which the SEC advised those using "distributed ledger or blockchain-enabled means for capital raising to take appropriate steps to ensure compliance" with the federal securities laws, and stated that "[a]ll securities offered and sold in the United States must be registered with the Commission . . ." or qualify for an exemption from registration. On the same day, the SEC issued an investor bulletin urging caution when investing in ICOs and urging investors to be mindful that promoters and initial sellers that lead buyers of tokens to expect a return on their investment or participate in shared returns provided by the project may be offering a security for sale.

102.    Digital currencies are a relatively new phenomenon, and numerous individuals and entities -- by engaging in unlawful conduct with near impunity -- are taking advantage of the time it takes for regulatory agencies to address new investment developments, as Defendants have here by raising hundreds of millions of dollars if not billions of dollars with promises of profits to be made from trading BCCs and/or the BitConnect Investment Programs.

103.    It is clear from recent events that the rampant disregard of state and federal securities laws and consequently, abuse of investors, taking place in connection with BITCONNECT's unlawful and fraudulent conduct has been noted by state regulatory agencies.

104.    While BCCs and the BitConnect Investment Programs plainly constitute investment contract securities, at no time was a registration statement ever filed or in effect with the SEC for the securities being offered. As such, the unlawful, unregistered offering of securities by Defendants to Plaintiffs and the Class violated Sections 5, 12(a)(1) and 15(a) of the Securities Act; and the private

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

right of action provided by Section 12(a)(1) of the Securities Act, created for just this type of situation, provides strict liability for Defendants' sale of such unregistered securities.

105.     Additionally, due to the fraudulent and deceitful conduct involved and necessary to propagate the BitConnect Investment Programs – particularly as relates to the Referral/Affiliate Program -- Defendants are liable for violating Florida's Deceptive and Unfair Trade Practices Act, breach of contract (with respect to Defendant BITCONNECT), unjust enrichment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, conversion, and civil conspiracy at the expense of unsuspecting public investors.

106.     Plaintiffs has duly performed all of their duties and obligations, and any conditions precedent to Plaintiffs bringing this action have occurred, have been performed, or else have been excused or waived.

107.     To enforce their rights and those of the Class, Plaintiffs have retained undersigned counsel and are obligated to pay counsel a reasonable fee for its services, for which Defendants are liable as a result of their bad faith and otherwise.

## CLAIMS FOR RELIEF

## COUNT I - VIOLATION OF SECTION 12(a)(1) OF THE SECURITIES ACT
### [AGAINST ALL DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 107 above, and further allege:

108.     Section 12(a)(1) grants Plaintiffs a private right of action against any person who offers or sells a security in violation of Section 5, and states that such person,

> Shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

109.     From January 2017 through January 2018, in connection with the BitConnect Investment Programs and offer and sale of BCCs, Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails for the purposes of offering, selling, or delivering unregistered securities in direct violation of the Securities Act.

110.     The offer and sale of BCCs and solicitation of investments in the BitConnect Investment Programs constituted the offer and sale of unregistered securities under controlling federal law.  BCCs and the BitConnect Investment Programs exhibit the following particular hallmarks of a security under the *Howey* test: (a) to receive any BCCs (and invest in the BitConnect Investment Programs), an investment of money, in the form of BTC and/or other currencies was required; (b) the investment of money was made into the common enterprise that is Defendant BITCONNECT and its ability to provide "guaranteed" returns using its trading algorithm or otherwise; and (c) the success of the investment opportunities and any potential returns thereon were entirely reliant on Defendants' ability to continuously provide such "guaranteed" returns to investors.

111.     Each of the individual Director and "affiliate"/recruiter Defendants constitute "seller[s]" under the Securities Act and is thus equally liable for selling unregistered securities in connection with BITCONNECT.   Moreover, the individual "affiliate"/recruiter Defendants personally profited by soliciting investors to use their "referral" links to participate in the BitConnect Investment Programs.

112.     As such, Defendants have participated in the offer and sale of unregistered securities in violation of the Securities Act, and are liable to Plaintiffs and the Class for rescission and/or compensatory damages.

