Rosemary M. Rivas (State Bar No. 209147)
Email: rrivas@zlk.com
**LEVI & KORSINSKY, LLP**
44 Montgomery Street, Suite 650
San Francisco, California 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

Eduard Korsinsky (to be admitted *pro hac vice*)
Email: ek@zlk.com
**LEVI & KORSINSKY, LLP**
30 Broad Street, 24th Floor
New York, New York 10004
Telephone: (212) 363-7500
Facsimile: (212) 636-7171

Donald J. Enright (to be admitted *pro hac vice*)
Email: denright@zlk.com
John A. Carriel (to be admitted *pro hac vice*)
Email: jcarriel@zlk.com
**LEVI & KORSINSKY, LLP**
1101 30th St., NW, Ste. 115
Washington, DC 20007
Telephone: (202) 524-4292
Facsimile: (202) 333-2121

*Counsel for Plaintiff Baltazar Avalos*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BALTAZAR AVALOS, individually and on behalf of all others similarly situated, | Case No. 3:18-cv-01165 |
| Plaintiff, | **CLASS ACTION** |
| v. | **CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(a)(1) AND 15(a) OF THE SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 *et seq.*; BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST ENRICHMENT** |
| BITCONNECT INTERNATIONAL PLC, BITCONNECT LTD., BITCONNECT TRADING LTD., JOSHUA JEPPESEN, GLENN ARCARO, TREVON BROWN A/K/A TREVON JAMES, RYAN HILDRETH, CRAIG GRANT, JOHN DOE 1 A/K/A NICHOLAS TROVATO A/K/A CRYPTONICK, and RYAN MAASEN, | |
| Defendants. | **JURY TRIAL DEMANDED** |

Case No. 3:18-cv-01165

Plaintiff Baltazar Avalos ("Plaintiff"), individually and on behalf of all other individuals and entities similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of Sections 12 and 15 of the Securities Act of 1933 (the "Securities Act") and California's Unfair Competition law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, breach of contract, actual fraud, Cal. Civ. Code § 1572, constructive fraud, Cal. Civ. Code § 1573, and unjust enrichment, the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: documents and solicitation materials released by Defendants (defined below), in connection with the BitConnect Investment Programs (defined below), and public statements made by Defendants concerning the BitConnect Investment Programs. Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## NATURE AND SUMMARY OF THE ACTION

1.     Plaintiff brings this action on behalf of himself and all other individuals and entities similarly situated against BitConnect International PLC, BitConnect Ltd., BitConnect Trading Ltd. (collectively "BitConnect"), Joshua Jeppesen ("Jeppesen"), Glenn Arcaro ("Arcaro"), Trevon Brown a/k/a Trevon James ("James"), Ryan Hildreth ("Hildreth"), Craig Grant ("Grant"), John Doe No. 1 a/k/a Nicholas Trovato a/k/a Cryptonick ("Trovato"), and Ryan Maasen ("Maasen," and together with Jeppesen, Arcaro, James, Hildreth, Grant, Trovato, and Maasen, the "Individual Defendants," and collectively with BitConnect, the "Defendants") for violation of Sections 12(a)(1) and 15(a), 15 U.S.C. §§ 77l(a)(1), 77o(a), of the Securities Act, and California's Unfair Competition law, Cal. Bus. Prof. §§ 17200 *et seq.*, breach/rescission of contract,[1] actual fraud, Cal. Civ. Code § 1572, constructive fraud, Cal. Civ. Code § 1573, and unjust enrichment.

2.     Specifically, Defendant BitConnect created and operated fraudulent Ponzi/pyramid schemes in the form of the BitConnect Lending Program and the BitConnect Staking Program (the "BitConnect Investment Programs"). To participate in the BitConnect Investment Programs, investors

---

[1]  Plaintiff's breach/rescission of contract claim is only alleged against Defendant BitConnect.

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.; BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST ENRICHMENT

1    were required to purchase BitConnect-created cryptocurrency called BitConnect Coins ("BCC") on

2    the BitConnect BCC Exchange with bitcoin ("BTC")[2] or fiat currency.

3          3.    The BitConnect Lending Program was marketed and sold on the Internet as an

4    opportunity for investors to "lend" their BCCs back to BitConnect, which BitConnect would then

5    purportedly use to generate profits by purchasing BTC when its price was low and selling BTC when

6    its price was high—a "buy low, sell high" strategy that was purportedly effectuated by a BitConnect-

7    designed "trading bot" implementing a proprietary trading algorithm: the "Volatility Software."  In

8    exchange for "lending" BCCs to BitConnect, investors were "guaranteed" lucrative returns on their

9    investments.

10          4.    The BitConnect Staking Program was marketed and sold on the Internet as an

11   opportunity for investors to "stake" their BCCs by holding their BCCs in the BitConnect-QT wallet (a

12   software and/or online wallet created by BitConnect).  In exchange for "staking" BCCs in the

13   BitConnect-QT Wallet, investors were "guaranteed" lucrative returns on their investments.

14          5.    As part of their solicitation efforts, BitConnect enlisted multi-level affiliate marketers

15   (the "Referral Program" or the "Affiliate Program") to further propagate the reach of the BitConnect

16   Investment Programs.  Under the Referral Program, BitConnect paid commissions to affiliates who

17   successfully solicited additional investments in the BitConnect Investment Programs.  Additionally,

18   affiliate promoters would receive a percentage of any investments made by the investors they referred

19   as well as a portion of investments made by subsequent investors recruited by their referrals, and so

20   forth—a standard multi-level-marketing scheme.  The Individual Defendants were highly influential

21   affiliate marketers and/or directors of BitConnect. .

22          6.    Despite being cloaked in technological sophistication and jargon, Defendants operated

23   a century-old fraud that was simple at its core—Defendants paid existing investors with new money

24

25   _____

     [2]  Bitcoin is a type of "digital currency"—also commonly referred to as a "cryptocurrency."  The
26   Financial Action Task Force, an inter-governmental agency that promotes laws combating anti-money
     laundering and in which the United States is a member, describes digital currency as a "digital
27   representation of value that can be digitally traded and functions as: (1) a medium of exchange; and/or
     (2) a unit of account; and/or (3) a store of value, but does not have legal tender status . . . in any
28   jurisdiction."

1  from new investors, who were in turn expected and incentivized to get more new investors to produce
2  more new money.

3      7.    As noted above, to participate in the BitConnect Investment Programs, investors were
4  required to purchase BCCs.  BCCs constitute "investment contract" securities as defined under the
5  Securities Act.  As discussed herein, BCCs are investment contracts because, *inter alia*, Defendants
6  explicitly referred to BCCs as an "investment option" under which investors could "buy BitConnect
7  coin [sic] at a lower price and sell[] them at [a] higher price," and Plaintiff and other BitConnect
8  investors were led to believe, and expected, that the BCCs they purchased would be worth more than
9  the BTC they invested with BitConnect.

