# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

| | |
|---|---|
| IN RE BITCONNECT SECURITIES LITIGATION | Lead Case No.: 9:18-cv-80086-DMM |

### CLASS ACTION

### JURY TRIAL DEMANDED

### THIRD AMENDED CLASS ACTION COMPLAINT

Respectfully submitted,

**SILVER MILLER**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone:     (954) 516-6000
DAVID C. SILVER
Florida Bar No. 572764
E-mail: DSilver@SilverMillerLaw.com
JASON S. MILLER
Florida Bar No. 072206
E-mail: JMiller@SilverMillerLaw.com

**LEVI & KORSINSKY, LLP**
EDUARD KORSINSKY
E-mail: ek@zlk.com
30 Broad Street, 24th Floor
New York, New York 10004
Telephone:     (212) 363-7500
Facsimile:     (212) 636-7171

DONALD J. ENRIGHT
E-mail: denright@zlk.com
ELIZABETH K. TRIPODI
E-mail: etripodi@zlk.com
JOHN A. CARRIEL
E-mail: jcarriel@zlk.com
**LEVI & KORSINSKY, LLP**
1101 30th Street, N.W., Suite 115
Washington, DC 20007
Telephone:     (202) 524-4290
Facsimile:     (202) 333-2121

*Co-Lead Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................................................1

JURISDICTION AND VENUE .........................................................................................8

PARTIES AND RELEVANT NON-PARTIES ................................................................8

    I.      PLAINTIFFS .....................................................................................................8

    II.     DEFENDANTS .................................................................................................9

          A.      THE BITCONNECT CORPORATE DEFENDANTS .............................9

          B.      THE DIRECTOR AND AFFILIATE PROMOTER DEFENDANTS ......10

          C.      YOUTUBE ..................................................................................12

          D.      OTHER LIABLE PERSONS/ENTITIES ................................................12

PLAINTIFFS' CLASS ACTION ALLEGATIONS................................................................12

SUBSTANTIVE ALLEGATIONS ....................................................................................14

    I.      BACKGROUND ON BLOCKCHAIN TECHNOLOGY AND INITIAL COIN OFFERINGS..........................................................................................14

          A.      BLOCKCHAINS .......................................................................14

          B.      INITIAL COIN OFFERINGS ....................................................15

    II.     BACKGROUND ON BITCONNECT ........................................................15

          A.      BITCONNECT'S FORMATION AND ORGANIZATIONAL STRUCTURE .............................................................................15

          B.      THE BITCONNECT WEBSITES ............................................17

    III.    BCC AND THE BITCONNECT INVESTMENT PROGRAMS ........................18

          A.      TRADING BCC..........................................................................18

          B.      THE BITCONNECT LENDING PROGRAM ........................18

          C.      THE BITCONNECT STAKING PROGRAM ........................20

          D.      THE BITCONNECT REFERRAL PROGRAM ....................22

IV.     THE BITCONNECT INVESTMENTS WERE PONZI SCHEMES AND
        SECURITIES ...........................................................................................25

        A.    THE BITCONNECT DEFENDANTS OPERATED A PONZI SCHEME .25

        B.    BCCS AND THE BITCONNECT INVESTMENT PROGRAMS WERE
              INVESTMENT CONTRACT SECURITIES ............................................26

        C.    THE BITCONNECT DEFENDANTS WERE "SELLERS" UNDER THE
              FEDERAL SECURITIES LAWS...............................................................29

        D.    BITCONNECT LED CLASS MEMBERS TO INCUR SUBSTANTIAL
              LOSSES .....................................................................................................30

V.      YOUTUBE'S NEGLIGENT FAILURE TO WARN PROXIMATELY CAUSED
        CLASS MEMBERS SUBSTANTIAL LOSSES.....................................................32

VI.     NECESSITY FOR JUDICIAL INTERVENTION.................................................38

COUNT I - VIOLATION OF SECTION 12(a) OF THE SECURITIES ACT ...........................40

COUNT II - VIOLATION OF SECTION 15(A) OF THE SECURITIES ACT..........................42

COUNT III - VIOLATION OF SECTION 15(A) OF THE SECURITIES ACT ........................42

COUNT IV - BREACH OF CONTRACT ....................................................................................43

COUNT V - UNJUST ENRICHMENT ........................................................................................45

COUNT VI - VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE
        PRACTICES ACT ("FDUTPA") .......................................................................45

COUNT VII - FRAUDULENT INDUCEMENT...........................................................................48

COUNT VIII - FRAUDULENT MISREPRESENTATION .........................................................49

COUNT IX - NEGLIGENT MISREPRESENTATION ...............................................................51

COUNT X - CONVERSION.........................................................................................................52

COUNT XI - CIVIL CONSPIRACY ...........................................................................................53

COUNT XII - NEGLIGENCE - FAILURE TO WARN................................................................56

PRAYER FOR RELIEF ...............................................................................................................57

DEMAND FOR TRIAL BY JURY ..............................................................................................58

Co-Lead Plaintiffs ALBERT PARKS, an individual ("PARKS"); and FARAMARZ SHEMIRANI, an individual ("SHEMIRANI") ("Plaintiffs"), individually and on behalf of all other persons similarly situated as defined herein, by and through undersigned counsel, allege in this Third Amended Class Action Complaint for violations of the of Sections 12 and 15 of the Securities Act of 1933 (the "Securities Act") and Fla. Stat. §§ 501.211, *et seq.* (the "Florida Deceptive and Unfair Trade Practices Act" [FDUTPA]), breach/rescission of contract, unjust enrichment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, conversion, and civil conspiracy the following, based upon personal knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (a) documents and solicitation materials released by Defendants (defined below), in connection with the BitConnect Investment Programs (defined below); (b) public statements made by Defendants concerning BITCONNECT (defined below) and the BitConnect Investment Programs; and (c) media publications concerning the BitConnect Investment Programs.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## <u>NATURE OF THE ACTION</u>

1.     This is a class action on behalf of a class of investors consisting of all individuals and entities who transferred to BITCONNECT any fiat currency or cryptocurrency to invest in BCC and/or the BitConnect Investment Programs (Defined Below) and who suffered financial injury as a result thereof.

2.       This action alleges violation of Sections 12(a)(1) and 15(a), 15 U.S.C. §§ 77l(a)(1), 77o(a), of the Securities Act, Fla. Stat. §§ 501.211, *et seq*., breach/rescission of contract,[1] unjust enrichment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, conversion, and civil conspiracy against BitConnect International PLC, a foreign corporation; BitConnect Ltd., a foreign corporation; BitConnect Trading Ltd., a foreign corporation (the business entities collectively referred to herein as "BITCONNECT"); Joshua Jeppesen, an individual ("JEPPENSEN"); Glenn Arcaro, an individual ("ARCARO"); Trevon Brown a/k/a Trevon James, an individual ("JAMES"); Ryan Hildreth, an individual ("HILDRETH"); Craig Grant, an individual ("GRANT"); John Doe No. 1 a/k/a Nicholas Trovato a/k/a Cryptonick, an individual ("CRYPTONICK"); Ryan Maasen, an individual ("MAASEN"); John Doe Nos. 2–10, individuals ("DOES 2–10" and together with ARCARO, JAMES, HILDRETH, GRANT, CRYPTONICK, and MAASEN, the "Affiliate Promoter Defendants," and collectively with BITCONNECT and JEPPESEN, the "BITCONNECT Defendants"); and negligent failure to warn against YouTube, LLC, a Delaware limited liability company ("YOUTUBE").

3.       Specifically, Defendant BITCONNECT created and operated fraudulent Ponzi/pyramid schemes in the form of the BitConnect Lending Program and the BitConnect Staking Program (the "BitConnect Investment Programs").  To participate in the BitConnect Investment Programs, investors were required to purchase BITCONNECT-created cryptocurrency called BitConnect Coins ("BCC") on the BITCONNECT BCC Exchange with bitcoin ("BTC")[2] or fiat currency.

---

[1] Plaintiffs' breach/rescission of contract claim is only alleged against Defendant BITCONNECT.

[2] Bitcoin is a type of "virtual currency" – also commonly referred to as "digital currency" or "cryptocurrency."  The Financial Action Task Force, an inter-governmental agency that promotes laws combating anti-money laundering, and in which the United States is a member, describes

4.      The BitConnect Lending Program was marketed and sold on the Internet as an opportunity for investors to "lend" their BCCs back to BITCONNECT, which BITCONNECT would then purportedly use to generate profits by purchasing BTC when its price was low and selling BTC when its price was high — a "buy low, sell high" strategy that was purportedly effectuated by a BITCONNECT-designed "trading bot" implementing a proprietary trading algorithm: the "Volatility Software."   In exchange for "lending" BCCs to BITCONNECT, investors were "guaranteed" lucrative returns on their investments.

5.      The BitConnect Staking Program was marketed and sold on the Internet as an opportunity for investors to "stake" their BCCs by holding their BCCs in the BITCONNECT-QT wallet (a software and/or online wallet created by BITCONNECT).   In exchange for "staking" BCCs in the BITCONNECT-QT Wallet, investors were "guaranteed" lucrative returns on their investments.

6.      As part of their solicitation efforts, BITCONNECT enlisted multi-level affiliate marketers (the "Referral Program" or the "Affiliate Program") to further propagate the reach of the BitConnect Investment Programs.   Under the Referral Program, BITCONNECT paid commissions to affiliates who successfully solicited additional investments in the BitConnect Investment Programs.   Additionally, affiliate promoters would receive a percentage of any investments made by the investors they referred as well as a portion of investments made by subsequent investors recruited by their referrals, and so forth—a standard multi-level-marketing

---

"virtual currency" as a "digital representation of value that can be digitally traded and functions as (1) a medium of exchange; and/or (2) a unit of account; and/or (3) a store of value, but does not have legal tender status . . . in any jurisdiction."   Importantly, virtual currencies do not have legal tender status like fiat currencies (*e.g.*, U.S. dollar and the Euro).   The most widely used virtual currencies are BTC and Ether ("ETH").

scheme.  The individual BITCONNECT Defendants were highly influential affiliate marketers and/or directors of BITCONNECT.

7.      Several of the Affiliate Promoter Defendants had partnerships with YOUTUBE pursuant to which the BITCONNECT Defendants disseminated fraudulent and harmful content to unsuspecting victims across the globe.  YOUTUBE was negligent in failing to warn those victims of the harmful content for which YOUTUBE compensated their creators and publishers.

8.      Despite being cloaked in technological sophistication and jargon, the BITCONNECT Defendants operated a century-old fraud that was simple at its core — victims would invest in the BitConnect Investment Programs after they were driven to BITCONNECT as a result of profitable partnerships the Affiliate Promoter Defendants had with YOUTUBE; and BITCONNECT would then pay existing investors with new money from new investors, who were in turn expected and incentivized to get more new investors to produce more new money for BITCONNECT.

9.      As noted above, to participate in the BitConnect Investment Programs, investors were required to purchase BCCs.  BCCs constitute "investment contract" securities as defined under the Securities Act.  As discussed herein, BCCs are investment contracts because, *inter alia*, the BITCONNECT Defendants explicitly referred to BCCs as an "investment option" under which investors could "buy BitConnect Coin at a lower price and sell[] them at [a] higher price," and Plaintiffs and other BITCONNECT investors were led to believe, and expected, that the BCCs they purchased would be worth more than the BTC or fiat currency they invested with BITCONNECT.

10.     Similarly, the BitConnect Investment Programs constitute "investment contract" securities as defined under the Securities Act.  As discussed herein, the BitConnect Investment

Programs qualify as investment contracts because, *inter alia*, the BITCONNECT Defendants have explicitly referred to the programs as lucrative investment opportunities that would lead to "financial freedom" and repeatedly stressed the profit potential from merely holding and "staking" BCCs. The BitConnect Investment Programs were the clear offer and sale of investment contract securities because, *inter alia*, the BITCONNECT Defendants touted, and Plaintiffs and other BitConnect Investment Program participants reasonably expected, that investors would receive substantial returns and a steady stream of income on their investments.

