# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

| | |
|---|---|
| IN RE BITCONNECT SECURITIES LITIGATION | Lead Case No.: 9:18-cv-80086-DMM |
| | **CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**LEAD PLAINTIFFS' OMNIBUS OPPOSITION TO THE MOTIONS TO
DISMISS LEAD PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION
COMPLAINT FILED BY DEFENDANTS GLENN ARCARO [DE 94],
RYAN MAASEN [DE 86], AND YOUTUBE LLC [DE 88]**

Respectfully submitted,

**SILVER MILLER**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone:     (954) 516-6000
DAVID C. SILVER
Florida Bar No. 572764
E-mail: DSilver@SilverMillerLaw.com
JASON S. MILLER
Florida Bar No. 072206
E-mail: JMiller@SilverMillerLaw.com

**LEVI & KORSINSKY, LLP**
EDUARD KORSINSKY
E-mail: ek@zlk.com
55 Broadway, 10th Floor
New York, NY 10006
Telephone:     (212) 363-7500
Facsimile:     (212) 363-7171

DONALD J. ENRIGHT
E-mail:denright@zlk.com
ELIZABETH TRIPODI
E-mail: etripodi@zlk.com
JOHN A. CARRIEL
E-mail: jcarriel@zlk.com
**LEVI & KORSINSKY, LLP**
1101 30th Street, N.W., Suite 115
Washington, DC 20007
Telephone:     (202) 524-4290
Facsimile:     (201) 333-2121

*Co-Lead Counsel for Plaintiffs*

## TABLE OF CONTENTS

NATURE OF THE ACTION ............................................................................................. 1

STATEMENT OF RELEVANT FACTS ......................................................................... 6

PROCEDURAL HISTORY .............................................................................................. 9

ARGUMENT ................................................................................................................... 11

I.    PLAINTIFFS HAVE ESTABLISHED THIS COURT'S PERSONAL
      JURISDICTION OVER THE PROMOTER DEFENDANTS AND
      YOUTUBE ........................................................................................................ 11

      A.    Standard of Review On A Rule 12(b)(2) Motion To Dismiss .............. 11

      B.    A Statutory Basis For Personal Jurisdiction Exists Here ................... 11

            1.    The Securities Act Confers Nationwide Jurisdiction Over the
                  Promoter Defendants ................................................................. 12

            2.    Jurisdiction By This Court Comports With Due Process ...... 12

      C.    Supplemental Jurisdiction Attaches to Plaintiffs' Remaining Claims 14

      D.    The Court Has Personal Jurisdiction Over YouTube ........................ 18

II.   STANDARD OF REVIEW ON A RULE 12(B)(6) MOTION ........................ 18

III.  THE PROMOTER DEFENDANTS ARE LIABLE UNDER THE FEDERAL
      SECURITIES LAWS ........................................................................................ 18

      A.    Elements of Plaintiffs' Section 12(a)(1) Claims ................................... 18

      B.    BCCs Constitute "Investment Contract Securities" ........................... 20

            1.    Purchases of BCCs Required An Investment of Money ......... 21

            2.    Investors in BCCs Invested in a Common Enterprise ............. 22

            3.    Investors in BCCs Invested With the Expectation of Profits
                  Produced By The Effort Of Others ........................................... 23

            4.    Representations To Investors ..................................................... 25

      C.    The Promoter Defendants Are Each "Statutory Sellers" Under *Pinter
            v. Dahl* ...................................................................................................... 25

      D.    Defendant Arcaro Is Liable as a Control Person Under Section 15(a)
            of the Securities Act .................................................................................. 27

IV.   UNJUST ENRICHMENT ................................................................................. 28

V.      **PLAINTIFFS' COMPLAINT CONTAINS ADEQUATE ALLEGATIONS
        SUPPORTING THEIR CLAIM UNDER FDUTPA** ....................................... 30

        A.      Arcaro's Arguments Fail to Warrant Dismissal of Plaintiffs FDUPTA
                Claims ............................................................................................. 31

VI.     **FRAUDULENT INDUCEMENT, FRAUDULENT
        MISREPRESENTATION AND NEGLIGENT MISREPRESENTATION** . 32

VII.    **CONVERSION AND CIVIL CONSPIRACY** .................................................. 34

VIII.   **PLAINTIFFS HAVE ADEQUATELY PLED THEIR NEGLIGENT
        FAILURE TO WARN CLAIM AGAINST YOUTUBE** ................................ 34

        A.      Elements Of Plaintiffs' Negligence Claim .............................................. 34

        B.      YouTube Assumed the Duty to Warn The Putative Class ................. 35

        C.      YouTube Is Not "Immune" From Liability For Its Negligence In
                Fulfilling A Duty It Imposed On Itself .................................................. 35

**CONCLUSION** ................................................................................................. 39

## Table of Authorities

Page(s)

### Cases

*All Underwriters Subscribing to Policy of Ins. No. B0621MMILSYB15055 v. Rika Boats Ltd.*,
No. 16-20498-CIV-LENARD/GOODMAN, 2017 U.S. Dist. LEXIS 8969 (S.D. Fla. Jan. 20, 2017) ...................................................................................................16

*Almeida v. Amazon.com, Inc.*,
456 F.3d 1316 (11th Cir. 2006) ...................................................................................42

*Alternate Energy Corp. v. Redstone*,
328 F. Supp. 2d 1379 (S.D. Fla. 2004) ...................................................................19, 20

*Am. Income Life Ins. Co. v Google, Inc.*,
No. 2:11-CV-4126-SLB, 2014 US Dist LEXIS 124870 (ND Ala Sep. 8, 2014) ..........................43

*Asahi Metal Indus. Co., Ltd. v. Superior Court of California*,
480 U.S. 102 (1987)...................................................................................................14

*Balmert v. Pulte Home Corp.*,
445 Fed. Appx. 256 (11th Cir. 2011).............................................................................28

*BankAtlantic v. Coast to Coast Contractors, Inc.*,
947 F. Supp. 480 (S.D. Fla. 1996) .................................................................................13

*Barnext Offshore, Ltd. v Ferretti Group USA, Inc.*,
No. 10-23869-CIV, 2012 U.S. Dist. LEXIS 61710 (S.D. Fla. May 2, 2012)................................37

*Bodie v Purdue Pharma Co.*,
236 F App'x 511 (11th Cir 2007).................................................................................41

*Bowe v Pub. Stor.*,
No. 1:14-cv-21559-UU, 2014 U.S. Dist. LEXIS 195556 (S.D. Fla. July 2, 2014) ......................37

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462, 478 (1985)........................................................................................14, 20

*Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003) ......................................................................................43

*Carriuolo v GM Co.*,
823 F.3d 977 (11th Cir. 2016) ......................................................................................38

*Chase v. Sandborn*,
835 F.2d 1341 (11th Cir. 1988) ....................................................................................14

*Cia. de Elaborados de Cafe v Cardinal Capital Mgt.*,
401 F.Supp 2d 1270 (S.D. Fla. 2003) .............................................................................42

*Cimaglia v. Moore*,
724 F. App'x 695 (11th Cir. 2018)..............................................................................33, 35

*Coffey v. WCW & Air, Inc.*,
No. 3:17-cv-90-MCR-CJK, 2018 U.S. Dist. LEXIS 148122 (N.D. Fla. Aug. 30, 2018) ........................................................................................................................ 35

*Consol. Dev. Corp. v. Sherritt, Inc.*,
216 F3d 1286 (11th Cir 2000) .......................................................................................... 11

*Davis v. Powertel, Inc.*,
776 So. 2d 971 (Fla. Dist. Ct. App. 2000) ....................................................................... 38

*Dowbenko v Google Inc.*,
582 F App'x 801 (11th Cir 2014) ..................................................................................... 42

*Eaton v. Coal Par of W. Virginia, Inc.*,
580 F. Supp. 572 (S.D. Fla. 1984) ................................................................................... 22

*Gordon v. Terry*,
684 F.2d 736 (11th Cir. 1982) .......................................................................................... 28

*Go–Video, Inc. v. Akai Elec. Co., Ltd.*,
885 F.2d 1406 (9th Cir.1989) ........................................................................................... 12

*Grail Garner v. Pearson*,
732 F.2d 850 (11th Cir. 1984) .......................................................................................... 18

*Grail Semiconductor, Inc. v. Stern*,
2012 U.S. Dist. LEXIS 167140 (S.D. Fla. Nov. 26, 2012) ............................................. 18

*Harris v Nordyne, LLC*,
No. 14-CIV-21884-BLOOM/Valle, 2014 U.S. Dist. LEXIS 189248 (S.D. Fla. Nov. 13, 2014,) .............................................................................................................. 36

*Helman v Bank of Am.*,
685 F App'x 723 (11th Cir 2017) ..................................................................................... 39

*High Tech Indus. v. Bethel Transp., Ltd.*, No. 18-14173-CIV, 2018 U.S. Dist. LEXIS 96060, at *2-3 (S.D. Fla. June 6, 2018) .................................................................... 11

*Hoffend v. Villa*,
261 F.3d 1148 (11th Cir. 2001) ........................................................................................ 20

*Int'l Shoe v. Washington*,
326 U.S. 310 (1945) .......................................................................................................... 19

*Lucero v. Trosch*,
121 F.3d 591 (11th Cir. 1997) .......................................................................................... 17

*Millennium Communs. & Fulfillment, Inc. v Off. of the AG, Dept. of Legal Affairs*,
761 So 2d 1256 (Fla Dist. Ct App 2000) ......................................................................... 37

*Mitsui Sumitomo Ins. Co. v. Carbel, LLC*,
No. 09-21208-CV, 2011 WL 13099717 (S.D. Fla. Mar. 17, 2011) .................................. 20

*Moore v. Kayport Package Express*,
885 F.2d 531 (9th Cir 1989) ............................................................................................. 30

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
135 S. Ct. 1318 (2015) ........................................................................................21

*Palm Beach Golf Ctr.-Boca, Inc v John G. Sarris, D.D.S., P.A.*,
781 F.3d 1245 (11th Cir. 2015) ..........................................................................40

*Parker v. Scrap Metal Processors, Inc.*,
468 F.3d 733 (11th Cir. 2006) .............................................................................16

*Pinter v. Dahl*,
486 U.S. 622 (1988).............................................................................22, 30, 31

*Raiford v. Buslease, Inc.*,
825 F.2d 351 (11th Cir. 1987) ......................................................................21, 22

*Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*,
119 F.3d 935 (11th Cir. 1997) ...........................................................12, 13, 14, 15

*Rollins, Inc. v. Butland*,
951 So. 2d 860 (Fla. 2d DCA 2006) ....................................................................36

*Scheck Investments, L.P. v. Kensington Mgt., Inc.*,
04-21160-CIV, 2009 WL 10668565 (S.D. Fla. June 17, 2009)..........................23

*Sculptchair, Inc. v. Century Arts, Ltd.*,
94 F.3d 623 (11th Cir.1996) ...............................................................................18

*SEC v. Big Apple Consulting USA, Inc.*,
783 F.3d 786 (11th Cir. 2004) .............................................................................22

*SEC v. Comcao Ltd.*,
855 F. Supp. 1258 (S.D. Fla. 1994) .....................................................................25

