## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE No: 18-cv-80086-MIDDLEBROOKS

IN RE BITCONNECT SECURITIES LITIGATION,

_____/

## ORDER ON MOTIONS TO DISMISS

**THIS CAUSE** comes before the Court upon the Motions to Dismiss filed by Defendant Ryan Maasen (DE 86), Defendant YouTube, LLC (DE 88), and Defendant Glenn Arcaro (DE 94). Co-Lead Plaintiffs Albert Parks and Faramarz Shemirani filed an omnibus response in opposition to these motions on November 20, 2019. (DE 97). Defendants Maasen, YouTube, and Arcaro each filed a reply in support of their respective motions on December 4, 2018. (DE 101; DE 102; DE 103). THIS CAUSE also comes before the Court on Defendant Arcaro's Request for Judicial Notice, to which Plaintiffs did not respond. (DE 105).

## BACKGROUND

This putative class action is composed of six different lawsuits brought on behalf of investors allegedly defrauded by a cryptocurrency Ponzi scheme. Pursuant to the Private Securities Litigation Reform Act of 1995, I previously consolidated these cases and appointed Albert Parks and Faramarz Shemirani, who together comprise the "BitConnect Investor Group," as Co-Lead Plaintiffs. (DE 46). The operative complaint in this matter is the Amended Consolidated Class Action Complaint ("Consolidated Complaint") filed on October 11, 2018 by Parks and Shemirani ("Plaintiffs").

The Consolidated Complaint categorizes the many Defendants in this matter into three groups. The first, composed of Defendants Bitcoin AMR Limited f/k/a BitConnect Public Limited, BitConnect International PLC, BitConnect Ltd., BitConnect Trading Ltd., is identified as

the "BitConnect Corporate Defendants." (Consol. Compl. ¶¶ 28–32). The Consolidated Complaint states that these entities (collectively "BitConnect") are wholly interrelated and are used as interchangeable instrumentalities of the alleged schemes. (*Id.* ¶ 33). Plaintiffs next identify a group of "BitConnect Developer Defendants," composed of eleven of BitConnect's founders, administrators, consultants, and operatives. (*Id.* ¶¶ 34–42). While summons have been issued as to all of the BitConnect Corporate Defendants and BitConnect Developer Defendants (DE 1; DE 3; DE 80; DE 81), the docket does not reflect whether any of them have been served, and none have appeared in this action. The third group, which includes seventeen identified individuals and nine John Does, is labeled as the "BitConnect Director and Promoter Defendants." (*Id.* ¶¶ 43–60). Of this group, four individuals have appeared in this action: Defendants Glenn Arcaro, Trevon Brown, Ryan Hildreth, and Ryan Maasen. The Consolidated Complaint refers to the BitConnect Corporate Defendants, the BitConnect Developer Defendants, and the BitConnect Director and Promoter Defendants collectively as the "BitConnect Defendants." The other Defendant named in this matter is YouTube, LLC ("YouTube").

The essence of the Consolidated Complaint is that BitConnect operated a pyramid/Ponzi scheme in the form of the BitConnect Lending Program and the BitConnect Staking Program (the "BitConnect Investment Programs"). (*Id.* ¶ 3). Participation in either of these programs required investors to purchase, using either bitcoin[1] or fiat currency, BitConnect-created cryptocurrency called BitConnect Coins ("BCC") on the BitConnect BCC Exchange. (*Id.* ¶ 3). The BitConnect

---

[1] Bitcoin is an electronic form of floating currency that is neither backed by any real asset nor regulated by a central bank or governmental authority—instead, the bitcoin supply is based on an algorithm that structures a decentralized peer-to-peer transaction system. *SEC v. Shavers*, No. 4:13-CV-416, 2013 WL 4028182 (E.D. Tex. Aug. 6, 2013) (citing Derek A. Dion, *I'll Glady Trade You Two Bits on Tuesday for a Byte Today: Bitcoin, Regulating Fraud in the E-Conomy of Hacker-Cash*, 2013 U. Ill. J.L. Tech & Pol'y 165, 167 (2013)). The value of Bitcoin is volatile. *Id.*

Lending Program was marketed as an opportunity for investors to "lend" their BCC back to BitConnect, which would then use a trading algorithm to create profit from volatility in the bitcoin market. (*Id.* ¶ 4). The BitConnect Staking Program was presented as a way for investors to "stake" their BCC by holding them in a digital wallet software created by BitConnect. (*Id.* ¶ 5). Both of the BitConnect Investment Programs are alleged to have "guaranteed" lucrative returns on investments. (*Id.* ¶¶ 4–5).

To extend the reach of the BitConnect Investment Programs, BitConnect is alleged to have used a multilevel affiliate marketing system in which affiliates were paid a commission for referrals and would receive a portion of investments made by subsequent investors. The Promoter Defendants are alleged to have been "highly influential affiliate marketers and/or directors" of BitConnect and to have received compensation directly from BitConnect. (*Id.* ¶ 6). YouTube's role in the allegations stems from its partnerships with the Promoter Defendants: The Consolidated Complaint alleges that YouTube was negligent in failing to warn the victims of the harmful BitConnect content for which YouTube compensated its creators and publishers. (*Id.* ¶ 7).

After an enormous amount of investment in BCC and the BitConnect Investment Programs—Plaintiffs allege that the class has suffered damages in excess of $2,000,000,000— BitConnect shut down its trading platforms in early 2018. (*Id.* ¶¶ 189, 192). It shut down the lending program and stopped honoring promises to return the principal invested in the program. (*Id.* ¶ 190). Within moments of BitConnect shutting down its trading and lending platforms, the price of BCC fell nearly 90% in value, and the Complaint states that BCC are now "effectively useless." (*Id.* ¶ 191).