**SILVER MILLER**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

## COUNT II - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT
### [AGAINST DEFENDANT ARCARO]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 107 above, and further allege:

113.    Due to his ownership in and/or control over Defendant BITCONNECT INTERNATIONAL PLC, Defendant ARCARO acted as controlling person of BITCONNECT INTERNATIONAL PLC within the meaning of Section 15(a) of the Securities Act as alleged herein.

114.    By virtue of his positions as an affiliate manager and/or director and participation in and/or awareness of Defendant BITCONNECT INTERNATIONAL PLC's operations, Defendant ARCARO had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the BitConnect Investment Programs, including the decision to engage in the sale of unregistered securities in furtherance thereof.

115.    By virtue of the foregoing, Defendant ARCARO is liable to Plaintiffs and the Class as a control person of Defendant BITCONNECT INTERNATIONAL PLC under Section 15(a) of the Securities Act.

## COUNT III - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT
### [AGAINST DEFENDANT JEPPENSEN]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 107 above, and further allege:

116.    Defendant JOSHUA JEPPESEN is subject to liability by virtue of his top-level executive position with BITCONNECT and his influence over the enterprise, which provided him the power to control or influence BITCONNECT's actions.  For example, JOSHUA JEPPESEN is reportedly a Director of BITCONNECT -- serving as the Director of Development for BITCONNECT's operations in the United States and Europe -- and is responsible for overseeing and contributing to development of the websites used by BITCONNECT to fraudulently offer and sell its BitConnect Investment Programs and BCCs to investors, including its operations vis-à-vis Plaintiffs and the Class Members.

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

117.     As a top-level executive and controlling person of BITCONNECT, JOSHUA JEPPESEN knew of, or recklessly disregarded, the alleged misrepresentations made by BITCONNECT on the BitConnect Websites in connection with the sale of the BitConnect Investment Programs and the BCCs.

118.     Defendant JOSHUA JEPPESEN had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the BitConnect Investment Programs, including the decision to engage in the sale of unregistered securities in furtherance thereof.

119.     Defendant JOSHUA JEPPESEN is a culpable participant in the fraudulent scheme described herein and caused BITCONNECT to engage in the acts and omissions described herein.

120.     Accordingly, Defendant JOSHUA JEPPESEN is liable to Plaintiffs and the Class as a "controlling person" of BITCONNECT within the meaning of Section 15(a) of the Securities Act.

## COUNT IV - BREACH OF CONTRACT
### [AGAINST DEFENDANT BITCONNECT]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 107 above, and further allege:

121.     The terms of the BitConnect Investment Programs constitute a contract between: (1) Plaintiffs and the Class Members, and (2) BITCONNECT.

122.     The contract was entered into by and between BITCONNECT and each Class Member between November 15, 2016 and January 17, 2018.

123.     The terms of the BitConnect Investment Programs called for an investment of fiat currency or cryptocurrency by Plaintiffs and the Class Members.

124.     The funds paid by Plaintiffs and the Class Members pursuant to the BitConnect Investment Programs were pooled by BITCONNECT in an effort by BITCONNECT to secure a profit for itself and the investors.  As a result, the investors, including Plaintiffs and the Class, shared in the risks and benefits of the investment.

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

125.     Plaintiffs and the Class Members relied on, and are dependent upon, the expertise and efforts of BITCONNECT for their investment returns.

126.     The terms of the BitConnect Investment Programs constitute an investment contract and are therefore subject to federal and state securities laws, including the registration requirements promulgated thereunder.

127.     BITCONNECT breached its contracts with Plaintiffs and the Class by failing to provide the "guaranteed" returns, daily interest, bonus interests, and return the initial investments pursuant to the terms of the BitConnect Lending Program.  Rather than adhere to the express, unequivocal terms of the contracts, BITCONNECT converted Plaintiffs' and the Class' investments into near worthless BCCs and shut down its operations.

128.     Moreover, no registration statement was filed or in effect with any federal or state regulatory body, and no exemption from registration exists with respect to the BitConnect Investment Programs.