10     8.    Similarly, the BitConnect Investment Programs constitute "investment contract"
11 securities as defined under the Securities Act.  As discussed herein, the BitConnect Investment
12 Programs qualify as investment contracts because, *inter alia*, Defendants have explicitly referred to
13 the programs as lucrative investment opportunities that would lead to "financial freedom" and
14 repeatedly stressed the profit potential from merely holding and "staking" BCCs.  The BitConnect
15 Investment Programs were the clear offer and sale of investment contract securities because, *inter alia*,
16 Defendants touted, and Plaintiff and other BitConnect Investment Program participants reasonably
17 expected, that investors would receive substantial returns and a steady stream of income on their
18 investments.

19     9.    With respect to the BitConnect Lending Program, a stream of income would
20 purportedly come in the form of a daily interest rate and a bonus interest percentage, each of which
21 were tied to BitConnect's creation and implementation of the Volatility Software, which BitConnect
22 claimed would produce returns sufficient to cover these payments.  In addition to the fixed returns that
23 were promised, BitConnect also guaranteed that the principal investment amount would be paid in full
24 on a specified date.

25     10.   Similarly, with respect to the BitConnect Staking Program, BitConnect "guaranteed" it
26 would provide returns of "up to 10% per month" which would result from merely holding BCCs in
27 the BitConnect-QT Wallet.

28

3                                    Case No. 3:18-cv-01165

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE
SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.;
BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST
ENRICHMENT

11.     In reality, BitConnect Investment Programs were nothing more than pyramid/Ponzi schemes. After operating for less than a year, BitConnect abruptly shut down its platform and stripped the value from all of Plaintiff's and the Class' (defined below) investments, leaving them with nearly worthless BCCs.[3]

12.     In short, Defendants defrauded tens of thousands of investors by capitalizing on the general public's excitement for digital currencies and by luring unsuspecting investors into purchasing unregistered securities and participating in pyramid/Ponzi schemes.

13.     The registration requirements contained within the Securities Act are designed to protect investors by ensuring they are provided adequate information upon which to base their investment decisions. The two basic objectives of registration are: (i) to require that investors receive necessary financial and other significant information concerning securities being offered for public sale; and (ii) to prohibit deceit, misrepresentations, and other fraud in the sale of securities. Absent registration and the protections of the federal securities laws, issuers of securities could seek to market their investment opportunities without disclosing information that might make a potential investor think twice before investing (*e.g.*, conflicts of interest or major setbacks to core product lines) or peddle its securities using unbounded exaggerations regarding the progress of its products, business plan, business strategies, or even fabricate the existence of relationships with vendors or other business partners.

14.     Accordingly, Plaintiff brings this action for violations of Sections 12 and 15 of the Securities Act and California's Unfair Competition law, and for breach of contract, actual fraud, constructive fraud, and unjust enrichment against Defendants for their offer and sale of investment contract securities in violation of the federal securities laws' registration requirements and participation in effectuating the fraudulent Ponzi/pyramid schemes.

15.     Due to the varied and innumerable ways in which investors can be, and are likely to be, manipulated and harmed absent any of the protections under the federal securities laws, Sections 5

---

[3]  For example, the value of BCC has fallen from over $430.00 in early January 2018 to $3.86 as of February 20, 2018.

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.; BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST ENRICHMENT

and 12(a)(1) of the Securities Act provide for strict liability against any person who offers or sells an unregistered security. As detailed herein, the BitConnect Investment Programs have at all times constituted an offer and sale of unregistered securities; and thus, Defendants are strictly liable under Section 12(a)(1) of the Securities Act. Similarly, Defendants' unlawful, immoral, and fraudulent conduct has caused, and is continuing to cause, significant financial harm to Plaintiff and the Class (defined below). Absent judicial intervention, Plaintiff and the Class are unlikely to ever recover their investments. Accordingly, judicial intervention is required and requested to rectify the existing and future harm facing Plaintiff and the Class—harm that is likely to be irreparable. For these reasons, Plaintiff on behalf of himself, and all similarly situated individuals and entities that invested in BCC and/or the BitConnect Investment Programs, seeks compensatory, exemplary, punitive, injunctive, and rescissory relief, providing rescission and repayment of all investments into BCCs and/or the BitConnect Investment Programs, and securing and conserving such funds until repayment.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction under 28 U.S.C. § 1367 (supplemental jurisdiction), 28 U.S.C. § 1331 (federal question jurisdiction) and Section 22 of the Securities Act (15 U.S.C. § 77v) because Plaintiff alleges violations of Sections 12(a)(1) and 15(a) of the Securities Act.

17. This Court has personal jurisdiction over each of the Defendants because each has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18. Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, as well as under 28 U.S.C. § 1391, because: (a) the conduct at issue took place and had an effect in this District; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District.

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE
SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.;
BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST
ENRICHMENT

**PARTIES**

*Plaintiff*

19.     Plaintiff is a resident within this District and a citizen of the United States.   On December 11, 2017, January 1, 2018 and January 4, 2018, Plaintiff funded his BitConnect account, through BitConnect's website, by investing, respectively, $10,000; $40,000; and $60,000.  On January 17, 2018, when BitConnect closed its lending and trading platform, Plaintiff held 410 BCCs.  As of February 22, 2018, 410 BCCs are worth approximately $1,271.

*The Corporate Defendants*

20.     Defendant BitConnect International PLC is a foreign for-profit company organized in England and Wales and is incorporated under the Companies Act 2006 as a public company limited by shares.  BitConnect International PLC's corporate record lists the entity's registered address as: Grant Thornton House, 22 Melton Street, Kings Cross, London, United Kingdom NW1 2EP.

21.     Defendant BitConnect LTD is a foreign for-profit company organized in England and Wales and is incorporated under the Companies Act 2006 as a private company limited by shares.  BitConnect's corporate record lists the entity's registered address as: The Panorama, Park Street, Ashford, United Kingdom TN24 8EZ.

22.     Defendant BitConnect Trading LTD is a foreign for-profit company organized in England and Wales and is incorporated under the Companies Act 2006 as a private company limited by shares.  BitConnect Trading LTD's corporate record lists the entity's registered address as: 23 St. Elizabeth Avenue, Bootle, United Kingdom L20 6FA.

23.     Upon information and belief, the BitConnect entities are wholly interrelated and are used interchangeably as instrumentalities for the fraud and unlawful schemes described herein.

*The Director and Affiliate/Recruiter Defendants*

24.     Defendant Jeppesen is an individual believed to be domiciled in the United States. According to published information, Jeppesen held the title of a Director at BitConnect, serving as the Development Director for BitConnect's operations in the United States and Europe.