11.     With respect to the BitConnect Lending Program, a stream of income would purportedly come in the form of a daily interest rate and a bonus interest percentage, each of which were tied to BITCONNECT's creation and implementation of the Volatility Software, which BITCONNECT claimed would produce returns sufficient to cover these payments. In addition to the fixed returns that were promised, BITCONNECT also guaranteed that the principal investment amount would be paid in full on a specified date.

12.     Similarly, with respect to the BitConnect Staking Program, BITCONNECT "guaranteed" it would provide returns of "up to 10% per month" which would result from merely holding BCCs in the BitConnect-QT Wallet.

13.     In reality, BitConnect Investment Programs were nothing more than pyramid/Ponzi schemes. After operating for less than a year, BITCONNECT abruptly shut down its platform and stripped the value from all of Plaintiffs' and the Class' (defined below) investments, leaving them with nearly worthless BCCs.[3]

---

[3] For example, the value of BCC has fallen from over $430.00 in early-January 2018 to $0.40 as of July 3, 2018.

14.     In short, aided by YOUTUBE's negligent failure to warn, the BITCONNECT Defendants defrauded tens of thousands of investors by capitalizing on the general public's excitement for virtual currencies and by luring unsuspecting investors into purchasing unregistered securities and participating in pyramid/Ponzi schemes.

15.     The registration requirements contained within the Securities Act are designed to protect investors by ensuring they are provided adequate information upon which to base their investment decisions.   The two basic objectives of registration are: (i) to require that investors receive necessary financial and other significant information concerning securities being offered for public sale; and (ii) to prohibit deceit, misrepresentations, and other fraud in the sale of securities.   Absent registration and the protections of the federal securities laws, issuers of securities could seek to market their investment opportunities without disclosing information that might make a potential investor think twice before investing (*e.g.*, conflicts of interest or major setbacks to core product lines) or peddle their securities using unbounded exaggerations regarding the progress of their products, business plan, business strategies, or even fabricate the existence of relationships with vendors or other business partners.

16.     Accordingly, Plaintiffs bring this action for violations of Sections 12 and 15 of the Securities Act, Florida's Deceptive and Unfair Trade Practices Act, breach/rescission of contract, unjust enrichment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, conversion, and civil conspiracy against the BITCONNECT Defendants for their offer and sale of investment contract securities in violation of the federal securities laws' registration requirements and participation in effectuating the fraudulent Ponzi/pyramid schemes; and negligence against YOUTUBE for failing to warn the Class (defined below) that their partners (the Affiliate Promoter Defendants) were soliciting investments in the fraudulent Ponzi/pyramid schemes.

17.     The BITCONNECT Defendants' promotional materials appeared in press releases, BITCONNECT's website, online chat rooms or forums located on websites such as Reddit.com ("Reddit"), white papers, postings on social media websites such as Twitter and Facebook, promotional videos posted on YOUTUBE, and/or other materials relating to BITCONNECT and the BitConnect Investment Programs, which were disseminated widely to the investing public.

18.     Due to the varied and innumerable ways in which investors can be, and are likely to be, manipulated and harmed absent any of the protections under the federal securities laws, Sections 5 and 12(a)(1) of the Securities Act provide for strict liability against any person who offers or sells an unregistered security.  As detailed herein, the BitConnect Investment Programs have at all times constituted an offer and sale of unregistered securities; and thus, the BITCONNECT Defendants are strictly liable under Section 12(a)(1) of the Securities Act. Similarly, the BITCONNECT Defendants' unlawful, immoral, and fraudulent conduct has caused, and is continuing to cause, significant financial harm to Plaintiffs and the Class (defined below). Absent judicial intervention, Plaintiffs and the Class are unlikely to ever recover their investments. Accordingly, judicial intervention is required and requested to rectify the existing and future harm facing Plaintiffs and the Class — harm that is likely to be irreparable.

19.     Investors in the BitConnect Investment Programs have little to show for their investments other than broken promises and mounting financial burdens.

20.     For these reasons, Plaintiffs on behalf of themselves, and all similarly situated individuals and entities that invested in BCC and/or the BitConnect Investment Programs, seeks compensatory, exemplary, punitive, injunctive, and rescissory relief, providing rescission and repayment of all investments into BCCs and/or the BitConnect Investment Programs, and securing and conserving such funds until repayment

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and Section 22 of the Securities Act [15 U.S.C. § 77v] because Plaintiffs allege violations of Sections 12(a)(1) and 15(a) of the Securities Act [15 U.S.C. §§ 77l(a)(1) and 77o(a)].

22.     The Court has personal jurisdiction over each of the Defendants because each either conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, as well as under 28 U.S.C. § 1391, because: (a) the conduct at issue took place and had an effect in this District; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District.

## PARTIES AND RELEVANT NON-PARTIES

### I.     Plaintiffs

24.     On June 20, 2018, this Court appointed PARKS and SHEMIRANI to serve as Co-Lead Plaintiffs for the class in this class action pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").

25.     Plaintiffs each actively researched BITCONNECT and the BitConnect Investment Programs prior to making their purchases of BCCs and throughout the periods in which they invested in BITCONNECT.  Accordingly, each of the Plaintiffs were personally, and successfully,

solicited by the BITCONNECT Defendants in connection with their public representations and active solicitations to purchase BCCs or participate in the BitConnect Investment Programs.

26. Plaintiff PARKS is an individual domiciled in Washington, Louisiana and is *sui juris*. Beginning on or about August 24, 2017, Plaintiff PARKS funded his BITCONNECT account, through BITCONNECT's website, by investing 2.39521532 bitcoin, which were valued at the time at approximately $10,359.79. From August 24, 2017 through November 10, 2017, Plaintiff PARKS invested a sum total of 109.029 BTC in the BitConnect Investment Programs. On January 17, 2018, when BITCONNECT closed its lending and trading platforms, Plaintiff PARKS' out-of-pocket investment loss at BITCONNECT totaled 49.03845866 bitcoin, which were believed to be valued at the time at approximately $544,032.66.

27. Plaintiff SHEMIRANI is an individual domiciled in Dubai, United Arab Emirates and is *sui juris*. Beginning on or about March 12, 2017, Plaintiff SHEMIRANI funded his BITCONNECT account, through BITCONNECT's website, by investing 0.249 bitcoin, which were valued at the time at approximately $305.07. From March 12, 2017 through December 8, 2017, Plaintiff SHEMIRANI invested a sum total of 192.7116 BTC in the BitConnect Investment Programs. On January 17, 2018, when BITCONNECT closed its lending and trading platforms, Plaintiff SHEMIRANI's out-of-pocket investment loss at BITCONNECT totaled 150.28 bitcoin, which were believed to be valued at the time at approximately $1,667,206.32.

## II.   Defendants

### A.   The BitConnect Corporate Defendants

28. Defendant BITCONNECT INTERNATIONAL PLC, is a foreign for-profit company organized in England and Wales and incorporated under the Companies Act 2006 as a private company limited by shares. BITCONNECT INTERNATIONAL PLC's corporate record

lists its principal place of business at Grant Thornton House, 22 Melton Street, Kings Cross, London, United Kingdom NW 1 2EP.

29.     Defendant BITCONNECT LTD. is a foreign for-profit company organized in England and Wales and incorporated under the Companies Act 2006 as a private company limited by shares.  BITCONNECT LTD.'s corporate record lists its principal place of business at The Panorama, Park Street, Ashford, United Kingdom TN24 8EZ.

30.     Defendant BITCONNECT TRADING LTD., is a foreign for-profit company organized in England and Wales and incorporated under the Companies Act 2006 as a private company limited by shares.  BITCONNECT TRADING LTD.'s corporate record lists its principal place of business at 23 St. Elizabeth Avenue, Bootle, United Kingdom L20 6FA.

31.     Upon information and belief, the BITCONNECT entities are wholly interrelated and are used interchangeably as instrumentalities for the fraud and unlawful schemes described herein.

**B.     The Director and Affiliate Promoter Defendants**

32.     Defendant JEPPESEN is an individual believed to be domiciled in the United States and is *sui juris*.  According to published information, JOSHUA JEPPESEN held the title of a Director at BITCONNECT, serving as the Development Director for BITCONNECT's operations in the United States and Europe.

33.     Defendant ARCARO is an individual domiciled in Moorpark, California and is *sui juris*.  According to paperwork filed with the corporate registry office in the United Kingdom, ARCARO is an active Director of BITCONNECT INTERNATIONAL PLC.  ARCARO not only served BITCONNECT by managing a team of U.S.-based affiliates/recruiters; he also served as one of the most successful affiliate/recruiters for BITCONNECT himself, soliciting hundreds if

not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YOUTUBE and Facebook.

34.     Defendant JAMES is an individual believed to be domiciled in Myrtle Beach, South Carolina and is *sui juris*.  JAMES served as an affiliate/recruiter for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YOUTUBE and Facebook.

35.     Defendant HILDRETH is an individual domiciled in Laguna Nigel, California and is *sui juris*.  HILDRETH served as an affiliate/recruiter for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YOUTUBE and Facebook.

36.     Defendant GRANT is an individual believed to be domiciled in Miami, Florida and is *sui juris*.  GRANT served as an affiliate/recruiter for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YOUTUBE and Facebook.

37.     Defendant CRYPTONICK is an individual believed to be domiciled in the United States and is *sui juris*.  His true name is Nicholas Trovato, though the state of his domicile is unknown at this time.   CRYPTONICK served as an affiliate/recruiter for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YOUTUBE and Facebook.

38.     Defendant MAASEN is an individual domiciled in Tulsa, Oklahoma and is *sui juris*.  MAASEN served as an affiliate/recruiter for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YOUTUBE and Facebook.

39.     Defendant DOE NOS. 2–10 are individuals located in the United States and abroad who served as affiliates/recruiters for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YOUTUBE and Facebook.

**C.      YouTube**

40.     Defendant YOUTUBE was purchased by Google, LLC in 2006, when the company was then known as YouTube, Inc.  YOUTUBE is a Delaware limited liability company with its principal place of business in Mountain View, California.

**D.      Other Liable Persons/Entities**

41.     In addition to those persons and entities set forth as Defendants herein, there are likely other parties who may well be liable to Plaintiffs and the Class (defined below), but respecting whom Plaintiffs currently lack specific facts to permit them to name such person or persons as a party defendant.  By not naming such persons or entities at this time, Plaintiffs are not waiving their right to amend this pleading to add such parties, should the facts warrant adding such parties

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

42.     Plaintiffs bring this action individually and as a class action on behalf of all individuals and entities who transferred to BITCONNECT any fiat currency or cryptocurrency to invest in BCC and/or the BitConnect Investment Programs and who suffered financial injury as a result thereof (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the individual Defendants.

43.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

44.    While the exact number of Class members is presently unknown to Plaintiffs and can only be ascertained through discovery, Plaintiffs believe that there are thousands of members in this Class.  All members of the Class may be identified by records maintained by Defendants and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

45.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following: (i) whether the BITCONNECT Defendants offered and sold unregistered securities in violation of the federal securities laws; (ii) whether the BITCONNECT Defendants engaged in unlawful business practices in violation of Florida's Deceptive and Unfair Trade Practices Act; (iii) whether Defendant BITCONNECT breached its contracts with Plaintiffs and the Class; (iv) whether the BITCONNECT Defendants fraudulently solicited investments from Plaintiffs and the Class; (v) whether Defendants have been unjustly enriched by the unlawful conduct alleged herein; (vi) whether Plaintiffs and the Class will suffer irreparable harm if such unlawful activities are not remedied; (vii) whether Defendant YOUTUBE negligently failed to warn Plaintiffs and the Class; and (viii) whether Plaintiffs and the Class are entitled to compensatory, exemplary, punitive, injunctive, or rescissory relief as a result of Defendants' wrongful conduct alleged herein, and the measure of such damages.