*SEC v. Edwards*,
540 U.S. 389 (2004).............................................................................................23

*SEC v. Friendly*,
49 F. Supp. 2d 1363 (S.D. Fla. 1999) ..................................................................25

*SEC v. Joiner*,
320 U.S. 344 (1943).............................................................................................30

*SEC v. Koscot Interplanetary, Inc.*,
497 F.2d 473 (5th Cir. 1974) ...............................................................................26

*SEC v. Merchant Capital, LLC*,
483 F.3d 747 (11th Cir. 2007) ........................................................................28, 29

*SEC v. Shavers*,
No. 4:13-cv-416, 2013 U.S. Dist. LEXIS 110018 (E.D. Tex. Aug. 6, 2013)...............25

*SEC v. Unique Fin. Concepts, Inc.*,
196 F.3d 1195 (11th Cir. 1999) ......................................................................24, 26

*SEC v. W.J. Howey Co*,
328 U.S. 293 (1946).............................................................................................23

*See Freed v Universal Health Servs.*,
   No. 04-1233, 2005 U.S. Dist. LEXIS 7789 (E.D. Pa. May 3, 2005) ................................. 32

*St. George v. Pinellas Cty.*,
   285 F.3d 1334 (11th Cir. 2002) ........................................................................................... 20

*Star Fruit Co. v. Eagle Lake Growers, Inc.*,
   160 Fla. 130 (1948) .............................................................................................................. 40

*Stowell v. Ted S. Finkel Inv. Serves., Inc.*,
   489 F. Supp. 1209 (S.D. Fla. 1980) ..................................................................................... 25

*Sun Bank, N.A., v. E.F. Hutton & Co., Inc.*,
   926 F.2d 1030 (11th Cir.1991) ............................................................................................ 12

*Theoharous v. Fong*,
   256 F.3d 1219 (11th Cir. 2001) ........................................................................................... 32

*Tippens v. Round Island Plantation LLC.*,
   2009 U.S. Dist. LEXIS 66224 (S.D. Fla. July 31, 2009) .................................................... 24

*Toole v. Baxter Healthcare Corp.*,
   235 F.3d 1307 (11th Cir. 2000) ........................................................................................... 41

*Twiss v. Kury,*
   25 F.3d 1551 (11th Cir. 1994) ............................................................................................. 42

*U.S. S.E.C. v. Carrillo*,
   115 F.3d 1540 (11h Cir. 1997) ............................................................................................ 13

*United Techs. Corp. v. Mazer*,
   556 F.3d 1260 (11th Cir. 2009) ........................................................................................... 11

*Uselton v. Comm. Lovelace Motor Freight, Inc.*,
   940 F.2d 564 (10th Cir. 1991) ............................................................................................. 25

*Villeneuve v. Advanced Bus. Concepts Corp.*,
   698 F.2d 1121 (11th Cir. 1990) ........................................................................................... 26

*Virgilio v. Ryland Grp., Inc.*,
   680 F.3d 1329 (11th Cir. 2012) ........................................................................................... 33

*Williams v. Wells Fargo Bank N.A.*,
   No. 11-21233-CIV-ALTONAGA/Simonton, 2011 U.S. Dist. LEXIS 119136 (S.D.
   Fla. Oct. 14, 2011) ............................................................................................................... 35

*Williamson v. Tucker*,
   645 F.2d 404 (11th Cir. 1981) ............................................................................................. 28

<u>Statutes</u>

15 U.S.C. § 77b(a)(1) ........................................................................................................23

15 U.S.C. § 77e ................................................................................................................21

15 U.S.C. § 77l(a)(1) ..................................................................................................21, 30

15 U.S.C. § 77v(a) .....................................................................................................12, 13

28 U.S.C. § 1367(a) .........................................................................................................16

47 U.S.C. § 230 .................................................................................................................5

Fla. Stat. § 48.193 ...........................................................................................................19

Fla. Stat. § 48.193(1) .......................................................................................................19

Co-Lead Plaintiffs Albert Parks, an individual ("PARKS"); and Faramarz Shemirani, an individual ("SHEMIRANI") ("Plaintiffs"), by and through their counsel, respectfully submit this omnibus response and memorandum of law ("Response") to the Motions to Dismiss (the "MTDs") Plaintiffs' Amended Consolidated Class Action Complaint (the "Complaint" or "Compl." [DE 78]) filed by Defendant Glenn Arcaro, an individual (the "Arcaro Motion" or "Arcaro MTD" [DE 94] filed by "ARCARO"); Defendant Ryan Maasen, an individual (the "Maasen Motion" or "Maasen MTD" [DE 84] filed by "MAASEN" and together with ARCARO, the "Promoter Defendants"),[1] and Defendant YouTube, LLC, a Delaware limited liability company (the "YouTube Motion" or "YouTube MTD" [DE 88] filed by "YOUTUBE").

## NATURE OF THE ACTION

This action seeks redress on behalf of tens of thousands of individuals and entities who suffered financial harm due to their investments in BITCONNECT's[2] fraudulent Ponzi/pyramid schemes—the BitConnect Lending Program and the BitConnect Staking Program (the "BitConnect Investment Programs"). The BitConnect Investment Programs gained popularity primarily due to BITCONNECT's multi-level affiliate marketer program (the "Referral Program" or "Affiliate Program").[3]

---

[1] Defendants ARCARO and MAASEN are jointly referred to as "Promoter Defendants" solely for the purposes of this Response. However, Plaintiffs note that this same term is used in their Complaint to refer to additional individual defendants that have not yet appeared or responded to the Complaint.

[2] "BITCONNECT" refers collectively to the business entities Bitcoin AMR Limited f/k/a BitConnect Public Limited, a foreign corporation; BitConnect International PLC, a foreign corporation; BitConnect Ltd., a foreign corporation; and BitConnect Trading Ltd., a foreign corporation.

[3] Compl. at ¶6.

This Affiliate Program was a run-of-the-mill multi-level marketing ("MLM") scheme.[4] That is, "affiliates"—*e.g.*, ARCARO and MAASEN—were paid commissions for their successful solicitation of additional investments in the BitConnect Investment Programs.  These "affiliates" received a percentage of any investments made by those they "referred"; and if their referrals themselves became affiliates, they also received a percentage of investments from subsequent investors recruited by their referrals.[5]  Defendants ARCARO and MAASEN were each highly influential—and highly paid—participants in the Referral Program.[6]

Defendant ARCARO's significant role in BITCONNECT's scheme is clear in light of the facts that he, *inter alia*: (1) was employed by BITCONNECT as one of just two "National Promoters" for BITCONNECT's operations within the United States—a position in which he was personally responsible for managing a team of U.S.-based affiliates/recruiters that successfully solicited tens of millions of dollars from the general public; (2) reported directly to Defendant Satish Kumbhani ("SATISH");[7] and (3) participated as an active Director of Defendant BITCONNECT INTERNATIONAL PLC.[8]

Likewise, Defendant MAASEN's significant role is clear considering the facts that he, *inter alia*: (1) was employed by BITCONNECT as a "Regional Promoter"; (2) received of a separate salary from BITCONNECT—which was paid in addition to commissions; and (3)

---

[4]  *Id.*

[5]  *Id.*  In MLM schemes, the recruiters below an affiliate are considered to be in their "downline" whereas the recruiters which they themselves pay are in their "upline."

[6]  *Id.*

[7]  Defendant SATISH is regarded as one of BITCONNECT's founders.  India's Criminal Investigation Department ("CID") alleges that SATISH fled to Dubai one-month prior to BITCONNECT closing the BitConnect Investment Programs.  *Id.* ¶43

[8]  *Id.* ¶¶ 90, 153.

received over 850,000 views of the nearly 100 BITCONNECT promotional videos he posted on his YOUTUBE channel. [9]

For each of the Promoter Defendants' roles as "sellers" of BITCONNECT's unregistered investment contract securities—in the form of BCCs and/or the BitConnect Investment Programs—and knowing active participation in furtherance of BITCONNECT's fraudulent schemes, Plaintiffs allege the following claims (unless otherwise noted):

COUNT I. Violation of Section 12(a) of the Securities Act of 1933 ("Securities Act");

COUNT XII Violation of Section 15(a) of the Securities Act;[10]

COUNT XV. Unjust Enrichment;

COUNT XVI. Violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA");

COUNT XVII. Fraudulent Inducement;

COUNT XVIII. Fraudulent Misrepresentation;

COUNT XIX. Negligent Misrepresentation;

COUNT XX. Conversion; and

COUNT XXI. Civil Conspiracy.

The Promoter Defendants' motions each seek dismissal of the Complaint's claims under Rule 12(b)(2) of the Federal Rules of Civil Procedure on the basis that this Court purportedly lacks personal jurisdiction over them. *See* Arcaro MTD at 6–11 and Maasen MTD at 5–11. More specifically, the Promoter Defendants each provide lengthy legal and factual analyses contending that, with respect to themselves, Florida's long-arm statute does not confer personal jurisdiction; and that even if it had, such jurisdiction would have been prohibited by constitutional limitations

---

[9] *Id*. ¶¶ 167; 170; 206.

[10] This Count is alleged only against Defendant ARCARO.

3

on due process under the Fourteenth Amendment.  *Id.*  These arguments fail for the following reasons: (1) Plaintiffs' claims alleged under the federal securities laws provide the basis for personal jurisdiction; (2) the Fifth Amendment's constitutional limits on due process apply – rather than the Fourteenth Amendment's; and (3) Plaintiffs' federal claims provide this Court with supplemental jurisdiction (pendant jurisdiction) over the Complaint's state and common law claims.  The Promoter Defendants also each seek dismissal of the Complaint's claims under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") on the grounds that the Complaint purportedly fails to adequately state a claim for relief under any of the Counts alleged.  As detailed *infra*, the Promoter Defendants' arguments fail as they: (i) are premised on a clear misunderstanding of the legal questions before this Court; (ii) set forth and apply irrelevant standards of law in direct conflict with controlling precedent; and/or (iii) are premised on a willingness to simply ignore the Complaint's highly-detailed allegations.

Several of BITCONNECT's most successful affiliate promoters, including Defendants ARCARO and MAASEN, had partnerships with YOUTUBE pursuant to which each party obtained considerable profit from the dissemination of BITCONNECT's fraudulent and harmful content to tens of thousands of unsuspecting victims across the globe.[11]  As set forth in the Complaint and *infra*, YOUTUBE, by its own volition, assumed the duty to protect its users, including Plaintiffs and the proposed class members, from harmful content disseminated by its "partners"; YOUTUBE breached this duty by ignoring its self-imposed advertising protocols and proprietary algorithms; and this breach proximately caused Plaintiffs' and the proposed class' damages by lending an air of legitimacy to BITCONNECT's fraudulent schemes and empowering their partners (the Promoter Defendants) with the ability to solicit investments in the BitConnect

---

[11] Compl. ¶7.

Investment Programs from millions of potential, and actual, investors—including Plaintiffs and the proposed class—that they would not have been otherwise able to solicit.  For this breach and for YOUTUBE's failure to warn Plaintiffs and the proposed class members of the dangers associated with investing with BITCONNECT, Count XXII of the Complaint seeks relief against Defendant YOUTUBE.