The Consolidated Complaint alleges a violation of Section 12(a) of the Securities Act of 1933 against the BitConnect Defendants. (Count I). The Consolidated Complaint also alleges violations of Section 15(a) of the Securities Act against most of the BitConnect Developer

Defendants and four of the Promoter Defendants: Defendants Satish Kumbhani, Divyesh Darji, Glenn Arcaro and Joshua Jeppesen. (Count II–Count XIII). Plaintiffs allege a breach of contract against the Corporate Defendants, the Developer Defendants, and Defendants Satish and Darji. (Count XIV). Against the BitConnect Defendants, Plaintiffs also allege unjust enrichment (Count XV), violation of Florida's Deceptive and Unfair Trade Practices Act (Count XVI), fraudulent inducement (Count XVII), fraudulent misrepresentation (Count XVIII), negligent misrepresentation (Count XIX), conversion (Count XX), and civil conspiracy (Count XXI). Against YouTube, Plaintiffs allege a single count of negligent failure to warn (Count XXII).

## ANALYSIS

Defendants Arcaro, Maasen, and YouTube seek dismissal for lack of personal jurisdiction and for failure to state a claim. Defendant YouTube also seeks dismissal on the basis that Plaintiffs' claim against it is barred by Section 230 of the Communications Decency Act.

### I.       Personal Jurisdiction

Defendant Arcaro is alleged to be a resident of California, Defendant Maasen is alleged to be a resident of Oklahoma, and Defendant YouTube is alleged to be a Delaware limited liability company with its principal place of business in California. (Consol. Compl. ¶¶ 51, 58, 61). Each argues that dismissal is warranted under Federal Rule of Civil Procedure 12(b)(2), which allows for dismissal of a claim when the court lacks personal jurisdiction over a defendant.

In deciding whether to exercise personal jurisdiction over a particular defendant, federal courts generally conduct a two-part inquiry, first determining whether the defendant can properly be served with process under the applicable statutory authority and then ascertaining whether that service comports with constitutional due process requirements. *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). The plaintiff "has the burden of establishing a prima facie case of personal jurisdiction." *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d

1357, 1360 (11th Cir. 2006) (citing *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1268-69 (11th Cir. 2002)).

### A. Defendants Arcaro and Maasen

Arcaro and Maasen argue that dismissal is proper because Florida's long-arm statute does not confer jurisdiction over them. Plaintiffs, however, identify a different statutory basis for personal jurisdiction: the Securities Act, which gives the district courts of the United States "jurisdiction of offenses and violations under this subchapter and under the rules and regulations promulgated by the Commission in respect thereto." 15 U.S.C. 77v(a). That section also provides that

> Any such suit or action may be brought in the district wherein the defendant is found or is an inhabitant or transacts business, or in the district where the offer or sale took place, if the defendant participated therein, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

*Id.* Where, as here, a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction. *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997).

The mere *allegation* of a Securities Act violation is not sufficient to confer personal jurisdiction, however. When a jurisdictional motion to dismiss depends "on the assertion of a right created by a federal statute, the court should dismiss for lack of jurisdiction only if the right claimed is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise devoid of merit as not to involve a federal controversy." *Id.* at 941 (citations and quotations omitted). Because Plaintiffs' securities claims against Arcaro and Maasen fail, however, *see infra* Section II, jurisdiction on the basis of the Securities Act is foreclosed.

Plaintiffs' remaining claims against Arcaro and Maasen are all state law causes of action. The only argument Plaintiffs advance with respect to these claims is that personal jurisdiction is

proper because the claims arise from the same nucleus of operative fact as Plaintiffs' securities claims.[2] "Pendent personal jurisdiction permits a court to entertain a claim against a defendant over whom it lacks personal jurisdiction, but only if that claim arises from a common nucleus of operative fact with a claim in the same suit for which the court does have personal jurisdiction over the defendant." 13D CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3567 (3d ed. 2019). Plaintiffs' securities claims against Arcaro and Maasen are subject to dismissal, however, and in the absence of an anchor claim, pendent jurisdiction does not provide a basis for personal jurisdiction of Plaintiffs' state law claims. *See Siegmund v. Xuelian Bian*, No. 16-62506-CIV, 2017 WL 5644599, at *10 (S.D. Fla. Sept. 29, 2017) (declining to exercise pendent personal jurisdiction over state law claims after determining federal securities claim was due to be dismissed).

Plaintiffs do not argue that personal jurisdiction over Arcaro and Grant should be premised on Florida's long arm statute. Accordingly, in the absence of any basis for the Court to exercise personal jurisdiction over Plaintiffs' state law claims against Arcaro and Grant, and these claims are dismissed.

## B. Defendant YouTube

I next turn to the question of whether the Court possesses personal jurisdiction over Defendant YouTube. "A defendant can be subject to personal jurisdiction under Florida's long-

---

[2] Plaintiffs, on this point, appear to conflate supplemental jurisdiction, which pertains to subject matter jurisdiction, with pendent jurisdiction, which pertains to personal jurisdiction. *See* 13D CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3567 (3d ed. 2019). While supplemental jurisdiction is expressed in a statute, 28 U.S.C. § 1367, pendent jurisdiction is a matter of common law and has not been adopted by the Eleventh Circuit. I note, however, that "'every circuit court of appeals to address the question [has] upheld the application of pendent personal jurisdiction.'" *See Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1176 (9th Cir. 2004) (quoting *United States v. Botefuhr*, 309 F.3d 1263, 1272–75 (10th Cir. 2002)) (adopting doctrine of pendent jurisdiction). Accordingly, for the purposes of this analysis, I will assume as valid the doctrine of pendent jurisdiction.