129.     By virtue of the foregoing, BITCONNECT is liable to Plaintiffs and the Class for damages resulting from BITCONNECT's breaches of contract.

130.     To the extent that Plaintiffs have received from BITCONNECT any benefits through the contract -- though none are known to them at this time -- Plaintiffs hereby offers to restore to BITCONNECT those benefits, once they are identified and can be quantified.

## COUNT V - UNJUST ENRICHMENT
### [AGAINST ALL DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 107 above, and further allege:

131.     Defendants have reaped the benefits of operating and/or personally benefiting from inducing Plaintiffs and the Class to invest in fraudulent Ponzi/pyramid schemes (BCC and/or the BitConnect Investment Programs), thereby causing actual harm to thousands of investors.

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

132.     It would be unconscionable and against the fundamental principles of justice, equity, and good conscience for Defendants to retain the substantial monetary benefits they have received as a result of their misconduct.

133.     To remedy Defendants' unjust enrichment, the Court should order Defendants to immediately return Plaintiffs' and the Class' investments and disgorge any amounts received by Defendants as a result of their misconduct alleged herein.

**COUNT VI – VIOLATION OF FLORIDA'S
DECEPTIVE AND UNFAIR TRADE PRACTICES ACT,
CHAPTER 501, § 211(1), FLA. STAT. ("FDUTPA")
[AGAINST ALL DEFENDANTS]**

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 107 above, and further allege:

134.     Chapter 501, Fla. Stat., Florida's Deceptive and Unfair Trade Practices Act is to be liberally construed to protect the consuming public, such as Plaintiffs and the Class Members in this case, from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce.

135.     Plaintiffs and the Class Members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

136.     By soliciting investor funds in the manner in which they did, Defendants engaged in "trade and commerce" within the meaning of Fla. Stat. §501.203(8).

137.     While FDUTPA does not define "deceptive" and "unfair," it incorporates by reference the Federal Trade Commission's interpretations of these terms.  The FTC has found that a "deceptive act or practice" encompasses "a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."

138.     The federal courts have defined a "deceptive trade practice" as any act or practice that has the tendency or capacity to deceive consumers and have defined an "unfair trade practice" as any

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

act or practice that offends public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

139.     Moreover, as the securities laws are designed for consumer protection and "proscribe[] unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices," a violation of the securities laws is a *per se* violation of FDUTPA.

140.     Defendants' acts and omissions of representing to Plaintiffs and the Class Members that, among other things:

(a) BITCONNECT utilized a proprietary, secret trading system (the "Volatility Software") that helped its investors generate far-greater-than-average returns on their investments;

(b) BITCONNECT's representation that a one percent (1%) daily return on investments was readily achievable regardless of market performance or the fluctuating value of bitcoin;

(c) Investment returns were legitimately generated and were not simply a reallocation of new BITCONNECT investors' money used to pay the promised returns on outstanding BITCONNECT investors' investments in classic Ponzi scheme fashion;

(d) The BitConnect Investment Programs complied with all applicable securities laws; and

(e) The BitConnect affiliates who were paid commissions for their sale of BitConnect Investment Programs were properly registered to procure those sales

constitute both deceptive and unfair trade practices because the false representations and omissions made by Defendants have a tendency or capacity to deceive consumers, such as Plaintiffs and the Class Members, into investing in BITCONNECT's falsely-touted business and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

141.     As a result of Defendants' deceptive trade practices, Plaintiffs and the Class Members were deceived into investing their money with a company that functioned solely as an engine of fraud -- thus causing significant economic damage to Plaintiffs and the Class Members.

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

142.    The materially false statements and omissions as described above, and the fact that this was a misleading investment, were unfair, unconscionable, and deceptive practices perpetrated on Plaintiffs and the Class Members which would have likely deceived a reasonable person under the circumstances.

143.    Defendants were on notice at all relevant times that the false representations of material facts described above were being communicated to prospective investors (such as Plaintiffs and the Class Members) by their authorized agents.