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.; BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST ENRICHMENT

25. Defendant Arcaro is an individual domiciled in Moorpark, California. According to paperwork filed with the corporate registry office in the United Kingdom, Arcaro is an active Director of BitConnect International PLC. Defendant Arcaro not only served BitConnect by managing a team of U.S.-based affiliates/recruiters, he also served as one of the most successful affiliate/recruiters for BitConnect himself, soliciting hundreds if not thousands of BitConnect investors in the United States and abroad through social media sites such as YouTube and Facebook.

26. Defendant James is an individual believed to be domiciled in the United States. Defendant James served as an affiliate/recruiter for BitConnect, soliciting hundreds if not thousands of BitConnect investors in the United States and abroad through social media sites such as YouTube and Facebook.

27. Defendant Hildreth is an individual domiciled in Laguna Nigel, California. Defendant Hildreth served as an affiliate/recruiter for BitConnect, soliciting hundreds if not thousands of BitConnect investors in the United States and abroad through social media sites such as YouTube and Facebook.

28. Defendant Grant is an individual believed to be domiciled in Miami, Florida. Defendant Craig served as an affiliate/recruiter for BitConnect, soliciting hundreds if not thousands of BitConnect investors in the United States and abroad through social media sites such as YouTube and Facebook.

29. Defendant Trovato is an individual believed to be domiciled in the United States. His true name and the state of his domicile are unknown at this time. Defendant Trovato served as an affiliate/recruiter for BitConnect, soliciting hundreds if not thousands of BitConnect investors in the United States and abroad through social media sites such as YouTube and Facebook.

30. Defendant Maasen is an individual believed to be domiciled in Tulsa, Oklahoma. Defendant Maasen served as an affiliate/recruiter for BitConnect, soliciting hundreds if not thousands of BitConnect investors in the United States and abroad through social media sites such as YouTube and Facebook.

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.; BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST ENRICHMENT

## CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action individually and as a class action on behalf of all individuals and entities who transferred to BitConnect any currency or cryptocurrency to invest in BCC and/or the BitConnect Investment Programs and who suffered financial injury as a result thereof (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the Individual Defendants.

32.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

33.     While the exact number of Class members is presently unknown to Plaintiff and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in this Class.  All members of the Class may be identified by records maintained by Defendants and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

34.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following: (i) whether Defendants offered and sold unregistered securities in violation of the federal securities laws; (ii) whether Defendants engaged in unfair business practices in violation of California' Unfair Competition law; (iii) whether Defendant BitConnect breached its contracts with Plaintiff and the Class; (iv) whether Defendants fraudulently solicited investments from Plaintiff and the Class; (v) whether Defendants have been unjustly enriched by the unlawful conduct alleged herein; (vi) whether Plaintiff and the Class will suffer irreparable harm if such unlawful activities are not remedied; and (vii) whether Plaintiff and the Class are entitled to compensatory, exemplary, punitive, injunctive, and/or rescissory relief as a result of Defendants' wrongful conduct alleged herein, and the measure of such damages.

35.     Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff does not have any interests adverse to the Class.  Additionally, Plaintiff and the other members

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE
SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.;
BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST
ENRICHMENT

of the Class have all sustained harm in a substantially identical manner as a result of Defendants' wrongful conduct as alleged herein.

36.     Plaintiff will fairly and adequately protect the interests of the Class and has retained competent counsel experienced in litigation of this nature.

37.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

38.     Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

39.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

40.     Accordingly, Plaintiff seeks compensatory, exemplary, punitive, rescissory, injunctive, and other equitable relief on behalf of himself and the Class to prevent the irreparable injury they will continue to suffer absent judicial intervention.

## SUBSTANTIVE ALLEGATIONS

### *Background on BitConnect*

41.     BitConnect International PLC; BitConnect LTD; and BitConnect Trading LTD (collectively "BitConnect") are all parts of the same foreign technology organization that conducted business on the Internet, principally by means of a website accessible at www.bitconnect.co.

42.     BitConnect describes itself as "an opensource all in one [sic] bitcoin and crypto community platform designed to provide multiple investment opportunities with cryptocurrency education where it is entirely possible to find the independence we all desire, in a community of like-minded, freedom loving individuals who, like you, are seeking the possibility of income stability in a very unstable world."

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.; BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST ENRICHMENT

43. BitConnect launched in late-2016 by conducting an initial coin offering,[4] which ran from November 15, 2016 through early January 2017 (the "BitConnect ICO").

44. The BitConnect ICO introduced BCC into the marketplace. BitConnect describes BCC as "an open source, peer-to-peer, community driven decentralized cryptocurrency that allow [sic] people to store and invest their wealth in a non-government controlled currency, and even earn a substantial interest on investment [sic]. This means anyone holding BitConnect Coin in their wallet will receive interest on their balance in return for helping maintain security on the network." Similarly, BCC was described as not just "an investment tool; [but as] the investment tool you need to jump start your financial security."

45. Shortly following the BitConnect ICO, BitConnect launched the BitConnect Exchange—a cryptocurrency exchange where investors could use BTC or fiat currency to purchase BCC.

---

[4] An "initial coin offering" is a capital raising event in which an entity offers participants a unique "coin" or "token" in exchange for consideration (often in the form of digital currency—most commonly BTC and Ethereum—or fiat currency). These tokens are issued on a blockchain and are oftentimes listed on online platforms, called virtual currency exchanges, where they are tradable for digital or fiat currencies.

To participate in an initial coin offering, investors are required to transfer digital currencies to the issuer's address, online wallet, or other account. After the completion of an initial coin offering, the issuer will typically distribute its unique "tokens" to the participants' unique address on the blockchain. Similar to stockholders in an initial public offering ("IPO"), holders of these tokens are then entitled to certain rights related to a venture underlying the initial coin offering, such as profits, shares of assets, use of certain services provided by the issuer, and/or voting rights.

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.; BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST ENRICHMENT

46.     Over the following year, BitConnect implemented various investment programs, including the BitConnect Lending Program, the BitConnect Staking Program, and the Referral/Affiliate Program. BitConnect marketed various uses for BCC:



*The BitConnect Websites*

47.     BitConnect maintained a website accessible at and a website accessible at http://bitconnectcoin.co (the "BitConnect Websites"). The BitConnect Websites were accessible worldwide to the general public, including residents of the United States.

48.     The BitConnect Investment Programs were available for purchase by individuals in the United States and worldwide through the BitConnect Websites and affiliated websites rendered in foreign languages. The investments were promoted on social media pages including, but not limited to, Facebook, YouTube, Reddit, Instagram, and Craigslist.