46.    Plaintiffs' claims are typical of the claims of the other members of the Class, and Plaintiffs do not have any interests adverse to the Class.  Additionally, Plaintiffs and the other members of the Class have all sustained harm in a substantially identical manner as a result of Defendants' wrongful conduct as alleged herein.

47.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained competent counsel experienced in litigation of this nature.

48.     Separate actions prosecuted by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

49.     Plaintiffs anticipate that there will be no difficulty in managing this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

50.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

51.     Accordingly, Plaintiffs seek compensatory, exemplary, punitive, rescissory, injunctive and other equitable relief on behalf of themselves and the Class to prevent the irreparable injury they will continue to suffer absent judicial intervention.

## SUBSTANTIVE ALLEGATIONS

## I.     Background on Blockchain Technology and Initial Coin Offerings

### A.     Blockchains

52.     A "blockchain" is essentially a digitized, decentralized, public ledger that cryptographically records, preserves, and presents information.  The general idea is that each "block" contains information, such as details on transactions that are made.  After a "block" is created (with cryptography to verify its contents), the information inside of it cannot be changed. The "block" then becomes part of the "blockchain," and an encrypted version of the information contained therein becomes publicly available along with all the previous "blocks" in the chain. After this process is complete, another block is created with additional information, and so on.

53.     To date, most "blockchains" are used to record transactions involving virtual currencies, *e.g.*, BTC and ETH.  However, a "blockchain" could be used to record all types of information.  For example, a blockchain could be used for deed recordation/transfers or even transfers of stock certificates.

### B.      Initial Coin Offerings

54.     An initial coin offering ("ICO") is a capital raising event in which an entity offers investors a unique "coin" or "token" in exchange for consideration—most commonly in the form of established virtual currencies (typically BTC and ETH) or fiat currency.  These tokens are issued on a blockchain and are oftentimes listed on online platforms, called virtual currency exchanges, where they are tradable for virtual or fiat currencies.

55.     To participate in an ICO, investors are typically required to transfer virtual currencies to the issuer's address, online wallet, or other account.  During an ICO, or after its completion, the issuer will typically distribute its unique "tokens" to the participants' unique address on the blockchain.  Similar to stockholders in an initial public offering ("IPO"), holders of these tokens are then entitled to certain rights related to a venture underlying the ICO, such as profits, shares of assets, use of certain services provided by the issuer, and/or voting rights.

## II.     Background on BitConnect

### A.      BitConnect's Formation and Organizational Structure

56.     BITCONNECT INTERNATIONAL PLC; BITCONNECT LTD.; and BITCONNECT TRADING LTD. (collectively "BITCONNECT") are all parts of the same foreign technology organization that conducted its business on the internet, principally by means of a website accessible at www.bitconnect.co.

57.     BITCONNECT describes itself as "an opensource all-in-one bitcoin and crypto community platform designed to provide multiple investment opportunities with cryptocurrency

education where it is entirely possible to find the independence we all desire, in a community of like-minded, freedom-loving individuals who, like you, are seeking the possibility of income stability in a very unstable world."

58.    BITCONNECT launched in late-2016 by conducting an ICO, which ran from November 15, 2016 through early-January 2017 (the "BITCONNECT ICO").

59.    The BITCONNECT ICO introduced BCC into the marketplace.  BITCONNECT describes BCC as "an open source, peer-to-peer, community driven decentralized cryptocurrency that allow [*sic*] people to store and invest their wealth in a non-government controlled currency, and even earn a substantial interest on investment [*sic*].  This means anyone holding BitConnect Coin in their wallet will receive interest on their balance in return for helping maintain security on the network."   Similarly, BCC was described as not just "an investment tool; [but as] the investment tool you need to jump start your financial security."

60.    Shortly following the BITCONNECT ICO, BITCONNECT launched the BitConnect Exchange – a cryptocurrency exchange where investors could use BTC or fiat currency to purchase BCC.

61.    Over the following year, BITCONNECT implemented various investment programs, including the BitConnect Lending Program, the BitConnect Staking Program, and the Referral/Affiliate Program.  BITCONNECT marketed various uses for BCC:



**B.** **The BitConnect Websites**

62.     BITCONNECT maintained a website accessible at http://bitconnect.co and a website accessible at http://bitconnectcoin.co (the "BitConnect Websites").  The BitConnect Websites were accessible worldwide to the general public, including residents of United States.

63.     The BitConnect Investment Programs were available for purchase by individuals in the United States and worldwide through the BitConnect Websites and affiliated websites rendered in foreign languages.  The investments were promoted on social media pages including, but not limited to, Facebook, YOUTUBE, Twitter, Reddit, Instagram, and Craigslist.

64.     BITCONNECT promoted its Investment Programs on the BitConnect Websites by making the following representations:

> (a) "There are multiple ways to invest in the BitConnect platform with different level of earning opportunity associated";
>
> (b) "You can invest BitConnect Coin in BitConnect lending platform exclusively from the BitConnect Dashboard.  This investment option involved profiting from BitConnect trading bot and volatility software.  You will receive daily profit based on your investment option.  Upon investment term completion, you will receive your capital back to take

out from the BitConnect lending platform or optionally reinvest back in lending platform to continue receiving daily profit"; and

(c) "Invest your wealth in community-driven decentralized cryptocurrency. Using BitConnect public exchanges, you can buy, sell and trade BitConnect Coin (BCC) directly to and from each other with no central organization involved."

65.    Upon information and belief, Defendant JEPPESEN played an integral role in developing and promoting the BitConnect Websites.  Without his vital contributions, the BitConnect Websites would not have functioned as well as they did and would not have ensnared as many victims who fell prey to Defendants' promotion of BCCs and the BitConnect Investment Programs.

## III.    BCC and the BitConnect Investment Programs

### A.    Trading BCC

66.    Trading BCC was marketed as an "investment option" that could be "used to profit on **price fluctuation**" in that investors could "buy BitConnect coin at a lower price and sell[ ] them at [a] higher price."  Additionally, investors could "profit[ ] from downward movements in [BCC] price by selling them at a higher price and buy[ing] them again at a lower price and pocketing the price difference."

67.    In addition to trading BCC, the two primary investment opportunities Defendants touted were the BitConnect Lending Program and the BitConnect Staking Program.  To participate in either investment opportunity, investors were required to expend BTC or fiat currency to purchase BCC on the BitConnect Exchange.

### B.    The BitConnect Lending Program

68.    The BitConnect Lending Program was described as an "investment option [that] involves profiting from [the] Bitconnect trading bot and volatility software" under which investors would "receive daily profit based on [their] investment option."  Following the "term completion,

[investors] [would] receive [their] **CAPITAL BACK** to take out from [the] Bitconnect lending

platform or optionally [*sic*] reinvest back in lending platform to **continue receiving daily profit**."

69.     The BitConnect Lending Program offered up to forty percent (40%) interest per

month as well as additional interest on a daily basis.  The general mechanics of the program are

demonstrated in the following graphic BITCONNECT published:



70.     In soliciting investors for the BitConnect Lending Program, BITCONNECT used

online banner ads such as the following:

 

71.     Under the BitConnect Lending Program investors would "lend" their BCCs to

BITCONNECT – "with no risk" – as part of an investment scheme whereby BITCONNECT

ostensibly used these BCC tokens to fund the trading activities using its Volatility Software.

72.     Once the funds were deposited into the BitConnect Lending Program, trading bots using the Volatility Software purportedly managed those funds, generating a guaranteed return using its volatility predictions for the price of BTC.  In exchange, investors receive income in the form of a daily fixed interest rate, and a bonus interest percentage, before eventually receiving the return of the principal amount invested.

73.     In short, investors were sold the promise of profit merely through "lending" BCCs and enjoying the guaranteed returns provided by trading bots and the Volatility Software.  These returns were allegedly backed by the earnings promised by BITCONNECT's development and implementation of the trading algorithms, which would purportedly produce returns sufficient to pay the following rates and bonuses:

**BitConnect Coin Lending Profits Interest**

| Lending Amount | Interest (Accrued Daily) | Capital Back |
|---|---|---|
| $100 - $1000 | Volatility Software Interest (up to 40 % Per Month) | After 299 Days |
| $1010 - $5000 | Volatility Software Interest + 0.10% Daily (up to 40 % Per Month) | After 239 Days |
| $5010 - $10000 | Volatility Software Interest + 0.20% Daily (up to 40 % Per Month) | After 179 Days |
| $10010 - $100000 | Volatility Software Interest + 0.25% Daily (up to 40 % Per Month) | After 120 Days |

**C.     The BitConnect Staking Program**

74.     The BitConnect Staking Program incentivized investors to purchase and hold BCCs by offering "guaranteed" interest paid in BCC.  The BitConnect Staking Program was sold to the public as an investment program that promised investors could earn interest of up to ten percent (10%) per month over a specified term through a process called "Proof of Stake Minting."   In essence, the BitConnect Staking Program and BCCs in general were sold as "interest bearing asset[s] with **120% return per year**.  It is that simple."

75.     The general mechanics of the BitConnect Staking Program are demonstrated in the following graphic BITCONNECT published:



76.     To participate in the BitConnect Staking Program, investors were required to download and install the BitConnect-QT wallet software to hold their BCCs; eventually BITCONNECT also released an online version of the BitConnect-QT Wallet.  After holding their BCCs in the BitConnect-QT Wallet for fifteen (15) days, an investor's BCCs would accrue interest.  The amount of interest paid to investors was purportedly contingent upon the dates of the investors' investments:

| Duration | Interest |
| --- | --- |
| 1st  6 months<br>Jan 2017 to June 2017 | 60%  (10%per month) |
| 2nd  6 months<br>July 2017 to Dec 2017 | 50%  (8%per month) |
| 3rd  6 months<br>Jan 2018 to June 2018 | 40%  (7%per month) |
| 4th  6 months<br>July 2018 to Dec 2018 | 30%  (5%per month) |
| 5th  6 months<br>Jan 2019 to June 2019 | 20%  (3%per month) |
| 6th  6 months<br>July 2019 to Dec 2019 | 10%  (1.4%per month) |

77.     BITCONNECT further represented that the BitConnect Staking Program was an opportunity for investors to: (i) "[s]ecure [their] future by gaining quick profit growth for tomorrow that is practical and attainable;" (ii) achieve "financial freedom;" (iii) "begin staking or holding BitConnect Coin and watch [their] interest grow;" and (iv) that "the more [ BCC investors] hold, the more [they] earn."

### D.     The BitConnect Referral Program

78.     In connection with the BitConnect Investment Programs, BITCONNECT operated the Referral Program, pursuant to which "affiliates" would earn additional income for referring additional investors to investing in BITCONNECT.  The Referral Program was a run-of-the-mill pyramid scheme.  Initially, the program extended "to Infinity" in that after the tenth (10) level was reached in the pyramid, 0.01% of all investments made by subsequent investors in the pyramid would siphon upwards to the top affiliate.  The concept is more plainly visible in the following graphic:



79.     Eventually, BITCONNECT modified the Referral Program to "7 levels of earning potential to" investors based on the number of referrals that signed up for BITCONNECT.

However, the core concept and fraudulent pyramid scheme remained in essence. Indeed, BITCONNECT encouraged investors to "[i]nvite [their] friends and family to join BitConnect via [their] unique **referral link** to start earning a serious income from [BITCONNECT's] affiliate program" and to "[s]pread the word on **social media** and other **online platforms** to help" make BITCONNECT a success.

80.     The Affiliate Promoter Defendants were some of BITCONNECT's most successful "affiliate" marketers.

81.     For example, upon information and belief, Defendant ARCARO was responsible for managing a large team of affiliate markets for BITCONNECT; and he personally assisted affiliates with preparing sales presentations and honing their sales pitches to potential investors in the BitConnect Investment Programs.