Defendant YOUTUBE seeks dismissal of Count XXII of the Complaint under Rule 12(b)(2) on the grounds that this Court purportedly lacks personal jurisdiction over YOUTUBE.  YouTube MTD at 4–6.  Additionally, YOUTUBE seeks dismissal under Rule 12(b)(6) because: (a) YOUTUBE is purported "immune" from Plaintiffs' negligence claim; (b) Plaintiffs' claim is purportedly barred by Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230 ("Section 230"); and (c) YOUTUBE purportedly lacked any duty to warn in the first place and thus, no failure could have occurred.  YouTube MTD at 6–20.

YOUTUBE's efforts to obtain a dismissal under Rule 12(b)(2) fail because Plaintiffs' federal claims provide supplemental jurisdiction as to their negligence claim as they each plainly arise from a "common nucleus of operative fact."  YOUTUBE's arguments for dismissal under Rule 12(b)(6) similarly fail because: (a) while Section 230 grants broadcasters a significant amount of leeway, YOUTUBE is not immune from Plaintiffs' claim; and (b) the Complaint clearly establishes each of the four elements necessary to sustain Plaintiffs' negligence claim, *to wit*: (1) YOUTUBE owed Plaintiffs and the proposed class a duty of reasonable care, one which it assumed voluntarily; (2) YOUTUBE breached that duty of reasonable care by failing to warn Plaintiffs and the proposed class of the dangers of investing in BITCONNECT; (3) Plaintiffs and the proposed class suffered damages; and (4) such damages were proximately caused by YOUTUBE's breach of its duty.  Compl. ¶ 352.

Accordingly, the Promoter Defendants' and YOUTUBE's respective Motions to Dismiss Plaintiffs' Complaint should be denied in full.

## STATEMENT OF RELEVANT FACTS

### I.      BCCs AND THE BITCONNECT INVESTMENT PROGRAMS

BITCONNECT created its BitConnect Coins ("BCC") in late-2016; and shortly thereafter, it launched the BitConnect Investment Programs.  Compl. ¶¶ 79-86.  To invest in the BitConnect Investment Programs, investors were required to purchase BCCs on a BITCONNECT-created exchange dubbed the "BCC Exchange" with bitcoin ("BTC") or fiat currency.  *Id*. ¶ 3.  BCCs have never been registered as a security with the Securities and Exchange Commission.  *Id*. ¶ 173.

The BitConnect Lending Program was marketed and sold on the Internet as an opportunity for investors to "lend" their BCCs back to BITCONNECT, which BITCONNECT would then purportedly use to generate profits by purchasing BTC when its price was low and selling BTC when its price was high — a "buy low, sell high" strategy that was purportedly effectuated by a BITCONNECT-designed "trading bot" implementing a proprietary trading algorithm: the "Volatility Software." *Id*. ¶ 4.  In exchange for "lending" BCCs to BITCONNECT, investors were "guaranteed" lucrative returns on their investments.  *Id*.   These returns were allegedly backed by the earnings promised by BITCONNECT's development and implementation of the trading algorithms, which would purportedly produce returns sufficient to pay returns of "up to 40% Per Month."  *Id*. ¶¶ 116–121.

The BitConnect Staking Program was marketed and sold on the Internet as an opportunity for investors to "stake" their BCCs by holding their BCCs in the BITCONNECT-QT wallet (a software and/or online wallet created by BITCONNECT). In exchange for "staking" BCCs in the BITCONNECT-QT Wallet, investors were "guaranteed" lucrative returns on their investments. *Id*. ¶ 5.  The BitConnect

6

Staking Program and BCCs in general were sold as "interest bearing asset[s] with **120% return per year**. It is that simple." *Id*. ¶ 122.

## II.   THE BITCONNECT REFERRAL PROGRAM, NATIONAL PROMOTER ARCARO AND REGIONAL PROMOTER MAASEN

To disseminate BITCONNECT's investment offerings and solicit interest in BCCs and/or the BitConnect Investment Programs, BITCONNECT created the BitConnect Referral Program under which "affiliates" would be compensated for getting others to invest in BITCONNECT. *Id*. ¶ 126.  The BitConnect Affiliate Program was, quite literally, a pyramid scheme—as plainly evident in the following graphic BITCONNECT released:



Much like its Referral Program, BITCONNECT's organizational structure was, unsurprisingly, itself a pyramid.  *Id*. ¶ 89.  BITCONNECT's top "promoter" employee was Defendant SATISH.  *Id*.  Directly below him, were the "National Promoters," which included Defendant ARCARO.  *Id*. ¶¶ 89-90.  BITCONNECT also employed "Regional Promoters," who reported to the National Promoter of their respective countries.  For example, BITCONNECT employed Defendant ARCARO as a National Promoter for the United States and Defendant MAASEN as a Regional Promoter that reported directly to ARCARO.  *Id*. ¶¶ 90-91.

The Promoter Defendants were not merely participants in this program; rather, each was a BITCONNECT employee and received additional compensation in the form of so-called

"development funds." *Id.* ¶ 141.  These funds were paid out from BITCONNECT to National Promoters, *e.g.*, ARCARO, who then used and disbursed these funds to their assigned Regional Promoters, *e.g.*, MAASEN.  *Id.* ¶¶ 141-144.

In addition to ARCARO being employed as one of BITCONNECT's "National Promoters," he was also an active Director and shareholder of Defendant BITCONNECT INTERNATIONAL PLC.  *Id.* ¶¶ 93-94.  In the words of ARCARO's co-defendant, Craig Grant ("GRANT"), during a publicly released group chat including ARCARO—the entity was BITCONNECT's "new setup"—an "international company ran by all top promoters."  *Id.* ¶ 96. GRANT further stated that ARCARO "told me about" it and how "he [ARCARO] had to send all his documents to bitconnect a couple of months ago so they can [sic] make a new company with all the promoters."  *Id.* ¶ 51.

### III.   BITCONNECT COLLAPSES

On January 4, 2018, the Texas State Securities Board issued an Emergency Cease and Desist Order against BITCONNECT in which the Securities Commissioner of the State of Texas presented his office's conclusion that BITCONNECT, *inter alia*, had unlawfully, and fraudulently, engaged in the offer and sale of securities in violation of numerous securities regulations and that their actions threatened immediate and irreparable public harm.  *Id.* ¶ 187.

On January 9, 2018, the Secretary of State of North Carolina - Securities Division issued Temporary Cease and Desist Order against BITCONNECT in which it ordered BITCONNECT to restrain from further violating state securities laws because BITCONNECT's investment offerings were unregistered securities being offered to North Carolina's residents and that those investments posed an immediate and irreparable harm to such residents.  *Id.* ¶ 188.

On January 13, 2018, BITCONNECT's website went down; and by January 16, 2018, BITCONNECT officially announced that the BitConnect Investment Programs were shut down, effective immediately. *Id.* ¶ 189. Within moments of this announcement, the price of BCC plummeted nearly ninety-percent in value; as it had become effectively useless. *Id.* As set forth in great detail throughout the Complaint, BITCONNECT's unlawful schemes have caused Plaintiffs and the proposed class damages in excess of $2 billion.

## PROCEDURAL HISTORY

This action was initiated on January 24, 2018, on behalf of the putative class of tens of thousands of victims who suffered injury as a result of their investments in BCCs and the BitConnect Investment Programs, with claims being asserted against BITCONNECT and certain BITCONNECT employees/affiliate promoters for their roles in perpetuating its unlawful, and fraudulent, securities offerings. Over the following months, related class action lawsuits against BITCONNECT and certain of its affiliates were filed, including:

1) *Paige v. BitConnect Int'l PLC*, No. 3:18-cv-58-JHM-CHL) (W.D.Ky Jan. 29, 2018) (the "*Paige* Action");

2) *Mengesha v. BitConnect Int'l PLC, et al.*, 0:18-cv-279- WMW-SER) (D.Minn. Jan. 31, 2018);

3) *Kline, et al. v. BitConnect Int'l PLC, et al.*, 8:18-cv-00319-EAK-MAP Feb. 7, 2018) (the "*Kline* Action");

4) *Long et al v. BitConnect International PLD, et al*, 18-cv-154-RBD-DCI (M.D. Fla. Jan. 30, 2018) (the "*Long* Action"); and

5) *Avalos v. BitConnect International Plc, et al.*, 1:18cv21118 (S.D. Fla. Mar. 23, 2018)
(the "*Avalos* Action" and collectively with the *Paige* Action, *Mengesha* Action, *Kline*
Action, and *Long* Action, the "Related Actions").

On February 2, 2018, Plaintiff Paige of the *Paige* Action filed a motion for a Preliminary
Injunction against Defendant MAASEN.  *Paige* Action at DE 9.  On February 26, 2018, Chief
Judge Joseph H. McKinley, Jr. of the United States District Court for the Western District of
Kentucky granted Paige's motion and imposed a Preliminary Injunction against Defendant
MAASEN pursuant to which MAASEN was "authorized to use his finances for: 1) retention of
legal counsel and ongoing legal fees and costs, 2) payment of reasonable personal expenses for
him and his family and 3) trading and investing cryptocurrencies for the purpose of generating
personal income." *Paige* Action, DE 22.  Any other use of Defendant MAASEN's assets are
prohibited unless specifically allowed by the Court.  *Id.*

On April 13, 2018, pursuant to the Private Securities Litigation Reform Act, Plaintiffs filed
a motion for appointment as lead plaintiff in this Action.  DE 31.  Plaintiffs also filed separate
motions seeking appointment as lead plaintiff in, or where appropriate, consolidation of, each of
the Related Actions.  On June 19, 2018, pursuant to the PSLRA, this Court entered an Order
consolidating the related actions pending in this district, appointing Plaintiffs as Co-Lead Plaintiffs
in this action, and appointing Plaintiffs' counsel as Co-Lead Counsel to serve on behalf of Plaintiffs
and the putative class. [DE 46].  In the months following Plaintiffs' appointment, each of the
Related Actions have also been transferred this Court and are now consolidated with this instant
action.[12]

---

[12] *See Long* Action, Transfer Order, DE 13-2 (Mar. 9, 2018); *Kline* Action, Transfer Order, DE 32
(Apr. 13, 2018); Order Approving Stipulation to Consolidate and Appoint Lead Plaintiff (DE 46);
*Mengesha* Action, Transfer Order, DE 30 (Sept. 27, 2018); and *Paige* Action, Transfer Order, DE

On August 14, 2018, the Court issued a Pretrial Scheduling Order pursuant to which Plaintiffs were required to file an amendment to their complaint by October 11, 2018.  [DE 64]. Pursuant to this Order, on October 11, 2018, Plaintiffs filed the Complaint.  The Maasen MTD and YouTube MTD were both filed on October 25, 2018.  Defendant ARCARO's MTD was filed on November 8, 2018.