arm statute in two ways." *Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1204 (11th Cir. 2015).    First, section 48.193(1)(a) lists acts that subject a defendant to *specific* personal jurisdiction—that is, jurisdiction over suits that arise out of or relate to a defendant's contacts with Florida. Fla. Stat. § 48.193(1)(a).    Second, section 48.193(2) provides that Florida courts may exercise *general* personal jurisdiction—that is, jurisdiction over any claims against a defendant, whether or not they involve the defendant's activities in Florida—if the defendant engages in "substantial and not isolated activity" in Florida. Fla. Stat. § 48.193(2). Plaintiffs do not address general personal jurisdiction, but argue instead that YouTube is subject to specific jurisdiction because Defendant Grant, who is alleged to be a resident of Miami, Florida, actively promoted BitConnect through videos he posted to YouTube. (Consol. Compl. ¶ 56). The Consolidated Complaint also alleges that in October of 2017, Grant began spending $7,000 per week on marketing with Google and YouTube. (*Id.* ¶ 148).

Florida's long-arm statute extends to, *inter alia*, persons and entities "[o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state." Fla. Stat. § 48.193(1)(a)(1). Even if YouTube's conduct satisfied this provision, I find that the exercise of personal jurisdiction would be improper under the second component of the personal jurisdiction analysis, which requires a determination of whether the exercise of jurisdiction would comport with constitutional due process.

Jurisdiction over a non-resident defendant comports with due process if the defendant has "certain minimum contacts with [the State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Since *International Shoe*, two categories of personal jurisdiction have arisen: general jurisdiction and specific jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, nn.8-9

(1984).  With respect to specific jurisdiction, at issue here, the Court applies a three-part due process test, examining: (1) whether the plaintiff's claims "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant "purposefully availed" himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472–73, 474–75 (1985)).  The plaintiff bears the burden of establishing the first two prongs, and if the plaintiff does so, "a defendant must make a 'compelling case' that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1267 (11th Cir. 2010).  In the instant case, Plaintiffs fail to establish the first prong, and the analysis proceeds no further.

With respect to the first prong, the Court must determine whether Plaintiffs' claim arises out of or relates to one of Defendants' contacts with Florida.  *Fraser v. Smith,* 594 F.3d 842, 850 (11th Cir. 2010) (citing *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1222 (11th Cir. 2009)).  To do so, I must "look to the 'affiliation between the forum and the underlying controversy,' focusing on any 'activity or . . . occurrence that [took] place in the forum State.'" *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1314 (11th Cir. 2018), *cert. denied sub nom. Waite v. Union Carbide Corp.*, 139 S. Ct. 1384, 203 L. Ed. 2d 611 (2019) (quoting *Bristol-Myers Squibb Co. v. Superior Court*, 137 S.Ct. 1773, 1780 (2017)).  In the absence of such a connection, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Id.* at 1781.  In the Eleventh Circuit, a tort arises out of or relates to the defendant's activity in a state only if the activity is a "but-for" cause of the tort.  *Waite*, 901 F.3d at 1314 (citing *Oldfield*, 558 F.3d at 1222–23).  In *Fraser*, for example, Fraser and his family were aboard a boat

in the Turks and Caicos Islands when it exploded, killing Fraser and injuring his family members. 594 F.3d at 844. When Fraser's estate and family members brought suit against the boat's operators in Florida, the Eleventh Circuit determined that specific personal jurisdiction could not be premised on the defendant's website or advertisements in Florida because, since the plaintiffs had not viewed them, they could not "reasonably be construed as the but-for causes of the accident." *Id.* at 844–45, 850. In this case, the premise of Plaintiffs' failure-to-warn claim is that "YouTube owed a duty to its users not to partner with purveyors of fraud such as the BitConnect Defendants." (Consol. Compl. ¶ 348). Plaintiffs allege that Defendant Grant, one of the BitConnect Defendants, lived in Miami, posted videos to YouTube, paid $7,000 per week to advertise with Google and YouTube, and participated in the "YouTube Partner Program," which "let content creators monetize their content on YouTube while simultaneously monetizing YouTube's business operation itself." (*Id.* ¶¶ 56, 148, 197, 202). Plaintiffs have not alleged, however, that they watched any of Grant's videos or saw any of the advertisements he paid for. There is thus no direct causal relationship "among 'the defendant, the forum, and the litigation,'" *Oldfield*, 558 F.3d at 1222 (quoting *Helicopteros*, 466 U.S. at 414), and YouTube's contacts with Grant cannot be considered a "but-for" cause of their failure to warn Plaintiffs. Accordingly, personal jurisdiction on the basis of Florida's long-arm statute is foreclosed.

The other argument Plaintiffs advance with respect to Defendant YouTube, pendant personal jurisdiction, also fails. While Plaintiffs' securities claims fail against Arcaro and Maasen, they may yet prevail with respect to other defendants in this action. Even so, the claims could not provide an anchor claim because, as YouTube argues, pendant jurisdiction provides a basis only for the exercise of personal jurisdiction over a plaintiff's related claims *against the same party*. *See Gill v. Three Dimension Sys., Inc.*, 87 F. Supp. 2d 1278, 1284 (M.D. Fla. 2000) (citing *Morley v. Cohen*, 610 F.Supp. 798 (D. Md. 1985)) (requiring plaintiff to plead sufficient facts to establish

basis for personal jurisdiction over pendant parties independent of the nationwide service of process provisions of the Securities Exchange Act of 1934). *See also* 13D CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3567 (3d ed. 2019) ("Pendent personal jurisdiction permits a court to entertain *a claim against a defendant* over whom it lacks personal jurisdiction, but only if that claim arises from a common nucleus of operative fact with a claim in the same suit for which the court does have personal jurisdiction *over the defendant.*") (emphasis added).   Indeed, the apparent reasoning behind the doctrine's adoption into the common law is that, "[w]hen a defendant must appear in a forum to defend against one claim, it is often reasonable to compel that defendant to answer other claims in the same suit arising out of a common nucleus of operative facts." *Action Embroidery*, 368 F.3d 1174, 1181 (9th Cir. 2004).   Such purpose would not be served by the exercise of pendant jurisdiction here, and accordingly, I decline to exercise pendant jurisdiction over Defendant YouTube.   For lack of personal jurisdiction, YouTube's Motion to Dismiss is due to be granted.   Leave to amend shall be withheld, as amendment would be futile in light of the Communications Decency Act. *See infra* section II.C.