144.    As a result of the false representations and violations of the securities laws described above, Plaintiffs and the Class Members have been damaged by, among other things losing their invested capital.

145.    Plaintiffs and the Class Members have also been damaged in other and further ways subject to proof at trial.

146.    Therefore, Defendants engaged in unfair and deceptive trade practices in violation of Section 501.201 *et seq.*, Fla. Stat.

147.    Pursuant to Sections 501.211(1) and 501.2105, Fla. Stat., Plaintiffs and the Class Members are entitled to recover from Defendants the reasonable amount of attorneys' fees Plaintiffs and the Class Members have had to incur in representing their interests in this matter.

## COUNT VII – FRAUDULENT INDUCEMENT
### [AGAINST ALL DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 107 above, and further allege:

148.    Defendants, by acts of both omission and commission, made to Plaintiffs and the Class Members false statements of material facts about the services Plaintiffs and the Class Members would receive from BITCONNECT upon opening a BITCONNECT account and investing in the BitConnect Investment Programs.

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

149.     Specifically, Defendants' representations to Plaintiffs and the Class Members that, among other things:

      (a)  BITCONNECT utilized a proprietary, secret trading system (the "Volatility Software") that helped its investors generate far-greater-than-average returns on their investments;

      (b)  BITCONNECT's representation that a one percent (1%) daily return on investments was readily achievable regardless of market performance or the fluctuating value of bitcoin;

      (c)  Investment returns were legitimately generated and were not simply a reallocation of new BITCONNECT investors' money used to pay the promised returns on outstanding BITCONNECT investors' investments in classic Ponzi scheme fashion;

      (d)  The BitConnect Investment Programs complied with all applicable securities laws; and

      (e)  The BitConnect affiliates who were paid commissions for their sale of BitConnect Investment Programs were properly registered to procure those sales

were false, and Defendants knew at the time the statements were made that the statements were false.

150.     Defendants intended that Plaintiffs and the Class Members would be induced into action by relying upon the statements of fact made to them by and on behalf of Defendants.

151.     In considering whether to open accounts at BITCONNECT, invest in the BitConnect Investment Programs, and entrust to BITCONNECT their valuable assets; Plaintiffs and the Class Members reasonably and justifiably relied on the statements of fact made to them by and on behalf of Defendants.

152.     As a direct and proximate result of Plaintiffs' and the Class Members' reliance on the statements made to them by Defendants, Plaintiffs and the Class Members have suffered damage.

SILVER MILLER
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

## COUNT VIII – FRAUDULENT MISREPRESENTATION
### [AGAINST ALL DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 107 above, and further allege:

153.     Defendants, by acts of both omission and commission, made to Plaintiffs and the Class Members false statements of material facts about the services Plaintiffs and the Class Members would receive from BITCONNECT upon opening a BITCONNECT account and investing in the BitConnect Investment Programs in exchange for the fees they were compelled to pay to maintain accounts at BITCONNECT.

154.     Specifically, Defendants' representations to Plaintiffs and the Class Members that, among other things:

(a) BITCONNECT utilized a proprietary, secret trading system (the "Volatility Software") that helped its investors generate far-greater-than-average returns on their investments;

(b) BITCONNECT's representation that a one percent (1%) daily return on investments was readily achievable regardless of market performance or the fluctuating value of bitcoin;

(c) Investment returns were legitimately generated and were not simply a reallocation of new BITCONNECT investors' money used to pay the promised returns on outstanding BITCONNECT investors' investments in classic Ponzi scheme fashion;

(d) The BitConnect Investment Programs complied with all applicable securities laws; and

(e) The BitConnect affiliates who were paid commissions for their sale of BitConnect Investment Programs were properly registered to procure those sales

were false, and Defendants knew at the time the statements were made that the statements were false.

155.     Defendants' misrepresentations were made with reckless disregard for the truth.

156.     Defendants intended that Plaintiffs and the Class Members would be induced into action by relying upon the statements of fact made to them by and on behalf of Defendants.