49.     BitConnect promoted its Investment Programs on the BitConnect Websites by making the following representations:

(a) "There are multiple ways to invest in the BitConnect platform with different level of earning opportunity associated";

(b) "You can invest BitConnect Coin in BitConnect lending platform exclusively from the BitConnect Dashboard. This investment option involved profiting from BitConnect trading bot and volatility software. You will receive daily profit based on your investment option. Upon investment term completion, you will

11

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.; BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST ENRICHMENT

1       receive your capital back to take out from the BitConnect lending platform or
optionally reinvest back in lending platform to continue receiving daily profit";
2       and

3    (c)  "Invest your wealth in community-driven decentralized cryptocurrency.  Using
BitConnect public exchanges, you can buy, sell and trade BitConnect Coin (BCC)
4       directly to and from each other with no central organization involved."

5      50.    Upon information and belief, Defendant Jeppesen played an integral role in developing

6 and promoting the BitConnect Websites.  Without his vital contributions, the BitConnect Websites

7 would not have functioned as well as they did and would not have ensnared as many victims who fell

8 prey to Defendants' promotion of BCCs and the BitConnect Investment Programs.

9 *Trading BCC*

10     51.    Trading BCC was marketed as an "investment option" that could be "used to profit on

11 **price fluctuation**" in that investors could "buy BitConnect coin at a lower price and sell[] them at [a]

12 higher price."  Additionally, investors could "profit[] from downward movements in [BCC] price by

13 selling them at a higher price and buy[ing] them again at a lower price and pocketing the price

14 difference."

15     52.    In addition to trading BCC, the two primary investment opportunities Defendants

16 touted were the BitConnect Lending Program and the BitConnect Staking Program.  To participate in

17 either investment opportunity, investors were required to expend BTC or fiat currency to purchase

18 BCC on the BitConnect Exchange.

19 *The BitConnect Lending Program*

20     53.    The BitConnect Lending Program was described as an "investment option [that]

21 involves profiting from Bitconnect trading bot and volatility software" under which investors would

22 "receive daily profit based on [their] investment option."  Following the "term completion, [investors]

23 [would] receive [their] **CAPITAL BACK** to take out from Bitconnect lending platform or optionally

24 [sic] reinvest back in lending platform to **continue receiving daily profit**."

25

26

27

28

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE
SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.;
BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST
ENRICHMENT

54.     The BitConnect Lending Program offered up to forty percent (40%) interest per month as well as additional interest on a daily basis.  The general mechanics of the program is demonstrated in the following graphic BitConnect published:



55.     In soliciting investors for the BitConnect Lending Program, BitConnect employed the use of online banner ads such as the following:




56.     Under the BitConnect Lending Program investors would "lend" their BCCs to BitConnect—"with no risk"—as part of an investment scheme whereby BitConnect ostensibly used these BCCs to fund the trading activities using its Volatility Software.

57.     Once the funds were deposited into the BitConnect Lending Program, trading bots using the Volatility Software purportedly managed those funds, generating a guaranteed return using its volatility predictions for the price of BTC.  In exchange, investors receive income in the form of a

1    daily fixed interest rate, and a bonus interest percentage, before eventually receiving the return of the

2    principal amount invested.

3        58.    In short, investors were sold the promise of profit merely through "lending" BCCs and

4    enjoying the guaranteed returns provided by trading bots and the Volatility Software.  These returns

5    were allegedly backed by the earnings promised by BitConnect's development and implementation of

6    the trading algorithms, which would purportedly produce returns sufficient to pay the following rates

7    and bonuses:

### BitConnect Coin Lending Profits Interest

| Lending Amount | Interest (Accrued Daily) | Capital Back |
|---|---|---|
| $100 - $1000 | Volatility Software Interest (up to 40 % Per Month) | After 299 Days |
| $1010 - $5000 | Volatility Software Interest + 0.10% Daily (up to 40 % Per Month) | After 239 Days |
| $5010 - $10000 | Volatility Software Interest + 0.20% Daily (up to 40 % Per Month) | After 179 Days |
| $10010 - $100000 | Volatility Software Interest + 0.25% Daily (up to 40 % Per Month) | After 120 Days |

*The BitConnect Staking Program*

16       59.    The BitConnect Staking Program incentivized investors to purchase and hold BCCs by

17   offering "guaranteed" interest—paid in BCC.  The BitConnect Staking Program was sold to the public

18   as an investment program that promised investors could earn interest of up to ten percent (10%) per

19   month over a specified term through a process called "Proof of Stake Minting."  In essence, the

20   BitConnect Staking Program and BCCs in general were sold as "interest bearing asset[s] with **120%**

21   **return per year**. It is that simple."

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE
SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.;
BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST
ENRICHMENT

60. The general mechanics of the BitConnect Staking Program are demonstrated in the following graphic BitConnect published:

**BitConnect Coin Staking**

bitconnect

- **Deposit BitCoin** — Deposit your BitCoin on given bitcoin deposit address
- **Buy BitConnect Coin** — Buy BitConnect Coin from BCC Exchange
- **Download Bitconnect Desktop Wallet** — Transfer your coin to BCC Desktop wallet
- **Stake Bitconnect Coin** — hold your BitConnect Coin minimum for 15 days to start earning Staking Interest

61. To participate in the BitConnect Staking Program, investors were required to download and install the BitConnect-QT wallet software to hold their BCCs; eventually BitConnect also released an online version of the BitConnect-QT Wallet. After holding their BCCs in the BitConnect-QT Wallet for fifteen (15) days, an investor's BCCs would accrue interest. The amount of interest paid to investors was purportedly contingent upon the dates of the investors' investments:

| Duration | Interest |
|---|---|
| 1st 6 months Jan 2017 to June 2017 | 60% (10% per month) |
| 2nd 6 months July 2017 to Dec 2017 | 50% (8% per month) |
| 3rd 6 months Jan 2018 to June 2018 | 40% (7% per month) |
| 4th 6 months July 2018 to Dec 2018 | 30% (5% per month) |
| 5th 6 months Jan 2019 to June 2019 | 20% (3% per month) |
| 6th 6 months July 2019 to Dec 2019 | 10% (1.4% per month) |

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.; BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST ENRICHMENT

62.     BitConnect further represented that the BitConnect Staking Program was an opportunity for investors to: (i) "[s]ecure [their] future by gaining quick profit growth for tomorrow that is practical and attainable"; (ii) achieve "financial freedom"; (iii) "begin staking or holding BitConnect Coin and watch [their] interest grow"; and (iv) that "the more [ BCC investors] hold, the more [they] earn."