82.     Evidently, Defendant ARCARO was so successful as an affiliate marketer and organizer that he received a Porsche Carrera 911 S as a reward during a live broadcast of the BitConnect Conference in October 2017.

83.     Defendant ARCARO is also believed to have created and orchestrated the "BCC School" – an online training program to "teach" the unsuspecting public how to participate in cryptocurrency investment opportunities, including the BitConnect Investment Programs. For example, on Defendant ARCARO's website, Futuremoney.io, "lessons" eight, nine, and ten in the course named "Cryptocurrency 101" were entitled, respectively, "Buying Your First Bitcoin," "Creating Your Bitconnect Account," and "Bitcoin to Bitconnect: Transfer and Start Earning!" Unsurprisingly, the "graduates" of "BCC School" were directed to open BITCONNECT accounts using Defendant ARCARO's and his team's referral links.

84.     In essence, the BCC School was little more than a conduit to get BCC School "graduates" to open up accounts at BITCONNECT, for which GLENN ARCARO and his team of affiliates reaped from BITCONNECT the riches of each client referral.

85.     Among the Affiliate Promoter Defendants, Defendants JAMES and GRANT have been particularly active affiliate promoters, primarily by using videos they posted on YOUTUBE wherein they solicited investments for the BitConnect Investment Programs.

86.     Shockingly, after the State of Texas issued an Emergency Cease and Desist Order against BITCONNECT in early-January 2018, Defendant JAMES encouraged the public to use a Virtual Private Network ("VPN") to simulate an IP address outside of Texas and continue using BITCONNECT: "Load you [sic] a VPN, they all are good, and keep using BitConnect.  Don't let Texas, don't let them government shut you down . . . they haters [sic], they mad cus [sic] we making money."

87.     Rather than exhibit even a semblance of remorse for his involvement propagating the BITCONNECT pyramid scheme, Defendant JAMES has opted to deem investors who were cheated by Defendants' fraudulent schemes – some of whom lost their life savings – "crybabies."

88.     Similarly, upon information and belief, Defendant HILDRETH marketed the BitConnect Investment Programs through his website (ryanhildreth.com), which was touted as teaching "how to make an extra $1,000 - $5,000+ per month" and targeted "ENTREPRENEURS WHO WANT THE FREEDOM TO MAKE MONEY FROM ANYWHERE IN THE WORLD, TRAVEL, AND CHOOSE THE LIFESTYLE [THEY] WANT TO LIVE!" (emphasis in original).

89.     With respect to Defendant GRANT, upon information and belief, has been hailed as a "godfather" of BITCONNECT and has promoted the BitConnect Investment Programs since

April 2017.  Additionally, Defendant GRANT has been alleged to have been involved in numerous other financial scams.[4]

90.      Similarly, Defendant CRYPTONICK was an extremely influential affiliate marketer who claimed to have become a millionaire as a result of his cryptocurrency investments. Defendant CRYPTONICK's participation and culpability in furthering the BITCONNECT pyramid/Ponzi scheme is evidenced by the fact that almost immediately after BITCONNECT closed its lending and exchange platforms, he deleted all of his YOUTUBE videos promoting the BitConnect Investment Programs and shut down all of his popular social media channels.

91.      Defendant MAASEN also published dozens of YOUTUBE videos promoting the BitConnect Investment Programs.  Further, Defendant MAASEN appears to have primarily focused his efforts on raising investments from high school and college-age investors.

## IV.  The BitConnect Investments Were Ponzi Schemes and Securities

### A.      The BitConnect Defendants Operated a Ponzi Scheme

92.      Contrary to the allegations of fantastic investment returns through the power of BITCONNECT's proprietary, secret trading Volatility Software and the communal power of the BitConnect Staking Program, the BITCONNECT Defendants were actually operating a Ponzi scheme.

93.      Any investment returns provided to BITCONNECT investors were not legitimately generated; rather, BITCONNECT simply used new BITCONNECT investors' money to pay the promised returns on outstanding BITCONNECT investors' investments.

---

[4] *See, e.g.*, http://www.davinsden.com/avalos/ (research compiled by a podcast team on Defendant GRANT's various schemes).

94.     In addition, BITCONNECT used new BITCONNECT investors' funds to pay the BITCONNECT Directors and affiliates -- including, but not limited to, Defendants JEPPESEN, ARCARO, JAMES, HILDRETH, GRANT, CRYPTONICK, and MAASEN -- salary and commissions for their role in bringing additional victims into the scheme.

95.     The reality is, BITCONNECT was not offering a revolutionary technology, but was instead selling a new take on a century-old scam.   Specifically, BITCONNECT used cryptocurrency to coat its Ponzi/pyramid scheme with the thinnest veneer of legitimacy.  Despite such efforts, it is abundantly clear that the BITCONNECT Defendants were conducting and/or supporting a Ponzi/pyramid scheme.   Indeed, the BitConnect Investment Programs exhibit numerous characteristics of such schemes, including:

      (a) providing daily interest on an investment that had no income other than new investor money;

      (b) artificially increasing the value of its cryptocurrency by having new investors in the Ponzi scheme purchase BCC to invest;

      (c) obfuscating the identities of BitConnect's owners by using an offshore company created through a company called Companies Made Simple; and

      (d) expanding the amount of people in this Ponzi scheme by implementing a Pyramid scheme that paid a commission 7-levels deep for recruits.

**B.     BCCs and the BitConnect Investment Programs were Investment Contract Securities**

96.     This Action alleges claims under Sections 12(a)(1) and 15(a) of the Securities Act [15 U.S.C. §§ 77l(a)(1) and 77o(a)], and are based solely on allegations of strict liability.

97.     Neither the BCCs nor the BitConnect Investment Programs were registered with the Securities and Exchange Commission ("SEC"); and thus, the BitConnect Defendants engaged in the offer and sale of unregistered securities.

98.    Under the Securities Act, a "security" is defined as including any "note," "investment contract," or "instrument commonly known as a 'security.'" *See* 15 U.S.C. §§ 77b(a)(1). Here, the BCCs, the BitConnect Lending Program, and the BitConnect Staking Program each constitute an investment contract.   In *SEC v. W.J. Howey Co.*, the United States Supreme Court established a three-part test to determine whether an offering, contract, transaction, or scheme constitutes an investment contract.[5]   Under the test articulated in *Howey*, a contract, transaction, or scheme is an "investment contract" if it involves: (i) the investment of money; (ii) in a common enterprise; (iii) with the expectation of profits to come solely from the efforts of others.

99.    When determining whether a security has been offered and sold, the focus must be on the economic realities underlying the transaction.  Here, the economic realities are that Plaintiffs and the Class invested funds to trade BCCs, "lend" BCCs and/or "stake" BCCs -- each of which they expected would lead to "financial freedom" and "guaranteed" lucrative returns.  Investors in the BitConnect Investment Programs used BTC or fiat currency to purchase the BCC required to make their investments.  Accordingly, Plaintiffs' and the Class' investment of BTC or fiat currency constitutes an investment of money for the purposes of determining whether an investment involved a security.

100.    Plaintiffs and the Class were investing in a common enterprise with the BITCONNECT Defendants, as the BTC and fiat currency were pooled under the control of Defendant BITCONNECT, and the success of the BitConnect platform -- and thus potential profits stemming from the future valuation of the BCC -- was entirely reliant on the BITCONNECT

---

[5] *See SEC v. W.J. Howey, Co.*, 328 U.S. 293 (1946); *see also Intern. Bhd. of Teamsters v. Daniel*, 421 U.S. 837, 852 (1979) (noting that the *Howey* test is not the only test for determining a security, but has been held to embody "all the attributes that run through all of the Court's decisions defining a security").

Defendants' actions, primarily BITCONNECT's implementation of its proprietary, secret trading system, which BITCONNECT claimed would produce returns sufficient to cover interest payments to the BCC holders.  With respect to the Affiliate Promoter Defendants, their anticipated success at soliciting additional purchases of BCC or luring additional victims to participate in the BitConnect Investment Programs was vital to increasing the value of BCC.

101.    As relates to the BitConnect Lending Program, investors were promised substantial fixed returns and a complete return of principal at a fixed time in the future.[6]  BITCONNECT provided a Daily Interest Chart on its websites that showed the daily interest that it purported to have paid to its investors in the three months prior to that date.  Although the daily interest rate for BITCONNECT investments varied on a daily basis, on average BITCONNECT guaranteed a return of 1% per day.[7]



---

[6] As relates to the BitConnect Staking Program, BITCONNECT failed to ever explain where the funds would come from to provide up to "120%" returns per year; thus, it can only be presumed that such funds were meant to also result from the BITCONNECT Defendants' actions, through the trading bots, or otherwise.

[7] Theoretically, if investors chose to reinvest the interest earned, this daily interest would potentially add up to significant returns as a result of daily compounding. For example, a one-hundred-dollar investment compounded at 1% daily interest would be worth $134.77 after one month, $599.58 after six months, and $3,778.02 by the end of the year – representing an outlandish 3,678.02% net profit.

102.    In short, it is indisputable that the BITCONNECT Defendants were selling investment contracts and that any success from BITCONNECT's implementation of its Volatility Software – enabling payment of the interests and bonuses that were to be distributed – as well as any future potential increases to the value of the BCCs were entirely dependent on the BITCONNECT Defendants' actions.

### C.    The BitConnect Defendants Were "Sellers" Under the Federal Securities Laws

103.    Liability for selling unregistered securities extends to "the person who successfully solicits the purchase [of an unregistered security], motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 643 (1988).

104.    As noted above, Plaintiffs and the Class were actively involved in researching BITCONNECT and the BitConnect Investment Programs prior to purchasing their BCCs or investing with BITCONNECT. Such research included reviewing virtual currency online forums, reading BITCONNECT's publications and viewing its promotional videos. Accordingly, each of the solicitations outlined below were successful in soliciting Plaintiffs and the Class to invest with BITCONNECT.

105.    Each of the BITCONNECT Defendants are considered "sellers," as each successfully solicited investments in BCCs and/or the BitConnect Investment Programs for their own or BITCONNECT's financial benefit.

106.    It is indisputable that BITCONNECT participated in the offer and sale of BCCs and the BitConnect Investment Program's investment contracts. More specifically, BITCONNECT -- as the direct issuer of BCCs and the creator, and host, of the BitConnect Investment Programs -- directly offered and sold such investment contract securities. Similarly, Defendants JEPPESEN and ARCARO -- as directors of BITCONNECT -- controlled its actions and are thus equally deemed "sellers."

107.    With respect to the Affiliate Promoter Defendants, each actively solicited investments in BCCs and the BitConnect Investment Programs -- largely through YOUTUBE -- for the sole purpose of receiving compensation.  Such activity falls squarely under the definition of "seller."

108.    Based on the foregoing, each of the BITCONNECT Defendants were "sellers" of unregistered securities (in the form of BCCs and/or contracts resulting from participation in the BitConnect Investment Programs) under the federal securities laws.

### D.    BitConnect Led Class Members to Incur Substantial Losses

109.    While the SEC has yet to involve itself – at least publicly – in the present matter, state regulators have displayed no such hesitancy.  By late-2017, it was apparent to BITCONNECT that the Ponzi scheme it had constructed was on the verge of toppling.  Not content with riding off into the sunset with its ill-gotten gains, BITCONNECT decided to take another bite at the apple and orchestrated a second BITCONNECT ICO to take place in January 2018 (the "BitConnectx ICO").  The Bitconnectx.co domain was registered in late-December 2017, and a crowdsale commenced less than two weeks later.  The company was seeking to sell 11.76 million of a new virtual currency ("BCCX"), which would earn BITCONNECT $588 million.  Additionally, BITCONNECT planned to retain another $145 million in BCCXs for itself, bringing its total expected income from the BitConnectx ICO to $733 million.