## ARGUMENT

### I.    PLAINTIFFS HAVE ESTABLISHED THIS COURT'S PERSONAL JURISDICTION OVER THE PROMOTER DEFENDANTS AND YOUTUBE

#### A.    Standard of Review On A Rule 12(b)(2) Motion To Dismiss

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of pleading enough facts to make out a *prima facie* case for personal jurisdiction." *High Tech Indus. v. Bethel Transp., Ltd.*, No. 18-14173-CIV, 2018 U.S. Dist. LEXIS 96060, at *2-3 (S.D. Fla. June 6, 2018) (citing *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009)).  "A prima facie case is established if the Plaintiff presents enough evidence to withstand a motion for directed verdict." *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F3d 1286, 1291 (11th Cir 2000). ).  Here, the Complaint readily satisfied that standard; and personal jurisdiction over the Promoter Defendants and YOUTUBE is clearly warranted.

#### B.    A Statutory Basis For Personal Jurisdiction Exists Here

The Promoter Defendants both seek a Rule 12(b)(2) dismissal of the Complaint's claims on the basis that Florida's long-arm statute does not confer personal jurisdiction and that even if it had, such jurisdiction would have been prohibited by constitutional limitations on due process

---

29 (Nov. 13, 2018).  Notably, Plaintiff Bryan Paige filed his motion to transfer the *Paige* Action to this Court on September 7, 2018.

under the Fourteenth Amendment.  These arguments miss the mark.  Personal jurisdiction in this case is not premised on Florida's long-arm statute, but rather on a specific statutory provision, 15 U.S.C. § 77v(a), which authorizes nationwide service of process for claims brought under the federal securities laws.  "When a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997).  In analyzing a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), the court must determine whether the applicable statute potentially confers jurisdiction over the defendants, and then determine whether the exercise of jurisdiction comports with due process.  *See BCCI Holdings*, 119 F.3d. at 940; *Sun Bank, N.A., v. E.F. Hutton & Co., Inc.,* 926 F.2d 1030, 1033 (11th Cir.1991); *Go–Video, Inc. v. Akai Elec. Co., Ltd.,* 885 F.2d 1406, 1413 (9th Cir.1989).  ).  With regard to the Complaint in the instant matter, both of those requirements have been met.

## 1.    The Securities Act Confers Nationwide Jurisdiction Over the Promoter Defendants

The first consideration here is easily determined.  Because the Securities Act provides for nationwide service of process in 15 U.S.C. § 77v(a), it is the statutory basis for personal jurisdiction in this case, not Florida's long-arm statute.  *See BankAtlantic v. Coast to Coast Contractors, Inc.*, 947 F. Supp. 480, 484 (S.D. Fla. 1996); *U.S. S.E.C. v. Carrillo*, 115 F.3d 1540, 1544 (11h Cir. 1997) (finding that "[b]ecause in this case our personal jurisdiction is invoked based on the applicable federal securities laws, which provide for worldwide service of process, we conclude that the proper forum for minimum contacts analysis is the United States").

## 2.    Jurisdiction By This Court Comports With Due Process

Next, the constitutional limits of due process must be considered.  "It is well established that when, as here, a federal statute provides the basis for jurisdiction, the constitutional limits of

12

due process derive from the Fifth, rather than the Fourteenth, Amendment." *BCCI Holdings*, 119 F.3d. at 942. The Fifth Amendment inquiry focuses the fairness and reasonableness of requiring a defendant to litigate in a particular forum. *See Chase v. Sandborn*, 835 F.2d 1341, 1345 (11th Cir. 1988) To evaluate whether the Fifth Amendment requirements of fairness and reasonableness have been satisfied, courts  balance the burdens imposed on the individual defendant against the federal interest involved in the litigation.  *See Asahi Metal Indus. Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 114 (1987) (reasonableness depends on burden to defendant, interest of sovereign, and plaintiff's interest in obtaining relief).  This balance, however, should only be considered if a defendant has established that his liberty has actually been infringed. *See BCCI Holdings*, 119 F.3d at 946.  And a defendant's contacts with the forum state "play not a magical role in the Fifth Amendment analysis." *Id*.  Rather a court must only ensure that requiring defendants to litigate in a plaintiff's chosen forum is not "unconstitutionally burdensome." *Id*. at 947.  The.  Eleventh Circuit precedent clearly establishes that "it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern." *Id*.  The burden is on the defendant to demonstrate that the assertion of jurisdiction in the forum will "make litigation 'so gravely difficult and inconvenient' that [he] unfairly is at a 'severe disadvantage' in comparison to his opponent." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) (citations omitted)

The Promoter Defendants have not demonstrated, and cannot demonstrate, that defending the litigation in this forum would be so gravely difficult and inconvenient as to put them at a severe disadvantage.  ARCARO merely argues that "Mr. Arcaro is an individual who lives more than 2,500 miles from this court, in California" and that "[t]he burden of defending this case in Florida would be—and already is—significant," but he provides no demonstration corroborating this burden.  Arcaro MTD at 10.  In fact, ARCARO has not had to appear in this Court and will likely

not have to appear in this Court but for trial.  Any discovery from him, including a deposition, would likely take place in or near his principal residence.  Similarly, MAASEN makes claims to support an argument the requisite showing of grave difficulty and severe disadvantage.  *See* Maasen MTD at 8.

Moreover, Plaintiffs, as noted by the Promoter Defendants, are not residents of Florida, and thus would have no strategic or tactical advantage from litigating before this Court.  Thus, it is absurd to contend, in this era of electronic filing and web-based legal research, that a defendant would be constitutionally prejudiced by litigating in Florida. "While distant litigation often is more bothersome than litigation at home, inconvenience that is not substantial should be ignored for constitutional purposes."  Maryellen Fullerton, *Constitutional Limits on Nationwide Personal Jurisdiction in the Federal Courts,* 79 Nw. U.L.Rev. 1, 38 (1984).

Because the Promoter Defendants have not demonstrated any constitutionally significant inconvenience, they have not met their burden of showing an infringement of their individual liberty interests as protected by the Fifth Amendment.  *See BCCI*, 119 F.3d at 948.  Thus, the Promoter Defendants' MTDs for lack of personal jurisdiction should be denied.

## C.    Supplemental Jurisdiction Attaches To Plaintiffs' Remaining Claims

"Under 28 U.S.C. § 1367(a), in any civil action over which a federal district court has original jurisdiction, the court may exercise supplemental jurisdiction 'over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.' 'The constitutional 'case or controversy' standard confers supplemental jurisdiction over all state claims which arise out of a common nucleus of operative fact with a substantial federal claim.'" *All Underwriters Subscribing to Policy of Ins. No. B0621MMILSYB15055 v. Rika Boats Ltd.*, No. 16-20498-CIV-

14

LENARD/GOODMAN], 2017 U.S. Dist. LEXIS 8969, at *15-16 (S.D. Fla. Jan. 20, 2017) (quoting *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 743 (11th Cir. 2006)). "The factors the Court considers when determining whether to exercise supplemental jurisdiction over state claims are judicial economy, convenience, fairness to the parties, and whether all claims would be expected to be tried together. *Parker*, 468 F.3d at 745 (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 725–26 (1966)).

The Promoter Defendants further contend that jurisdiction as to Plaintiffs' federal securities claims should not confer jurisdiction as to the remaining causes of action which arise under state or common law.   For example, Defendant MAASEN suggests that, because the number of Plaintiffs' federal securities claims is less than the number of their state and common law claims, jurisdiction over the former should not provide supplemental, or pendant, jurisdiction over the latter:

> Plaintiffs bring seven Florida claims against Maasen and lack standing to bring their lone deficiently pled federal claim against him. *See* Section II.A, *infra*. Thus, Plaintiffs cannot credibly argue for a nationwide "minimum contacts" approach.

Maasen MTD at 7.

In a similar vein, Defendant ARCARO argues:

> To the extent Plaintiffs contend that 15 U.S.C. § 77v precludes the necessity of analysis under Florida's long-arm statute, Arcaro submits that the Securities Act counts (Counts I, XII) must be dismissed. *See* Section IV.A, *infra*"

Arcaro Motion at 6 and n.3.

Such arguments fail to account for the fact that Plaintiffs' state and common law claims "arise out of a common nucleus of operative fact" as their federal claims and are therefore afforded supplemental/pendant jurisdiction through the Court's jurisdiction over their federal claims.  *See Lucero v. Trosch*, 121 F.3d 591, 597 (11th Cir. 1997).  Here, Plaintiffs' claims share a common

nucleus of operative fact, as they each arise from BITCONNECT's unlawful, and fraudulent, offer and sale of unregistered securities in the form of BCCs, the BitConnect Lending Program and/or the BitConnect Staking Program.  Accordingly, supplemental/pendant jurisdiction attaches to their state and common law claims.  *Id.*

YOUTUBE's efforts to obtain a dismissal under Rule 12(b)(2) similarly fail because Plaintiffs' federal claims provide supplemental jurisdiction as to their negligence claim, as they each plainly arise from a "common nucleus of operative fact."  Importantly, "federal jurisdiction to try a pendent claim exists even when the federal claim is dismissed before trial if the federal claim is dismissed before trial if the federal claim was "not insubstantial. . . . Under this test, if there is 'any foundation of plausibility to the claim, federal jurisdiction [over the pendent claim] exists.'" *Grail Semiconductor, Inc. v. Stern*, 2012 U.S. Dist. LEXIS 167140, at *6 (S.D. Fla. Nov. 26, 2012) (quoting *Grail Garner v. Pearson*, 732 F.2d 850, 854 (11th Cir. 1984)).  Plaintiffs' federal securities claims plainly have substantially more than a mere "foundation of plausibility." Moreover, even if Plaintiffs' federal securities claims were dismissed prior to trial, pendant jurisdiction would still attach to their remaining claims**.**

**D.    The Court Has Personal Jurisdiction Over YOUTUBE**

Much like its partners ARCARO and MAASEN, YOUTUBE also argues that Plaintiffs' action should be dismissed for lack of personal jurisdiction under Rule 12(b)(2).  To determine whether personal jurisdiction exists over an out-of-state defendant, a court must conduct a two-pronged analysis. *Sculptchair, Inc. v. Century Arts, Ltd.,* 94 F.3d 623, 626 (11th Cir.1996).).  First, the Court must assess whether there is jurisdiction under the state's long-arm statute. *Id.*  Second, the court must decide whether the defendant has established sufficient minimum contacts with the state, such that the exercise of jurisdiction will satisfy the Fourteenth Amendment's due process

requirement by comporting with "traditional notions of fair play and substantial justice." *Id.* (quoting *Int'l Shoe v. Washington,* 326 U.S. 310, 316 (1945)).

Florida's long-arm statute—Fla. Stat. § 48.193—provides for personal jurisdiction over a nonresident defendant under two sets of circumstances. The first, contained in Fla. Stat. § 48.193(1), provides for specific personal jurisdiction when a claim arises from the defendant's forum-related contacts. Actions that give rise to specific jurisdiction include carrying on a business in Florida, which confers jurisdiction pursuant to § 48.193(1)(a). *Alternate Energy Corp. v. Redstone*, 328 F. Supp. 2d 1379, 1382 (S.D. Fla. 2004). Here, Plaintiffs' Complaint alleges that defendant GRANT, a resident of Florida, was an active promoter of BITCONNECT's through his use of videos posted on YOUTUBE wherein he solicited investments for the BitConnect Investment Programs. Compl. ¶¶ 51, 56. Moreover, the Complaint specifically alleges that Defendant GRANT was spending $7,000 per week on marketing with Google and YOUTUBE as of October 2017. *Id.* ¶ 148.