## II.     Failure to State a Claim

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a complaint. *See* Fed. R. Civ. P. 12(b)(6).   To satisfy the pleading standard of Rule 8(a)(2), as articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a complaint "must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570).   "Dismissal is therefore permitted when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (internal quotations

omitted) (citing *Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993)).

When reviewing a motion to dismiss, a court must construe a plaintiff's complaint in the light most favorable to the plaintiff and take the complaint's factual allegations as true. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). Pleadings that "are no more than conclusions[] are not entitled to the assumption of truth," however. *Iqbal*, 556 U.S. at 678.

## A. Section 12(a) of the Securities Act

The Securities Act of 1933 protects investors by ensuring that companies issuing securities (known as "issuers") make a full and fair disclosure of information relevant to a public offering. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1323 (2015) (citing *Pinter v. Dahl*, 486 U.S. 622, 646 (1988)). "The linchpin of the Act is its registration requirement." *Id.* Section 5 of the Act, 15 U.S.C. § 77e, prohibits the sale of unregistered securities, and Section 12(a)(1) of the Act, 15 U.S.C. § 77l, creates a private right of action against any person who "offers or sells" a security in violation of Section 5.

"To establish a prima facie case of violation of section 5, a plaintiff need allege only the sale or offer to sell securities, the absence of a registration statement covering the securities, and the use of the mails or facilities of interstate commerce in connection with the sale or offer." *Raiford v. Buslease, Inc.*, 825 F.2d 351, 354 (11th Cir. 1987) (citing *Swenson v. Engelstad*, 626 F.2d 421, 424–25 (5th Cir. 1980)). While neither Arcaro nor Maasen deny that BCC lacked a registration statement, Arcaro argues that BCC is not a security while Maasen, for the purposes of his motion, assumes that it is. (*See* DE 86 at 12). With respect to the second element of the prima facie case, Arcaro and Maasen argue that they did not offer or sell BCC within the scope of the statute.

### 1. BCC constitute a "security"

The purpose of the securities laws is to regulate investments, "in whatever form they are made and by whatever name they are called," and to that end, Congress enacted a definition of "security" broad enough "to encompass virtually any instrument that might be sold as an investment." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990). The Securities Act of 1933 defines the term "security" to encompass "any note, stock, treasury stock, security future, security-based swap, bond, debenture, . . . investment contract, . . . or, in general, any interest or instrument commonly known as a 'security.' " 15 U.S.C. § 77b(a)(1).

While the term "investment contract" is not defined by the statute, the Supreme Court established a test for whether a particular scheme is an investment contract in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). The *Howey* test requires courts to determine "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 301. This definition "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299. In analyzing whether something is a security, "form should be disregarded for substance," *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), "and the emphasis should be on economic realities underlying a transaction, and not on the name appended thereto." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975).

The first element of the *Howey* test asks whether the purported investment contract required an "investment of money." *Id.* at 301. "An 'investment of money' refers to an arrangement whereby an investor commits assets to an enterprise or venture in such a manner as to subject himself to financial losses." *S.E.C. v. Friendly Power Co. LLC*, 49 F. Supp. 2d 1363, 1368–69 (S.D. Fla. 1999) (citing *Stowell v. Ted S. Finkel Inv. Servs., Inc.*, 489 F.Supp. 1209, 1224 (S.D.

Fla. 1980)).  Arcaro argues that the first element of the *Howey* test cannot be met because BCC can only be purchased with bitcoin.[3]  Bitcoin is an unregulated cryptocurrency rather than a fiat currency, Arcaro argues, and so purchase of BCC is not an investment of *money*, per se.  I find such pedantry unavailing in the face of the broad and adaptable conceptions of investment contracts, as defined by the Supreme Court, and of securities, as contemplated by Congress.  "It is well established that cash is not the only form of contribution or investment that will create an investment contract." *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 940 F.2d 564, 574 (10th Cir. 1991) (collecting cases).  I thus determine that Plaintiffs' investment of Bitcoin satisfies the first element of the *Howey* test. *See also Sec. & Exch. Comm'n v. Shavers*, No. 4:13-CV-416, 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013), *adhered to on reconsideration*, No. 4:13-CV-416, 2014 WL 12622292 (E.D. Tex. Aug. 26, 2014) (determining that an investment of Bitcoin satisfies the first prong of *Howey* on the basis that it can be exchanged for conventional currencies and used as money to purchase goods and services).

With respect to the second element—common enterprise—the Eleventh Circuit has adopted the concept of vertical commonality, which maintains that a common enterprise exists where "the fortunes of the investor are interwoven with and dependent on the efforts and success of those seeking the investment or of third parties." *Villeneuve v. Advanced Business Concepts Corp.,* 698 F.2d 1121, 1124 (11th Cir. 1983), *aff'd en banc,* 730 F.2d 1403 (11th Cir. 1984) (quoting *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 n. 7 (9th Cir. 1973)).  "[T]he requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the [promoter]." *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 479 (5th

---

[3] I also note that the Consolidated Complaint, the allegations of which must be accepted at this stage of the litigation, alleges that BCC *could*, in fact, be purchased with fiat currency as well as bitcoin, undermining Arcaro's argument.  (Consol. Compl. ¶ 115).