SILVER MILLER
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

157.     In considering whether to open accounts at BITCONNECT, invest in the BitConnect Investment Programs, and entrust to BITCONNECT their valuable assets; Plaintiffs and the Class Members reasonably and justifiably relied on the statements of fact made to them by and on behalf of Defendants.

158.     As a direct and proximate result of Plaintiffs' and the Class Members' reliance on the statements made to them by Defendants, Plaintiffs and the Class Members have suffered damage.

## COUNT IX – NEGLIGENT MISREPRESENTATION
### [AGAINST ALL DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 107 above, and further allege:

159.     Defendants, by acts of both omission and commission, made to Plaintiffs and the Class Members false statements of material facts about the services Plaintiffs and the Class Members would receive from BITCONNECT upon opening a BITCONNECT account and investing in the BitConnect Investment Programs in exchange for the fees they were compelled to pay to maintain accounts at BITCONNECT.

160.     Specifically, Defendants' representations to Plaintiffs and the Class Members that, among other things:

(a) BITCONNECT utilized a proprietary, secret trading system (the "Volatility Software") that helped its investors generate far-greater-than-average returns on their investments;

(b) BITCONNECT's representation that a one percent (1%) daily return on investments was readily achievable regardless of market performance or the fluctuating value of bitcoin;

(c) Investment returns were legitimately generated and were not simply a reallocation of new BITCONNECT investors' money used to pay the promised returns on outstanding BITCONNECT investors' investments in classic Ponzi scheme fashion;

(d) The BitConnect Investment Programs complied with all applicable securities laws; and

(e) The BitConnect affiliates who were paid commissions for their sale of

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

> BitConnect Investment Programs were properly registered to procure those sales

were false, and Defendants knew, or should have known, at the time the statements were made that the statements were false.

161.     Defendants had no reasonable grounds upon which to believe the statements were true when made to Plaintiffs and the Class Members.

162.     Defendants intended that Plaintiffs and the Class Members would be induced into action by relying upon the statements of fact made to them by and on behalf of Defendants.

163.     In considering whether to open accounts at BITCONNECT, invest in the BitConnect Investment Programs, and entrust to BITCONNECT their valuable assets; Plaintiffs and the Class Members reasonably and justifiably relied on the statements of fact made to them by and on behalf of Defendants.

164.     As a direct and proximate result of Plaintiffs' and the Class Members' reliance on the statements made to them by Defendants, Plaintiffs and the Class Members have suffered damage.

## COUNT X – CONVERSION
### [AGAINST ALL DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 107 above, and further allege:

165.     Plaintiffs transferred funds and assets to BITCONNECT for investment, and as a purported loan, to participate in the BitConnect Investment Programs.

166.     BITCONNECT has kept Plaintiffs' and the Class Members' funds and assets after Plaintiffs and the Class Members requested their return, despite BITCONNECT's lack of any ownership interest in the assets and despite BITCONNECT's agreement in writing to return to Plaintiffs and the Class Members -- in the form of fiat currency (*i.e.*, U.S. Dollars or Euros), not BCCs -- all of Plaintiffs' and the Class Members' holdings.

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

167.     By refusing to return to Plaintiffs and the Class Members their assets, BITCONNECT intended to interfere with, and indeed has interfered with, Plaintiffs' and the Class Members' ownership and interest in those holdings and has deprived Plaintiffs and the Class Members of their property, permanently or temporarily.

168.     Upon information and belief, BITCONNECT has utilized Plaintiffs' and the Class Members' funds and assets to cover BITCONNECT's own business expenses and to enrich its Directors, shareholders, and affiliates, including Defendants JOSHUA JEPPESEN, GLENN ARCARO, TREVON JAMES, RYAN HILDRETH, CRAIG GRANT, JOHN DOE NO. 1 a/k/a NICHOLAS TROVATO a/k/a CRYPTONICK, RYAN MASSEN, and JOHN DOE NOS. 2-10.

169.     As a result of BITCONNECT's conversion of Plaintiffs' and the Class Members' funds and assets to its own corporate uses and the personal use of its Directors, shareholders, and affiliates; Plaintiffs and the Class Members have suffered damage.