**The BitConnect Referral Program**

63.     In connection with the BitConnect Investment Programs, BitConnect operated the Referral Program pursuant to which "affiliates" would earn additional income for referring additional investors to invest in BitConnect. The Referral Program was a run-of-the-mill pyramid scheme. Initially, the program extended "to Infinity" in that after the tenth (10) level was reached in the pyramid, 0.01% of all investments made by subsequent investors in the pyramid would siphon upwards to the top affiliate. The concept is more plainly visible in the following graphic:



64.     Eventually, BitConnect modified the Referral Program to "7 levels of earning potential to" investors based on the number of referrals that signed up for the BitConnect. However, the core concept and fraudulent Pyramid scheme remained in essence. Indeed, BitConnect encouraged investors to "[i]nvite [their] friends and family to join BitConnect via [their] unique **referral link** to

Case No. 3:18-cv-01165

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.; BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST ENRICHMENT

start earning a serious income from [BitConnect's] affiliate program" and to "[s]pread the word on **social media** and other **online platforms** to help" make BitConnect a success.

65.     Defendants Arcaro, James, Hildreth, Grant, Trovato, and Maasen were some of BitConnect's most successful "affiliate" marketers.

66.     For example, upon information and belief, Defendant Arcaro was responsible for managing a large team of affiliate markets for BitConnect; and he personally assisted affiliates with preparing sales presentations and honing their sales pitches to potential investors in the BitConnect Investment Programs.

67.     Evidently, Defendant Arcaro was so successful as an affiliate marketer and organizer that he received a Porsche Carrera 911 S as a reward during a live broadcast of the BitConnect Conference in October 2017.

68.     Defendant Arcaro is also believed to have created and orchestrated the "BCC School"—an online training program to "teach" the unsuspecting public how to participate in cryptocurrency investment opportunities, including the BitConnect Investment Programs.   For example, on Defendant Arcaro's website, Futuremoney.io, "lessons" eight, nine, and ten in the course named "Cryptocurrency 101," were entitled, respectively, "Buying Your First Bitcoin," "Creating Your Bitconnect Account," and "Bitcoin to Bitconnect: Transfer and Start Earning!"  Unsurprisingly, the "graduates" of "BCC School" were directed to open BitConnect accounts using Defendant Arcaro's and his team's referral links.

69.     In essence, the BCC School was little more than a conduit to get BCC School "graduates" to open up accounts at BitConnect, for which Defendant Arcaro and his team of affiliates reaped from BitConnect the riches of each client referral.

70.     Among the BitConnect "affiliate" marketers, Defendant James has been a particularly active affiliate promoter, primarily by using videos he posted on YouTube wherein he solicited investments for the BitConnect Investment Programs.

71.     Shockingly, after Texas issued an Emergency Cease and Desist Order against BitConnect in early-January 2018, Defendant James encouraged the public to use a Virtual Private

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.; BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST ENRICHMENT

Network ("VPN") to simulate an IP address outside of Texas and continue using BitConnect: "Load you [sic] a VPN, they all are good, and keep using BitConnect. Don't let Texas, don't let them government shut you down . . . they haters [sic], they mad cus [sic] we making money."

72. Rather than exhibit even a semblance of remorse for his involvement propagating the BitConnect pyramid schemes, Defendant James has opted to deem investors who were cheated by Defendants' fraudulent schemes—some of whom lost their life savings—"crybabies."

73. Similarly, upon information and belief, Defendant Hildreth marketed the BitConnect Investment Programs through his website named ryanhildreth.com which was touted as teaching "how to make an extra $1,000-$5,000+ per month" and targeted "ENTREPRENEURS WHO WANT THE FREEDOM TO MAKE MONEY FROM ANYWHERE IN THE WORLD, TRAVEL, AND CHOOSE THE LIFESTYLE [THEY] WANT TO LIVE!" (emphasis in original).

74. With respect to Defendant Grant, upon information and believe, he has been hailed as a "godfather" of BitConnect and began promoting the BitConnect Investment Programs in April 2017. Additionally, Defendant Grant has been alleged to have been involved in numerous other scams.[5]

75. Similarly, Defendant Trovato was an extremely influential affiliate marketer who claimed to have become a millionaire as a result of his cryptocurrency investments. Defendant Trovato's participation and culpability in furthering the BitConnect pyramid/Ponzi schemes is further evident from the fact that he has recently taken to deleting all of his YouTube videos promoting any cryptocurrency investment opportunity.

76. Defendant Maasen also published dozens of YouTube videos promoting the BitConnect Investment Programs. Further, Defendant Maasen appears to have primarily targeted raising investments from high school and college-age investors.

77. Each of the affiliate Defendants personally benefited from their marketing efforts on behalf of BitConnect from investors using their individual referral links to open BitConnect accounts.

---

[5] *See, e.g.*, http://www.davinsden.com/avalos/, (research compiled by a podcast team on Defendant Grant's various schemes).

18                                   Case No. 3:18-cv-01165

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.; BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST ENRICHMENT

***The BitConnect Investments Were Ponzi Schemes***

78.     Contrary to the claims of fantastic investment returns through the power of its proprietary, secret trading volatility software, and the communal power of the BitConnect Staking Program, BitConnect was actually operating Ponzi schemes.

79.     Any investment returns provided to BitConnect investors were not legitimately generated; rather, BitConnect simply used new BitConnect investors' money to pay the promised returns on outstanding BitConnect investors' investments.

80.     In addition, BitConnect used new BitConnect investors' funds to pay the BitConnect Directors and affiliates—including, but not limited to, Defendants Jeppesen, Arcaro, James, Hildreth, Grant, Trovato, and Maasen—salary and/or commissions for their role in bringing additional victims into the schemes.

***BCCs and the BitConnect Investment Programs Are Investment Contract Securities***

81.     Moreover, BitConnect and its affiliates engaged in the offer and sale of unregistered securities.

82.     Under the Securities Act, a "security" is defined as including any "note," "investment contract," or "instrument commonly known as a 'security.'" *See* 15 U.S.C. § 77b(a)(1). Here, the BCCs, the BitConnect Lending Program, and the BitConnect Staking Program each constitute an investment contract. In *SEC v. W.J. Howey Co.*, the United States Supreme Court established a three-part test to determine whether an offering, contract, transaction, or scheme constitutes an investment contract.[6] Under the test articulated in *Howey*, a contract, transaction, or scheme is an "investment contract" if it involves: (i) the investment of money; (ii) in a common enterprise; (iii) with the expectation of profits to come solely from the efforts of others.

83.     When determining whether a security has been offered and sold, the focus must be on the economic realities underlying the transaction. Here, the economic realities are that Plaintiff and

---

[6]  *See SEC v. W.J. Howey, Co.*, 328 U.S. 293 (1946); *see also Intern. Bhd. of Teamsters v. Daniel*, 421 U.S. 837, 852 (1979) (noting that the *Howey* test is not the only test for determining a security, but has been held to embody "all the attributes that run through all of the Court's decisions defining a security").