110.    On January 4, 2018, the Texas State Securities Board issued an Emergency Cease And Desist Order against BITCONNECT in which the Securities Commissioner of the State of Texas presented his office's conclusion that, *inter alia*:

      (a) the BitConnect Investments are securities;

      (b) BITCONNECT had violated numerous securities regulations by offering the BitConnect Investments for sale in Texas;

(c) BITCONNECT had engaged in fraud and made materially misleading statements about the BitConnect Investments that were likely to deceive the public; and

(d) BITCONNECT's conduct, acts, and practices threaten an immediate and irreparable public harm.

111. Soon thereafter, on January 9, 2018, the Secretary of State of North Carolina - Securities Division issued Temporary Cease and Desist Order against BITCONNECT to prevent BITCONNECT from further violating state securities laws and restrain it from conducting the second ICO, because the State had concluded that the BITCONNECT's investment offerings were unregistered securities being offered to the residents of the State and that those investments posed an immediate and irreparable harm to the residents of North Carolina.

112. On January 13, 2018, BITCONNECT's website went down. Although the website was back up just a few days later, on January 16, 2018, BITCONNECT posted an anonymous announcement declaring that BITCONNECT had closed the trading platform:

This is to inform all community members that we are closing the BitConnect lending and exchange platform. We are closing the lending operation immediately with the release of all outstanding loans. With release of your entire active loan in the lending wallet we are transferring all your lending wallet balance to your BitConnect wallet balance at 363.62 USD. This rate has been calculated based on last 15 days averages of the closing price registered on coinmarketcap.com. You are free to withdraw your BitConnect coin currently in QT wallets that was used for staking as well. We are also closing BCC exchange platform in 5 days. In short, we are closing lending service and exchange service while BitConnect.co website will operate for wallet service, news and educational purposes.

The reason for halt of lending and exchange platform has many reasons as follow:

The continuous bad press has made community members uneasy and created a lack of confidence in the platform.

We have received two Cease and Desist letters, one from the Texas State Securities Board, and one from the North Carolina Secretary of State Securities Division. These actions have become a hindrance for the legal continuation of the platform.

Outside forces have performed DDoS attacks on platform several times and have made it clear that these will continue. These interruptions in service have made the platform unstable and have created more panic inside the community.

Closing the lending and exchange platform doesn't mean that we will stop supporting BitConnect coin. Closing the lending platform will allow Bitconnect to be listed on outside exchanges giving more options for trading.

We will keep working to make BitConnect coin available to merchant websites providing them API access to accept BitConnect Coins on their platforms.

BitConnect X ICO is still functional and we are building an exchange platform on the BitConnect X website. With BitConnect X operating as an exchange platform, BitConnect Coin (BCC) will be listed there.

This is not the end of this community, but we are closing some of the services on the website platform and we will continue offering other cryptocurrency services in the future.

113.    Evidently, the lending program was shut down entirely; and BITCONNECT no longer honored its promise to pay interest thereon nor return the principal investments made into the lending program.    Moreover, BITCONNECT determined to move forward with the BitConnectx ICO – which is still ongoing as of February 27, 2018.

114.    Within moments of BITCONNECT shutting down its trading and lending platforms, the price of BCC plummeted nearly ninety percent (90%) in value; and the token is believed to be effectively useless now.

115.    As a result of the BITCONNECT Defendants' fraudulent and misleading activities -- as well as their violation of multiple securities laws -- Plaintiffs and the Class have suffered damages believed to be greater than $2 billion.

**V.    YouTube's Negligent Failure to Warn Proximately Caused Class Members Substantial Losses**

116.    YOUTUBE fosters a close business relationship with its most popular content providers -- a relationship designed to inure to both YOUTUBE's and the content provider's great economic benefit -- through its "YouTube Partner Program."

117.     The closeness of the relationship YOUTUBE forges with these content providers, such as the Affiliate Promoter Defendants, is emboldened by the term YOUTUBE chose to describe these highly-viewed providers: "Partner."

118.     Under well-established partnership law, a partner typically bears the shared burdens of his/her/its partner's acts as if he/she/it had committed those acts himself/herself/itself.  That is one of many reasons why the law requires that people (and companies) carefully chose their partners.

119.     The YouTube Partner Program is designed to let content creators monetize their content on YOUTUBE while simultaneously monetizing YOUTUBE's business operation itself.

120.     Prior to January 16, 2018, all that was required for a content provider to be eligible to become a "partner" with YOUTUBE was for the candidate to have had a 10,000 views across all of the videos on its "channel."  After that threshold was met, YOUTUBE would then review the candidate's activity against the company's "policies."

121.     On January 16, 2018, YOUTUBE announced enhanced eligibility standards pursuant to which for a content provider to be eligible to "partner" with YOUTUBE under the YouTube Partner Program, the content provider's channel must have received 4,000 watch hours in the previous twelve months and have at least 1,000 subscribers.

122.     Several of the Affiliate Promoter Defendants had a viewership following that greatly exceeded the threshold numbers for even the "enhanced" eligibility standards.

123.     Upon information and belief, the top ten BITCONNECT affiliates on YOUTUBE published over 70,000 hours of unedited content, generating 58,000,000 views and luring thousands if not hundreds of thousands of victims into the BITCONNECT Defendants' fraudulent investment scheme.

124.    For example, Defendant GRANT is believed to have posted approximately 2,500 videos of varying length on YOUTUBE promoting the BitConnect Investment Programs and the BitConnect Investments.  His 100,000+ YOUTUBE subscribers and others members of the general public registered nearly 33,000,000 independent views of his videos.  Additionally, he is believed to have generated for himself approximately $5,000,000.00 of income as a direct result of sponsoring over 12,000 investors -- who provided $52,000,000.00 of investment capital to BITCONNECT -- the majority of whom were recruited for "sponsorship" through his videos on, and as a result of his partnership with, YOUTUBE.

125.    Defendant JAMES is believed to have had no fewer than 136,000 YOUTUBE subscribers registering 8,000,000 views of one or more of his 600+ BITCONNECT promotional videos on one of his many YOUTUBE channels, and he is believed to have earned for himself around $2,000,000.00 as a result of the approximately 3,000 investors (and nearly $12,000,000.00 of investment capital to BITCONNECT) he sponsored -- the majority of whom were recruited for "sponsorship" through his videos on, and as a result of his partnership with, YOUTUBE.

126.    Defendant CRYPTONICK is believed to have had nearly 200,000 YOUTUBE subscribers to his 400+ BITCONNECT promotional videos on YOUTUBE, generating over $10,000,000.00 of investment capital from nearly 3,000 investors for BITCONNECT -- the majority of whom were recruited for "sponsorship" through his videos on, and as a result of his partnership with, YOUTUBE.  Such recruitment activities are believed to have resulted in CRYPTONICK earning approximately $900,000.00.

127.    At the height of the BITCONNECT frenzy, Defendant HILDRETH is believed to have had at least 106,000 YOUTUBE subscribers and nearly 3,500,000 views in total across the

250+ BITCONNECT videos he posted on YOUTUBE -- efforts that produced over $20,000,000.00 of investment capital to BITCONNECT from over 5,000 investors.

128.    Defendant MAASEN is believed to have had 20,000+ YOUTUBE subscribers, and over 850,000 views, of the nearly 100 BITCONNECT videos he published as a "partner" on YOUTUBE.

129.    Even Defendant ARCARO posted more than 150 videos of varying length on YOUTUBE promoting the BitConnect Investment Programs and the BitConnect Investments.

130.    YOUTUBE acts as a unilateral gatekeeper in formulating policies and procedures that determine which videos get monetized and greatly influence which videos get ushered to the top of its search engine.

131.    By enacting policies designed to prevent bad actors (such as those soliciting investments in fraudulent Ponzi schemes) from disseminating harmful, offensive, or inappropriate content through its platform, YOUTUBE owed, by its own assumption, Plaintiffs and the Class a duty of reasonable care to prevent such content from harming its users.

132.    To effectuate its policy against bad actors publishing harmful material on its site, YOUTUBE created a program with proprietary algorithms that were supposed to demonetize -- thus decreasing, if not entirely eliminating, the opportunity to view -- any videos which failed to meet its content guidelines.

133.    The algorithms did not work, as they failed to capture and demonetize content such as the videos published on YOUTUBE by BITCONNECT and the Affiliate Promoter Defendants -- thus exposing countless YOUTUBE users (including Plaintiffs and the Class) to harmful videos and illegally-promoted investments in a fraudulent Ponzi scheme and unregistered securities.

134.   In fact, numerous videos posted on YOUTUBE and cataloged in YOUTUBE's databases clearly put YOUTUBE on notice of the fraudulent activity in which the BITCONNECT Defendants were engaging.  For example, videos with titles such as:

(a) "Craig Grant Explains the Bitconnect scam" (Published: July 29, 2017)[8]

(b) "How bitconnect scam works in great detail" (Published: August 26, 2017)[9]

(c) "Why BitConnect is a Scam and Ponzi Scheme - Stay AWAY!!!" (Published: September 6, 2017)[10]

(d) "Bitconnect scam alert! Is this 800 million dollar cryptocurrency a ponzi scheme?" (Published: September 5, 2017)[11]

(e) "THE BITCONNECT SCAM $$$ (Quick Review)" (Published: September 23, 2017)[12]

(f) "BitConnect is the $900,000,000 Crypto Ponzi Scheme" (Published: October 2, 2017)[13]

(g) "The Bitconnect Youtube Scam - Think Thursday" (Published: November 2, 2017)[14]

(h) "Bitconnect Final Warning: PONZI PYRAMID" (Published: November 18, 2017)[15]

(i) "Bitconnect Scam?  Do NOT Get Into Bitconnect Until You See This!!!" (Published: November 24, 2017)[16]

(j) Bitconnect: Scam, Pyramid, and Ponzi? Yaaaaaas." (Published: December 3, 2017)[17]

---

[8] https://www.youtube.com/watch?v=XmMH30bCkFA.

[9] https://www.youtube.com/watch?v=fmyMBVx3zC4.

[10] https://www.youtube.com/watch?v=9xWpyvIJLsE.

[11] https://www.youtube.com/watch?v=7MeREnecIFw.

[12] https://www.youtube.com/watch?v=9v3kg_1CmDA.

[13] https://www.youtube.com/watch?v=eqi2zySlSRQ.

[14] https://www.youtube.com/watch?v=gknG-FJZrwE.

[15] https://www.youtube.com/watch?v=8pm34Al1nsA.

[16] https://www.youtube.com/watch?v=rT-fk7RjdfE.

[17] https://www.youtube.com/watch?v=PqYkawUu8ZQ.

proliferated YOUTUBE's database long before BITCONNECT ceased its operations; and those videos were ignored or overlooked by YOUTUBE.[18]

135.   Had YOUTUBE conducted a reasonably appropriate search of its own databases, it would have known or should have known to delist or demonetize the videos uploaded by BITCONNECT and its affiliate promoters.

136.   YOUTUBE failed to conduct a reasonably appropriate search of its databases and, instead, accepted more and more BITCONNECT-related videos to be posted on it site while also accepting the financial benefits concomitant with the popularity of those damaging videos.

137.   As a result of YOUTUBE's failure to delist or demonetize the BITCONNECT Defendants' videos, a countless number of victims -- including many members of the Class -- were exposed to the BITCONNECT Defendants' scam, which YOUTUBE could have and should have acted to shut down earlier than BITCONNECT chose to shut down the scam itself.

138.   Relatedly, in March 2018, Google, LLC -- recognizing the potential for harm to users of all Google-owned platforms, including YOUTUBE -- changed its financial products policy to restrict and ban all advertisements related to cryptocurrencies and associated content (including but not limited to initial coin offerings, cryptocurrency exchanges, cryptocurrency wallets, and cryptocurrency trading advice).  As Scott Spencer, Director of Sustainable Ads at Google publicly stated at the time: "We don't have a crystal ball to know where the future is going to go with cryptocurrencies, but we've seen enough consumer harm or potential for consumer harm that it's an area that we want to approach with extreme caution."