In considering whether YOUTUBE has sufficient minimum contacts with Florida, the Court must consider: (1) whether YOUTUBE has purposefully availed itself of the benefits of doing business in the forum state; (2) whether the cause of action arose out of the activities through which YOUTUBE did so; and (3) whether YOUTUBE could have reasonably anticipated being haled into court in the forum state. *Burger King,* 471 U.S. at 475. In determining whether Internet contacts satisfy the above factors, Florida courts have applied the *Zippo* precedent, which holds that engaging in commercial activity over the Internet constitutes sufficient minimum contacts to satisfy due process requirements. *Alternate Energy*, 328 F. Supp. 2d at 1382. Given that YOUTUBE not only permits viewers in Florida to view its content, but also persons in Florida, like GRANT, to post

17

content on it, YOUTUBE clearly engages in commercial activity that involves this forum.  Thus, YOUTUBE has sufficient minimum contacts with this forum to satisfy due process.

## II.      STANDARD OF REVIEW ON A RULE 12(B)(6) MOTION

For purposes of a motion to dismiss under Rule 12(b)(6), the Court's review is "limited to the four corners of the complaint."  *See Mitsui Sumitomo Ins. Co. v. Carbel, LLC*, No. 09-21208-CV, 2011 WL 13099717, at *4 (S.D. Fla. Mar. 17, 2011) (quoting *St. George v. Pinellas Cty.*, 285 F.3d 1334, 1337 (11th Cir. 2002). The Court must also accept as true all factual allegations in the complaint and evaluate all inferences derived from those facts in the light most favorable to plaintiff. *Id.*; *see also Hoffend v. Villa*, 261 F.3d 1148, 1150 (11th Cir. 2001).

## III.     THE PROMOTER DEFENDANTS ARE LIABLE UNDER THE FEDERAL SECURITIES LAWS

As discussed herein, the Promoter Defendants violated Sections 12(a)(1), 15 U.S.C. § 77l(a)(1), of the Securities Act by offering and selling unregistered securities—in the form of BCCs and the BitConnect Investment Programs—as part of their, respective, employment with BITCONNECT.  Defendants' actions in soliciting investments in BCCs and/or the BitConnect Investment Programs directly violated the Securities Act and have deprived Plaintiffs and the Class of their rights and protections under the federal securities laws.

### A.      Elements of Plaintiffs' Section 12(a)(1) Claims

Section 12(a)(1), 15 U.S.C. § 77l(a)(1), of the Securities Act creates a private right of action against any person who "offers or sells a security in violation of" Section 5, 15 U.S.C. § 77e, of the Securities Act.  *See e.g.*, *Raiford v. Buslease, Inc.*, 825 F.2d 351, 353 (11th Cir. 1987) ("Section 12[a](1) merely provides a remedy for a violation of that section by authorizing recovery in a civil action against any person who offers or sells a security in contravention of section 5(a)"). Section 5 of the Securities Act prohibits the offer or sale of unregistered securities. 15 U.S.C. § 77e.. "The

18

lynchpin of the [Securities] Act is its registration requirement." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1323 (2015)

Due to the varied and innumerable ways in which investors are likely to be manipulated and harmed absent the protections of the federal securities laws, Sections 5 and 12(a)(1) of the Securities Act provide for strict liability against any person who offers or sells an unregistered security. *See Pinter v. Dahl*, 486 U.S. 622, 638 (1988)) ("The registration requirements are the heart of the [Securities] Act, and § 12[a](1) imposes strict liability for violating those requirements. Liability under § 12[a](1) is a particularly important enforcement tool, because in many instances a private suit is the only effective means of detecting and deterring a seller's wrongful failure to register securities before offering them for sale.") (citation omitted); see also *Raiford*, 825 F.2d at 354 ("Section 12[a](1) will allow a purchaser to recover his investment 'regardless of whether he can show any degree of fault, negligent or intentional, on the seller's part'") (citation omitted); *Eaton v. Coal Par of W. Virginia, Inc.*, 580 F. Supp. 572, 576 (S.D. Fla. 1984) ("As modified by section 5, section 12[a](1) prohibits the use of interstate commerce or of the mails to aid in the offer or sale of an unregistered security . . .").

To adequately plead a Section 5 violation, and thus liability under Section 12(a)(1), a "plaintiff need only allege [1] the sale or offer to sell securities, [2] the absence of a registration statement covering the securities, and [3] the use of the mails or facilities of interstate commerce in connection with the sale or offer." *Raiford*, 825 F.2d at 354; *see also SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 806-07 (11th Cir. 2004) (setting forth same three elements for a Section 5 violation); *Scheck Investments, L.P. v. Kensington Mgt., Inc.*, 04-21160-CIV, 2009 WL 10668565, at *4 (S.D. Fla. June 17, 2009) (same). A careful review of the Complaint clearly demonstrates that all such required allegations are properly set forth against the movants.

19

### B.   BCCs Constitute "Investment Contract Securities"

Under Section 2(a)(1), 15 U.S.C. § 77b(a)(1), of the Securities Act, the definition of a "security" includes an "investment contract." "An investment contract is an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *SEC v. Edwards*, 540 U.S. 389, 393 (2004).  "This definition 'embodies a flexible, rather than a static, principle that is capable of adaption to meet the countless and variable schemes devised by those seeking to use others' money on the promise of profits.'"  *Id*. at 395 (quoting *SEC v. W.J. Howey Co*, 328 U.S. 293, 301 (1946)).

An application of the *Howey* test concludes that BCCs, the BitConnect Lending Program and the BitConnect Staking Program are each deemed securities under the "investment contract" definition in Section 2(a)(1), 15 U.S.C. § 77b(a)(1), of the Securities Act.  *Howey Co.*, 328 U.S. at 298–99.  "Under *Howey* and its progeny, an offering is an investment contract if there is: '(1) an investment of money (2) in a common enterprise, (3) with the expectation of profits to come solely from the efforts of others.'"  *Tippens v. Round Island Plantation LLC.*, 2009 U.S. Dist. LEXIS 66224, at *30 (S.D. Fla. July 31, 2009) (quoting *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999)).

Plaintiffs allege that the Promoter Defendants engaged in the unlawful offer and sale of three different types of investment securities: (1) BCCs; (2) the BitConnect Lending Program; and (3) the BitConnect Staking Program.  *See, e.g.*, ¶¶ 236–37.  Defendant ARCARO disputes only allegations concerning BCCs and thus, the analysis here pertains solely to BCCs.  Given that ARCARO has not attempted to dispute allegations that the BitConnect Lending Program nor the BitConnect Staking Program also constitute investment securities, he is presumed to admit such allegations.

20

In any event, as detailed below, Defendant ARCARO's arguments concerning whether BCCs are a security fail for obvious reasons.

### 1.     Purchases of BCCs Required An Investment of Money

An investment of money under the *Howey* test includes digital currencies such as BTC. To purchase BCCs—whether as an investment asset or to participate in the BitConnect Investment Programs—putative class members invested BTC or fiat currency in order to receive BCC Tokens. Compl. ¶238. Digital currencies such as BTC are deemed "money" for the purposes of the *Howey* test. *See, e.g.*, *SEC v. Shavers*, No. 4:13-cv-416, 2013 U.S. Dist. LEXIS 110018, at *4–5 (E.D. Tex. Aug. 6, 2013) ("First, the Court must determine whether the BTCST investments constitute an investment of money . . . Bitcoin is a currency or form of money, and investors wishing to invest in BTCST provided an investment of money"). Furthermore, "in spite of *Howey*'s reference to an 'investment of money,' it is well established that cash is not the only form of contribution or investment that will create an investment contract." *Uselton v. Comm. Lovelace Motor Freight, Inc.*, 940 F.2d 564, 574 (10th Cir. 1991).

Moreover, "[a]n 'investment of money' refers to an arrangement whereby an investor commits assets to an enterprise or venture in such a manner as to subject himself to financial losses." *SEC v. Friendly*, 49 F. Supp. 2d 1363, 1368–69 (S.D. Fla. 1999) (citing *Stowell v. Ted S. Finkel Inv. Serves., Inc.*, 489 F. Supp. 1209, 1220 (S.D. Fla. 1980); see also *SEC v. Comcao Ltd.*, 855 F. Supp. 1258, 1260 (S.D. Fla. 1994) (same).

Defendant ARCARO's purported *Howey* analysis fails when he argues that the first element of the *Howey* test is not satisfied because "BCC is simply not an investment of money." Arcaro MTD at 13. In determining whether BCCs are securities, the question is whether the assets used to "invest" (*i.e.*, purchase) BCC(s) constituted "money"—not whether BCC(s) themselves

21

are "money."  In short, ARCARO's entire argument collapses due to its failure to comprehend the "investment of money" element considers whether the asset expended to purchase BCC(s) was "money" rather than whether BCC(s) was money itself.

### 2.    Investors in BCCs Invested in a Common Enterprise

The Eleventh Circuit has adopted the vertical commonality test, under which "[a] common enterprise exists where the 'fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties.'" *SEC v. Unique*, 196 F.3d at 1199 (citing *Villeneuve v. Advanced Bus. Concepts Corp.*, 698 F.2d 1121, 1124 (11th Cir. 1990)).  "The requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the [promoter].'"  *Id*. at 1199–1200 (quoting *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974)).

Here, Plaintiffs and the proposed Class were investing in a common enterprise with the Promoter Defendants, as the BTC and fiat currency invested were pooled under the control of Defendant BITCONNECT; and the success of the BitConnect platform -- and thus potential profits stemming from the future valuation of the BCC -- was entirely reliant on BITCONNECT and the Promoter Defendants' actions, *e.g.*, BITCONNECT's implementation of its "proprietary, secret trading system," which BITCONNECT claimed would produce returns sufficient to cover interest payments to the BCC holders. With respect to the Promoter Defendants, their anticipated success at soliciting additional purchases of BCC or luring additional victims to purchase BCCs and/or participate in the BitConnect Investment Programs was vital to increasing the value of BCC. Compl. ¶ 176.

Further, the Promoter Defendants received commissions in BCCs and thus, it is evident that a portion of any potential value ascribed to the BCCs was expected to be allocated for their

personal benefits, in addition to Plaintiff's and the Class' benefit.  Accordingly, it is abundantly clear that the success of BCC tied the interests of BITCONNECT investors to those of the Promoter Defendants; and any such success was entirely reliant on the defendants' actions.  As such, the "common enterprise" element of the *Howey* test is plainly met.