Cir. 1974).[4] *See also Eberhardt v. Waters,* 901 F.2d 1578, 1580–81 (11th Cir. 1990) ("The thrust

of the common enterprise test is that the investors have no desire to perform the chores necessary

for a return."). Reference to the decision in *Howey* is illustrative here:

> [The respondent companies] are offering an opportunity to contribute
> money and to share in the profits of a large citrus fruit enterprise managed and
> partly owned by respondents. They are offering this opportunity to persons who
> reside in distant localities and who lack the equipment and experience requisite to
> the cultivation, harvesting and marketing of the citrus products. Such persons have
> no desire to occupy the land or to develop it themselves; they are attracted solely
> by the prospects of a return on their investment. Indeed, individual development of
> the plots of land that are offered and sold would seldom be economically feasible
> due to their small size. Such tracts gain utility as citrus groves only when cultivated
> and developed as component parts of a larger area. A common enterprise managed
> by respondents or third parties with adequate personnel and equipment is therefore
> essential if the investors are to achieve their paramount aim of a return on their
> investments.

328 U.S. at 299–300.

Arcaro argues that the BitConnect operation does not satisfy the second *Howey* prong

because BCC purchasers were never led to believe that their BCC purchases "would be used to

invest in or develop any future product or common enterprise." (DE 94 at 13). This argument

misses the forest for the trees: the BitConnect platform *itself* was the common enterprise. Those

who purchased BCC did so in order to make a return on their investment; indeed, BCC appear to

have no other purpose.[5] The success of an investment in BCC was inextricably linked to the value

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh
Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior
to close of business on September 30, 1981.

[5] According to the Consolidated Complaint, investor opportunities were inextricably linked to
BitConnect from very early on—BitConnect launched in February 2016 and in June 2016 launched
what it purported to be the world's first automated Bitcoin lending platform, even before
introducing BCC through the BitConnect ICO in November and December of 2016. (Consol.
Compl. ¶¶ 79, 83). BitConnect is alleged to describe itself as "an opensource [sic] all-in-one
bitcoin and crypto community platform designed to provide multiple investment opportunities
with cryptocurrency education" and to describe BCC as "an open source, peer-to-peer, community
driven decentralized cryptocurrency that allow [sic] people to store and invest their wealth in a
non-government-controlled currency, and even earn a substantial interest on investment [sic]."

of the BCC, which in turn was "interwoven with and dependent on the efforts and success" of the BitConnect Defendants, who were to operate the BitConnect Lending Program and the BitConnect Staking Program. The investors had neither the desire nor the capacity to operate these investment programs. Additionally, to the extent that the Promoter Defendants received their commissions in BCC, as Plaintiffs allege, the efforts of the promoters are also a fundamental part of the enterprise.

Arcaro attempts to distinguish *In the Matter of Munchee Inc.*, a Securities and Exchange Commission investigation in which the Commission, after determining that Munchee's sale of digital tokens ("MUN tokens") constituted sale of an unregistered security in violation of the Securities Act of 1933, imposed a cease-and-desist order halting the sale and requiring the return of all proceeds. *In the Matter of Munchee Inc.*, Securities Act of 1933 Release No. 10445 (December 11, 2017), https://www.sec.gov/litigation/admin/2017/33-10445.pdf. Munchee, which operated an iPhone application for restaurant reviews, was selling the MUN tokens to raise capital to improve the application and recruit users, with the eventual goal of creating an "ecosystem" in

---

(*Id.* ¶¶ 78, 84). Indeed, the Consolidated Complaint includes the following image (*Id.* ¶ 86) from BitConnect's marketing materials, suggesting the central purpose of investing in BCC *is to invest*:



which MUN could be used to buy goods and services, such as advertisements on its platform, for restaurants, and meals and in-application purchases, for users of the Munchee application.  The Commission determined that

> MUN token purchasers had a reasonable expectation of profits from their investment in the Munchee enterprise. . . . The investors reasonably expected they would profit from any rise in the value of MUN tokens created by the revised Munchee App and by Munchee's ability to create an "ecosystem" . . . . In addition, Munchee highlighted that it would ensure a secondary trading market for MUN tokens would be available shortly after the completion of the offering and prior to the creation of the ecosystem.  Like many other instruments, the MUN token did not promise investors any dividend or other periodic payment.  Rather, as indicated by Munchee and as would have reasonably been understood by investors, investors could expect to profit from the appreciation of value of MUN tokens resulting from Munchee's efforts.

*Id.* at 8–9.  An "enterprise" need not be so all-encompassing as to constitute an "ecosystem" in order to satisfy the *Howey* test, of course, but the Consolidated Complaint does in fact allege a complex and self-reinforcing common venture built around the Lending Program and its apparently nonexistent bitcoin trading algorithm.  "The commonality element is present as long as the fortunes of all of the investors are tied to the expertise and efforts of the promoter." *Eberhardt*, 901 F.2d at 1581 (11th Cir. 1990) (citing *Plunkett v. Francisco*, 430 F.Supp. 235 (N.D. Ga. 1977)).  That standard is certainly met here.