### COUNT XI – CIVIL CONSPIRACY
#### [AGAINST ALL DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-107 above, and further allege:

170.     Defendants conspired with one another to perpetrate an unlawful act upon Plaintiffs and the Class Members or to perpetrate a lawful act by unlawful means, *to wit*: they made multiple misrepresentations of fact to Plaintiffs and the Class Members in an effort to extract from Plaintiffs and the Class Members funds, assets, and cryptocurrency to fund BITCONNECT's own business expenses and to enrich its Directors, shareholders, and affiliates, including Defendants JOSHUA JEPPESEN, GLENN ARCARO, TREVON JAMES, RYAN HILDRETH, CRAIG GRANT, JOHN DOE NO. 1 a/k/a NICHOLAS TROVATO a/k/a CRYPTONICK, RYAN MASSEN, and JOHN DOE NOS. 2-10, not to fund the purportedly legitimate purpose to which Plaintiffs and the Class Members were told by Defendants that their investment assets were being applied – all of which

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

put Defendants' own pecuniary interest ahead of Plaintiffs' and the Class Members' welfare and economic safety.

171.    Defendants solicited and/or accepted from Plaintiffs and the Class Members large sums of funds, assets, and cryptocurrency while withholding from Plaintiffs and the Class Members certain material facts, including:

(a)    BITCONNECT did not utilize a proprietary, secret trading system (the "Volatility Software") that helped its investors generate far-greater-than-average returns on their investments;

(b)    BITCONNECT's representation that a one percent (1%) daily return on investments was readily achievable regardless of market performance or the fluctuating value of bitcoin;

(c)    Investment returns were not legitimately generated and were simply a reallocation of new BITCONNECT investors' money used to pay the promised returns on outstanding BITCONNECT investors' investments in classic Ponzi scheme fashion;

(d)    The BitConnect Investment Programs did not comply with all applicable securities laws; and

(e)    The BitConnect affiliates who were paid commissions for their sale of BitConnect Investment Programs were not properly registered to procure those sales; and

(f)    The "BCC School" orchestrated by Defendant GLENN ARCARO was not a "school" at all; rather, it was a mere conduit to get BCC School "graduates" to open up accounts at BITCONNECT, for which GLENN ARCARO and his team of affiliates reaped from BITCONNECT the riches of each client referral.

172.    All Defendants agreed to the illicit purpose for garnering investment monies from Plaintiffs and the Class Members so that BITCONNECT's Directors, shareholders, and affiliates could enjoy lavish lifestyles with Plaintiffs' and the Class Members' funds, assets, and cryptocurrency.

173.    Defendants were each aware of, and consented to, the misrepresentations detailed above and knew that the efforts to garner funds, assets, and cryptocurrency from Plaintiffs and the Class Members was all part of a fraud aimed solely at enriching BITCONNECT's Directors,

shareholders, and affiliates without any intent to remunerate Plaintiffs and the Class Members in any legitimate way purported by the BitConnect Investment Programs.

174.    In furtherance of their conspiracy, Defendants made to Plaintiffs and the Class Members, or agreed to have someone make on their behalf, the false statements of fact detailed above and purposefully withheld from Plaintiffs and the Class Members certain material facts detailed above in a concerted effort to obtain Plaintiffs' and the Class Members' funds, assets, and cryptocurrency.

175.    To fulfill their role in the conspiracy, the BITCONNECT corporate parties operated the BitConnect Websites and pretended to be operating a legitimate, legally-compliant trading exchange and lending platform.

176.    To fulfill his role in the conspiracy, Defendant JOSHUA JEPPESEN oversaw and personally participated in developing the BitConnect Websites as well as BITCONNECT's business operations in the United States and Europe -- falsely representing that the operations were legitimate.