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.; BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST ENRICHMENT

the Class invested funds to trade BCCs, "lend" BCCs, and/or "stake" BCCs—each of which they expected would lead to "financial freedom" and/or "guaranteed" lucrative returns. Investors in the BitConnect Investment Programs used BTC or fiat currency to purchase the BCC required to make their investments. Accordingly, Plaintiff's and the Class' investment of BTC or fiat currency constitutes an investment of money for the purposes of determining whether an investment involved a security.

84.     Plaintiff and the Class were investing in a common enterprise with Defendants, as the BTC and fiat currency were pooled under the control of Defendant BitConnect, and the success of the BitConnect platform—and thus potential profits stemming from the future valuation of the BCC— was entirely reliant on Defendants' actions, primarily BitConnect's implementation of its proprietary, secret trading system, which BitConnect claimed would produce returns sufficient to cover interest payments to the BCC holders. With respect to the BitConnect Lending Program, investors were promised substantial fixed returns and a complete return of principal at a fixed time in the future.[7] BitConnect provided a Daily Interest Chart on its website that showed the daily interest that it purported to have paid to its investors in the three months prior to that date. Although the daily interest rate for BitConnect investments varied on a daily basis, on average BitConnect guaranteed a return of 1% per day.[8]

[7]  As relates to the BitConnect Staking Program, BitConnect failed to ever explain where the funds would come from to provide up to "120%" returns per year; thus, it can only be presumed that such funds were meant to also result from Defendants' actions, through trading bots or otherwise.

[8]  Theoretically, if investors chose to reinvest the interest earned, this daily interest would potentially add up to significant returns as a result of daily compounding. For example, a one-hundred-dollar investment compounded at 1% daily interest would be worth $134.77 after one month, $599.58 after six months, and $3,778.02 by the end of the year—representing an outlandish 3,678.02% net profit.





85.     In short, it is indisputable that Defendants were selling investment contracts and that any success from BitConnect's implementation of its Volatility Software—enabling payment of the interests and bonuses that were to be distributed—as well as any future potential increases to the value of the BCCs were entirely dependent on Defendants' actions.

***BitConnect Failed to Register the Securities***

86.     The reality is, BitConnect was not offering a revolutionary technology, but was instead selling a new take on a century-old scam.  Specifically, BitConnect used cryptocurrency to coat its Ponzi/pyramid schemes with the thinnest veneer of legitimacy.  Despite such efforts, it is abundantly clear that Defendants were conducting and/or supporting the Ponzi/pyramid schemes.  Indeed, the BitConnect Investment Programs exhibit numerous characteristics of such schemes, including:

  (a) providing daily interest on an investment that had no income other than new investor money;

  (b) artificially increasing the value of its cryptocurrency by having new investors in the Ponzi scheme purchase BCC to invest;

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.; BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST ENRICHMENT

(c) obfuscating the identities of BitConnect's owners by using an offshore company created through a company called Companies Made Simple; and

(d) expanding the amount of people in this Ponzi scheme by implementing a Pyramid scheme that paid a commission 7-levels deep for recruits.

87.     While the SEC has yet to involve itself—at least publicly—in the present matter, state regulators have displayed no such hesitancy.  By late-2017, it was apparent to BitConnect that the Ponzi schemes it had constructed was on the verge of toppling.  Not content with riding off into the sunset with its ill-gotten gains, BitConnect decided to take another bite at the apple and orchestrated a second BitConnect ICO to take place in January 2018 (the "BitConnectx ICO").  The Bitconnectx.co domain was registered in late-December 2017, and a crowdsale commenced less than two weeks later.  The company was seeking to sell 11.76 million of a new digital currency ("BCCX"), which would earn BitConnect $588 million.  Additionally, BitConnect planned to retain another $145 million in BCCXs for itself, bringing its total expected income from the BitConnectx ICO to $733 million.

88.     On January 4, 2018, the Texas State Securities Board issued an Emergency Cease and Desist Order against BitConnect in which the Securities Commissioner of the State of Texas presented his office's conclusion that, *inter alia*:

(a) the BitConnect Investments are securities;

(b) BitConnect had violated numerous securities regulations by offering the BitConnect Investments for sale in Texas;

(c) BitConnect had engaged in fraud and made materially misleading statements about the BitConnect Investments that were likely to deceive the public; and

(d) BitConnect's conduct, acts, and practices threaten an immediate and irreparable public harm.

89.     Soon thereafter, on January 9, 2018, the Secretary of State of North Carolina – Securities Division issued a Temporary Cease and Desist Order against BitConnect to prevent BitConnect from further violating state securities laws and restrain it from conducting the second ICO because the State had concluded that BitConnect's investment offerings were unregistered securities

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.; BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST ENRICHMENT

being offered to the residents of the State and that those investments posed an immediate and irreparable harm to the residents of North Carolina.

### BitConnect Abruptly Closed Its Operations

90.     On January 13, 2018, Bitconnect's website went down.  Although the website was back up just a few days later, on January 16, 2018, BitConnect posted an anonymous announcement declaring that BitConnect had closed the trading platform:

> This is to inform all community members that we are closing the Bitconnect lending and exchange platform. We are closing the lending operation immediately with the release of all outstanding loans. With release of your entire active loan in the lending wallet we are transferring all your lending wallet balance to your BitConnect wallet balance at 363.62 USD. This rate has been calculated based on last 15 days averages of the closing price registered on coinmarketcap.com. You are free to withdraw your BitConnect coin currently in QT wallets that was used for staking as well. We are also closing BCC exchange platform in 5 days.  In short, we are closing lending service and exchange service while BitConnect.co website will operate for wallet service, news and educational purposes.

> The reason for halt of lending and exchange platform has many reasons as follow:

> The continuous bad press has made community members uneasy and created a lack of confidence in the platform.

> We have received two Cease and Desist letters, one from the Texas State Securities Board, and one from the North Carolina Secretary of State Securities Division. These actions have become a hindrance for the legal continuation of the platform.

> Outside forces have performed DDos attacks on platform several times and have made it clear that these will continue. These interruptions in service have made the platform unstable and have created more panic inside the community.

> Closing the lending and exchange platform doesn't mean that we will stop supporting BitConnect coin. Closing the lending platform will allow Bitconnect to be listed on outside exchanges giving more options for trading.

> We will keep working to make BitConnect coin available to merchant websites providing them API access to accept BitConnect Coins on their platforms.

> BitConnect X ICO is still functional and we are building an exchange platform on the BitConnect X website. With BitConnect X operating as an exchange platform, BitConnect Coin (BCC) will be listed there.

> This is not the end of this community, but we are closing some of the services on the website platform and we will continue offering other cyptocurrency services in the future.