---

[18] These ten videos are but a small example of a much larger collection of videos that exist in YOUTUBE's databases and that will be revealed in the discovery process in this matter.

139.    Plaintiffs and the Class are among the consumers harmed by the content that Google and YOUTUBE were belatedly "approach[ing] with extreme caution" -- something Google and YOUTUBE concede that they saw much sooner and about which they should have erected warnings or barriers to stop further public dissemination of such harmful content.

140.    As a result of the review process it claimed to undertake and the revenues YOUTUBE paid BITCONNECT and its affiliates as content "partners" for the videos they published, YOUTUBE was aware, or should have been aware, of the content contained therein -- content which solicited from the general public investments in unregistered securities and a fraudulent Ponzi scheme.

141.    Accordingly, YOUTUBE breached its duty of reasonable care owed to Plaintiffs and the Class.

142.    As noted above, hundreds if not thousands of Class members were successfully solicited to invest in BCCs by the Affiliate Promoter Defendants' videos published pursuant to their partnerships on YOUTUBE.  Accordingly, YOUTUBE's breach of its duty of reasonable care proximately caused Class members damages attendant to their investments with BITCONNECT.

143.    As demonstrated herein, YOUTUBE failed as a gatekeeper to protect its users from, and warn its users of, the very harm YOUTUBE set out to prevent with its advertising protocols and proprietary algorithms.

## VI.    Necessity for Judicial Intervention

144.    In 2013, the SEC issued an investor alert on "Ponzi Schemes Using Virtual Currencies," warning investors to be wary of investment opportunities offering "high investment returns with little or no risk" and explaining that "Ponzi schemes typically involve investments that have not been registered with the SEC or with state securities regulators."   Here, the

BITCONNECT Defendants -- fueled in material part by their partnerships with YOUTUBE -- have conducted and propagated precisely such a scheme.

145.    On July 25, 2017, the SEC issued a report on "the DAO," which offered tokens for sale online, in which the SEC advised those using "distributed ledger or blockchain-enabled means for capital raising to take appropriate steps to ensure compliance" with the federal securities laws, and stated that "[a]ll securities offered and sold in the United States must be registered with the Commission . . ." or qualify for an exemption from registration.  On the same day, the SEC issued an investor bulletin urging caution when investing in ICOs and urging investors to be mindful that promoters and initial sellers that lead buyers of tokens to expect a return on their investment or participate in shared returns provided by the project may be offering a security for sale.

146.    Virtual currencies are a relatively new phenomenon, and numerous individuals and entities -- by engaging in unlawful conduct with near impunity -- are taking advantage of the time it takes for regulatory agencies to address new investment developments, as the BITCONNECT Defendants have here by raising hundreds of millions of dollars if not billions of dollars with promises of profits to be made from trading BCCs and/or the BitConnect Investment Programs.

147.    It is clear from recent events that the rampant disregard of state and federal securities laws and consequently, abuse of investors, taking place in connection with BITCONNECT's unlawful and fraudulent conduct has been noted by state regulatory agencies.

148.    While BCCs and the BitConnect Investment Programs plainly constitute investment contract securities, at no time was a registration statement ever filed or in effect with the SEC for the securities being offered.  As such, the unlawful, unregistered offering of securities by the BITCONNECT Defendants to Plaintiffs and the Class violated Sections 5, 12(a)(1) and 15(a) of the Securities Act; and the private right of action provided by Section 12(a)(1) of the

Securities Act, created for just this type of situation, provides strict liability for the BITCONNECT

Defendants' sale of such unregistered securities.

149.     Additionally, due to the fraudulent and deceitful conduct involved and necessary to

propagate the BitConnect Investment Programs – particularly as relates to the Referral/Affiliate

Program -- the BITCONNECT Defendants are liable for violating Florida's Deceptive and Unfair

Trade Practices Act, breach of contract (with respect to Defendant BITCONNECT), unjust

enrichment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation,

conversion, and civil conspiracy at the expense of unsuspecting public investors.

150.     Plaintiffs have duly performed all of their duties and obligations, and any conditions

precedent to Plaintiffs bringing this action have occurred, have been performed, or else have been

excused or waived.

151.     To enforce their rights and those of the Class, Plaintiffs have retained undersigned

counsel and are obligated to pay counsel a reasonable fee for its services, for which Defendants

are liable as a result of their bad faith and otherwise.

## COUNT I - VIOLATION OF SECTION 12(a) OF THE SECURITIES ACT
### [AGAINST THE BITCONNECT DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-151 above, and further allege:

152.     Section 12(a)(1) grants Plaintiffs a private right of action against any person who

offers or sells a security in violation of Section 5, and states that such person,

> Shall be liable . . . to the person purchasing such security from him, who may
> sue either at law or in equity in any court of competent jurisdiction, to recover
> the consideration for such security with interest thereon, less the amount of
> any income received thereon, upon the tender of such security, or for damages
> if he no longer owns the security.

153.     From January 2017 through January 2018, in connection with the BitConnect

Investment Programs and offer and sale of BCCs, Defendants unlawfully made use of means or

instruments of transportation or communication in interstate commerce or of the mails for the purposes of offering, selling, or delivering unregistered securities in direct violation of the Securities Act.

154.    The offer and sale of BCCs and solicitation of investments in the BitConnect Investment Programs constituted the offer and sale of unregistered securities under controlling federal law.  BCCs and the BitConnect Investment Programs exhibit the following particular hallmarks of a security under the *Howey* test: (a) to receive any BCCs (and invest in the BitConnect Investment Programs), an investment of money, in the form of BTC and/or other currencies was required; (b) the investment of money was made into the common enterprise that is Defendant BITCONNECT and its ability to provide "guaranteed" returns using its trading algorithm or otherwise; and (c) the success of the investment opportunities and any potential returns thereon were entirely reliant on Defendants' ability to continuously provide such "guaranteed" returns to investors.

155.    Each of the individual Director and Affiliate Promoter Defendants constitute "seller[s]" under the Securities Act and is thus equally liable for selling unregistered securities in connection with BITCONNECT.  Moreover, the individual Affiliate Promoter Defendants personally profited by soliciting investors to use their "referral" links to participate in the BitConnect Investment Programs.

156.    As such, the BITCONNECT Defendants have participated in the offer and sale of unregistered securities in violation of the Securities Act, and are liable to Plaintiffs and the Class for rescission and/or compensatory damages.

## COUNT II - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT
### [AGAINST DEFENDANT ARCARO]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-151 above, and further allege:

157.    Due to his ownership in and/or control over Defendant BITCONNECT INTERNATIONAL PLC, Defendant ARCARO acted as controlling person of BITCONNECT INTERNATIONAL PLC within the meaning of Section 15(a) of the Securities Act as alleged herein.

158.    By virtue of his positions as an affiliate manager and/or director and participation in and/or awareness of Defendant BITCONNECT INTERNATIONAL PLC's operations, Defendant ARCARO had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the BitConnect Investment Programs, including the decision to engage in the sale of unregistered securities in furtherance thereof.

159.    By virtue of the foregoing, Defendant ARCARO is liable to Plaintiffs and the Class as a control person of Defendant BITCONNECT INTERNATIONAL PLC under Section 15(a) of the Securities Act

## COUNT III - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT
### [AGAINST DEFENDANT JEPPESEN]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-151 above, and further allege:

160.    Defendant JEPPESEN is subject to liability by virtue of his top-level executive position with BITCONNECT and his influence over the enterprise, which provided him the power to control or influence BITCONNECT's actions.   For example, Defendant JEPPESEN is reportedly a Director of BITCONNECT -- serving as the Director of Development for BITCONNECT's operations in the United States and Europe -- and is responsible for overseeing and contributing to development of the websites used by BITCONNECT to fraudulently offer and

sell its BitConnect Investment Programs and BCCs to investors, including its operations vis-à-vis Plaintiffs and the Class Members.

161.    As a top-level executive and controlling person of BITCONNECT, Defendant JEPPESEN knew of, or recklessly disregarded, the alleged misrepresentations made by BITCONNECT on the BitConnect Websites in connection with the sale of the BitConnect Investment Programs and the BCCs.

162.    Defendant JEPPESEN had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the BitConnect Investment Programs, including the decision to engage in the sale of unregistered securities in furtherance thereof.

163.    Defendant JEPPESEN is a culpable participant in the fraudulent scheme described herein and caused BITCONNECT to engage in the acts and omissions described herein.

164.    Accordingly, Defendant JEPPESEN is liable to Plaintiffs and the Class as a "controlling person" of BITCONNECT within the meaning of Section 15(a) of the Securities Act.

### COUNT IV - BREACH OF CONTRACT
#### [AGAINST DEFENDANT BITCONNECT]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-151 above, and further allege:

165.    The terms of the BitConnect Investment Programs constitute a contract between: (1) Plaintiffs and the Class Members, and (2) BITCONNECT.

166.    The contract was entered into by and between BITCONNECT and each Class Member between November 15, 2016 and January 17, 2018.

167.    The terms of the BitConnect Investment Programs called for an investment of fiat currency or cryptocurrency by Plaintiffs and the Class Members.

168.    The funds paid by Plaintiffs and the Class Members pursuant to the BitConnect Investment Programs were pooled by BITCONNECT in an effort by BITCONNECT to secure a profit for itself and the investors.  As a result, the investors, including Plaintiffs and the Class, shared in the risks and benefits of the investment.

169.    Plaintiffs and the Class Members relied on, and are dependent upon, the expertise and efforts of BITCONNECT for their investment returns.

170.    The terms of the BitConnect Investment Programs constitute an investment contract and are therefore subject to federal and state securities laws, including the registration requirements promulgated thereunder.

171.    BITCONNECT breached its contracts with Plaintiffs and the Class by failing to provide the "guaranteed" returns, daily interest, bonus interests, and return the initial investments pursuant to the terms of the BitConnect Lending Program.  Rather than adhere to the express, unequivocal terms of the contracts, BITCONNECT converted Plaintiffs' and the Class' investments into near worthless BCCs and shut down its operations.

172.    Moreover, no registration statement was filed or in effect with any federal or state regulatory body, and no exemption from registration exists with respect to the BitConnect Investment Programs.

173.    By virtue of the foregoing, BITCONNECT is liable to Plaintiffs and the Class for damages resulting from BITCONNECT's breaches of contract.

174.    To the extent that Plaintiffs have received from BITCONNECT any benefits through the contract -- though none are known to them at this time -- Plaintiffs hereby offers to restore to BITCONNECT those benefits, once they are identified and can be quantified.

## COUNT V - UNJUST ENRICHMENT
### [AGAINST THE BITCONNECT DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-151 above, and further allege:

175.    The BITCONNECT Defendants have reaped the benefits of operating and/or personally benefiting from inducing Plaintiffs and the Class to invest in fraudulent Ponzi/pyramid schemes (BCC and/or the BitConnect Investment Programs), thereby causing actual harm to thousands of investors.

176.    It would be unconscionable and against the fundamental principles of justice, equity, and good conscience for the BITCONNECT Defendants to retain the substantial monetary benefits they have received as a result of their misconduct.

177.    To remedy the BITCONNECT Defendants' unjust enrichment, the Court should order the BITCONNECT Defendants to immediately return Plaintiffs' and the Class' investments and disgorge any amounts received by the BITCONNECT Defendants as a result of their misconduct alleged herein.

## COUNT VI - VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA")
### [AGAINST THE BITCONNECT DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-151 above, and further allege:

178.    Chapter 501, Fla. Stat., Florida's Deceptive and Unfair Trade Practices Act is to be liberally construed to protect the consuming public, such as Plaintiffs and the Class Members in this case, from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce.