Despite the foregoing, ARCARO argues that the "common enterprise element" of the *Howey* test has not been satisfied because: (a) "the fortunes of BCC purchaser [sic] are [purportedly] not interwoven with the fortunes of BitConnect or Mr. Arcaro"; and (b) "the facts of this case are distinguishable from those relating to a recent action in which the SEC contended that a token offering met the definition of an investment contract."  Arcaro MTD at 13 (citing *In the Matter of Munchee Inc., Admin Proc.*, No. 3-18304, Release No. 10445 (Dec. 11, 2017)).  These arguments fail because: (a) the Complaint has countless allegations that investors and ARCARO's fortunes were tied together and, as noted, such allegations are deemed true in the context of a motion to dismiss under Rule 12(b)(6); (b) the common enterprise is obvious in the fact that ARCARO received a portion of his compensation in BCCs, and therefore potential increases in value to BCC would be for his benefit as well as those he solicited purchases from; (c) the common enterprise was the imaginary trading bot—but in reality the value of BCC was dependent on whether ARCARO, his team, and his international counterparts maintain and grow BITCONNECT's fraudulent pyramid scheme.

### 3.    Investors in BCCs Invested With the Expectation of Profits Produced By The Effort Of Others

The third prong of the *Howey* test is satisfied when "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.'" *Balmert v. Pulte Home Corp.*, 445 Fed. Appx. 256, 262 (11th Cir. 2011) (*quoting Williamson v. Tucker*, 645 F.2d 404, 418 (11th Cir. 1981); *see also SEC v.*

*Merchant Capital, LLC*, 483 F.3d 747, 755 (11th Cir. 2007)("'the focus is on the dependency of the investor on the entrepreneurial or managerial skills of a promoter or other party'") (quoting *Gordon v. Terry*, 684 F.2d 736, 741 (11th Cir. 1982)).

Here, it is indisputable that the value and existence of the BCCs have been at all times entirely dependent on BITCONNECT and the Promoter Defendants' actions. Indeed, absent the Promoter Defendants, and their counterparts throughout the world, having been able to grow their MLM pyramids, BITCONNECT would never have achieved the pervasive level of harm that it did. Accordingly, the "essential managerial efforts" underpinning the success or failure of BITCONNECT's fraudulent schemes were to be, *inter alia*, Defendants'. Thus, this element is satisfied.

Despite the foregoing, ARCARO argues that this third element is not satisfied because investors had the freedom to buy and sell BCCs when they pleased. The notion that Plaintiffs' and the Class' freedom to decide when to sell their BCCs could ever constitute "significant investor control" is nonsensical. To have sufficient "control," investors would have to have substantial control over the enterprise itself – not over the disposition of the security. After all, a stock can be bought or sold, but that does not mean it is not a security. Moreover, as a factual matter, many investors were **<u>unable to even sell their BCCs</u>** when BITCONNECT shut down its Investment Programs in January 2018. Furthermore, this argument fails because BCCs would literally not exist but for BITCONNECT's managerial efforts.[13] Thus, Arcaro's argument on this point should be disregarded.

---

[13]     BITCONNECT created and sold BCC, and described them as "an open source, peer-to-peer, community driven decentralized cryptocurrency that allow [*sic*] people to store and invest their wealth in a non-government-controlled currency, and even earn a substantial interest on investment [*sic*]. This means anyone holding BitConnect Coin in their wallet will receive interest on their balance in return for helping maintain security on the network." Similarly, BCC was

### 4.     <u>Representations To Investors</u>

Courts in the Eleventh Circuit also look to the representations made to investors and what they were led to expect.  *See e.g.*, *Merchant*, 483 F.3d at 756 ("Consistent with *Howey*'s focus on substance over form, we look at all the representations made by the promoter in marketing the interests . . ..") (citing *SEC v. Joiner*, 320 U.S. 344, 353 (1943)). Here, the Complaint is replete with examples of the Promoter Defendants presenting BITCONNECT as an investment opportunity for the purposes of making a profit.  Trading BCC was marketed as an "investment option" that could be "used to profit on price fluctuation" in that investors could "buy BitConnect coin at a lower price and sell[ ] them at [a] higher price." Additionally, investors could "profit[ ] from downward movements in [BCC] price by selling them at a higher price and buy[ing] them again at a lower price and pocketing the price difference."  Compl. ¶ 114.  Similarly, ARCARO's website promised that "[p]assive income is just a click away" for investors who "join Bitconnect", and that investors would "MAKE HUGE PROFITS WITH BITCONNECT".  Compl. ¶¶ 153, 154. Defendant MAASEN, for his own part, disseminated dozens of YOUTUBE videos promoting BITCONNECT investments, offering the prospect of substantial profits to potential investors. Compl. ¶¶ 167.

### C.     <u>The Promoter Defendants Are Each "Statutory Sellers" Under *Pinter v. Dahl*</u>

Section 12(a)(1) creates liability against any person who "offers or sells" an unregistered security "to the person who purchased such security from him." 15 U.S.C. § 77l(a)(1). "In *Pinter*, the Court held that liability extends beyond those who pass title to a security; those who solicit a purchase may also face liability as 'sellers' under section 12[a](1) of the Securities Act." *Moore*

---

described as not just "an investment tool; [but as] the investment tool you need to jump start your financial security."  Compl. ¶ 84.

*v. Kayport Package Express*, 885 F.2d 531, 535 (9th Cir 1989) (stating that the Supreme Court's holding in *Pinter v. Dahl*, 486 U.S. 622 (1988)) was premised on, in part, it having "reasoned that Congress intended to impose liability on those who solicit because 'solicitation of a buyer is perhaps the most critical stage of the selling transaction'") (quoting *Pinter*, 486 U.S. at 646). In reaching this conclusion, the *Pinter* court interpreted the words "offers or sells" and the word "from" in Section 12(a)(1).

The *Pinter* court ultimately determined that there are two types of sellers: (1) direct sellers passing title; and (2) those engaged in solicitation of the purchase or sale. With respect to the latter, the Court established a two-part test for determining whether a defendant was a "statutory seller" under Section 12(a)(1), holding that "liability extends to the person who [1] successfully solicits the purchase, [2] motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id*. at 622, 647.. The Court found that so long as these two elements are met, then "it is fair to say that the buyer 'purchased' the security **from** him . . . ." *Id*. at 638 (emphasis added).

Each of the Promoter Defendants was literally paid to solicit investments in BITCONNECT, whether through the purchase of BCCs or the BitConnect Investment Programs. Thus, each is clearly a "statutory seller" under *Pinter*. Nevertheless, ARCARO and MAASEN argue that because they did not personally sell BCCs to Plaintiffs, they are not sellers of BCCs for the purposes of a Section 12(a)(1) claim. *See, e.g.*, Arcaro Motion at 2 (arguing that ARCARO "did not 'sell BCC within the meaning of the statute and relevant case law"); *see also* Maasen MTD at 13.

As noted above, in *Pinter*, the Supreme Court held that liability under Section 12(a)(1) may extend to those who solicit a purchase so long as it was for their own or the sellers' financial

26

benefit. *Pinter*, 486 U.S. at 638. In reaching this ruling, the Supreme Court provided the following reasoning:

> A natural reading of the statutory language would include in the statutory seller status at least some persons who urged the buyer to purchase. For example, a securities vendor's agent who solicited the purchase would commonly be said, and would be thought by the buyer, to be among those "from" whom the buyer "purchased," even though the agent himself did not pass title.

Here, the Promoter Defendants each fall squarely within the Supreme Court's definition of a "statutory seller" because they both: (a) "solicited the purchase" of unregistered securities (BCCs and the BitConnect investment Programs; and (b) did so for their own financial benefit. Indeed, the Promoter Defendants' activities were precisely those which the court described in its reasoning for adopting its definition. In short, the Promoter Defendants, who were employed to solicit investments in BITCONNECT, are deemed "sellers" under Section 12(a)(1) of the Securities Act.

## D. Defendant Arcaro Is Liable as a Control Person Under Section 15(a) of the Securities Act

Liability under Section 15(a) of the Securities Act requires an underlying violation of the Securities Act. To state a claim under Section 15(a), a plaintiff must allege: (1) a primary violation of the securities laws by a controlled company; (2) that the defendant had "the power to control the business affairs of" the controlled company; and (3) that the defendant "had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability." *Theoharous v. Fong*, 256 F.3d 1219, 1227 (11th Cir. 2001) (quotation marks omitted). The element of "culpable participation" is not a prerequisite at the pleading stage. *See Freed v Universal Health Servs*., No. 04-1233, 2005 U.S. Dist. LEXIS 7789, at *34 n.6 (E.D. Pa. May 3, 2005).

Defendant ARCARO seeks dismissal on the basis that the Complaint does not allege that he had control over BITCONNECT. This is false. Indeed, such control is evidence in the

Complaint's allegations setting forth details as to his disbursement of BITCONNECT's funds as he pleased to Defendants Trevon James and Craig Grant; his decisions regarding BITCONNECT's promotional materials; his organization of the BitConnect Yacht party, club events, conferences, and even the BitConnect School.  Compl. at ¶¶ 95-96, 133-156.

In short, Defendant ARCARO had a significant amount of control over BITCONNECT's actions and is therefore subject to control person liability under Section 15(a) of the Securities Act.

## IV.    <u>UNJUST ENRICHMENT</u>

"Under Florida law, '[a] claim for unjust enrichment has three elements: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendant to retain it without paying the value thereof.'"  *Cimaglia v. Moore*, 724 F. App'x 695, 698 (11th Cir. 2018) (quoting *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012)).  The Complaint contains ample allegations sufficient to satisfy each of these elements.  *See, e.g.*, Compl. ¶ 291 (alleging that ARCARO and MAASEN were among those which "reaped monetary rewards from operating and/or personally benefiting from inducing Plaintiffs and the Class to invest in fraudulent Ponzi/pyramid schemes (BCC and/or the BitConnect Investment Programs), thereby causing actual harm to thousands of investors.").

The Promoter Defendants each seek dismissal under Rule 12(b)(2) of the Complaint's unjust enrichment claim on the grounds that unjust enrichment claims under Florida law, purportedly, require a plaintiff to allege and show that they "*directly* conferred a benefit on the defendants."  Arcaro MTD at 24; *see also* Maasen MTD (claiming that Plaintiffs must show the they "directly conferred a benefit" on MAASEN and that an "indirect benefit" cannot support their unjust enrichment claim).

This argument fails because Plaintiffs clearly allege that the Promoter Defendants benefited directly *and* indirectly as a result of Plaintiffs' and the proposed class' investments in BITCONNECT's unlawful investment offerings.   For example, the Complaint alleges that: "BITCONNECT used new BITCONNECT investors' funds to pay the BITCONNECT Directors and affiliates – including but not limited to, Defendants . . . ARCARO . . . and MAASEN – salary and commissions for their role in bring additional victims into the scheme."    Compl. ¶ 170. Moreover, the direct benefit conferred on ARCARO and MAASEN is painfully obvious—they both received commissions which were a percentage of the amount of investments they or those in their "downline" were able to successfully solicit. *See, e.g.*, *id.* ¶ 6 (explaining the mechanics of the BitConnect Referral Program operated to provide affiliate—such as the Promoter Defendants—with "a percentage of any investments made by the investors they referred as well as a portion of the investments made by subsequent investors recruited by their referrals, and so forth—a standard multi-level marketing ("MLM") scheme").