The third *Howey* element is satisfied when an investor "is led to expect profits solely from the efforts of the promoter or a third party."  328 U.S. at 298–299.[6]  "Although the [Supreme] Court used the word 'solely' in the *Howey* decision, it should not be interpreted in the most literal sense." *Williamson v. Tucker,* 645 F.2d 404, 418 (5th Cir. 1981).  The test is "'whether the efforts

---

[6] The vertical commonality conceptualization of "enterprise" has been observed to overlap somewhat with the third *Howey* element. *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 88 (2d Cir. 1994) ("If a common enterprise can be established by the mere showing that the fortunes of investors are tied to the efforts of the promoter, two separate questions posed by *Howey*—whether a common enterprise exists and whether the investors' profits are to be derived solely from the efforts of others—are effectively merged into a single inquiry: "whether the fortuity of the investments collectively is essentially dependent upon promoter expertise.")

made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.'" *Id.* (quoting *SEC v. Glenn W. Turner Enters.,* 474 F.2d 476, 482 (9th Cir. 1973)). "An interest thus does not fall outside the definition of investment contract merely because the purchaser has some nominal involvement with the operation of the business. Rather, 'the focus is on the dependency of the investor on the entrepreneurial or managerial skills of a promoter or other third party.'" *S.E.C. v. Merch. Capital, LLC,* 483 F.3d 747, 755 (11th Cir. 2007) (quoting *Gordon v. Terry,* 684 F.2d 736, 741 (11th Cir. 1982)). "An investor who has the ability to control the profitability of his investment, either by his own efforts or by majority vote in a group venture, is not dependent upon the managerial skill of others." *Gordon,* 684 F.2d at 741.

Arcaro contends that the third element was not satisfied because BCC owners retained control of their purchases, but this argument denies the economic reality of the investor-plaintiffs. Arcaro relies on *Alunni v. Dev. Res. Grp., LLC,* 445 F. App'x 288, 298 (11th Cir. 2011) (unpublished), but BCC, unlike the condominiums in *Alunni,* have a limited range of uses. Apparently only three, in fact: BCC could be invested in the BitConnect Lending Program, invested in the BitConnect Staking Program, or exchanged with other currencies. (DE 94 at 14; *supra* n.5). Considering these options—either place your BCC in a BitConnect-operated program, in which case profitability depends on the program's operation, or unload it—it is clear that "the efforts made by those other than the investor are the undeniably significant ones." *Williamson,* 645 F.2d at 418. Especially considering that the valuation of BCC was also largely dependent on the actions of BitConnect, I find that the investors' profits were dependent on the efforts of others such that the third prong of the *Howey* test is satisfied.

Accordingly, I determine that BCC constitute investment contracts under *Howey,* and that they are thus subject to the provisions of the Securities Act of 1933.

## 2. Arcaro and Maasen were not statutory sellers

Regardless of whether BCC constitute "securities," however, Plaintiffs' Section 12(a) claim against Maasen and Arcaro must be dismissed for their failure to satisfactorily allege the second element their prima facie case. In *Pinter v. Dahl*, the Supreme Court articulated two circumstances in which a defendant could be considered to have "sold" unregistered securities. Liability extends to both "the person who transfers title to, or other interest in, that property" and "the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." 486 U.S. at 642, 647. Plaintiffs argue that Arcaro and Maasen's solicitation makes them liable under the latter category.

In defining the contours of solicitors' § 12 liability, the *Pinter* Court found that the language of § 12 indicated the need to "focus[] on the defendant's relationship with the plaintiff-purchaser" and noted that the statute does not "impose express liability for *mere participation* in unlawful sales transactions." *Id.* at 651–52 (emphasis added). The *Pinter* decision rejected as too broad the Fifth Circuit's "substantial-factor" test, which imposed liability if the defendant's participation in the buy-sell transaction was "a substantial factor in causing the transaction to take place." *Id.* at 649.

Interpreting *Pinter*, the Eleventh Circuit cited a law review article for the proposition that the § 12 liability of "participants who do not own the securities" is governed by a two-part test that first asks whether the participant in the sale "solicited" the purchase and second asks "whether the participant or the owner of the security sold benefited." *Ryder Int'l Corp. v. First Am. Nat. Bank*, 943 F.2d 1521, 1531 (11th Cir. 1991) (citing Joseph E. Reece, *Would Someone Please Tell Me the Definition of the Term 'Seller': The Confusion Surrounding Section 12(2) of the Securities Act of 1933*, 14 Del. J. Corp. L. 35 (1989)). In *Ryder*, the Eleventh Circuit affirmed the trial court's grant of summary judgment for defendants on the basis that the plaintiff-appellant failed to satisfy the

first part of the test: "The substance of the communications between Wallace Case and Mike Casey (the parties to the two transactions at issue), is not in dispute and reveals that Casey (working for [Defendant bank]) only executed [Plaintiff corporation]'s orders.  Casey did not actively solicit the orders, *i.e.* 'urge' or 'persuade' Casey (working for [Plaintiff]) to buy [the subject securities]." *Id.* at 1531 (citing *Pinter,* 486 U.S. at 644, 647).  Thus "a plaintiff must allege not only that the defendant actively solicited investors, but that the plaintiff purchased securities as a result of that solicitation.  Mere conclusory allegations that a defendant solicited the sale of stock and was motivated by financial gain to do so are insufficient to state a claim under Section 12." *In re CNL Hotels & Resorts, Inc.*, No. 04-cv-1231ORL-31KRS, 2005 WL 2291729, at *5 (M.D. Fla. Sept. 20, 2005).