177.    To fulfill his role in the conspiracy, Defendant GLENN ARCARO managed, coached, and supported a United States-based team of BITCONNECT affiliates to sharpen their recruiting techniques and lure in BITCONNECT investors.  Defendant GLENN ARCARO is also believed to have created and orchestrated the BCC School, which was little more than a conduit to get BCC School "graduates" to open up accounts at BITCONNECT, for which GLENN ARCARO and his team of affiliates reaped from BITCONNECT the riches of each client referral.

178.    To fulfill their role in the conspiracy, Defendants TREVON JAMES, RYAN HILDRETH, CRAIG GRANT, CRYPTONICK, RYAN MASSEN, and JOHN DOES NOS. 2-10 served as United States-based BITCONNECT affiliates who used social media channels such as YouTube, Twitter, Reddit, and Facebook to recruit unsuspecting investors in the United States and abroad to purchase BitConnect Investment Programs.  For their efforts, Defendants TREVON JAMES, RYAN HILDRETH, CRAIG GRANT, JOHN DOE NO. 1 a/k/a NICHOLAS

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

TROVATO a/k/a CRYPTONICK, RYAN MASSEN, and JOHN DOES NOS. 2-10 were paid large commissions and participated in a lucrative bonus program that provided them sizeable incomes.

179.    BITCONNECT conducted no legitimate business -- something of which Defendants JOSHUA JEPPESEN, GLENN ARCARO, TREVON JAMES, RYAN HILDRETH, CRAIG GRANT, JOHN DOE NO. 1 a/k/a NICHOLAS TROVATO a/k/a CRYPTONICK, RYAN MASSEN, and JOHN DOES NOS. 2-10 were aware and which they accepted as part of the scheme to defraud BITCONNECT investors and accountholders, including Plaintiffs and the Class Members.

180.    As a direct and proximate result of Defendants' conspiracy, Plaintiffs and the Class Members have suffered damage.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs CHARLES WILDES, FRANCISCO DORIA, AKIVA KATZ, JAMES GURRY, RONALD NELSON, and JUSTIN PERRY, individually and on behalf of all others similarly situated, respectfully pray for relief as follows:

(a) Declaring that this action is properly maintainable as a class action and certifying Plaintiffs as the Class representatives and their counsel as Class counsel;

(b) Declaring that Defendants offered and sold unregistered securities in violation of the federal securities laws;

(c) Declaring Defendants are liable to Plaintiffs and the Class under Sections 12(a)(1) and/or 15(a) of the Securities Act;

(d) Declaring Defendants violated Florida's Deceptive and Unfair Trade Practices Act and are therefore required to provide rescissory and/or other equitable relief to Plaintiffs and the Class;

(e) Declaring Defendants are liable to Plaintiffs and the Class due to their breach of contract, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, conversion, and civil conspiracy;

(f) Preliminarily enjoining Defendants from making further transfers or dissipations of the investments raised from the offer and sale of BCCs and in connection with the BitConnect Investment Programs, or using such funds in any further purchases or transactions;

**SILVER MILLER**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

Civil Action No. 9:18-cv-80086-DMM

(g) Requiring an accounting of the remaining funds and assets raised from Plaintiffs and the Class in connection with the offer and sale of BCCs and the BitConnect Investment Programs;

(h) Imposing a constructive trust over the funds and assets rightfully belonging to Plaintiffs and the Class;

(i) Ordering rescission of the investments made by Plaintiffs and the Class relating to the offer and sale of BCCs and the BitConnect Investment Programs and/or compensatory damages;

(j) Awarding Plaintiffs the costs of this action, including reasonable allowance for Plaintiffs' attorneys' and experts' fees; and

(k) Granting such other and further relief as this Court may deem just and proper.

## PLAINTIFFS' DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

Respectfully submitted,

**SILVER MILLER**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone:     (954) 516-6000

By: _____
       DAVID C. SILVER
       Florida Bar No. 572764
       E-mail: DSilver@SilverMillerLaw.com
       JASON S. MILLER
       Florida Bar No. 072206
       E-mail: JMiller@SilverMillerLaw.com

       *Counsel for Plaintiffs*

Dated:  February 27, 2018

**SILVER MILLER**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com