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.; BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST ENRICHMENT

91.     Evidently, the lending program was shut down entirely; and BitConnect no longer honored its promise to pay interest thereon nor return the principal investments made into the lending program.  Moreover, BitConnect determined to move forward with the BitConnectx ICO—which is still ongoing as of February 21, 2018.

92.     Within moments of BitConnect shutting down its trading and lending platforms, the price of BCC plummeted nearly ninety percent (90%) in value; and the token is believed to be effectively useless now.

93.     As a result of Defendants' fraudulent and misleading activities—as well as their violation of the federal securities laws—Plaintiff and the Class have suffered damages believed to be greater than $2 billion.

***Necessity for Judicial Intervention***

94.     In 2013, the SEC issued an investor alert on "Ponzi Schemes Using Virtual Currencies," warning investors to be wary of investment opportunities offering "high investment returns with little or no risk" and explaining that "Ponzi schemes typically involve investments that have not been registered with the SEC or with state securities regulators."  Here, Defendants have conducted and propagated precisely such schemes.

95.     On July 25, 2017, the SEC issued a report on "the DAO," which offered tokens for sale online, in which the SEC advised those using "distributed ledger or blockchain-enabled means for capital raising to take appropriate steps to ensure compliance" with the federal securities laws, and stated that "[a]ll securities offered and sold in the United States must be registered with the Commission . . ." or qualify for an exemption from registration.  On the same day, the SEC issued an investor bulletin urging caution when investing in ICOs and urging investors to be mindful that promoters and initial sellers that lead buyers of tokens to expect a return on their investment or participate in shared returns provided by the project may be offering a security for sale.

96.     Digital currencies are a relatively new phenomenon, and numerous individuals and entities—by engaging in unlawful conduct with near impunity—are taking advantage of the time it takes for regulatory agencies to address new investment developments, as Defendants have here by

raising hundreds of millions of dollars if not billions of dollars with promises of profits to be made from trading BCCs and/or the BitConnect Investment Programs.

97.    It is clear from recent events that the rampant disregard of state and federal securities laws and consequently, abuse of investors, taking place in connection with BitConnect's unlawful and fraudulent conduct has been noted by state regulatory agencies.

98.    While BCCs and the BitConnect Investment Programs plainly constitute investment contract securities, at no time was a registration statement ever filed or in effect with the SEC for the securities being offered.  As such, the unlawful, unregistered offering of securities by Defendants to Plaintiff and the Class violated Sections 5, 12(a)(1), and 15(a) of the Securities Act; and the private right of action provided by Section 12(a)(1) of the Securities Act, created for just this type of situation, provides strict liability for Defendants' sale of such unregistered securities.

99.    Additionally, due to the fraudulent and deceitful conduct involved and necessary to propagate the BitConnect Investment Programs—particularly as relates to the Referral/Affiliate Program—Defendants are liable for violating California's Unfair Competition law, breach of contract (with respect to Defendant BitConnect), actual fraud, constructive fraud, as well as for being unjustly enriched at the expense of unsuspecting public investors.

100.    Plaintiff has duly performed all of his duties and obligations, and any conditions precedent to Plaintiff bringing this action have occurred, have been performed, or else have been excused or waived.

## **CLAIMS FOR RELIEF**

### **COUNT I**

**Claim for Violation of Section 12(a)(1) of the Securities Act**
**Against All Defendants**

101.    Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

102.    Section 12(a)(1) grants Plaintiff a private right of action against any person who offers or sells a security in violation of Section 5 and states that such person,

Shall be liable . . . to the person purchasing such security from him, who may sue
either at law or in equity in any court of competent jurisdiction, to recover the

consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

103.    From January 2017 through January 2018, in connection with the BitConnect Investment Programs and offer and sale of BCCs, Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails for the purposes of offering, selling, or delivering unregistered securities in direct violation of the Securities Act.

104.    The offer and sale of BCCs and solicitation of investments in the BitConnect Investment Programs constituted the offer and sale of unregistered securities under controlling federal law.  BCCs and the BitConnect Investment Programs exhibit the following particular hallmarks of a security under the *Howey* test: (a) to receive any BCCs (and invest in the BitConnect Investment Programs), an investment of money, in the form of BTC and/or other currencies was required; (b) the investment of money was made into the common enterprise that is Defendant BitConnect and its ability to provide "guaranteed" returns using its trading algorithm or otherwise; and (c) the success of the investment opportunities and any potential returns thereon were entirely reliant on Defendants' ability to continuously provide such "guaranteed" returns to investors.

105.    Each of the Individual Defendants constitutes "seller[s]" under the Securities Act and is thus equally liable for selling unregistered securities in connection with BitConnect.  Moreover, the individual "affiliate"/recruiter Defendants personally profited by soliciting investors to use their "referral" links to participate in the BitConnect Investment Programs.

106.    As such, Defendants have participated in the offer and sale of unregistered securities in violation of the Securities Act, and are liable to Plaintiff and the Class for rescission and/or compensatory damages.

## COUNT II

### Claim for Violation of Section 15(a) of the Securities Act
### Against Defendant Arcaro

107.    Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

108.    Due to his ownership in and/or control over Defendant BitConnect International PLC, Defendant Arcaro acted as controlling person of BitConnect International PLC within the meaning of

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.; BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST ENRICHMENT

Section 15(a) of the Securities Act as alleged herein. By virtue of his position(s) as an affiliate manager and/or director and participation in and/or awareness of Defendant BitConnect International PLC's operations, Defendant Arcaro had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the BitConnect Investment Programs, including the decision to engage in the sale of unregistered securities in furtherance thereof.

109. By virtue of the foregoing, Defendant Arcaro is liable to Plaintiff and the Class as a control person of Defendant BitConnect International PLC under Section 15(a) of the Securities Act.

## COUNT III

### Claim for Violation of Section 15(a) of the Securities Act
### Against Defendant Jeppesen

110. Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

111. Defendant Jeppesen is subject to liability by virtue of his top-level executive position with BitConnect and his influence over the enterprise, which provided him the power to control or influence BitConnect's actions. For example, Defendant Jeppesen is reportedly a Director of BitConnect—serving as the Director of Development for BitConnect's operations in the United States and Europe—and is responsible for overseeing and contributing to development of the websites used by BitConnect to fraudulently offer and sell its BitConnect Investment Programs and BCCs to investors, including its operations vis-à-vis Plaintiffs and the Class.

112. As a top-level executive and controlling person of BitConnect, Defendant Jeppesen knew of, or recklessly disregarded, the fact that BitConnect was offering unlawful Ponzi/pyramid schemes on the BitConnect Websites in connection with the sale of the BitConnect Investment Programs and the BCCs.

113. Defendant Jeppesen had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the BitConnect Investment Programs, including the decision to engage in the sale of unregistered securities in furtherance thereof.

114. Defendant Jeppesen is a culpable participant in the fraudulent schemes described herein and caused BitConnect to engage in the acts and omissions described herein.