179.    Plaintiffs and the Class Members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

180.    By soliciting investor funds in the manner in which they did, the BITCONNECT Defendants engaged in "trade and commerce" within the meaning of Fla. Stat. §501.203(8).

181.    While FDUTPA does not define "deceptive" and "unfair," it incorporates by reference the Federal Trade Commission's interpretations of these terms.  The FTC has found that a "deceptive act or practice" encompasses "a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."

182.    The federal courts have defined a "deceptive trade practice" as any act or practice that has the tendency or capacity to deceive consumers and have defined an "unfair trade practice" as any act or practice that offends public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

183.    Moreover, as the securities laws are designed for consumer protection and "proscribe[] unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices," a violation of the securities laws is a *per se* violation of FDUTPA

184.    The BITCONNECT Defendants have reaped monetary rewards from operating and/or personally benefiting from inducing Plaintiffs and the Class to invest in fraudulent Ponzi/pyramid schemes (BCC and/or the BitConnect Investment Programs), thereby causing actual harm to thousands of investors.

185.    The BITCONNECT Defendants' acts and omissions of representing to Plaintiffs and the Class Members that, among other things:

(a) BITCONNECT utilized a proprietary, secret trading system (the "Volatility Software") that helped its investors generate far-greater-than-average returns on their investments;

(b) BITCONNECT's representation that a one percent (1%) daily return on investments was readily achievable regardless of market performance or the fluctuating value of bitcoin;

(c) Investment returns were legitimately generated and were not simply a reallocation of new BITCONNECT investors' money used to pay the promised returns on outstanding BITCONNECT investors' investments in classic Ponzi scheme fashion;

(d) The BitConnect Investment Programs complied with all applicable securities laws; and

(e) The BitConnect affiliates who were paid commissions for their sale of BitConnect Investment Programs were properly registered to procure those sales

constitute both deceptive and unfair trade practices because the false representations and omissions made by the BITCONNECT Defendants have a tendency or capacity to deceive consumers, such as Plaintiffs and the Class Members, into investing in BITCONNECT's falsely-touted business and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

186.    As a result of the BITCONNECT Defendants' deceptive trade practices, Plaintiffs and the Class Members were deceived into investing their money with a company that functioned solely as an engine of fraud -- thus causing significant economic damage to Plaintiffs and the Class Members.

187.    The materially false statements and omissions as described above, and the fact that this was a misleading investment, were unfair, unconscionable, and deceptive practices perpetrated on Plaintiffs and the Class Members which would have likely deceived a reasonable person under the circumstances.

188.    The BITCONNECT Defendants were on notice at all relevant times that the false representations of material facts described above were being communicated to prospective investors (such as Plaintiffs and the Class Members) by their authorized agents.

189.    As a result of the false representations and violations of the securities laws described above, Plaintiffs and the Class Members have been damaged by, among other things losing their invested capital.

190.     Plaintiffs and the Class Members have also been damaged in other and further ways subject to proof at trial.

191.     Therefore, the BITCONNECT Defendants engaged in unfair and deceptive trade practices in violation of Section 501.201 *et seq*., Fla. Stat.

192.     Pursuant to Sections 501.211(1) and 501.2105, Fla. Stat., Plaintiffs and the Class Members are entitled to recover from the BITCONNECT Defendants the reasonable amount of attorneys' fees Plaintiffs and the Class Members have had to incur in representing their interests in this matter.

## COUNT VII - FRAUDULENT INDUCEMENT
[AGAINST THE BITCONNECT DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-151 above, and further allege:

193.     The BITCONNECT Defendants, by acts of both omission and commission, made to Plaintiffs and the Class Members false statements of material facts about the services Plaintiffs and the Class Members would receive from BITCONNECT upon opening a BITCONNECT account and investing in the BitConnect Investment Programs.

194.     Specifically, the BITCONNECT Defendants' representations to Plaintiffs and the Class Members that, among other things:

    (a)     BITCONNECT utilized a proprietary, secret trading system (the "Volatility Software") that helped its investors generate far-greater-than-average returns on their investments;

    (b)     BITCONNECT's representation that a one percent (1%) daily return on investments was readily achievable regardless of market performance or the fluctuating value of bitcoin;

    (c)     Investment returns were legitimately generated and were not simply a reallocation of new BITCONNECT investors' money used to pay the promised returns on outstanding BITCONNECT investors' investments in classic Ponzi scheme fashion;

    (d)      The BitConnect Investment Programs complied with all applicable securities laws; and

    (e)      The BitConnect affiliates who were paid commissions for their sale of BitConnect Investment Programs were properly registered to procure those sales

were false, and the BITCONNECT Defendants knew at the time the statements were made that the statements were false.

195.    The BITCONNECT Defendants intended that Plaintiffs and the Class Members would be induced into action by relying upon the statements of fact made to them by and on behalf of the BITCONNECT Defendants.

196.    In considering whether to open accounts at BITCONNECT, invest in the BitConnect Investment Programs, and entrust to BITCONNECT their valuable assets; Plaintiffs and the Class Members reasonably and justifiably relied on the statements of fact made to them by and on behalf of the BITCONNECT Defendants.

197.    As a direct and proximate result of Plaintiffs' and the Class Members' reliance on the statements made to them by the BITCONNECT Defendants, Plaintiffs and the Class Members have suffered damage.

## COUNT VIII - FRAUDULENT MISREPRESENTATION
### [AGAINST THE BITCONNECT DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-151 above, and further allege:

198.    The BITCONNECT Defendants, by acts of both omission and commission, made to Plaintiffs and the Class Members false statements of material facts about the services Plaintiffs and the Class Members would receive from BITCONNECT upon opening a BITCONNECT account and investing in the BitConnect Investment Programs.

199.    Specifically, the BITCONNECT Defendants' representations to Plaintiffs and the Class Members that, among other things:

(a)     BITCONNECT utilized a proprietary, secret trading system (the "Volatility Software") that helped its investors generate far-greater-than-average returns on their investments;

(b)     A one percent (1%) daily return on investments was readily achievable regardless of market performance or the fluctuating value of bitcoin;

(c)     Investment returns were legitimately generated and were not simply a reallocation of new BITCONNECT investors' money used to pay the promised returns on outstanding BITCONNECT investors' investments in classic Ponzi scheme fashion;

(d)     The BitConnect Investment Programs complied with all applicable securities laws; and

(e)     The BitConnect affiliates who were paid commissions for their sale of BitConnect Investment Programs were properly registered to procure those sales

were false, and the BITCONNECT Defendants knew at the time the statements were made that the statements were false.

200.    The BITCONNECT Defendants' misrepresentations were made with reckless disregard for the truth.

201.    The BITCONNECT Defendants intended that Plaintiffs and the Class Members would be induced into action by relying upon the statements of fact made to them by and on behalf of the BITCONNECT Defendants.

202.    In considering whether to open accounts at BITCONNECT, invest in the BitConnect Investment Programs, and entrust to BITCONNECT their valuable assets; Plaintiffs and the Class Members reasonably and justifiably relied on the statements of fact made to them by and on behalf of the BITCONNECT Defendants.

203.    As a direct and proximate result of Plaintiffs' and the Class Members' reliance on the statements made to them by the BITCONNECT Defendants, Plaintiffs and the Class Members have suffered damage.

## COUNT IX - NEGLIGENT MISREPRESENTATION
### [AGAINST THE BITCONNECT DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-151 above, and further allege:

204.    The BITCONNECT Defendants, by acts of both omission and commission, made to Plaintiffs and the Class Members false statements of material facts about the services Plaintiffs and the Class Members would receive from BITCONNECT upon opening a BITCONNECT account and investing in the BitConnect Investment Programs in exchange for the fees they were compelled to pay to maintain accounts at BITCONNECT.

205.    Specifically, the BITCONNECT Defendants' representations to Plaintiffs and the Class Members that, among other things:

(a)    BITCONNECT utilized a proprietary, secret trading system (the "Volatility Software") that helped its investors generate far-greater-than-average returns on their investments;

(b)    A one percent (1%) daily return on investments was readily achievable regardless of market performance or the fluctuating value of bitcoin;

(c)    Investment returns were legitimately generated and were not simply a reallocation of new BITCONNECT investors' money used to pay the promised returns on outstanding BITCONNECT investors' investments in classic Ponzi scheme fashion;

(d)    The BitConnect Investment Programs complied with all applicable securities laws; and

(e)    The BitConnect affiliates who were paid commissions for their sale of BitConnect Investment Programs were properly registered to procure those sales

were false, and the BITCONNECT Defendants knew at the time the statements were made that the statements were false.

206.    The BITCONNECT Defendants had no reasonable grounds upon which to believe the statements were true when made to Plaintiffs and the Class Members.

207.    The BITCONNECT Defendants intended that Plaintiffs and the Class Members would be induced into action by relying upon the statements of fact made to them by and on behalf of the BITCONNECT Defendants.

208.    In considering whether to open accounts at BITCONNECT, invest in the BitConnect Investment Programs, and entrust to BITCONNECT their valuable assets; Plaintiffs and the Class Members reasonably and justifiably relied on the statements of fact made to them by and on behalf of the BITCONNECT Defendants.

209.    As a direct and proximate result of Plaintiffs' and the Class Members' reliance on the statements made to them by the BITCONNECT Defendants, Plaintiffs and the Class Members have suffered damage.

## COUNT X - CONVERSION
### [AGAINST THE BITCONNECT DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-151 above, and further allege:

210.    Plaintiffs transferred funds and assets to BITCONNECT for investment, and as a purported loan, to participate in the BitConnect Investment Programs.

211.    BITCONNECT has kept Plaintiffs' and the Class Members' funds and assets after Plaintiffs and the Class Members requested their return, despite BITCONNECT's lack of any ownership interest in the assets and despite BITCONNECT's agreement in writing to return to Plaintiffs and the Class Members -- in the form of fiat currency (*i.e.*, U.S. Dollars or Euros), not BCCs -- all of Plaintiffs' and the Class Members' holdings.

212.    By refusing to return to Plaintiffs and the Class Members their assets, BITCONNECT intended to interfere with, and indeed has interfered with, Plaintiffs' and the Class Members' ownership and interest in those holdings and has deprived Plaintiffs and the Class Members of their property, permanently or temporarily.

213.    Upon information and belief, BITCONNECT has utilized Plaintiffs' and the Class Members' funds and assets to cover BITCONNECT's own business expenses and to enrich its Directors, shareholders, and affiliates, including Defendants JEPPESEN, ARCARO, JAMES, HILDRETH, GRANT, CRYPTONICK, MASSEN, and JOHN DOE NOS. 2-10.

214.    As a result of BITCONNECT's conversion of Plaintiffs' and the Class Members' funds and assets to its own corporate uses and the personal use of its Directors, shareholders, and affiliates; Plaintiffs and the Class Members have suffered damage.

## COUNT XI - CIVIL CONSPIRACY
### [AGAINST THE BITCONNECT DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-151 above, and further allege:

215.    The BITCONNECT Defendants conspired with one another to perpetrate an unlawful act upon Plaintiffs and the Class Members or to perpetrate a lawful act by unlawful means, *to wit*: they made multiple misrepresentations of fact to Plaintiffs and the Class Members in an effort to extract from Plaintiffs and the Class Members funds, assets, and cryptocurrency to fund BITCONNECT's own business expenses and to enrich its Directors, shareholders, and affiliates, including Defendants JEPPESEN, ARCARO, JAMES, HILDRETH, GRANT, CRYPTONICK, MASSEN, and JOHN DOE NOS. 2-10, not to fund the purportedly legitimate purpose to which Plaintiffs and the Class Members were told by the BITCONNECT Defendants that their investment assets were being applied – all of which put the BITCONNECT Defendants' own pecuniary interest ahead of Plaintiffs' and the Class Members' welfare and economic safety.