In any event, consideration of whether an indirect or direct benefit was conferred is unnecessary given the fact that each of the Promoter Defendants, once again, misstate the standards of law applicable to Plaintiffs' unjust enrichment claims.   That is, contrary to the Promoter Defendants' claims, there is no requirement that Plaintiffs allege or show that a "direct" benefit was conferred on ARCARO or MAASEN by way of a direct transfer of their personal funds to the Promoter Defendants to sustain their claims for unjust enrichment.   Rather, "just because the benefit conferred by Plaintiffs on Defendants did not pass directly from Plaintiffs to Defendants — but instead passed through a third party — does not preclude an unjust-enrichment claim. Indeed to hold otherwise would be to undermine the equitable purpose of unjust enrichment claims." *Williams v. Wells Fargo Bank N.A.*, No. 11-21233-CIV-ALTONAGA/Simonton, 2011

U.S. Dist. LEXIS 119136, at *14-15 (S.D. Fla. Oct. 14, 2011) (citations omitted).  In fact, earlier

this year, "the Eleventh Circuit . . . found that a plaintiff may have conferred a 'direct benefit' on

a defendant through an intermediary where . . . the defendant directly profited from and involved

in depriving the plaintiff of the benefit at issue."  *Coffey v. WCW & Air, Inc.*, No. 3:17-cv-90-

MCR-CJK, 2018 U.S. Dist. LEXIS 148122, at *23 (N.D. Fla. Aug. 30, 2018) (citing *Cimaglia*,

724 F. App'x at 699).

In sum, Defendants' arguments seeking dismissal of Plaintiffs' unjust enrichment claim

fail, as Plaintiffs allege defendants received a direct benefit from their and the putative class'

investments in BITCONNECT; and in any event, Defendants' analyses are based on an incorrect

standard of law.

## V.      PLAINTIFFS' COMPLAINT CONTAINS ADEQUATE ALLEGATIONS SUPPORTING THEIR CLAIM UNDER FDUTPA

As set forth in the Complaint, "Chapter 501, Fla. Stat., Florida's Deceptive and Unfair

Trade Practices Act is to be liberally construed to protect the consuming public, such as Plaintiffs

and the Class Members in this case, from those who engage in unfair methods of competition, or

unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce."

Compl. ¶ 294.

"A claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair

practice in the course of trade or commerce; (2) causation; and (3) actual damages."  *Harris v*

*Nordyne, LLC*, No. 14-CIV-21884-BLOOM/Valle, 2014 U.S. Dist. LEXIS 189248, at *13 (S.D.

Fla. Nov. 13, 2014,) (citing *See Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006).

FDUTPA's "coverage is 'extremely broad,' and has been applied to class action claims alleging

failure to disclose relatively benign product defects."  *Id*. at 15 (collecting cases standing for the

proposition that while "FDUTPA does not define what constitutes 'unfair and deceptive,' courts

have held that the statute should be construed liberally and that the concept should be regarded as extremely broad.").

### A.   Arcaro's Arguments Fail to Warrant Dismissal of Plaintiffs FDUPTA Claims

The Complaint's allegations establish each of the required elements for their claim under FDUTPA.  Notwithstanding that patent fact, the Promoter defendants each seek dismissal of Plaintiffs' FDUTPA claim.  More specifically, ARCARO argues that the FDUTPA claims should be dismissed on the grounds that: (1) the alleged misstatements regarding BITCONNECT did not occur within Florida and thus a valid claim cannot be sustained; and (2) violations of Section 12(a)(1) and 15(a) do not constitute *per se* violations of FDUPTA.  *Id*.  Each of these arguments fail because: (a) FDUTPA does not only protect consumers within Florida but also out-of-state residents[14], (b) even if such a requirement existed, there are numerous putative class members that are residents of Florida and more than willing to join this action as a named plaintiff and thus, the purported requirement could be swiftly met; and (c) Plaintiffs need not establish a *per se* violation of FDUTPA, rather, as noted, "[t]o state a cause of action under FDUTPA, Plaintiff must allege '(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.' *Bowe v Pub. Stor.*, No. 1:14-cv-21559-UU, 2014 U.S. Dist. LEXIS 195556, at *9 (S.D. Fla. July 2, 2014) (citation omitted).

Defendant ARCARO further argues that Plaintiffs' FDUTPA claims must be dismissed because Plaintiffs purportedly "could not have reasonably relied on any alleged misstatements."

___

[14] *See, e.g.*, *Barnext Offshore, Ltd. v Ferretti Group USA, Inc.*, No. 10-23869-CIV, 2012 U.S. Dist. LEXIS 61710, at *19 (S.D. Fla. May 2, 2012) (discussing the court's holding in *Millennium Communs. & Fulfillment, Inc. v Off. of the AG, Dept. of Legal Affairs*, 761 So 2d 1256, 1261 (Fla. 3d DCA 2000) in which It was "not persuaded by th[e] holding [in *Ortiz*, 764 So. 2d 7, that the FDUTPA protects only Florida residents] . . . because as we have earlier noted, there are no geographical or residential restrictions contained in the express language of section 501.202").

Arcaro MTD at 22. Contrary to ARCARO's claims, there is no reliance requirement whatsoever for claims under FDUTPA. *See, e.g.*, *Carriuolo v GM Co.*, 823 F.3d 977, 984 (11th Cir. 2016) ("Under Florida law, an objective test is employed in determining whether the practice was likely to deceive a consumer acting reasonably. That is, '[a] party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue.'") (quoting *Davis v. Powertel, Inc.*, 776 So. 2d 971, 973 (Fla. Dist. Ct. App. 2000). In other words, Plaintiffs could have never even heard of ARCARO prior to this action and still be able to maintain a FDUTPA claim so long as they can show that some hypothetical unidentified "reasonable" person/investor could have/would have relied on ARCARO's statements made in soliciting investments in BITCONNECT.

## VI. FRAUDULENT INDUCEMENT, FRAUDULENT MISREPRESENTATION AND NEGLIGENT MISREPRESENTATION

Defendant ARCARO argues that each of Plaintiffs' Fraudulent Inducement, Fraudulent Misrepresentation and Negligent Misrepresentation claims should be dismissed because Plaintiffs have purportedly failed to identify an unfair or deceptive act or omission and failed to allege the required element of causation. More specifically, ARCARO argues Plaintiffs "could not possibly have reasonably relied on any misrepresentations allegedly made to them regarding BitConnect's Investment Programs." To make this argument, ARCARO cites to a 1993 opinion from a Florida appellate court which purportedly supports ARCARO's proposition that "[t]he reliance element for fraudulent inducement and misrepresentation is virtually identical and requires that plaintiff reasonably rely on a false statement made by a defendant." Arcaro MTD at 21. ARCARO's claim in that regard directly contradicts the Eleventh Circuit Court of Appeals' holding in *Helman v Bank of Am.*, 685 F App'x 723, 729, n. 5 (11th Cir 2017), which correctly notes that mere reliance—not justifiable reliance—is sufficient to state a claim for fraudulent inducement under Florida law. *Id.*

Nevertheless, ARCARO fails to submit any actual basis to demonstrate why Plaintiffs were purportedly "unreasonable" in investing in BITCONNECT other than his ridiculous contention that the Complaint's arguments concerning YOUTUBE having been on notice of the BITCONNECT fraud due to its position as gatekeeper for its "partners"—*e.g.*, ARCARO and MAASEN—belie Plaintiffs' arguments "reasonable reliance by showing that no hypothetical reasonable investor would have invested in BitConnect and considered Arcaro's misstatements/solicitations as containing the truth. In essence, ARCARO's position does nothing more than suggest that the tens of thousands, probably hundreds of thousands, of individuals who invested in BITCONNECT were being unreasonable. Moreover, this argument stops just short of ARCARO acknowledging that he knew BITCONNECT was offering fraudulent investment opportunities, because he essentially contends that the investors should have known.

Regardless, ARCARO's effort to use Plaintiffs' allegations as to Defendant YOUTUBE to support dismissal of Plaintiffs' claims against ARCARO fails due to the obvious fact that, as set forth *infra*, YOUTUBE voluntarily assumed the role as gatekeeper for what content was appropriate for its partners to disseminate (by enacting various policies, which it then did not follow). Moreover, not only was it YOUTUBE's job to monitor these promotional materials, but it also, at all times, had access to proprietary algorithms, thousands of employees, and Google's massive resources. The "reasonable investor" did not assume such role nor did they have access to any of the foregoing resources. In short, the insinuation that the standard of reasonableness applicable to YOUTUBE is interchangeable with that for the "reasonable investor" is ludicrous.

## VII.   CONVERSION AND CIVIL CONSPIRACY

ARCARO's final argument concerns Plaintiffs' conversion claim—he makes no attempt to dispute Plaintiffs' claim for civil conspiracy.[15]  "Under Florida law, '[a] conversion consists of an act in derogation of the plaintiff's possessory rights, and any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time, is a conversion." *Palm Beach Golf Ctr.-Boca, Inc. v John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1258-1259 (11th Cir. 2015) (citing *Star Fruit Co. v. Eagle Lake Growers, Inc.*, 160 Fla. 130, 132, 33 (1948)).  The Promoter Defendants each seek dismissal of Plaintiffs' conversion claims on the legally deficient notion that because the Promoter Defendants purportedly never personally held the literal dollars invested, Plaintiffs' claim must fail.  The Promoter Defendants provide no legal authorities in making this argument; and thus, it warrants no consideration.

## VIII.   PLAINTIFFS HAVE ADEQUATELY PLED THEIR NEGLIGENT FAILURE TO WARN CLAIM AGAINST YOUTUBE

### A.   Elements Of Plaintiffs' Negligence Claim

A claim for negligent failure to warn contains the same four elements applicable to any other negligence claim: "(1) that the defendant had a duty; (2) that the defendant failed to provide adequate warnings of the hazards of a particular product, thereby breaching that duty; (3) that the breach was the proximate cause of the plaintiff's harm; (4) that the plaintiff suffered injury as a result." *Bodie v Purdue Pharma Co.*, 236 F App'x 511, 518 (11th Cir 2007) (citing *Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1314 (11th Cir. 2000)).   Defendant YOUTUBE submits

---

[15] Defendant MAASEN submits an argument purporting to warrant dismissal of Plaintiffs' civil conspiracy claim, though it merely argues that MAASEN was not involved with BITCONNECT to the extent that he could have taken part in a conspiracy.  However, MAASEN's argument in this respect is belied by virtue of his employment as a "Regional Promoter."

arguments concerning solely the first of these elements, *i.e.*, that it owed no duty to Plaintiffs or the putative class of BITCONNECT victims.