Plaintiffs in this matter fail to allege that they purchased securities *as a result of* Arcaro and Maasen's solicitations.  The Consolidated Complaint contains broad recitations of the elements of Plaintiffs' § 12(a) claims[7] but is devoid of specific allegations regarding Arcaro and Maasen's efforts to urge or persuade Plaintiffs, individually, to purchase BCC.  Plaintiffs seek to establish liability on the sole basis that they encountered publicly available content created by Arcaro and Maasen during their efforts to research the BitConnect Investment Programs:

> Such research included reviewing virtual currency online forums, reading BITCONNECT's publications and viewing its promotional videos.  Accordingly, each of the solicitations outlined below were successful in soliciting Plaintiffs and the Class to invest with BITCONNECT. . . . With respect to the Promoter Defendants, each actively solicited investments in BCCs and the BitConnect Investment Programs -- largely through YOUTUBE -- for the sole purpose of

---

[7] *See, e.g.*, Consol. Compl. ¶ 25 ("[E]ach of the Plaintiffs were personally, and successfully, solicited by the BITCONNECT Defendants in connection with their public representations and active solicitations to purchase BCCs or participate in the BitConnect Investment Programs."); ¶ 51 ("ARCARO himself was one of the most successful affiliate/recruiters for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YOUTUBE and Facebook."); ¶ 58 ("MAASEN served as an affiliate/recruiter for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YOUTUBE and Facebook.").

receiving compensation.   Such activity falls squarely under the definition of "seller."

(Consol. Compl. ¶¶ 180, 184).  As explored above, however, such activity does not fall under the definition of "seller," and Plaintiffs supply no caselaw to the contrary.  *See also Rensel v. Centra Tech, Inc.*, No. 17-24500-CIV, 2019 WL 2085839, at *2 (S.D. Fla. May 13, 2019) (dismissing § 12(a)(1) claim where only solicitation allegations entailed two posts on defendant's Twitter account related to the subject security).

The Consolidated Complaint contains no allegations regarding a relationship between any of the Plaintiffs and Arcaro or Maasen.  Nor does it contain allegations that either Defendant engaged in active efforts to urge or persuade any of the Plaintiffs to invest in BCC.  In the absence of any such individualized allegations, Plaintiffs have not satisfied the two-part *Pinter* test articulated by the Eleventh Circuit in *Ryder*.  Plaintiffs have thus failed to state a § 12(a) claim against Arcaro or Maasen.

### B.  Section 15(a) of the Securities Act

Section 15 of the Securities Act of 1933 imposes joint and several liability upon controlling persons for acts, committed by those under their control, that violate §§ 11 and 12. *See* 15 U.S.C. § 77o.  To state a claim for control person liability in the Eleventh Circuit, a plaintiff must allege facts that establish, in addition to a primary violation of the securities laws, that the defendant "had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws" *and* that the Defendant "had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." *Brown v. Enstar Grp., Inc.*, 84 F.3d 393, 396 (11th Cir. 1996) (quotations omitted).  "A complaint that merely restates the legal standard for control person liability, without providing facts in support of the allegation, does not adequately plead control person liability." *Bruhl v. Price Waterhousecoopers Int'l*, No. 03-23044-CIV, 2007 WL 983263, at *10–11 (S.D. Fla. Mar. 27, 2007).  "A defendant is

not subject to control person liability simply because he is an officer or director of a corporation. Rather, the plaintiff must make a showing that the defendant 'had power, directly or indirectly, to influence the policy and decision making process of the one who violated the act, such as through ownership of voting stock, by contract or through managerial power.'" *Tippens v. Round Island Plantation L.L.C.*, No. 09-CV-14036, 2009 WL 2365347, at *10 (S.D. Fla. July 31, 2009) (quoting *In re Sahlen & Assocs., Inc. Secs. Litig.*, 773 F.Supp. 342, 362–63 (S.D. Fla. 1991)).

Count XXII of the Consolidated Complaint alleges that Defendant Arcaro is liable under § 15(a) because he had power to control, and did control, the decision-making related to the BitConnect Investment Programs, including the decision to engage in the sale of unregistered securities thereof.   The Consolidated Complaint alleges that, after Arcaro began promoting BitConnect, he was hired as one of BitConnect's "National Promoters," which entailed "managing a team of U.S.-based affiliates/recruiters." (Consol. Compl. ¶ 51).   In his capacity as a National Promoter, Arcaro is alleged to have reported directly to Defendant Satish, who is regarded as one of BitConnect's founders. (*Id.* ¶¶ 43, 90).   Arcaro was listed as an active director and shareholder of BitConnect International PLC, according to paperwork filed with the corporate registry office in the United Kingdom, but after he notified the Business and Properties Courts of England and Wales Companies Court (ChD) that the listing was inaccurate, the listing was redacted to the extent he was identified as a member or shareholder of the company. (*Id.* ¶¶ 51, 93–94).[8]   Plaintiffs

---

[8] Defendant Arcaro has filed a Request for Judicial Notice regarding the order of the High Court of Justice. (DE 105).   Attached to the request is a copy of the order and a copy of the witness statement Arcaro submitted to that court.   Federal Rule of Evidence 201 governs judicial notice of adjudicative facts and Rule 201(b) provides that a judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.   Fed. R. Evid. 201(b).   Rule 201(c)(2) states that a court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).   Accordingly, Arcaro's request for judicial shall be granted.

provide a portion of a group chat log in which Defendant Grant purportedly reveals that the Arcaro's application to the foreign court was a farce

> Grant:   too many, and i see the new company with all the promoters, pretty slick
> geln [sic] told me about aLL THAT [sic]
> he had to send all his documents to bitconnect a couple months ago
> so they can make a new company with all the promoters.