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.; BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST ENRICHMENT

115.     Accordingly, Defendant Jeppesen is liable to Plaintiff and the Class as a "controlling person" of BitConnect within the meaning of Section 15(a) of the Securities Act.

## COUNT IV

### Claim for Violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*
### Against All Defendants

116.     Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

117.     Defendants violated the Unfair Business Competition law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, both by offering and selling unregistered securities to Plaintiff and the Class in violation of the federal securities laws and by conducting and/or substantially assisting in the furtherance of a fraudulent, unlawful, and widespread Ponzi/pyramid schemes through direct and/or personal solicitations of investments in BCC and/or the BitConnect Investment Programs.

118.     Defendants engaged in immoral and unethical practices to the detriment of public investors, as well as law-abiding industry participants in related cryptocurrency markets.

119.     Plaintiff and the Class have suffered monetary injuries in fact due to Defendants' actions alleged herein and are entitled to the rescission of their investments in BCC and/or the BitConnect Investment Programs and injunctive relief.

## COUNT V

### Breach of Contract
### Against Defendant BitConnect

120.     Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

121.     Defendant BitConnect breached its contracts with Plaintiff and the Class by failing to provide the "guaranteed" returns, daily interest, bonus interests, and return the initial investments pursuant to the terms of the BitConnect Lending Program.  Rather than adhere to the express, unequivocal terms of the contracts, Defendant BitConnect converted Plaintiff's and the Class' investments into near worthless BCCs and shut down its operations.

122.     By virtue of the foregoing, Defendant BitConnect is liable to Plaintiff and the Class for damages resulting from Defendant BitConnect's breaches of contract.

123.    To the extent that Plaintiff has received from BitConnect any benefits through the contract—though none are known to him at this time—Plaintiff hereby offers to restore to BitConnect those benefits, once they are identified and can be quantified.

## COUNT VI

### Actual Fraud (Cal. Civ. Code § 1572)
### Against All Defendants

124.    Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

125.    Actual fraud consists of, *inter alia*, any of the following acts "committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract": (1) the "suggestion, as a fact, of that which is not true, by one who does not believe it to be true"; (2) the "positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true"; (3) the "suppression of that which is true, by one having knowledge or belief of the fact"; **or** (4) "[a]ny other act fitted to deceive."

126.    Due to Defendant BitConnect's actual knowledge that the BitConnect Investment Programs were fraudulent pyramid/Ponzi schemes, Defendant BitConnect is liable to Plaintiff and the Class for damages.  Similarly, due to the fact that the Individual Defendants knew or were grossly negligent in not knowing that the BitConnect Investment Programs for which they solicited investments—so as to receive significant personal monetary benefits as parties to the contracts involving investors using their "referral" links—the Individual Defendants are likewise liable for committing actual fraud as defined by Cal. Civ. Code § 1572 and thus, are liable to Plaintiff and the Class for damages.

## COUNT VII

### Constructive Fraud (Cal. Civ. Code § 1573)
### Against the Individual Defendants

127.    Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

Case No. 3:18-cv-01165

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE
SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.;
BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST
ENRICHMENT

128.    Constructive fraud includes: "any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or anyone claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him" or "any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud."

129.    The Individual Defendants each undertook substantial efforts to promote the BitConnect Ponzi/Pyramid schemes, which by definition are fraudulent in nature.  In the event the Individual Defendants are not found liable for "actual fraud," at minimum, each Individual Defendant gained substantial personal benefits as a result of their significant and persistent efforts to induce the unwitting public to invest in the unlawful and fraudulent BitConnect Investment Programs, constituting constructive fraud under Cal. Civ. Code § 1573 and thus, are liable to Plaintiff and the Class for damages.

## COUNT VIII

### Unjust Enrichment
### Against the All Defendants

130.    Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

131.    Defendants have reaped the benefits of operating and/or personally benefiting from inducing Plaintiff and the Class to invest in fraudulent Ponzi/pyramid schemes (BCC and/or the BitConnect Investment Programs), thereby causing actual harm to thousands of investors.

132.    It would be unconscionable and against the fundamental principles of justice, equity, and good conscience for Defendants to retain the substantial monetary benefits they have received as a result of their misconduct.

133.    To remedy Defendants' unjust enrichment, the Court should order Defendants to immediately return Plaintiff's and the Class' investments and disgorge any amounts received by Defendants as a result of their misconduct alleged herein.

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.; BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST ENRICHMENT

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

B.     Declaring that Defendants offered and sold unregistered securities in violation of the federal securities laws;

C.     Declaring Defendants are liable to Plaintiff and the Class under Sections 12(a)(1) and/or 15(a) of the Securities Act;

D.     Declaring Defendants violated California's Unfair Business Competition law and are therefore required to provide rescissory and/or other equitable relief to Plaintiff and the Class;

E.     Declaring Defendants are liable to Plaintiff and the Class due to their breach of contract, actual fraud, constructive fraud, and/or unjust enrichment;

F.     Preliminarily enjoining Defendants from making further transfers or dissipations of the investments raised from the offer and sale of BCCs and in connection with the BitConnect Investment Programs, or using such funds in any further purchases or transactions;

G.     Requiring an accounting of the remaining funds and assets raised from Plaintiff and the Class in connection with the offer and sale of BCCs and the BitConnect Investment Programs;

H.     Imposing a constructive trust over the funds and assets rightfully belonging to Plaintiff and the Class;

I.     Ordering rescission of the investments made by Plaintiff and the Class relating to the offer and sale of BCCs and the BitConnect Investment Programs and/or compensatory damages;

J.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

K.     Granting such other and further relief as this Court may deem just and proper.

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.; BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST ENRICHMENT

**JURY DEMAND**

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: February 22, 2018

**LEVI & KORSINSKY, LLP**

By: /s/ *Rosemary M. Rivas*
Rosemary M. Rivas
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

Eduard Korsinsky (to be admitted *pro hac vice*)
**LEVI & KORSINSKY, LLP**
30 Broad Street, 24th Floor
New York, New York 10004
Telephone: (212) 363-7500
Facsimile: (212) 636-7171

Donald J. Enright (to be admitted *pro hac vice*)
Email: denright@zlk.com
John A. Carriel (to be admitted *pro hac vice*)
Email: jcarriel@zlk.com
**LEVI & KORSINSKY, LLP**
1101 30th St., NW, Ste. 115
Washington, DC 20007
Telephone: (202) 524-4292
Facsimile: (202) 333-2121

*Attorneys for Baltazar Avalos*

Case No. 3:18-cv-01165

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTION 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933; VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.; BREACH OF CONTRACT; ACTUAL FRAUD; CONSTRUCTIVE FRAUD; AND UNJUST ENRICHMENT