216.    The BITCONNECT Defendants solicited and/or accepted from Plaintiffs and the Class Members large sums of funds, assets, and cryptocurrency while withholding from Plaintiffs and the Class Members certain material facts, including:

217.    BITCONNECT did not utilize a proprietary, secret trading system (the "Volatility Software") that helped its investors generate far-greater-than-average returns on their investments;

218.    BITCONNECT's representation that a one percent (1%) daily return on investments was readily achievable regardless of market performance or the fluctuating value of bitcoin;

219.    Investment returns were not legitimately generated and were simply a reallocation of new BITCONNECT investors' money used to pay the promised returns on outstanding BITCONNECT investors' investments in classic Ponzi scheme fashion;

220.    The BitConnect Investment Programs did not comply with all applicable securities laws; and

221.    The BitConnect affiliates who were paid commissions for their sale of BitConnect Investment Programs were not properly registered to procure those sales; and

222.    The "BCC School" orchestrated by Defendant ARCARO was not a "school" at all; rather, it was a mere conduit to get BCC School "graduates" to open up accounts at BITCONNECT, for which ARCARO and his team of affiliates reaped from BITCONNECT the riches of each client referral.

223.    Each of the BITCONNECT Defendants agreed to the illicit purpose for garnering investment monies from Plaintiffs and the Class Members so that BITCONNECT's Directors, shareholders, and affiliates could enjoy lavish lifestyles with Plaintiffs' and the Class Members' funds, assets, and cryptocurrency.

224.    The BITCONNECT Defendants were each aware of, and consented to, the misrepresentations detailed above and knew that the efforts to garner funds, assets, and cryptocurrency from Plaintiffs and the Class Members was all part of a fraud aimed solely at

enriching BITCONNECT's Directors, shareholders, and affiliates without any intent to remunerate Plaintiffs and the Class Members in any legitimate way purported by the BitConnect Investment Programs.

225.    In furtherance of their conspiracy, the BITCONNECT Defendants made to Plaintiffs and the Class Members, or agreed to have someone make on their behalf, the false statements of fact detailed above and purposefully withheld from Plaintiffs and the Class Members certain material facts detailed above in a concerted effort to obtain Plaintiffs' and the Class Members' funds, assets, and cryptocurrency.

226.    To fulfill their role in the conspiracy, the BITCONNECT corporate parties operated the BitConnect Websites and pretended to be operating a legitimate, legally-compliant trading exchange and lending platform.

227.    To fulfill his role in the conspiracy, Defendant JEPPESEN oversaw and personally participated in developing the BitConnect Websites as well as BITCONNECT's business operations in the United States and Europe -- falsely representing that the operations were legitimate.

228.    To fulfill his role in the conspiracy, Defendant ARCARO managed, coached, and supported a United States-based team of BITCONNECT affiliates to sharpen their recruiting techniques and lure in BITCONNECT investors.  Defendant ARCARO is also believed to have created and orchestrated the BCC School, which was little more than a conduit to get BCC School "graduates" to open up accounts at BITCONNECT, for which ARCARO and his team of affiliates reaped from BITCONNECT the riches of each client referral.

229.    To fulfill their role in the conspiracy, Defendants JAMES, HILDRETH, GRANT, CRYPTONICK, MASSEN, and JOHN DOES NOS. 2-10 served as United States-based

BITCONNECT affiliates who used social media channels such as YOUTUBE, Twitter, Reddit, and Facebook to recruit unsuspecting investors in the United States and abroad to purchase BitConnect Investment Programs.  For their efforts, Defendants JAMES, HILDRETH, GRANT, CRYPTONICK, MASSEN, and DOES NOS. 2-10 were paid large commissions and participated in a lucrative bonus program that provided them sizeable incomes.

230.    BITCONNECT conducted no legitimate business -- something of which Defendants JEPPESEN, ARCARO, JAMES, HILDRETH, GRANT, CRYPTONICK, MASSEN, and DOES NOS. 2-10 were aware and which they accepted as part of the scheme to defraud BITCONNECT investors and accountholders, including Plaintiffs and the Class Members.

231.    As a direct and proximate result of the BITCONNECT Defendants' conspiracy, Plaintiffs and the Class Members have suffered damage.

## COUNT XII - NEGLIGENCE - FAILURE TO WARN
### [AGAINST DEFENDANT YOUTUBE]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-151 above, and further allege:

232.    Both by its own assumption of responsibility and the nature of its business, YOUTUBE owed a duty to its users to not partner with purveyors of fraud such as the BITCONNECT Defendants and their fraudulent investment scheme.

233.    By monetizing the videos created and published on YOUTUBE by the BITCONNECT Defendants, YOUTUBE partnered with the BITCONNECT Defendants and drove additional user traffic to those videos promoting the illegally-offered BCC and BitConnect Investment Programs in return for enjoying mutual financial benefit with the BITCONNECT Defendants.

234.    YOUTUBE's level of engagement and management in: (1) learning the meaning of, and intent behind, videos published on YOUTUBE, (2) manipulating individual users and

funneling them into pockets of activity on YOUTUBE's website, including the videos promoting the BitConnect Investment Programs and the BitConnect Investments, and (3) developing policies and procedures (as well as code-based functionalities executed on YOUTUBE's website) to effectuate its goals demonstrate that YOUTUBE was not merely a publisher of third party content on its website. Instead, and acting in bad faith, YOUTUBE was an active participant in the events that give rise to Plaintiffs' and the Class' claims.

235.   YOUTUBE was aware, or should have been aware, that the BITCONNECT Defendants were using YOUTUBE to promote the fraudulent BitConnect Investment Programs and to recruit unsuspecting investors in the United States and abroad to purchase BitConnect Investments.

236.   YOUTUBE breached its duties to its users -- including Plaintiffs and the Class -- by failing to warn them of the dangers associated with investing in the fraudulent BitConnect Investment Programs and the fraudulently-promoted BitConnect Investments.

237.   YOUTUBE's negligence was a substantial factor in and proximately caused damage to Plaintiffs and the Class.

238.   As a direct and proximate result of YOUTUBE's breach of its duties, Plaintiffs and the Class Members have suffered damage.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs ALBERT PARKS and FARAMARZ SHEMIRANI, individually and on behalf of all others similarly situated, respectfully pray for relief as follows:

(a) Declaring that this action is properly maintainable as a class action and certifying Plaintiffs as the Class representatives and their counsel as Class counsel;

(b) Declaring that the BITCONNECT Defendants offered and sold unregistered securities in violation of the federal securities laws;

(c)  Declaring the BITCONNECT Defendants are liable to Plaintiffs and the Class under Sections 12(a)(1) and/or 15(a) of the Securities Act;

(d)  Declaring the BITCONNECT Defendants violated Florida's Deceptive and Unfair Trade Practices Act and are therefore required to provide rescissory and/or other equitable relief to Plaintiffs and the Class;

(e)  Declaring that the BITCONNECT Defendants are liable to Plaintiffs and the Class due to their breach of contract, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, conversion, and civil conspiracy;

(f)  Preliminarily enjoining the BITCONNECT Defendants from making further transfers or dissipations of the investments raised from the offer and sale of BCCs and in connection with the BitConnect Investment Programs, or using such funds in any further purchases or transactions;

(g)  Requiring an accounting of the remaining funds and assets raised from Plaintiffs and the Class in connection with the offer and sale of BCCs and the BitConnect Investment Programs;

(h)  Imposing a constructive trust over the funds and assets rightfully belonging to Plaintiffs and the Class;

(i)  Ordering rescission of the investments made by Plaintiffs and the Class relating to the offer and sale of BCCs and the BitConnect Investment Programs and/or compensatory damages;

(j)  Declaring that YOUTUBE was negligent in its failure to warn Plaintiffs and the Class and are thus liable to the Class;

(k)  Awarding Plaintiffs the costs of this action, including reasonable allowance for Plaintiffs' attorneys' and experts' fees; and

(l)  Granting such other and further relief as this Court may deem just and proper.


## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

Respectfully submitted,

**SILVER MILLER**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone:      (954) 516-6000

By: _____
     DAVID C. SILVER
     Florida Bar No. 572764
     E-mail: DSilver@SilverMillerLaw.com
     JASON S. MILLER
     Florida Bar No. 072206
     E-mail: JMiller@SilverMillerLaw.com
     - and -

     **LEVI & KORSINSKY, LLP**
     EDUARD KORSINSKY
     E-mail: ek@zlk.com
     30 Broad Street, 24th Floor
     New York, New York 10004
     Telephone:      (212) 363-7500
     Facsimile:      (212) 636-7171

     DONALD J. ENRIGHT
     E-mail: denright@zlk.com
     ELIZABETH K. TRIPODI
     E-mail: etripodi@zlk.com
     JOHN A. CARRIEL
     E-mail: jcarriel@zlk.com
     **LEVI & KORSINSKY, LLP**
     1101 30th Street, N.W., Suite 115
     Washington, DC 20007
     Telephone:      (202) 524-4290
     Facsimile:      (202) 333-2121

     *Co-Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing was electronically filed with the Clerk of Court on this __3rd__ day of July 2018 by using the CM/ECF system and that a true and correct copy will be served via electronic mail to: All Counsel of Record on the attached Service List.

_____
DAVID C. SILVER

Lead Case No.: 9:18-cv-80086-DMM

# SERVICE LIST

**In re BitConnect Securities Litigation**
**United States District Court - Southern District of Florida**
**Lead Case No. 9:18-cv-80086-DMM**


**Carl E. Volz, Esq.**                           *Counsel for Defendant Glenn Arcaro*
**Desiree Moore, Esq.**
**Nicole Claire Mueller, Esq.**
K&L GATES, LLP
70 W. Madison Street – Suite 3100
Chicago, IL 60602-4207
Telephone:     (312) 807-4245
Facsimile:     (312) 827-8114
E-mail: carl.volz@klgates.com; desiree.moore@klgates.com; nicole.mueller@klgates.com;


**Carol Lumpkin, Esq.**                          *Counsel for Defendant Glenn Arcaro*
K&L GATES, LLP
Southeast Financial Center
200 S. Biscayne Blvd. – Suite 3900
Miami, FL 33131-3300
Telephone:     (305) 539-3300
Facsimile:     (305) 358-7095
E-mail: carol.lumpkin@klgates.com


**Ryan K. Stumphauzer, Esq.**                    *Counsel for Defendant Ryan Maasen*
**Kiran N. Bhat, Esq.**
STUMPHAUZER & SLOMAN
SunTrust International Center
One SE Third Avenue, Suite 1820
Miami, FL 33131
Telephone:     (305) 371-9686
Facsimile:     (305) 371-9687
E-mail: rstumphauzer@sslawyers.com; kbhat@sslawyers.com


**Ryan Hildreth**                                *Defendant - Pro Se*
2801 Kelvin Avenue - Unit 596
Irvine, CA 92614
Telephone:     (657) 229-2116
E-mail: hildreth951@gmail.com

**Jasper D. Ward IV, Esq.**                    *Plaintiffs' Counsel - Executive Committee*
JONES WARD PLC
The Pointe
1205 E. Washington Street - Suite 111
Louisville, KY 40206
Telephone:     (502) 882-6000
E-mail: jasper@jonesward.com


**Joshua H. Eggnatz, Esq.**                    *Plaintiffs' Counsel - Executive Committee*
**Michael J. Pascucci, Esq.**
EGGNATZ | PASCUCCI
5400 S. University Drive – Suite 417
Davie, FL 33328
Telephone:     (954) 889-3359
Facsimile:      (954) 889-5913
E-mail: JEggnatz@JusticeEarned.com; MPascucci@JusticeEarned.com


**John A. Yanchunis, Esq.**                    *Plaintiffs' Counsel - Executive Committee*
MORGAN & MORGAN
201 N. Franklin Street - 7th Floor
Tampa, FL 33602
Telephone:     (813) 223-5505
E-mail: JYanchunis@ForThePeople.com