###    B.    <u>YouTube Assumed the Duty to Warn The Putative Class</u>

Defendant YOUTUBE argues that it had no "special relationship" with Plaintiffs and thus, could not have assumed a duty to warn.  Contrary to YOUTUBE's claim, they did have a "special relationship" with Plaintiffs and the proposed class—one resulting from YOUTUBE's "partners", like the Promoter Defendants, successfully soliciting investments in BITCONNECT.  Regardless, this question is moot given that a duty to warn attaches not only where a special relationship exists with the plaintiff, but also from YOUTUBE's ability to control its partner's solicitation efforts.  "'Under the common law, a person has no duty to control the conduct of another or to warn those placed in danger by such conduct unless a special relationship exists between the defendant and the persons whose behavior needs to be controlled or the foreseeable victim of such conduct.' . . . Thus, at trial, Plaintiffs would be required to show that Defendant either had a special relationship with Shah, whose alleged behavior needed controlling, or with Plaintiffs, the alleged foreseeable victims of such conduct." *Cia. de Elaborados de Cafe v Cardinal Capital Mgt.*, 401 F.Supp 2d 1270, 1279 (S.D. Fla. 2003) (*quoting Twiss v. Kury,* 25 F.3d 1551, 1555 (11th Cir. 1994)).  As alleged in the Complaint, YOUTUBE indeed had a special relationship with its promotional partners (like the Promoter Defendants) and had the ability, as well as the obligation, to control the harmful content being disseminated by those partners.  Compl. at ¶¶ 193-227.

###    C.    <u>YouTube Is Not "Immune" From Liability For Its Negligence In Fulfilling A Duty It Imposed On Itself</u>

YOUTUBE seeks dismissal of Plaintiffs' negligence claim under Rule 12(b)(6) on the basis that YOUTUBE is immune under Section 230 of the CDA.  Under Section 230, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of

any information provided by another information content provider." "'The majority of federal circuits have interpreted the CDA to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third party user of the service.'" *Dowbenko v Google Inc.*, 582 F App'x 801, 804 (11th Cir 2014) (quoting *Almeida v. Amazon.com, Inc*., 456 F.3d 1316, 1321 (11th Cir. 2006)).

Section 230's "grant of immunity is not without limits, however. It applies only to the extent that an interactive computer service provider is not also the information content provider of the content at issue. An 'information content provider' is defined as 'any person or entity that is responsible, *in whole or in part*, for the creation or development of information provided through the Internet or any other interactive computer service." Accordingly, "if a website operator is in part responsible for the creation or development of content, then it is an information content provider as to that content — and is **not immune** from claims predicated on it. *Am. Income Life Ins. Co. v Google, Inc.*, No. 2:11-CV-4126-SLB, 2014 U.S. Dist. LEXIS 124870, at *18-20 (ND Ala Sep. 8, 2014) (citing *Carafano v. Metrosplash.com, Inc*., 339 F.3d 1119, 1123 (9th Cir. 2003)).

As set forth in the Complaint, several of the affiliate/marketer defendants were also YOUTUBE's "content partners." It was through these "partnerships" that BITCONNECT's top affiliates published tens of thousands of hours of content promoting BITCONNECT's unlawful sales of securities and lured in millions of prospective investors. As set forth in the Complaint, YOUTUBE "fosters a close business relationship with its most popular content providers – a relationship designed to inure to both YOUTUBE's and the content provider's great economic benefit – through its 'YouTube Partner Program.'" Compl. at ¶ 193. In short, YOUTUBE played a substantially greater role in disseminating BITCONNECT's unlawful investment opportunities than that of a run-of-the-mill service provider of an "interactive computer service." Due to the

foregoing, content published by YOUTUBE's "partners"—such as ARCARO and MAASEN—
were not merely disseminated by "third parties" disassociated from YOUTUBE but rather by
YOUTUBE itself and its respective partners.  Accordingly, YOUTUBE is not immune from
Plaintiffs' negligence claim under Section 230 of the CDA.

While the CDA does confer broad immunity upon "service providers" that provide an
"interactive computer service" for third parties to post their own content, such immunity does not
extend to parties seeking dismissal under Rule 12(b)(6) because Section 230 of the CDA
purportedly provides YOUTUBE with "federal immunity" from Plaintiffs' claim because (a)
"service providers" are "immune" from liability for information originating with third party users
of their service; and (b) YOUTUBE purportedly did not have a "special relationship" with
Plaintiffs and the proposed class and thus, it had no duty that could be breached.

In its Motion to Dismiss, YOUTUBE brushes aside its partnerships entirely by lamely
suggesting that its use of the word "partner" was intended to refer to "little more than a user who
uploaded videos that received more than a certain number of views and thus was eligible to share
advertising revenue generated by the videos" and that these "'partnerships' did not fundamentally
transform the relationship between YouTube and such users."  YouTube Motion at 19.
YOUTUBE's "partnerships" were undoubtedly more involved than YOUTUBE's coy position
reveals to the Court.  For example, YOUTUBE actively and loudly solicited partners (like the
Promoter Defendants) from whom it believed it would develop a financially lucrative relationship:



Moreover, to join the program, a user needed to meet significant eligibility standards that YOUTUBE closely scrutinized.  Accordingly, it is entirely reasonable to infer that YOUTUBE's involvement in reviewing or editing the BITCONNECT-affiliated promoters in the YouTube Partnership Program rose to or above the minimal level necessary for which Section 230's immunity would not apply.  *See Am. Income Life Ins. Co.*, 2014 U.S. Dist. LEXIS 124870, at *18-20.[16]

YOUTUBE's attempt to immunize itself under Section 230 lacks merit by virtue of the fact that Plaintiffs' negligence claim does not arise from YOUTUBE's activities as a mere "service provider" enabling "third parties" to post content and thus, Plaintiffs claims do not seek to hold YOUTUBE liable as a "publisher."  Rather, YOUTUBE's negligence occurred by its failure to enforce against its own business partners its internal policies that are designed to prevent the dissemination of harmful materials.  Finally, YOUTUBE did have a "special relationship" not only with its "partners" but also with Plaintiffs and the proposed class in that YOUTUBE was engaged in numerous partnerships with persons, like the Promoter Defendants, who successfully solicited investments in BITCONNECT. Regardless, this question is moot given that a duty to warn attaches not only where a special relationship exists with the plaintiff, but also from YOUTUBE's ability to control its partner's solicitation efforts. *Cia. de Elaborados de Café*, 401 F.Supp. 2d at 1279.

---

[16] Plaintiffs are currently unable to discern YOUTUBE's level of involvement in their reviews of, or edits to, any BITCONNECT-related promotional materials released by their "partners" on the YouTube platform.  However, Plaintiffs would be able to identify such during discovery. Accordingly, Plaintiffs submit that granting YOUTUBE blanket immunity under Section 230 of the CDA would be improper at this preliminary stage of the pleadings, as Plaintiffs should be permitted to investigate the nature of YOUTUBE's "partnerships" with the individual BITCONNECT-related individuals.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants ARCARO's [DE 94], MAASEN's [DE 86], and YOUTUBE's [DE 88] Motions to Dismiss.  To the extent that the Complaint fails to adequately allege facts as to any claim, Plaintiffs submit that they can cure any such deficiencies and respectfully request leave to amend to do so.

Respectfully submitted,

**SILVER MILLER**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone:     (954) 516-6000


By: */s/ David C. Silver*
            DAVID C. SILVER
            Florida Bar No. 572764
            E-mail: DSilver@SilverMillerLaw.com
            JASON S. MILLER
            Florida Bar No. 072206
            E-mail: JMiller@SilverMillerLaw.com
             - and -
            **LEVI & KORSINSKY, LLP**
            EDUARD KORSINSKY
            E-mail: ek@zlk.com
            30 Broad Street, 24th Floor
            New York, New York 10004
            Telephone:     (212) 363-7500
            Facsimile:     (212) 636-7171

            DONALD J. ENRIGHT
            E-mail: denright@zlk.com
            ELIZABETH K. TRIPODI
            E-mail: etripodi@zlk.com
            JOHN A. CARRIEL
            E-mail: jcarriel@zlk.com
            **LEVI & KORSINSKY, LLP**
            1101 30th Street, N.W., Suite 115
            Washington, DC 20007
            Telephone:     (202) 524-4290
            Facsimile:     (202) 333-2121

            *Co-Lead Counsel for Plaintiffs*

39

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a copy of the foregoing was electronically filed with the Clerk of Court on this ___20th___ day of November 2018 by using the CM/ECF system and that a true and correct copy will be served <u>via</u> <u>electronic</u> <u>mail</u> to: All Counsel of Record on the attached Service List.

                                        ___*/s/  David C. Silver*_____
                                        DAVID C. SILVER

## SERVICE LIST

**Desiree Moore, Esq.**                    *Counsel for Defendant Glenn Arcaro*
**Nicole Claire Mueller, Esq.**
K&L GATES, LLP
70 W. Madison Street – Suite 3100
Chicago, IL 60602-4207
Telephone:     (312) 807-4245
Facsimile:     (312) 827-8114
E-mail: desiree.moore@klgates.com; nicole.mueller@klgates.com


**Carol Lumpkin, Esq.**                    *Counsel for Defendant Glenn Arcaro*
K&L GATES, LLP
Southeast Financial Center
200 S. Biscayne Blvd. – Suite 3900
Miami, FL 33131-3300
Telephone:     (305) 539-3300
Facsimile:     (305) 358-7095
E-mail: carol.lumpkin@klgates.com


**Ryan K. Stumphauzer, Esq.**              *Counsel for Defendant Ryan Maasen*
**Kiran N. Bhat, Esq.**
STUMPHAUZER & SLOMAN
SunTrust International Center
One SE Third Avenue, Suite 1820
Miami, FL 33131
Telephone:     (305) 371-9686
Facsimile:     (305) 371-9687
E-mail: rstumphauzer@sslawyers.com; kbhat@sslawyers.com


**Brian M. Willen, Esq.**                  *Counsel for Defendant YouTube, LLC*
**Eli B. Richlin, Esq.**
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas - 40th Floor
New York, NY 10019
Telephone:     (212) 999-5800
E-mail: BWillen@wsgr.com; ERichlin@wsgr.com

Lead Case No.: 9:18-cv-80086-DMM

**Nathan Berman, Esq.**                    *Counsel for Defendant YouTube, LLC*
ZUCKERMAN SPAEDER LLP
101 East Kennedy Blvd. - Suite 1200
Tampa, FL 33602
Telephone:     (813) 221-1010
Facsimile:     (813) 223-7961
E-mail: NBerman@zuckerman.com


**Ryan Hildreth**                          *Defendant - Pro Se*
30211 Avenida de las Banderas - Suite 200
Rancho Santa Margarita, CA 92688
Telephone:     (657) 229-2116
E-mail: hildreth951@gmail.com


**Jasper D. Ward IV, Esq.**                *Plaintiffs' Counsel - Executive Committee*
JONES WARD PLC
The Pointe
1205 E. Washington Street - Suite 111
Louisville, KY 40206
Telephone:     (502) 882-6000
E-mail: jasper@jonesward.com


**Joshua H. Eggnatz, Esq.**               *Plaintiffs' Counsel - Executive Committee*
**Michael J. Pascucci, Esq.**
EGGNATZ | PASCUCCI
5400 S. University Drive – Suite 417
Davie, FL 33328
Telephone:     (954) 889-3359
Facsimile:     (954) 889-5913
E-mail: JEggnatz@JusticeEarned.com; MPascucci@JusticeEarned.com


**John A. Yanchunis, Esq.**                *Plaintiffs' Counsel - Executive Committee*
MORGAN & MORGAN
201 N. Franklin Street - 7th Floor
Tampa, FL 33602
Telephone:     (813) 223-5505
E-mail: JYanchunis@ForThePeople.com