(*Id.* ¶¶ 95–96).  Without more, I cannot conclude this message is sufficient to allege controlling person liability, which requires allegations that a defendant had the power to control the general affairs of the primarily liable entity and that the defendant had the power to control the specific corporate policy which resulted in the primary liability.   Nor are Plaintiffs' remaining allegations—that Arcaro knew he was involved in a Ponzi scheme (*id.* ¶ 140), that he created numerous websites to "funnel" investors seeking information regarding cryptocurrencies to BitConnect (*id.* ¶¶ 141-44), that he encouraged investors to attend a BitConnect conference in Thailand (*id.* ¶ 145), and that he was given access to a "development fund" that he used to provide resources to other promoter defendants (*id.* ¶¶ 141–43)—sufficient to meet this standard.  While Plaintiffs paint a portrait of Arcaro as a person who knowingly and ruthlessly took advantage of others by working as hard as he could to further a Ponzi scheme, they have not described him as having control over that scheme, and thus their § 15(a) claim against Arcaro must be dismissed.

### C.  The Communications Decency Act

Even if the exercise of personal jurisdiction over YouTube were proper, I find that Plaintiffs' negligence claim would be preempted by § 230 of the Communications Decency Act ("CDA").

The CDA is generally considered to "establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'"  *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997).  "[L]awsuits seeking to hold a service

provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred." *Zeran*, 129 F.3d at 330. The statute explicitly preempts any inconsistent state law causes of action. 47 U.S.C. § 230(e)(3).

YouTube relies on the following provision of the CDA: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." § 230(c)(1). The Parties do not dispute that YouTube is an "interactive computer service," a term defined by the CDA to include "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server[.]" § 230(f)(2). Rather, the Parties dispute whether YouTube acted as an "information content provider" in this instance.

The CDA defines an "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the internet or any other interactive computer service." § 230(f)(3). Plaintiffs contend that where "a website operator is in part responsible for the creation or development of content, then it is an information content provider as to that content—and is not immune from claims predicated on it." *Am. Income Life Ins. Co. v. Google, Inc.*, No. 2:11-CV-4126-SLB, 2014 WL 4452679, at *7 (N.D. Ala. Sept. 8, 2014) (citing *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119. 1123 (9th Cir. 2003)). The Consolidated Complaint, however, does not satisfactorily allege that YouTube acted as an "information content provider."

The Consolidated Complaint details at length the degree to which the BitConnect Defendants used YouTube to solicit investment in BCC. Indeed, YouTube's platform provided the BitConnect Defendants with an extraordinary reach: for example, Defendant Grant alone is alleged to have posted approximately 2,500 videos promoting the BitConnect Investment Programs, and his videos are alleged to have received nearly 33,000,000 independent views.

(Consol. Compl. ¶ 202). Several of the BitConnect Defendants are alleged to have been designated as "Partners" through the "YouTube Partner Program" (*id.* ¶¶ 195, 197, 202–06), and Plaintiff argues that this relationship requires YouTube to be considered an "information content provider." While participation in the "YouTube Partner Program" may have helped direct traffic to the BitConnect Defendants' videos, traffic redirection alone is not sufficient to preclude § 230 immunity. *See Dowbenko v. Google Inc.*, 582 F. App'x 801, 805 (11th Cir. 2014) (unpublished) (citing *Zeran*, 129 F.3d at 330) (noting that allegation defendant manipulated its search results to prominently feature the article at issue did not change determination that defamation claim was preempted under § 230(c)(1)). Nothing else nothing about the program, as described in the Consolidated Complaint, indicates that YouTube was "responsible, in whole or in part, for the creation or development," § 230(f)(3), of the BitConnect Defendants' videos. *See Fair Hous. Council of San Fernando Valley v. Roommates.Com*, LLC, 521 F.3d 1157, 1167 (9th Cir. 2008) (interpreting the term "development" as used in § 230(f)(3) as "referring not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness. In other words, a website helps to develop unlawful content, and thus falls within the exception to section 230, if it *contributes materially* to the alleged illegality of the conduct") (emphasis added); *see also Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 413 (6th Cir. 2014) (adopting "material contribution" test described in *Roommates.Com*); *Roca Labs, Inc. v. Consumer Opinion Corp.*, 140 F. Supp. 3d 1311, 1321 (M.D. Fla. 2015) (same).

Defendant YouTube is alleged to have profited significantly from the exposure of its users to videos advertising Defendants' purported Ponzi scheme. (Consol. Compl. ¶¶ 193, 197). While YouTube may have had a moral or ethical responsibility to protect its users from Defendants' allegedly fraudulent schemes, Plaintiffs' claim that it had a *legal* duty to do so is preempted by the

CDA. Accordingly, Plaintiffs' claim against YouTube is thoroughly foreclosed and shall be dismissed with prejudice.

## CONCLUSION

In light of the foregoing, it is **ORDERED and ADJUDGED** as follows:

**(1)** Defendant Ryan Maasen's Motion to Dismiss (DE 86) is **GRANTED**.

**(2)** Defendant YouTube, LLC's Motion to Dismiss (DE 88) is **GRANTED**.

**(3)** Defendant Glenn Arcaro's Motion to Dismiss (DE 94) is **GRANTED**.

**(4)** Defendants Ryan Maasen and Glenn Arcaro are **DISMISSED WITHOUT PREJUDICE**.

**(5)** Defendant YouTube, LLC is **DISMISSED WITH PREJUDICE**.

**(6)** Plaintiffs are **DIRECTED** to file a Second Amended Consolidated Class Action Complaint on or before September 13, 2019.

**(7)** Defendant Arcaro's Request for Judicial Notice (DE 105) is **GRANTED**. The Court takes judicial notice of the Order of the Business and Properties Courts of England and Wales Companies Court (ChD) regarding the registrar of companies. (DE 105-1).

**SIGNED** in Chambers at West Palm Beach, Florida this 22 day of August, 2019.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

cc:     Counsel of Record