**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| | |
|---|---|
| IN RE BITCONNECT SECURITIES LITIGATION | Lead Case No.: 9:18-cv-80086-DMM |

<u>**CLASS ACTION**</u>

<u>**JURY TRIAL DEMANDED**</u>

<u>**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**</u>

Respectfully submitted,

**SILVER MILLER**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone:    (954) 516-6000
DAVID C. SILVER
Florida Bar No. 572764
E-mail: DSilver@SilverMillerLaw.com
JASON S. MILLER
Florida Bar No. 072206
E-mail: JMiller@SilverMillerLaw.com

**LEVI & KORSINSKY, LLP**
EDUARD KORSINSKY
E-mail: ek@zlk.com
55 Broadway, 10th Floor
New York, NY 10006
Telephone:    (212) 363-7500
Facsimile:    (212) 363-7171

DONALD J. ENRIGHT
E-mail:denright@zlk.com
ELIZABETH TRIPODI
E-mail: etripodi@zlk.com
JOHN A. CARRIEL
E-mail: jcarriel@zlk.com
**LEVI & KORSINSKY, LLP**
1101 30th Street, N.W., Suite 115
Washington, DC 20007
Telephone:    (202) 524-4290
Facsimile:    (201) 333-2121

*Co-Lead Counsel for Plaintiffs*

Second Amended Consolidated Class Action Complaint
Lead Case No.: 9:18-cv-80086-DMM

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ....................................................................................1

JURISDICTION AND VENUE ..............................................................................8

PARTIES AND RELEVANT NON-PARTIES ........................................................9

    I.        PLAINTIFFS .............................................................................9

    II.      DEFENDANTS ........................................................................12

           A.      THE BITCONNECT CORPORATE DEFENDANTS ...........................12

           B.      THE BITCONNECT DEVELOPER DEFENDANTS.............................13

           C.      THE BITCONNECT DIRECTOR AND PROMOTER DEFENDANTS.16

           D.      OTHER LIABLE PERSONS/ENTITIES.................................................21

PLAINTIFFS' CLASS ACTION ALLEGATIONS.....................................................21

SUBSTANTIVE ALLEGATIONS ..........................................................................23

    I.        BACKGROUND ON BLOCKCHAIN TECHNOLOGY AND INITIAL COIN OFFERINGS............................................................23

           A.      BLOCKCHAINS ........................................................................23

           B.      INITIAL COIN OFFERINGS ....................................................24

    II.      BACKGROUND ON BITCONNECT .........................................24

           A.      BITCONNECT'S FORMATION AND CREATION OF BCC...............24

           B.      THE BITCONNECT ORGANIZATIONAL STRUCTURE ...................28

           C.      THE OWNERS OF BITCONNECT .............................................30

           D.      THE BITCONNECT WEBSITES ...............................................34

    III.    BCC AND THE BITCONNECT INVESTMENT PROGRAMS .......................35

           A.      TRADING BCC...........................................................................35

           B.      THE BITCONNECT LENDING PROGRAM .........................................35

           C.      THE BITCONNECT STAKING PROGRAM .........................................37

           D.      THE BITCONNECT REFERRAL PROGRAM ......................................39

i

IV. THE BITCONNECT NATIONAL AND REGIONAL PROMOTERS................40

 A. DEFENDANTS SATISH AND DARJI ....................................40

 B. DEFENDANTS ARCARO, JAMES, AND GRANT..............................42

 C. THE BITCONNECT CONFERENCE .....................................50

 D. DEFENDANTS CRYPTO CLOVER, MAASEN, HILDRETH, CRYPTONICK, AND FOX .....................................51

V. THE BITCONNECT INVESTMENTS WERE PONZI SCHEMES AND SECURITIES .....................................53

 A. THE BITCONNECT DEFENDANTS OPERATED A PONZI SCHEME .....................................53

 B. BCCS AND THE BITCONNECT INVESTMENT PROGRAMS WERE INVESTMENT CONTRACT SECURITIES.............................54

 C. THE BITCONNECT DEFENDANTS WERE "SELLERS" UNDER THE FEDERAL SECURITIES LAWS.............................57

 D. BITCONNECT LED CLASS MEMBERS TO INCUR SUBSTANTIAL LOSSES .....................................60

VI. NECESSITY FOR JUDICIAL INTERVENTION................................63

COUNT I - VIOLATION OF SECTION 12(a) OF THE SECURITIES ACT ............................65

COUNT II - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT ............................66

COUNT III - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT ........................676

COUNT IV - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT ........................67

COUNT V - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT ........................687

COUNT VI - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT ........................68

COUNT VII - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT ........................69

COUNT VIII - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT........................69

COUNT IX - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT ........................70

COUNT X - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT ..........................71

COUNT XI - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT ........................71

COUNT XII - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT........................72

COUNT XIII - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT........................73

COUNT XIV - BREACH OF CONTRACT ...................................................................74

COUNT XV - UNJUST ENRICHMENT .....................................................................75

COUNT XVI - VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE
    PRACTICES ACT ("FDUTPA") ........................................................................76

COUNT XVII - FRAUDULENT INDUCEMENT ......................................................79

COUNT XVIII - FRAUDULENT MISREPRESENTATION ......................................80

COUNT XIX - NEGLIGENT MISREPRESENTATION............................................82

COUNT XX - CONVERSION .....................................................................................83

COUNT XXI - CIVIL CONSPIRACY ........................................................................84

PRAYER FOR RELIEF ..............................................................................................87

DEMAND FOR TRIAL BY JURY ............................................................................88

Co-Lead Plaintiffs ALBERT PARKS, an individual ("PARKS"); and FARAMARZ SHEMIRANI, an individual ("SHEMIRANI"); and Plaintiffs Maryann Marryshow, an individual ("MARRYSHOW"); Mija Yoo, an individual ("YOO"); Nelson Arias, an individual ("ARIAS"); and Cory Struzan, an individual ("STRUZAN") ("Plaintiffs"); individually and on behalf of all other persons similarly situated as defined herein, by and through undersigned counsel, allege in this Second Amended Consolidated Class Action Complaint for violations of the of Sections 12 and 15 of the Securities Act of 1933 (the "Securities Act") and Fla. Stat. §§ 501.211, *et seq*. (the "Florida Deceptive and Unfair Trade Practices Act" [FDUTPA]), breach/rescission of contract, unjust enrichment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, conversion, and civil conspiracy the following, based upon personal knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (a) documents and solicitation materials released by Defendants (defined below), in connection with the BitConnect Investment Programs (defined below); (b) public statements made by Defendants concerning BITCONNECT (defined below) and the BitConnect Investment Programs; and (c) media publications concerning the BitConnect Investment Programs.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a class action on behalf of a class of investors consisting of all individuals and entities who transferred to BITCONNECT any fiat currency or cryptocurrency to invest in

BCC and/or the BitConnect Investment Programs (Defined Below) and who suffered financial injury as a result thereof.

2.     This action alleges violation of Sections 12(a)(1) and 15(a), 15 U.S.C. §§ 77l(a)(1), 77o(a), of the Securities Act, Fla. Stat. §§ 501.211, *et seq*., breach/rescission of contract,[1] unjust enrichment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, conversion, and civil conspiracy against Bitcoin AMR Limited f/k/a BitConnect Public Limited, a foreign corporation; BitConnect International PLC, a foreign corporation; BitConnect Ltd., a foreign corporation; BitConnect Trading Ltd., a foreign corporation (the business entities collectively referred to herein as "BITCONNECT"); Nalin Kotadiya, an individual ("KOTADIYA"); Suresh Gorasiya, an individual ("GORASIYA"); Mahendra Chaudhari, an individual ("CHAUDHARI"); Gautam Lathiya, an individual ("LATHIYA"); Dhaval Mavani, an individual ("MAVANI"); Piyush Savaliya, an individual; ("SAVALIYA"); Ramdayal Purohit ("PUROHIT"); Ranjeet Saxena, an individual ("SAXENA"); Sandip Balvantrai Naik, an individual ("SANDIP"), Smit Sandiphbhai Naik, an individual ("SMIT"), and Raj Sandipobhai Naik, an individual ("RAJ" and together with SANDIP and SMIT, the "NAIKS" and collectively with KOTADIYA, GORASIYA, CHAUDHARI, LATHIYA, MAVANI, SAVALIYA, PUROHIT, SAXENA, SANDIP and SMIT, the "Developer Defendants"); Satish Kumbhani, an individual ("SATISH"); Yuris Praseteya, an individual ("PRASETEYA"); Nay Minh a/k/a Mr. Roberts, an individual ("ROBERTS"); Le Thi Thannh Huy a/k/a Ms. Helen, an individual ("HELEN"); Santoso Wardah a/k/a Mr. Santoso, an individual ("SANTOSO"); Divyesh Darji, an individual ("DARJI"); Jeson Talingting Bana-ay a/k/a Satao Nakamoto, an individual ("SATAO"); Joshua Jeppesen, an individual ("JEPPESEN"); Glenn Arcaro, an individual

---

[1] Plaintiffs' breach/rescission of contract claim is only alleged against Defendant BITCONNECT.

("ARCARO"); Jean-Simon Labreche, an individual ("LABRECHE"); Trevon Brown a/k/a Trevon James, an individual ("JAMES"); Ryan Hildreth, an individual ("HILDRETH"); Craig Grant, an individual ("GRANT"); Calen Powell a/k/a Crypto Clover, an individual ("CRYPTO CLOVER"); John Doe No. 1 a/k/a Nicholas Trovato a/k/a Cryptonick, an individual ("CRYPTONICK"); Ryan Maasen, an individual ("MAASEN"); Tanner Fox, an individual ("FOX" and together with SATISH, PRATESEYA, SANTOSO, ROBERTS, HELEN, DARJI, SATAO, JEPPESEN, ARCARO, LABRECHE, JAMES, HILDRETH, GRANT, CRYPTO CLOVER, CRYPTONICK, and MAASEN the "Promoter Defendants"); and Jane or John Doe Nos. 2–10, individuals ("DOES 2–10" and collectively with BITCONNECT, the Promoter Defendants, and the Developer Defendants, the "BITCONNECT Defendants").

3.      Specifically, Defendant BITCONNECT created and operated fraudulent Ponzi/pyramid schemes in the form of the BitConnect Lending Program and the BitConnect Staking Program (the "BitConnect Investment Programs").  To participate in the BitConnect Investment Programs, investors were required to purchase BITCONNECT-created cryptocurrency called BitConnect Coins ("BCC") on the BITCONNECT BCC Exchange with bitcoin ("BTC")[2] or fiat currency.

4.      The BitConnect Lending Program was marketed and sold on the Internet as an opportunity for investors to "lend" their BCCs back to BITCONNECT, which BITCONNECT

[2] Bitcoin is a type of "virtual currency" – also commonly referred to as "digital currency" or "cryptocurrency."  The Financial Action Task Force, an inter-governmental agency that promotes laws combating anti-money laundering, and in which the United States is a member, describes "virtual currency" as a "digital representation of value that can be digitally traded and functions as (1) a medium of exchange; and/or (2) a unit of account; and/or (3) a store of value, but does not have legal tender status . . . in any jurisdiction."  Importantly, virtual currencies do not have legal tender status like fiat currencies (*e.g.*, U.S. dollar and the Euro).  The most widely used virtual currencies are BTC and ethereum ("ETH").

would then purportedly use to generate profits by purchasing BTC when its price was low and selling BTC when its price was high — a "buy low, sell high" strategy that was purportedly effectuated by a BITCONNECT-designed "trading bot" implementing a proprietary trading algorithm: the "Volatility Software."   In exchange for "lending" BCCs to BITCONNECT, investors were "guaranteed" lucrative returns on their investments.

5.   The BitConnect Staking Program was marketed and sold on the Internet as an opportunity for investors to "stake" their BCCs by holding their BCCs in the BITCONNECT-QT wallet (a software and/or online wallet created by BITCONNECT).   In exchange for "staking" BCCs in the BITCONNECT-QT Wallet, investors were "guaranteed" lucrative returns on their investments.

6.   As part of their solicitation efforts, BITCONNECT enlisted multi-level affiliate marketers (the "Referral Program" or the "Affiliate Program") to further propagate the reach of the BitConnect Investment Programs.   Under the Referral Program, BITCONNECT paid commissions to affiliates who successfully solicited additional investments in the BitConnect Investment Programs.   The affiliate promoters would receive a percentage of any investments made by the investors they referred as well as a portion of investments made by subsequent investors recruited by their referrals, and so forth—a standard multi-level-marketing ("MLM") scheme.   Additionally, each of the Promoter Defendants received compensation directly from BITCONNECT.   The individual Promoter Defendants were highly influential affiliate marketers and/or directors of BITCONNECT.

7.   Several of the Promoter Defendants had partnerships with YouTube pursuant to which the BITCONNECT Defendants disseminated fraudulent and harmful content to unsuspecting victims across the globe.

8.     Despite being cloaked in technological sophistication and jargon, the BITCONNECT Defendants operated a century-old fraud that was simple at its core — victims would invest in the BitConnect Investment Programs after they were driven to BITCONNECT as a result of profitable partnerships the Promoter Defendants had with YouTube; and BITCONNECT would then pay existing investors with new money from new investors, who were in turn expected and incentivized to get more new investors to produce more new money for BITCONNECT.

9.     As noted above, to participate in the BitConnect Investment Programs, investors were required to purchase BCCs.  BCCs constitute "investment contract" securities as defined under the Securities Act.  As discussed herein, BCCs are investment contracts because, *inter alia*, the BITCONNECT Defendants explicitly referred to BCCs as an "investment option" under which investors could "buy BitConnect Coin at a lower price and sell[] them at [a] higher price," and Plaintiffs and other BITCONNECT investors were led to believe, and expected, that the BCCs they purchased would be worth more than the BTC or fiat currency they invested with BITCONNECT.

10.     Similarly, the BitConnect Investment Programs constitute "investment contract" securities as defined under the Securities Act.  As discussed herein, the BitConnect Investment Programs qualify as investment contracts because, *inter alia*, the BITCONNECT Defendants have explicitly referred to the programs as lucrative investment opportunities that would lead to "financial freedom" and repeatedly stressed the profit potential from merely holding and "staking" BCCs.  The BitConnect Investment Programs were the clear offer and sale of investment contract securities because, *inter alia*, the BITCONNECT Defendants touted, and Plaintiffs and other

BitConnect Investment Program participants reasonably expected, that investors would receive substantial returns and a steady stream of income on their investments.

11.     With respect to the BitConnect Lending Program, a stream of income would purportedly come in the form of a daily interest rate and a bonus interest percentage, each of which were tied to BITCONNECT's creation and implementation of the Volatility Software, which BITCONNECT claimed would produce returns sufficient to cover these payments.  In addition to the fixed returns that were promised, BITCONNECT also guaranteed that the principal investment amount would be paid in full on a specified date.

12.     Similarly, with respect to the BitConnect Staking Program, BITCONNECT "guaranteed" it would provide returns of "up to 10% per month" which would result from merely holding BCCs in the BitConnect-QT Wallet.

13.     In reality, BitConnect Investment Programs were nothing more than pyramid/Ponzi schemes.  After operating for less than a year, BITCONNECT abruptly shut down its platform and stripped the value from all of Plaintiffs' and the Class' (defined below) investments, leaving them with nearly worthless BCCs.[3]

14.     In short, the BITCONNECT Defendants defrauded tens of thousands of investors by capitalizing on the general public's excitement for virtual currencies and by luring unsuspecting investors into purchasing unregistered securities and participating in pyramid/Ponzi schemes.

15.     The registration requirements contained within the Securities Act are designed to protect investors by ensuring they are provided adequate information upon which to base their investment decisions.  The two basic objectives of registration are: (i) to require that investors

---

[3]  For example, the value of BCC fell from over $430.00 in early-January 2018 to $0.40 in early-July 2018.  Currently, BCCs are not listed for trading on any major cryptocurrency trading exchange.

receive necessary financial and other significant information concerning securities being offered for public sale; and (ii) to prohibit deceit, misrepresentations, and other fraud in the sale of securities.  Absent registration and the protections of the federal securities laws, issuers of securities could seek to market their investment opportunities without disclosing information that might make a potential investor think twice before investing (*e.g.*, conflicts of interest or major setbacks to core product lines) or peddle their securities using unbounded exaggerations regarding the progress of their products, business plan, business strategies, or even fabricate the existence of relationships with vendors or other business partners.

16.     Accordingly, Plaintiffs bring this action for violations of Sections 12 and 15 of the Securities Act, Florida's Deceptive and Unfair Trade Practices Act, breach/rescission of contract, unjust enrichment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, conversion, and civil conspiracy against the BITCONNECT Defendants for their offer and sale of investment contract securities in violation of the federal securities laws' registration requirements and participation in effectuating the fraudulent Ponzi/pyramid schemes.

17.     The BITCONNECT Defendants' promotional materials appeared in press releases, BITCONNECT's website, online chat rooms or forums located on websites such as Reddit.com ("Reddit"), white papers, postings on social media websites such as Twitter and Facebook, promotional videos posted on YouTube, and/or other materials relating to BITCONNECT and the BitConnect Investment Programs, which were disseminated widely to the investing public.

18.     Due to the varied and innumerable ways in which investors can be, and are likely to be, manipulated and harmed absent any of the protections under the federal securities laws, Sections 5 and 12(a)(1) of the Securities Act provide for strict liability against any person who offers or sells an unregistered security.  As detailed herein, the BitConnect Investment Programs

have at all times constituted an offer and sale of unregistered securities; and thus, the BITCONNECT Defendants are strictly liable under Section 12(a)(1) of the Securities Act. Similarly, the BITCONNECT Defendants' unlawful, immoral, and fraudulent conduct has caused, and is continuing to cause, significant financial harm to Plaintiffs and the Class (defined below). Absent judicial intervention, Plaintiffs and the Class are unlikely to ever recover their investments. Accordingly, judicial intervention is required and requested to rectify the existing and future harm facing Plaintiffs and the Class — harm that is likely to be irreparable.

19.     Investors in the BitConnect Investment Programs have little to show for their investments other than broken promises and mounting financial burdens.

20.     For these reasons, Plaintiffs on behalf of themselves, and all similarly situated individuals and entities that invested in BCC and/or the BitConnect Investment Programs, seeks compensatory, exemplary, punitive, injunctive, and rescissory relief, providing rescission and repayment of all investments into BCCs and/or the BitConnect Investment Programs, and securing and conserving such funds until repayment

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and Section 22 of the Securities Act [15 U.S.C. § 77v] because Plaintiffs allege violations of Sections 12(a)(1) and 15(a) of the Securities Act [15 U.S.C. §§ 77l(a)(1) and 77o(a)].

22.     The Court has personal jurisdiction over each of the Defendants because each either conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

23.     The Court also has personal jurisdiction over each of the Defendants under Fla. Stat. § 48.193 because each operated, conducted, engaged or carried on a business or business venture within this state, committed a tortious act within this state, or caused injuries to persons or property within this state arising out of acts or omissions outside of this state because, at the time of the injury, each Defendant was engaged in solicitation or service activities within this state.

24.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, as well as under 28 U.S.C. § 1391, because: (a) the conduct at issue took place and had an effect in this District; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District.

## PARTIES AND RELEVANT NON-PARTIES

### I.     Plaintiffs

25.     On June 20, 2018, this Court appointed PARKS and SHEMIRANI to serve as Co-Lead Plaintiffs for the class in this class action pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").

26.     Plaintiffs each actively researched BITCONNECT and the BitConnect Investment Programs prior to making their purchases of BCCs and throughout the periods in which they invested in BITCONNECT.  Accordingly, each of the Plaintiffs were personally, and successfully, solicited by the BITCONNECT Defendants in connection with their public representations and active solicitations to purchase BCCs or participate in the BitConnect Investment Programs.

27.     Plaintiff PARKS is an individual domiciled in Washington, Louisiana and is *sui juris*.  Beginning on or about August 24, 2017, Plaintiff PARKS funded his BITCONNECT account, through BITCONNECT's website, by investing 2.39521532 bitcoin, which were valued

at the time at approximately $10,359.79.  From August 24, 2017 through November 10, 2017, Plaintiff PARKS invested a sum total of 109.029 BTC in the BitConnect Investment Programs.  On January 17, 2018, when BITCONNECT closed its lending and trading platforms, Plaintiff PARKS' out-of-pocket investment loss at BITCONNECT totaled 49.03845866 bitcoin, which were believed to be valued at the time at approximately $544,032.66.

28.    Plaintiff SHEMIRANI is an individual domiciled in Dubai, United Arab Emirates and is *sui juris*.  Beginning on or about March 12, 2017, Plaintiff SHEMIRANI funded his BITCONNECT account, through BITCONNECT's website, by investing 0.249 bitcoin, which were valued at the time at approximately $305.07.  From March 12, 2017 through December 8, 2017, Plaintiff SHEMIRANI invested a sum total of 192.7116 BTC in the BitConnect Investment Programs.  On January 17, 2018, when BITCONNECT closed its lending and trading platforms, Plaintiff SHEMIRANI's out-of-pocket investment loss at BITCONNECT totaled 150.28 bitcoin, which were believed to be valued at the time at approximately $1,667,206.32.

29.    Plaintiff MARRYSHOW is an individual domiciled in Berwyn, Pennsylvania and is *sui juris*.  Beginning on or about December 3, 2017, Plaintiff MARRYSHOW completed the "training program" available on Defendant ARCARO's primary website to "funnel" investments into BitConnect —Futuremoney.io.  Following Plaintiff MARRYSHOW's completion of training on futuremoney.io, Plaintiff MARRYSHOW invested approximately 1.52838 bitcoin into the BitConnect Investment Programs.  On January 17, 2018, when BITCONNECT closed its lending and trading platforms, Plaintiff MARRYSHOW's out-of-pocket investment loss at BITCONNECT totaled approximately $27,870.00.

30.    Plaintiff YOO is an individual domiciled in Canoga Park, California and is *sui juris*.  Plaintiff YOO was personally and successfully solicited to invest in BitConnect by Defendants

ARCARO and MAASEN.  Specifically, Plaintiff YOO viewed Defendant ARCARO's and MAASEN's YouTube videos and signed up for BitConnect through their affiliate programs.  From December 20, 2017 through December 29, 2017, Defendants ARCARO and MAASEN successfully solicited Plaintiff YOO's investment of 1.59551122 bitcoin into the BitConnect Investment Programs.  On January 17, 2018, when BITCONNECT closed its lending and trading platforms, Plaintiff YOO's out-of-pocket investment loss at BITCONNECT totaled approximately $29,000.00.

31.     Plaintiff ARIAS is an individual domiciled in Tampa, Florida and is *sui juris*. Plaintiff ARIAS was personally and successfully solicited to invest in BitConnect by Defendants ARCARO and FOX.  Specifically, Plaintiff ARIAS viewed Defendant ARCARO's and FOX's YouTube videos and signed up for BitConnect through Defendant FOX's referral affiliate program.   In approximately September 2017, Defendants ARCARO and FOX successfully solicited Plaintiff ARIAS' investment of approximately $6,500.00 into the BitConnect Investment Programs.  On January 17, 2018, when BITCONNECT closed its lending and trading platforms, Plaintiff ARIAS' out-of-pocket investment loss at BITCONNECT totaled approximately $10,000.00.

32.     Plaintiff STRUZEN is an individual domiciled in Canoga Park, California and is *sui juris*.  Plaintiff STRUZEN was personally and successfully solicited to invest in BitConnect by Defendants ARCARO, JAMES and HILDRETH.  Specifically, Plaintiff STRUZEN viewed Defendant ARCARO's, JAMES' and HILDRETH's YouTube videos and signed up for BitConnect through their affiliate programs.  From November 9, 2017 through December 20, 2017, Defendants ARCARO, JAMES, and HILDRETH successfully solicited Plaintiff STRUZEN's investment of 4.75934893 bitcoin into the BitConnect Investment Programs.  On January 17, 2018,

when BITCONNECT closed its lending and trading platforms, Plaintiff STRUZEN's out-of-pocket investment loss at BITCONNECT totaled 2.55644348 bitcoin, which were believed to be valued at the time at approximately $28,400.00.

## II.   Defendants

### A.   The BitConnect Corporate Defendants

33.   Defendant BITCOIN AMR LIMITED f/k/a BITCONNECT PUBLIC LIMITED is a foreign for-profit company organized in England and Wales and incorporated under the Companies Act 2006 as a private company limited by shares.  The company was incorporated on September 4, 2017 as BitConnect Public Limited.  On September 27, 2017, the company filed a special resolution changing its name to Bitcoin AMR Limited.  Until May 18, 2018, BITCOIN AMR LIMITED's corporate record listed its principal place of business at Grant Thornton House, 22 Melton Street, Kings Cross, London, United Kingdom NW 1 2EP.  On May 18, 2018, the company's principal place of business was changed to PO Box 4385, 10944876: Companies House Default Address, Cardiff, CF14 8LH.

34.   Defendant BITCONNECT INTERNATIONAL PLC is a foreign for-profit company organized in England and Wales and incorporated under the Companies Act 2006 as a private company limited by shares.  The company was incorporated on September 6, 2017.  Until January 31, 2018, BITCONNECT INTERNATIONAL PLC's corporate record listed its principal place of business at Grant Thornton House, 22 Melton Street, Kings Cross, London, United Kingdom NW 1 2EP.  On January 31, 2018, the company's principal place of business was changed to PO Box 4385, 10948031: Companies House Default Address, Cardiff, CF14 8LH.

35.   Defendant BITCONNECT LTD. was a foreign for-profit company organized in England and Wales and had been incorporated under the Companies Act 2006 as a private

company limited by shares.  The company was incorporated on July 13, 2016.  On March 13, 2018

BITCONNECT LTD. was dissolved via compulsory strike-off.   Prior to its dissolution,

BITCONNECT LTD's corporate record listed its principal place of business at The Panorama,

Park Street, Ashford, United Kingdom TN24 8EZ.

36.     Defendant BITCONNECT TRADING LTD., is a foreign for-profit company

organized in England and Wales and incorporated under the Companies Act 2006 as a private

company limited by shares.  BITCONNECT TRADING LTD.'s corporate record lists its principal

place of business at 23 St. Elizabeth Avenue, Bootle, United Kingdom L20 6FA.

37.     Defendant BITCONNECT was initially operated from Gujarat, India.   In

September 2017, BITCONNECT's principal operations were migrated to Dubai, United Arab

Emirates -- more specifically, to the 135th floor of the Burj Khalifa.

38.     Upon information and belief, the BITCONNECT entities are wholly interrelated

and are used interchangeably as instrumentalities for the fraud and unlawful schemes described

herein.

**B.      The BitConnect Developer Defendants**

39.     Defendant KOTADIYA is a former politician in India having served as a Member

of the Legislative Assembly (MLA) for the Bharatiya Janata Party (BJP).  The BJP is the current

ruling political party in India.  As detailed below, Defendant KOTADIYA, along with several

other top BJP leaders, has been accused by the Indian National Congress (the "Congress"), a large

political party in India, of being one of the "masterminds" behind BitConnect.  In May 2018, an

arrest warrant was issued for KOTADIYA in connection with an abduction and alleged extortion

of 200 BTC from Shailesh Bhatt ("Bhatt"), and Indian businessman and investor in

BITCONNECT.  KOTADIYA thereafter absconded and released a video in which he stated that

"if he is arrested, he will reveal damning evidences which will expose top BJP leaders in the state" as having been involved with BITCONNECT.  KOTADIYA also stated that he feared for his safety if he turned himself in because of his knowledge as to who was behind BITCONNECT.  In September 2018, KOTADIYA was arrested.  Since his arrest, there has been very little public information released concerning his criminal case or statements he has made.

40.     Defendant GORASIYA is an individual formally domiciled in Surat, Gujarat, India.  According to India's Criminal Investigation Department ("CID"), GORASIYA was one of BITCONNECT's founders.  Defendant GORASIYA is believed to have personally acquired tens of millions of dollars through BITCONNECT's fraudulent operations.  India's CID alleges that GORASIYA fled to Dubai in December 2017, one month prior to BITCONNECT's collapse.

41.     Defendant CHAUDHARI is an individual domiciled in Surat, Gujarat, India.  According to India's CID, CHAUDHARI was one of BITCONNECT's founders.  Defendant CHAUDHARI is believed to have personally acquired tens of millions of dollars through BITCONNECT's fraudulent operations.  India's CID alleges that CHAUDHARI fled to Dubai in December 2017, one month prior to BITCONNECT's collapse.

42.     Defendant LATHIYA is an individual formally domiciled in Surat, Gujarat, India.  According to India's CID, LATHIYA was one of BITCONNECT's founders. Defendant LATHIYA is believed to have personally acquired tens of millions of dollars through BITCONNECT's fraudulent operations.  India's CID alleges that LATHIYA fled to Dubai in December 2017, one month prior to BITCONNECT's collapse.

43.     Defendant MAVANI is an individual formally domiciled in Surat, Gujarat, India.  According to India's CID, MAVANI was one of BITCONNECT's founders and one of BITCONNECT's "Administrators."  Defendant MAVANI is believed to have personally acquired

tens of millions of dollars through BITCONNECT's fraudulent operations According India's CID alleges that MAVANI fled India in February 2018 following his kidnapping, as detailed below.

44.     Defendant SAVALIYA is an individual domiciled in Surat, Gujarat, India. SAVALIYA was one of BITCONNECT's employees primarily responsible for various posting updates concerning BITCONNECT on social media platforms such as LinkedIn.  SAVALIYA's employment with BITCONNECT dates back to February 2016.

45.     Defendant PUROHIT is an individual domiciled in Surat, Gujarat, India. PUROHIT received an "award" for being a "Top Regional Promoter" in India during the BITCONNECT Conference.   PUROHIT owns R.V. Purohit & Co., a "Tax & Accounts Consultant" company.   Additionally, PUROHIT is co-owner of Innovative Biztrade Private Limited ("Biztrade").  Biztrade was incorporated on April 24, 2017.  PUROHIT's jointly owns Biztrade with Defendant DARJI who, as discussed below, has been arrested and labeled one of the "masterminds" behind BITCONNECT.

46.     Ranjeet Saxena ("SAXENA") is an individual domiciled in Surat, Gujarat, India. SAXENA is the sole owner Ranjeet Genus Private Limited, a purported "consultant" working in various fields, including "Social Media, Business Intelligence, Investment & Wealth Advisory Services and Cryptocurrency & Digital Wallets."  Additionally, SAXENA is co-owner of Vivid Sportz Private Limited, a company he recently used to purchase a professional wrestling team in India.  SAXENA was one of Amit Bhardwaj's ("Bhardwaj") closest aides.  Bhardwaj was the leader of a Ponzi scheme named "Gain Bitcoin."  Gain Bitcoin defrauded investors of $300 million. The scheme was shut down in April 2018, and Bhardwaj along with eight other individuals were arrested.  Defendant SAXENA was also substantially involved with BITCONNECT.  For example,

during the BITCONNECT Conference, SAXENA received a cash award for being a "Top Regional Promoter" in India.

47.      Defendants SANDIP, SMIT and RAJ (collectively, the "NAIKS") are individuals believed to be domiciled in Surat, Gujarat, India.  As noted and detailed further below, Defendant DARJI was a key figure in BITCONNECT's operations.   The NAIKS are co-owners with Defendant DARJI, or members of his immediate family, in several companies that, upon information and belief have been used, or are being used, to launder funds invested in the unlawful BITCONNECT scheme.

### C.      The BitConnect Director and Promoter Defendants

48.      Defendant SATISH is an individual believed to have been domiciled in Surat, Gujarat, India.  According to India's CID, SATISH fled to Dubai in December 2017, one month prior to BITCONNECT closing its lending and trading platform.  Prior to his involvement with BITCONNECT, SATISH worked as a Mail Sorter for India's Royal Mail.  SATISH has been publicly linked to BITCONNECT since at least June 2016.  SATISH is widely regarded as one of BITCONNECT's founders.  For example, India's CID alleges that SATISH was one of BITCONNECT's founders and identifies him as officially the "Head of BitConnect Asia." SATISH was a conduit through which the Developer Defendants and true founders of BITCONNECT communicated with the Promoter Defendants.  CID further alleges that SATISH was also the founder of another cryptocurrency investment scheme called "Nexa Coin."

49.      Defendant PRASETEYA is believed to be domiciled in Indonesia.  PRASETEYA was frequently referred to as BITCONNECT's "Lead Development Director." Prior to his involvement with BITCONNECT, PRASETEYA was a marketing manager employed by OneCoin Ltd. and its related corporate entities ("OneCoin").  OneCoin operates a Ponzi/pyramid

scheme extremely similar to BITCONNECT's.  To date, over 100 individuals have been arrested and prosecuted throughout the world for their involvement in OneCoin's operations, and approximately $400 million in investor funds have been recovered.  Defendant PRASETEYA frequently accompanied Defendant SATISH on "road shows" marketing BITCONNECT.

50.  Defendant SANTOSO is an individual believed to be domiciled in Indonesia. SANTOSO served as an affiliate/recruiter for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors throughout the world.  SANTOSO was the "Director" of BITCONNECT Indonesia.  SANTOSO frequently accompanied Defendants SATISH and PRASETEYA on "road shows" marketing BITCONNECT.

51.  Defendant ROBERTS is an individual believed to be domiciled in Vietnam. ROBERTS served as an affiliate/recruiter for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors throughout the world.  ROBERTS frequently accompanied Defendants SATISH, PRASETEYA and SANTOSO on "road shows" marketing BITCONNECT. ROBERTS and Defendant HELEN have been married at all relevant times.

52.  Defendant HELEN is an individual believed to be domiciled in Vietnam.  HELEN served as an affiliate/recruiter for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors throughout the world.  BITCOIN AMR LIMITED f/k/a BITCONNECT PUBLIC LIMITED's corporate filings list Defendant HELEN as one of the company's three shareholders.  Additionally, Defendant HELEN is listed as one of BITCONNECT INTERNATIONAL PLC's shareholders.  Local media in Vietnam report that Defendant ROBERTS and HELEN are the actual owners of BITCONNECT.[4]  Defendant HELEN frequently

---

[4] *See*, *e.g.*, https://fintechtimes.org/co-nen-tu-hao-khi-chu-coin-bitconnect-scam-lon-nhat-lich-su-crypto-la-nguoi-viet.

accompanied Defendants SATISH, PRASETEYA, SANTOSO and ROBERTS on "road shows" marketing BITCONNECT.

53.     Defendant SATAO is an individual believed to be domiciled in the Philippines. BITCONNECT's early press releases claimed SATAO was the BITCONNECT's "President" of "Development."  There is little information available able SATAO other than the fact that he was associated with another cryptocurrency investment scheme widely denounced as a scam: "BTC Panda."

54.     Defendant DARJI is an individual domiciled in Surat, Gujarat, India.  India's CID alleges that DARJI was one of BITCONNECT's founders.  Similarly, local media in India report that DARJI was one of the "masterminds" behind BITCONNECT.  CID further alleges that in December 2017, DARJI fled to Dubai.  However, for his involvement in BITCONNECT, DARJI was arrested on August 19, 2018 at an airport in Delhi, India as he arrived from Dubai.  Authorities reportedly seized 169 BTC and 8 kg of gold from DARJI during his arrest.[5]

55.     Defendant JEPPESEN is an individual believed to be domiciled in the United States and is *sui juris*.  According to published information, JOSHUA JEPPESEN held the title of a Director at BITCONNECT, serving as the "Development Director" for BITCONNECT's operations in the United States and Europe.

56.     Defendant ARCARO is an individual domiciled in Moorpark, California and is *sui juris*.  Prior to his employment with BITCONNECT, Defendant ARCARO worked as a multi-level-marketer for the Empower Network, a product-based pyramid scheme which went bankrupt in August 2017.  Defendant ARCARO began promoting BITCONNECT in or about June 2018.

---

[5]   *See*, *e.g.*,   https://bitcoinexchangeguide.com/alleged-bitconnect-crypto-scam-sees-head-of-operation-divyesh-darji-arrested-in-delhi/.

ARCARO was initially a promoter underneath Defendant GRANT, until ARCARO applied for and was hired as one of BITCONNECT's "National Promoters"; at which point most influential U.S.-based promoters, including Defendant GRANT, reported to ARCARO.   According to paperwork filed with the corporate registry office in the United Kingdom, ARCARO was an active Director of BITCONNECT INTERNATIONAL PLC.   ARCARO served BITCONNECT as a "National Promoter" tasked with managing a team of U.S.-based affiliates/recruiters.   ARCARO reported directly to Defendant SATISH.   ARCARO was responsible for managing, *inter alia*, Defendants JAMES, GRANT, HILDRETH, MAASEN, and FOX.   Additionally, ARCARO himself was one of the most successful affiliate/recruiters for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YouTube and Facebook.

57.    Defendant LABRECHE in an individual believed to be domiciled in Canada. According to paperwork filed with the corporate registry office in the United Kingdom, LABRECHE was an active Director of BITCONNECT INTERNATIONAL PLC.  LABRECHE served BITCONNECT as a "National Promoter" tasked with managing a team of Canadian-based affiliates/recruiters.   LABRECHE reported directly to Defendant SATISH.   Prior to his involvement with BITCONNECT, LABRECHE was a successful "Independent Business Owner" employed with ACN Network Marketing, a large MLM company.

58.    Defendant JAMES is an individual believed to be domiciled in Myrtle Beach, South Carolina and is *sui juris.*   JAMES served as an affiliate/recruiter for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YouTube and Facebook.

59.     Defendant HILDRETH is an individual domiciled in Laguna Nigel, California and is *sui juris*.  HILDRETH served as an affiliate/recruiter for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YouTube and Facebook.

60.     Defendant CRYPTO CLOVER is an individual formerly domiciled in Seattle, Washington.   Following BITCONNECT's collapse, CRYPTO CLOVER moved his office to Malaysia.   CRYPTO CLOVER served as an affiliate/recruiter for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YouTube and Facebook.

61.     Defendant GRANT is an individual believed to be domiciled in Miami, Florida and is *sui juris*.  GRANT served as an affiliate/recruiter for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YouTube and Facebook.

62.     Defendant CRYPTONICK is an individual believed to be domiciled in the United States and is *sui juris*.  His true name is Nicholas Trovato, though the state of his domicile is unknown at this time.   CRYPTONICK served as an affiliate/recruiter for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YouTube and Facebook.

63.     Defendant MAASEN is an individual domiciled in Tulsa, Oklahoma and is *sui juris*.  MAASEN served as an affiliate/recruiter for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YouTube and Facebook.

64.     Defendant FOX is an individual domiciled in San Diego, California and is *sui juris*. FOX served as an affiliate/recruiter for BITCONNECT, soliciting thousands of BITCONNECT investors in the United States and abroad through social media sites such as YouTube and Facebook.

65.     Defendant DOE NOS. 2–10 are individuals located in the United States and abroad who created and operated BITCONNECT and/or served as affiliates/recruiters for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YouTube and Facebook.

**D.     <u>Other Liable Persons/Entities</u>**

66.     In addition to those persons and entities set forth as Defendants herein, there are likely other parties who may well be liable to Plaintiffs and the Class (defined below), but respecting whom Plaintiffs currently lack specific facts to permit them to name such person or persons as a party defendant.  By not naming such persons or entities at this time, Plaintiffs are not waiving their right to amend this pleading to add such parties, should the facts warrant adding such parties

**<u>PLAINTIFFS' CLASS ACTION ALLEGATIONS</u>**

67.     Plaintiffs bring this action individually and as a class action on behalf of all individuals and entities who transferred to BITCONNECT any fiat currency or cryptocurrency to invest in BCC and/or the BitConnect Investment Programs and who suffered financial injury as a result thereof (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the individual Defendants.

68.     Additionally, the Class is comprised of subclasses of investors, each consisting of a class of investors who were personally and successfully solicited to invest in the BitConnect Investment Programs by each of the Promoter Defendants.

69.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

70.     While the exact number of Class members is presently unknown to Plaintiffs and can only be ascertained through discovery, Plaintiffs believe that there are thousands of members in this Class.  All members of the Class may be identified by records maintained by Defendants and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

71.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following: (i) whether the BITCONNECT Defendants offered and sold unregistered securities in violation of the federal securities laws; (ii) whether the BITCONNECT Defendants engaged in unlawful business practices in violation of Florida's Deceptive and Unfair Trade Practices Act; (iii) whether Defendant BITCONNECT breached its contracts with Plaintiffs and the Class; (iv) whether the BITCONNECT Defendants fraudulently solicited investments from Plaintiffs and the Class; (v) whether Defendants have been unjustly enriched by the unlawful conduct alleged herein; (vi) whether Plaintiffs and the Class will suffer irreparable harm if such unlawful activities are not remedied; and (vii) whether Plaintiffs and the Class are entitled to compensatory, exemplary, punitive, injunctive, or rescissory relief as a result of Defendants' wrongful conduct alleged herein, and the measure of such damages.

72.     Plaintiffs' claims are typical of the claims of the other members of the Class, and Plaintiffs do not have any interests adverse to the Class.  Additionally, Plaintiffs and the other members of the Class have all sustained harm in a substantially identical manner as a result of Defendants' wrongful conduct as alleged herein.

73.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained competent counsel experienced in litigation of this nature.

74.     Separate actions prosecuted by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

75.     Plaintiffs anticipate that there will be no difficulty in managing this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

76.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

77.     Accordingly, Plaintiffs seek compensatory, exemplary, punitive, rescissory, injunctive and other equitable relief on behalf of themselves and the Class to prevent the irreparable injury they will continue to suffer absent judicial intervention.

## SUBSTANTIVE ALLEGATIONS

### I.     Background on Blockchain Technology and Initial Coin Offerings

#### A.     Blockchains

78.     A "blockchain" is essentially a digitized, decentralized, public ledger that cryptographically records, preserves, and presents information.  The general idea is that each "block" contains information, such as details on transactions that are made.  After a "block" is

created (with cryptography to verify its contents), the information inside of it cannot be changed. The "block" then becomes part of the "blockchain," and an encrypted version of the information contained therein becomes publicly available along with all the previous "blocks" in the chain. After this process is complete, another block is created with additional information, and so on.

79.    To date, most "blockchains" are used to record transactions involving virtual currencies, *e.g.*, BTC and ETH.  However, a "blockchain" could be used to record all types of information.  For example, a blockchain could be used for deed recordation/transfers or even transfers of stock certificates.

### B.    Initial Coin Offerings

80.    An initial coin offering ("ICO") is a capital raising event in which an entity offers investors a unique "coin" or "token" in exchange for consideration—most commonly in the form of established virtual currencies (typically BTC and ETH) or fiat currency.  These tokens are issued on a blockchain and are oftentimes listed on online platforms, called virtual currency exchanges, where they are tradable for virtual or fiat currencies.

81.    To participate in an ICO, investors are typically required to transfer virtual currencies to the issuer's address, online wallet, or other account.  During an ICO, or after its completion, the issuer will typically distribute its unique "tokens" to the participants' unique address on the blockchain.  Similar to stockholders in an initial public offering ("IPO"), holders of these tokens are then entitled to certain rights related to a venture underlying the ICO, such as profits, shares of assets, use of certain services provided by the issuer, and/or voting rights.

### II.    Background on BitConnect

### A.    BitConnect's Formation and Creation of BCC

82.    BITCOIN  AMR  LIMITED  f/k/a  BITCONNECT  PUBLIC  LIMITED; BITCONNECT INTERNATIONAL PLC; BITCONNECT LTD.; and BITCONNECT TRADING

LTD. (collectively "BITCONNECT") are all parts of the same foreign technology organization that conducted its business on the internet, principally by means of websites accessible at www.bitconnect.co and www.bitconnectcoin.co.

83.     BITCONNECT describes itself as "an opensource all-in-one bitcoin and crypto community platform designed to provide multiple investment opportunities with cryptocurrency education where it is entirely possible to find the independence we all desire, in a community of like-minded, freedom-loving individuals who, like you, are seeking the possibility of income stability in a very unstable world."

84.     BITCONNECT launched on or about February 19, 2016.  The organization initially claimed to be involved in creating a social community and education programs relating to cryptocurrencies.  This idea was short-lived, as BITCONNECT soon thereafter transitioned into creating its own cryptocurrency (BCCs).  In June 2016, BITCONNECT launched the purported "World First Automated Bitcoin Lending platform" which Defendant SATISH touted as offering "Earning Opportunity Up to 30% a month and 5% Referral Bonus."

85.     In June 2016, Defendant SATISH began seeking "Business Partner(s)" to promote the initial BITCONNECT investment scheme.  For example, on June 30, 2016, he posted the following on Facebook:



86.     The initial iteration of the BITCONNECT lending platform did not involve any BCCs; rather, investors were expected to lend BTC directly to BITCONNECT.  That investment scheme received little-to-no attention.

87.     On November 8, 2016, in an effort to curb tax evasion, Indian Prime Minister Narendra Modi announced the demonetization of all 500 and 1,000 rupee notes -- declaring that they would no longer be recognized as legal tender as of December 30, 2016.

88.     As reported by *Bloomberg*, an estimated $650 million of "black money" (undeclared income which goes untaxed) flowed into Gujarat, India following the Prime Minister's announcement so those funds could be hidden away into assets such as diamonds and cryptocurrencies.  The prevailing theory is that BITCONNECT's founders capitalized on this unexpected announcement by conducting an ICO which ran from November 16, 2016 through

December 30, 2016 (the "BITCONNECT ICO").  The BITCONNECT ICO introduced BCC into the marketplace and is believed to have attracted those seeking to launder their "black money."

89.     BITCONNECT describes BCC as "an open source, peer-to-peer, community driven decentralized cryptocurrency that allow [*sic*] people to store and invest their wealth in a non-government controlled currency, and even earn a substantial interest on investment [*sic*].  This means anyone holding BitConnect Coin in their wallet will receive interest on their balance in return for helping maintain security on the network."  Similarly, BCC was described as not just "an investment tool; [but as] the investment tool you need to jump start your financial security."

90.     Shortly following the BITCONNECT ICO, BITCONNECT launched the BitConnect Exchange – a cryptocurrency exchange where investors could use BTC or fiat currency to purchase BCC.

91.     Over the following year, BITCONNECT implemented various investment programs, including the BitConnect Lending Program, the BitConnect Staking Program, and the Referral/Affiliate Program.  BITCONNECT marketed various uses for BCC:



### B.      The BitConnect Organizational Structure

92.     The sudden influx of capital into the BITCONNECT ICO from those seeking to launder their "black money" enabled BITCONNECT to rapidly expand its operations.   The Developer Defendants, Defendant SATISH, and the yet-to-be identified BITCONNECT founders quickly recruited individuals heavily experienced with MLM schemes, including Defendants PRASETEYA, ROBERTS, HELEN, LATHIYA, SANTOSO, DARJI, and SATAO.

93.     By August 2017, BITCONNECT's operations had expanded to include experienced MLM promoters throughout the world.   For example, in early-August 2017, BITCONNECT began holding training events and conferences in Indonesia attended by successful Promoter Defendants, including Defendants SATISH, PRASETEYA, ROBERTS, HELEN, SANTOSO, ARCARO, LABRECHE, and CRYPTO CLOVER.[6]

94.     BITCONNECT's organizational structure was, unsurprisingly, itself a pyramid. The top "promoter" employee was Defendant SATISH.   Each of the "National Promoters" reported to SATISH.   The "National Promoters" then had "Regional Promoters" who reported to them.

95.     The National Promoters who reported directly to SATISH included Defendants: PRASETEYA and SANTOSO on behalf of BitConnect Indonesia; ROBERTS and HELEN on behalf of BitConnect Vietnam; JEPPESEN on behalf of Europe and North America; ARCARO on behalf of the United States; LABRECHE on behalf of CANADA; and SATAO on behalf of the Philippines.

96.     The Regional Promoters identified herein each reported directly to Defendant ARCARO  or Defendant  JEPPESEN,  including:  JAMES;  HILDRETH;  GRANT;  CRYPTO

---

[6] *See, e.g.*, https://www.youtube.com/watch?v=3R5yiXgQ2KI.

CLOVER; CRYPTONICK, MAASEN, and FOX.  Additionally, certain Regional Promoters had

frequent contact and communication with Defendants SATISH, DARJI and/or LATHIYA.

99.     In mid-2017, BITCONNECT began holding meetings for "top promoters" in

Dubai.  For example, in December 2017, Defendant CRYPTO CLOVER attended one of these

meetings and published a video discussing what occurred during that particular meeting.  In his

video, CRYPTO CLOVER stated:

> There was about 50 people at this meeting . . . We went over some
> new guidelines for promoters, for top promoters and regional
> promoters . . . we went over a few different security measures.
> Overall the event was really interesting.  It was led by Satish … For
> the most part they're trying to find ways to grow and expand so I
> think you're going to see some new things coming forward.[7]

98.     As noted, BITCONNECT INTERNATIONAL PLC was incorporated on

September 6, 2017.  Defendants HELEN, DARJI, LABRECHE, SANTOSO, and ARCARO were

each listed as its initial shareholders and directors.

99.     On February 19, 2018, ARCARO filed an application in the High Court of Justice

Business and Property Courts of England and Wales Companies Court (ChD) claiming that he was

not and had never been a shareholder of BITCONNECT INTERNATIONAL PLC.  Defendant

ARCARO's application claimed that filings referring to him as a director or shareholder in

BITCONNECT INTERNATIONAL PLC were false, and he thus sought to remove his name from

inclusion on any such records.  The application was unopposed and subsequently granted.

100.    On September 26, 2018, Defendant GRANT publicly released videos on YouTube

containing two chat logs between Defendants ARCARO, JAMES, and himself (the "Chat Logs").

The first log was a group chat log including Defendants ARCARO, JAMES, and GRANT (the

---

[7] *See* https://www.youtube.com/watch?v=06mc2I0lZec.

"Group Chat").  The second log included messages directly between Defendant ARCARO and

GRANT (the "Arcaro Chat").  These chat logs consist of messages from June 2017 through

December 2017 and provide substantial insight into inner-workings of BITCONNECT's

organization with respect to its National and Regional Promoters.  On or about October 4, 2018,

Defendant GRANT deleted both Chat Logs from YouTube.

101.    The Group Chat logs reveal that Defendant ARCARO's application protesting his

listing as a BITCONNECT Director was a farce.  For example, on November 10, 2017, Defendant

JAMES messaged GRANT in the group chat by posting a link to BITCONNECT

INTERNATIONAL PLC's corporate record and stated:

| | |
|---|---|
| **James**: | This is the new license correct? |
| **Craig**: | yes<br>thats the new setup<br>international company ran by all top promoters |
| | *    *    * |
| **James** | Craig how many times have you been asked about the UK filing thing today? |
| **Grant**: | too many, and i see the new company with all the promoters, pretty slick<br>geln [sic] told me about aLL THAT [sic]<br>he had to send all his documents to bitconnect a couple months ago so<br>they can make a new company with all the promoters. |

### C.    The Owners of BitConnect

102.    According to media reports in India, leaders in the Congress political party, India's

CID and/or local reports relating to the BITCONNECT scheme, the behind the scenes

BITCONNECT owners included Defendant KOTADIYA, GORASIYA, CHAUDHARI

MAVANI, and LATHIYA.

103.    Additionally, as noted, Defendants PUROHIT, SAXENA, RAJ, SANDIP, and

SMIT were each either involved in BITCONNECT's operations or are involved in laundering

BITCONNECT investors' funds.  With respect to Defendant PUROHIT, he received a "Top Regional Promoter Award" during the BITCONNECT Conference and thus, undeniably worked with BITCONNECT.  However, not only did PUROHIT receive an award for promoting BITCONNECT, but he also co-owns a company named Biztrade with Defendant DARJI, who has been arrested and is alleged to be one of the "masterminds" behind BITCONNECT.  Based on the foregoing, it is reasonable to infer that PUROHIT is more involved in BITCONNECT's operation than the typical BITCONNECT promoter.

104.    Similarly, Defendant SAXENA also received a "Top Regional Promoter Award" during the BITCONNECT Conference.  The fact that SAXENA has already been linked at a high level to another cryptocurrency Ponzi scheme (Gain Bitcoin) coupled with the facts that he worked for BITCONNECT during the same timeframe and has amassed enough wealth as a "consultant" to purchase a professional wrestling team is highly indicative of the fact that SAXENA was likely one of the key players in the BITCONNECT organization.

105.    The NAIKS and DARJI, or members of his immediate family, are co-directors/co-owners of various companies with RAJ, SANDIP and/or SMIT, each of which were created, or purchased, during BITCONNECT's operation or following its closure.  For example:

- DARJI and SANDIP each became directors/owners in S and D Integrated Private Limited ("S&D") on July 28, 2017; and on March 21, 2018, SMIT and RAJ also become owners/directors in S&D;

- DARJI and SANDIP each became directors/owners in WFConnect Technologies Limited on April 1, 2017;

- SANDIP became a director/owner in Y2 Integrated Agro Ventures and Consultancy Private Limited ("Y2") on July 28, 2017; and on January 6, 2018 DARJI's wife Malini Divyesh Kumar Darjee became a director/co-owner in Y2;

- DARJI's son Rankesh Divyeshbhai Darji and RAJ each became a director/owner in FN Realty Private Limited ("FN") on January 12, 2018 (SMIT also became a director/owner in FN on March 21, 2018); and

- DARJI's son Dimki Divyesh Bhai Darji and RAJ each became directors/owners in MT Infrastructure Private Limited ("MT") on January 15, 2018; and on March 21, 2018, SMIT also became a director/owner in MT.

106.    Based on the timing when the parties engaged in such ventures and the fact that DARJI was without question a key player in the BITCONNECT scheme, the NAIKS were involved in BITCONNECT's operation as well or in laundering funds illegally raised from Plaintiffs and the Class.

107.    The facts and events described below were obtained from an Order issued in the High Court of Gujarat at Ahmedabad on August 20, 2018 in the matter entitled *Kiritbahi Jagubhai Vala vs. State of Gujarat*, R/CR.MA/14587/2018 and local media reports concerning developments regarding the same.

108.    Mr. Bhatt is an individual formerly domiciled in Surat, Gujarat, India. Bhatt was an investor in BITCONNECT who suffered a few hundred thousand dollars in financial losses due to BITCONNECT's collapse in January 2017. Shortly after BITCONNECT's collapse, Bhatt enlisted the services of various individuals to locate and capture Defendant SATISH. Bhatt's efforts led to the identification of Defendant SAVALIYA as being one of BITCONNECT's employees.

109.    On January 30, 2018, Bhatt and his associates are alleged to have abducted SAVALIYA and taken him to a farmhouse where he was threatened and held for three days. On February 1, 2018, Defendant SAVALIYA disclosed that Defendant MAVANI was one of BITCONNECT's administrators and had access to funds invested in BITCONNECT's fraudulent operation. Additionally, SAVALIYA disclosed the location where MAVANI could be found. That same day, Bhatt and his associates are alleged to have abducted Defendant MAVANI.

110.    MAVANI was thereafter allegedly beaten and forced to transfer 2,422 BTC to Bhatt and his associates.  As of the date of this amended complaint, this 2,422 BTC is valued at approximately $16,027,391.24.   Bhatt then demanded additional funds in exchange for MAVANI's release, which prompted MAVANI to contact Defendant GORASIYA for assistance.  GORASIYA subsequently caused an additional $1,960,690 to be transferred to Bhatt and his associates.  Following MAVANI's release, he is believed to have fled India for Dubai.

111.    On or about February 10, 2018, Bhatt was abducted by various individuals, allegedly beaten and forced to transfer 200 BTC to his abductors.  Shortly thereafter, Bhatt filed a complaint alleging that he was abducted at the direction of Defendant KOTADIYA.  Local media reports stated that Bhatt was abducted by BITCONNECT as retribution for his actions the prior week.

112.    In May 2018, an arrest warrant was issued against Defendant KOTADIYA in connection with the investigation concerning Bhatt's abduction.   KOTADIYA promptly absconded.  While on the lam, KOTADIYA released a video claiming that Bhatt had originally stolen the BTC at issue from BITCONNECT employees in February 2018 and further claimed that he feared turning himself in because he had evidence implicating senior politicians as being involved with BITCONNECT.  Additionally, KOTADIYA stated that "if he is arrested, he will reveal damning evidences which will expose top BJP leaders in the state" as having been involved with BITCONNECT.

113.    Defendant KOTADIYA, along with several other top BJP leaders, has been accused by the Indian National Congress (the "Congress"), a large political party in India, of being one of the "masterminds" behind BitConnect.   Rather than investigate BITCONNECT and KOTADIYA's claims, local enforcement agencies in India opened an action against Bhatt for his

abduction of BITCONNECT employees.  Following those revelations, Bhatt and his family fled

India.  To date, the CID has charged ten (10) individuals, including Bhatt, with conspiracy to

abduct BITCONNECT employees and extort funds.

114.    In September 2018, KOTADIYA was arrested for his role in abducting Bhatt.

Since his arrest, there has been very little public information released concerning his criminal case

or statements he has made relating to BITCONNECT.

### D.    The BitConnect Websites

115.    BITCONNECT    maintained    dozens    of    websites    including,

bitconnect.com/.online/.in/.net/.org/.xyz/.tech/.info/.biz/.cc.  BITCONNECT's primary websites

were accessible at http://bitconnect.co and a website accessible at http://bitconnectcoin.co (the

"BitConnect Websites").  The BitConnect Websites were accessible worldwide to the general

public, including residents of United States.

116.    The BitConnect Investment Programs were available for purchase by individuals

in the United States and worldwide through the BitConnect Websites and affiliated websites

rendered in foreign languages.  The investments were promoted on social media pages including,

but not limited to, Facebook, YouTube, Twitter, Reddit, LinkedIn, Instagram, and Craigslist.

117.    BITCONNECT promoted its Investment Programs on the BitConnect Websites by

making the following representations:

> (a) "There are multiple ways to invest in the BitConnect platform with
> different level of earning opportunity associated";
>
> (b) "You can invest BitConnect Coin in BitConnect lending platform
> exclusively from the BitConnect Dashboard.  This investment option
> involved profiting from BitConnect trading bot and volatility software.
> You will receive daily profit based on your investment option.  Upon
> investment term completion, you will receive your capital back to take
> out from the BitConnect lending platform or optionally reinvest back in
> lending platform to continue receiving daily profit"; and

(c) "Invest your wealth in community-driven decentralized cryptocurrency. Using BitConnect public exchanges, you can buy, sell and trade BitConnect Coin (BCC) directly to and from each other with no central organization involved."

118.    Upon information and belief, Defendant JEPPESEN played an integral role in developing and promoting the BitConnect Websites.  Without his vital contributions, the BitConnect Websites would not have functioned as well as they did and would not have ensnared as many victims who fell prey to Defendants' promotion of BCCs and the BitConnect Investment Programs.

## III.    BCC and the BitConnect Investment Programs

### A.    Trading BCC

119.    Trading BCC was marketed as an "investment option" that could be "used to profit on **price fluctuation**" in that investors could "buy BitConnect coin at a lower price and sell[ ] them at [a] higher price."  Additionally, investors could "profit[ ] from downward movements in [BCC] price by selling them at a higher price and buy[ing] them again at a lower price and pocketing the price difference."

120.    In addition to trading BCC, the two primary investment opportunities Defendants touted were the BitConnect Lending Program and the BitConnect Staking Program.  To participate in either investment opportunity, investors were required to expend BTC or fiat currency to purchase BCC on the BitConnect Exchange.

### B.    The BitConnect Lending Program

121.    The BitConnect Lending Program was described as an "investment option [that] involves profiting from [the] Bitconnect trading bot and volatility software" under which investors would "receive daily profit based on [their] investment option."  Following the "term completion,

[investors] [would] receive [their] **CAPITAL BACK** to take out from [the] Bitconnect lending platform or optionally [sic] reinvest back in lending platform to **continue receiving daily profit**."

122.    The BitConnect Lending Program offered up to forty percent (40%) interest per month as well as additional interest on a daily basis.  The general mechanics of the program are demonstrated in the following graphic BITCONNECT published:



123.    In soliciting investors for the BitConnect Lending Program, BITCONNECT used online banner ads such as the following:




124.    Under the BitConnect Lending Program investors would "lend" their BCCs to BITCONNECT – "with no risk" – as part of an investment scheme whereby BITCONNECT ostensibly used these BCC tokens to fund the trading activities using its Volatility Software.

125.     Once the funds were deposited into the BitConnect Lending Program, trading bots using the Volatility Software purportedly managed those funds, generating a guaranteed return using its volatility predictions for the price of BTC.  In exchange, investors receive income in the form of a daily fixed interest rate, and a bonus interest percentage, before eventually receiving the return of the principal amount invested.

126.     In short, investors were sold the promise of profit merely through "lending" BCCs and enjoying the guaranteed returns provided by trading bots and the Volatility Software.  These returns were allegedly backed by the earnings promised by BITCONNECT's development and implementation of the trading algorithms, which would purportedly produce returns sufficient to pay the following rates and bonuses:

**BitConnect Coin Lending Profits Interest**

| Lending Amount | Interest (Accrued Daily) | Capital Back |
|---|---|---|
| $100 - $1000 | Volatility Software Interest (up to 40 % Per Month) | After 299 Days |
| $1010 - $5000 | Volatility Software Interest + 0.10% Daily (up to 40 % Per Month) | After 239 Days |
| $5010 - $10000 | Volatility Software Interest + 0.20% Daily (up to 40 % Per Month) | After 179 Days |
| $10010 - $100000 | Volatility Software Interest + 0.25% Daily (up to 40 % Per Month) | After 120 Days |

**C.     The BitConnect Staking Program**

127.     The BitConnect Staking Program incentivized investors to purchase and hold BCCs by offering "guaranteed" interest paid in BCC.  The BitConnect Staking Program was sold to the public as an investment program that promised investors could earn interest of up to ten percent (10%) per month over a specified term through a process called "Proof of Stake Minting."   In essence, the BitConnect Staking Program and BCCs in general were sold as "interest bearing asset[s] with **120% return per year**.  It is that simple."

128.    The general mechanics of the BitConnect Staking Program are demonstrated in the following graphic BITCONNECT published:



129.    To participate in the BitConnect Staking Program, investors were required to download and install the BitConnect-QT wallet software to hold their BCCs; eventually BITCONNECT also released an online version of the BitConnect-QT Wallet.  After holding their BCCs in the BitConnect-QT Wallet for fifteen (15) days, an investor's BCCs would accrue interest.  The amount of interest paid to investors was purportedly contingent upon the dates of the investors' investments:

| Duration | Interest |
|---|---|
| 1st 6 months<br>Jan 2017 to June 2017 | 60% (10% per month) |
| 2nd 6 months<br>July 2017 to Dec 2017 | 50% (8% per month) |
| 3rd 6 months<br>Jan 2018 to June 2018 | 40% (7% per month) |
| 4th 6 months<br>July 2018 to Dec 2018 | 30% (5% per month) |
| 5th 6 months<br>Jan 2019 to June 2019 | 20% (3% per month) |
| 6th 6 months<br>July 2019 to Dec 2019 | 10% (1.4% per month) |

130.    BITCONNECT further represented that the BitConnect Staking Program was an opportunity for investors to: (i) "[s]ecure [their] future by gaining quick profit growth for tomorrow that is practical and attainable;" (ii) achieve "financial freedom;" (iii) "begin staking or holding BitConnect Coin and watch [their] interest grow;" and (iv) that "the more [ BCC investors] hold, the more [they] earn."

### D.    The BitConnect Referral Program

131.    In connection with the BitConnect Investment Programs, BITCONNECT operated the Referral Program, pursuant to which "affiliates" would earn additional income for referring additional investors to investing in BITCONNECT.  The Referral Program was a run-of-the-mill pyramid scheme.  Initially, the program extended "to Infinity" in that after the tenth (10) level was reached in the pyramid, 0.01% of all investments made by subsequent investors in the pyramid would siphon upwards to the top affiliate.  The concept is more plainly visible in the following graphic:



132.    Eventually, BITCONNECT modified the Referral Program to "7 levels of earning potential to" investors based on the number of referrals that signed up for BITCONNECT.

However, the core concept and fraudulent pyramid scheme remained in essence. Indeed, BITCONNECT encouraged investors to "[i]nvite [their] friends and family to join BitConnect via [their] unique **referral link** to start earning a serious income from [BITCONNECT's] affiliate program" and to "[s]pread the word on **social media** and other **online platforms** to help" make BITCONNECT a success.

## IV.   The BitConnect National and Regional Promoters

### A.   Defendants Satish and Darji

133.   As noted, while Defendant SATISH was the top public "Promoter" employed by BITCONNECT, he was largely a figurehead and conduit through which the actual founders of BITCONNECT could communicate with the National Promoters. As explained by Defendant CRYPTO CLOVER in a video he published discussing his relationships with Defendants SATISH and DARJI:

> I would say that I had a better rapport or relationship with Divesh than Satish. And I was able to communicate with Satish and, you know, I had um, different conversations, at different times, with him. I hung out with him in, uh Santa Clara during that event. And he's um, you know, he's a very shy guy. And you know, I've kind-of known him on a little bit of a personal level. Those guys are very central to kind-of what's going on with BitConnect now. Now, they're not the main developers. So there's a developer team and those developers have, you know, for, you know, for those of you guys that have been following the story, they've been anonymous. They haven't, you know. And nobody really knows how to get in contact with those guys other than Satish and Divyesh. From my understanding.[8]

134.   The fact that SATISH was far from the "mastermind" behind BITCONNECT was well-known amongst the National and Regional Promoters.[9]   For example, Defendant GRANT published a video recounting a discussion he had with SATISH, in which he stated that SATISH

---

[8]  At 7:56.

[9]  https://www.youtube.com/watch?v=nQnLSYU164E.

"explained it to him that [SATISH's] role was really just a conduit between people like [GRANT] and the 'system,' the 'system.'  So, [SATISH] doesn't have a huge responsibility."

135.    Similarly, in August 2017, Defendant SATISH gave an interview in which he was asked about whether there would be an opportunity to "meet more of the BitConnect team" at the BITCONNECT Conference "like developers and support personnel."  In response, SATISH stated, "Yeah, everybody's waiting to meet the developers and, uh, the founder of the system.  But actually, they are not likely to come to the event.  Because we are [a] combination, we are developing the networking all around the world, and they, don't want to be on the stage, for some reasons and that's why we might not see [them]."[10]

136.    As noted, Defendant DARJI was arrested in August 2018 and is alleged to be one of the "masterminds" behind BITCONNECT.  Upon information and belief, in addition to the Aston Martin Vantage he received from BITCONNECT, DARJI has amassed tens of millions of dollars through BITCONNECT -- so much so that he was able to purchase the entire 135th floor of the Burj Khalifa in Dubai as well as a separate penthouse in Dubai.  Defendant DARJI was an enthusiastic promoter of BITCONNECT, and he made sure his affection for the scheme was known in his speech at the BITCONNECT Conference:

> Good evening friends!  HELLO BCC.  I'm Divyesh Darji from India. Welcome to BitConnect Annual Conference 2017.  Guys, 2017 and 18 is the emerging year for the cryptocurrency . . . Seven-Fifty millions [*sic*], billions [*sic*]; Seven point six million billion [*sic*] people of the world.  One percent of that still don't know about the BitCoin [*sic*]!  If! One percent comes into the cryptocurrency market, think! What would be the cost of Bitcoin! Never ever imagine [*sic*]! Think! What would happen the big BCC coin value [*sic*]! Today, January 1st started with one dollar [*sic*]!  And today, its two-hundred and fifteen dollar! [*Inaudible*]! . . . I would like to request you [*sic*], find out and take the help of the Google! Learn about the cryptocurrency! Learn about the Bitcoin! And, one more thing, keep in mind, 95% of the cryptocurrency are BOGUS!  And, only ONE and one of the genuine! And authentic! BCC

---

[10] https://www.youtube.com/watch?v=7BBx227koPo.

Platform, available in the world [*sic*]! Who!? Who makes ordinary people into billionaires and going to be billionaires [*sic*]! Come, join us, learn about the cryptocurrency! [*inaudible*] BCC! BCC! BCC!

137.    Defendant DARJI, much like SATISH, was largely a figurehead for BITCONNECT.  Nonetheless, DARJI has profited handsomely from his participation in defrauding tens of thousands of individuals of billions of dollars.  Since his arrest, DARJI has yet to provide much more than a pithy proclamation that he is "innocent."

**B.    Defendants Arcaro, James, and Grant**

138.    Defendant ARCARO was responsible for managing a large team of affiliate markets for BITCONNECT; and he personally assisted affiliates with preparing sales presentations and honing their sales pitches to potential investors in the BitConnect Investment Programs.

139.    Evidently, Defendant ARCARO was so successful as an affiliate marketer and organizer that he received a Porsche Carrera 911 S as a reward during a live broadcast of the BitConnect Conference in October 2017.

140.    Among the Promoter Defendants, Defendants JAMES and GRANT have been particularly active affiliate promoters, primarily by using videos they posted on YouTube wherein they solicited investments for the BitConnect Investment Programs. Shockingly, after the State of Texas issued an Emergency Cease and Desist Order against BITCONNECT in early-January 2018, Defendant JAMES encouraged the public to use a Virtual Private Network ("VPN") to simulate an IP address outside of Texas and continue using BITCONNECT: "Load you [*sic*] a VPN, they all are good, and keep using BitConnect.  Don't let Texas, don't let them government shut you down . . . they haters [*sic*], they mad cus [*sic*] we making money."

141.    Rather than exhibit even a semblance of remorse for his involvement propagating the BITCONNECT pyramid scheme, Defendant JAMES has opted to deem investors who were cheated by Defendants' fraudulent schemes – some of whom lost their life savings – "crybabies."

142.   Defendant GRANT, upon information and belief, has been hailed as a "godfather" of BITCONNECT and has promoted the BitConnect Investment Programs since in or about April 2017.  Additionally, Defendant GRANT has been alleged to have been involved in numerous other financial scams.[11]

143.   The Chat Logs reveal that Defendants ARCARO and JAMES were initially affiliate promoters working underneath Defendant GRANT's "down line."  However, in August 2017, Defendants ARCARO and JAMES each **applied** for a senior role with BITCONNECT but were denied, while ARCARO was hired as a "National Promoter."

144.   Additionally, the Chat Logs reveal that BITCONNECT unilaterally moved affiliate promoters amongst different "down lines."  For example, after ARCARO was hired, BITCONNECT moved JAMES out from GRANT's "down line" to ARCARO's "down line."

145.   Defendants ARCARO, JAMES, and GRANT were fully aware of the fact that they were promoting a Ponzi scheme.  This fact is plainly seen in the following exchange that took place between them on October 5, 2017:

**Arcaro**:   what do you guys know/think about this I am [*sic*] English guy?  He wants to be regional but doesn't really do too much volume.  Especially for how long he's been doing youtube.

**Grant**:   he no good at marketing
he does drama
but he can do better, if motivated

**Arcaro**:   the pure number of videos he does, why isn't he doing more volume?  He said he's done 90k total.

**Grant**:   he says crypto market dried up. I tend to agree.

**Arcaro**:   what does that mean?

---

[11]  *See, e.g.*, http://www.davinsden.com/avalos/ (research compiled by a podcast team on Defendant GRANT's various schemes).

**Grant**:     more volume can come from outside crypto space

**Arcaro**:   I don't believe it's dried up
            it's just about proper targeting

**Grant**:     most beleive [*sic*] it is
            crypto is small space

**Arcaro**:   most people eat at mcdonalds
            it's small but I think there is new blood all the time coming in
            also, we just need to target better

**Grant**:     i am focused on new blood

**Arcaro**:   **are you hitting those hyips keywords**[12] **in youtube**?
            ethrade, coinxl and all those
            should add regal coin to the mix

**Grant**:     I am doing great with all i am doing

**Arcaro**:   coo
            I'd make a video targeting just regal coin
            Start out by saying
            "don't invest into regal coin until you watch this video"
            Blah blah blah
            I'd do that for each of the hyips
            And run that ad only against that keyoword [*sic*]
            Maybe we can't do it because we are promoters but
            we can get our team to

**Grant**:     sounds like your area of expertice [*sic*]

**Arcaro**:   I'd say something nice about the program and then
            say I have something better than xyz program…

**Grant**:     bitconnect needs you to do this stuff

---

[12] "Hyips" are "High-yield investment programs."  A high-yield investment program is a Ponzi scheme that offers unsustainably high returns on investment to lure in investors.  As typical with a Ponzi scheme, new investor funds are then used to return established investors.  Investor.gov explains that the "hallmark of an HYIP scam is the promise of incredible returns at little or no risk to the investor.  A HYIP website might promise annual (or even monthly, weekly, or daily!) returns of 30 or 40 percent – or more."  BITCONNECT's Investment Programs fall squarely in this definition.

146.    Not only were the Promoter Defendants some of BITCONNECT's most successful "affiliate" marketers, but they each received additional compensation in the form of so-called "development funds."   Development funds were paid out from BITCONNECT to National Promoters who then used and shared the funds with their top Regional Promoters.  These funds were meant to offset any costs the Promoter Defendants might have relating to their promotion of BITCONNECT.

147.    On October 9, 2017, Defendant JAMES submitted a screenshot showing the "Promoter" dashboard for BITCONNECT's top promoters.   This dashboard explained the "development funds" as follows:

-----One structure national representative terms and conditions-----

The development fund assigned to you is the fund given by bitconnect system to operate bitconnect network more efficiently in your country.   Development percentage given to you is calculated based on total volume generated by your own structure network and paid weekly.

***For example***: *If you have been given 15% development fund by bitconnect and your network volume for current week is $100,000, you will receive $15000 on completion of current week.*

148.    In September 2017, Defendant ARCARO began providing Defendant GRAIG with Development Funds to build the "BCC School"– an online training program to "teach" the unsuspecting public how to participate in cryptocurrency investment opportunities, including the BitConnect Investment Programs.  BITCONNECT wanted the existence of development funds to remain a secret.  For example, on August 25, 2017, ARCARO messaged Grant, stating: "Satish was pissed when he saw me talking about the development fund on YouTube.  I deleted the video. I guess they don't watch that."  GRANT responded by asking whether SATISH was angry about how ARCARO talked about the fund or how ARCARO had been using the funds, to which ARCARO stated that the issue was "[n]ot how I talked about it but the fact that I talked about it.

I uploaded a video called 'how to get a dev account' and 20 min later [he] messaged me. I quickly deleted it. I think he can care less what I actually do with the money. As long as they see results, we are all adults here." Similarly, on September 10, 2017, Defendant GRANT published a video discussing his use of Development Funds after which ARCARO warned GRANT not to discuss the Development Funds in his videos because the "Bitconnect honchos say don't talk about the development fund on video. Big no no in their eyes. You're supposed to phrase it all as if it's coming from you. Just don't mention that they are funding."

149.   On October 2, 2017, ARCARO informed JAMES and GRANT that "all of the national promoters dev fund was cut by 1/3" -- meaning that he would receive 10% of the network volume instead of 15%. In early-October 2017, the total investment volume in BITCONNECT per week was approximately $7 million, meaning that the development fund disbursed to JEPPESEN or ARCARO was approximately $700,000 *per week*.

150.   On October 13, 2017, ARCARO asked JAMES and GRANT if they wanted to attend the BITCONNECT Conference in Thailand and told them to try and get their audiences to attend. In response, Defendant JAMES asked ARCARO "what do you mean by the more people we get to the event the more money we will make?" ARCARO responded to JAMES question with the following:

> When people get to events and they actually see human flesh that only existed on a computer screen, something clicks in your head and it becomes real only at that moment.
>
> People just want to be a part of something bigger than themselves.
>
> They're bored and they're lives generally suck. If they feel like they belong somewhere, all the guards come down, that's when they start investing for real.
>
> No this little 10k, 20k shit but real dough which is usually accessed in 401ks iras etc.

It looks like the banks and investment houses are close to flipping the switch and making it easy for people to get bitcoin.  I think it will start happening next year.

When that happens you're talking trillions of dollars easily accessible in btc. Things will really change then.

If nothing else the events build towards that.

151.    Defendant ARCARO stated that he planned to have 1,000 BTC by the BITCONNECT conference on October 28, 2017.

152.    By late-October 2017, Defendant JAMES was personally generating $4 million per week in new investments.  On October 23, 2017, JAMES shared a link to a post sharing a screenshot from JAMES' internal BITCONNECT platform showing that he had $625,199 in commissions, a lending profit of $113,541, and access to $154,672 in "development funds."  The post was alleging BITCONNECT to be a Ponzi scheme and raising questions as to what the "development fund" was.  Defendant JAMES criticized the post in the Group Chat by stating "people are cry babies [*sic*]."  In response, GRANT stated: "nobody knows, but they can speculate."

153.    Also in late-October 2017, Defendant GRANT began spending $7,000 per week on marketing with Google and YouTube in addition to the $5,250 he was spending for marketing on Facebook.

154.    By October 30, 2017, Defendant JAMES was responsible for nearly $1 million in new investments in BITCONNECT per day.  By early-November 2017, the U.S. was converting well-over $10 million per week in new investments.

155.    On November 13, 2017, Defendant JAMES boasted to the group that he had 128 BTC in one of his wallets.   On that date, 128 BTC was worth approximately $850,000. Additionally, JAMES bragged that he had been earning $10,000 per day.

156.    Between November 25, 2017 and November 26, 2017, BTC's market price increased approximately $700 dollars.   On November 26, 2017, Defendant ARCARO boasted in the Group Chat that he "probably make a mil overnight" because he "never sell[s] btc."   For ARCARO to have made $1 million overnight from BTC's appreciation, he would have had to hold nearly 1,430 BTC.   At that time, 1,430 BTC was worth approximately $12,000,000.

157.    In the Group Chat, Defendant GRANT frequently voiced his desire to avoid the spotlight by not attending large events such as the BITCONNECT Conference.   GRANT explained that he "like[s] being under the crypto radar, w[h]ile earn[ing] tons of money from regular folk," to which ARCARO responded: "Lol I agree."

158.    Defendant ARCARO had numerous websites promoting BITCONNECT.   Each of these websites were meant to serve as a "funnel" into investing in BITCONNECT or any other pyramid scheme for that matter.   For example, the home page for "glennarcaro.com" hosted the following image:



Second Amended Consolidated Class Action Complaint
Lead Case No.: 9:18-cv-80086-DMM

159.     Similarly, Defendant ARCARO's website, "BitFunnel" hosted the following image:



160.     Defendant ARCARO's primary "funnel" site appears to have been Futuremoney.io. On that website, "lessons" eight, nine, and ten in the course named "Cryptocurrency 101" were entitled, respectively, "Buying Your First Bitcoin," "Creating Your Bitconnect Account," and "Bitcoin to Bitconnect: Transfer and Start Earning!"  Unsurprisingly, the "graduates" of "BCC School" were directed to open BITCONNECT accounts using Defendant ARCARO's and his team's referral links.

161.     In essence, the BCC School and all of the related "Future Money" funnel websites were little more than conduits to get "graduates" to open up accounts at BITCONNECT, for which ARCARO and his team of affiliates reaped from BITCONNECT the riches of each client referral.

C.      **The BitConnect Conference**

162.    Defendant PRASETEYA was not only honored as a "Top Promoter" during the BitConnect Conference, but he also served as BITCONNECT's representative in providing various rewards to National and Regional Promoters.  For example, PRASETEYA took the stage to provide $250,000 in cash "rewards" to various BITCONNECT promoters.

163.    Defendant JEPPESEN was BITCONNECT's "director" for the United States and Europe.  JEPPESEN was one of BITCONNECT's most public figures, having represented the organization at various blockchain related events.  For example, on October 19, 2017, BITCONNECT used one of its social media accounts to post the following:

164.    Defendant LABRECHE was the "National Promoter" for Canada.  LABRECHE solicited hundreds if not thousands of BITCONNECT investors throughout the world.  Defendant LABRECHE's success promoting BITCONNECT was also rewarded during the BITCONNECT Conference.  In fact, LABRECHE's efforts were so effective that he was recognized as one of the "Top BitConnect Promoters" alongside Defendants SATISH, PRASETEYA, ROBERTS, HELEN, SANTOSO, DARJI, ARCARO, and JEPPESEN.  Additionally, Defendant LABRECHE was one of the few BITCONNECT promoters that received the official "Top Promoters Reward": a "Cash Reward of $50,000."   Furthermore, Defendant LABRECHE even served as BITCONNECT's representative in rewarding Defendant DARJI with a brand new Aston Martin Vantage during the conference.

165.    Like Defendant DARJI's, Defendant SANTOSO's speech during the BITCONNECT conference was also animated and a clear exhibition of his affinity for BITCONNECT's fraudulent operation.  Defendant SANTOSO's speech began as follows: "I'm SANTOSO, I'm from Indonesia.  I am BitConnect!  I am BitConnect!  I am BitConnect."  Defendant SANTOSO's contribution to BITCONNECT was rewarded with a Mercedes GTS

during the conference.  Similarly, Defendants HELEN and ROBERTS were rewarded with a Lamborghini Huracan.

166.    One of the final "awards" provided during the conference was the "Best BitConnect Supporters Rewards" -- a $50,000 Cash Reward -- of which Defendants JEPPESEN and SATISH were each recipients:



### D.    Defendants Crypto Clover, Maasen, Hildreth, CryptoNick, and Fox

167.    Defendant CRYPTO CLOVER was an influential affiliate marketer on one of Defendant ARCARO's referral teams.  CRYPTO CLOVER posted dozens of videos on YouTube promoting the BitConnect Investment Programs and often traveled to Indonesia and Vietnam to personally spend time with Defendants SATISH, DARJI, and the Developer Defendants.

168.    Defendant HILDRETH marketed the BitConnect Investment Programs through his website (ryanhildreth.com), which was touted as teaching "how to make an extra $1,000 - $5,000+ per month" and targeted "ENTREPRENEURS WHO WANT THE FREEDOM TO MAKE

MONEY FROM ANYWHERE IN THE WORLD, TRAVEL, AND CHOOSE THE LIFESTYLE [THEY] WANT TO LIVE!" (emphasis in original).

169.    Defendants  HILDRETH  and  CRYPTONICK  frequently  worked  together  in marketing BITCONNECT.  For example, they operated "Bitcoinmastery.teachable.com" which offered the following course for $497:



170.    The "course" was described as follows:

> This program, featuring Cryptocurrency Business Owners Ryan Hildreth and Crypto Nick, will guide you to becoming highly profitable in the Cryptocurrency space.  Ryan and Nick believe that when building a 6 figure income through Bitcoin and cryptocurrencies, you should have multiple flows of coin.  They will be guiding you to the mastery of trading, mining, lending, and building a brand around crypto.

171.    Defendant CRYPTONICK was an extremely influential affiliate marketer who claimed to have become a millionaire as a result of his cryptocurrency investments.  Defendant CRYPTONICK's participation and culpability in furthering the BITCONNECT pyramid/Ponzi scheme is evidenced by the fact that almost immediately after BITCONNECT closed its lending

and exchange platforms, he deleted all of his YouTube videos promoting the BitConnect Investment Programs and shut down all of his popular social media channels. When questioned as to CRYPTONICK's whereabouts, Defendant CRYPTO CLOVER recently stated the following:

> Crypto Nick? Nick's probably in hiding . . . The thing about Crypto Nick was, he had a, um, he had a bigger following than [JAMES]. So he was one of the biggest YouTubers in the space . . . once he started talking about BitConnect, like he started doing really well, but he made a ton of money on referrals. A ton of money. People would sign up and he really didn't have that much money invested in BitConnect. So he was, um, in a lot of ways, he was just, he was basically just kind-of doing it for the referrals. And he made a lot of money in referrals, way, way more than I did. And um, so he just kind-of cashed out and took his channel down and um, now he's in hiding.

172.    Defendant MAASEN also published dozens of YouTube videos promoting the BitConnect Investment Programs. Further, Defendant MAASEN appears to have primarily focused his efforts on raising investments from high school and college-age investors.

173.    Likewise, Defendant FOX published hundreds of YouTube videos promoting the BitConnect Investment Programs and successfully solicited thousands of investors from those efforts.

**V.    The BitConnect Investments Were Ponzi Schemes and Securities**

   **A.    The BitConnect Defendants Operated a Ponzi Scheme**

174.    Contrary to the allegations of fantastic investment returns through the power of BITCONNECT's proprietary, secret trading Volatility Software and the communal power of the BitConnect Staking Program, the BITCONNECT Defendants were actually operating a Ponzi scheme.

175.    Any investment returns provided to BITCONNECT investors were not legitimately generated; rather, BITCONNECT simply used new BITCONNECT investors' money to pay the promised returns on outstanding BITCONNECT investors' investments.

176.    In addition, BITCONNECT used new BITCONNECT investors' funds to pay the BITCONNECT Directors and affiliates -- including, but not limited to, Defendants JEPPESEN, ARCARO, JAMES, HILDRETH, GRANT, CRYPTO CLOVER, CRYPTONICK, MAASEN, and FOX -- salary and commissions for their role in bringing additional victims into the scheme.

177.    The reality is, BITCONNECT was not offering a revolutionary technology, but was instead selling a new take on a century-old scam.   Specifically, BITCONNECT used cryptocurrency to coat its Ponzi/pyramid scheme with the thinnest veneer of legitimacy.  Despite such efforts, it is abundantly clear that the BITCONNECT Defendants were conducting and/or supporting a Ponzi/pyramid scheme.   Indeed, the BitConnect Investment Programs exhibit numerous characteristics of such schemes, including:

(a) providing daily interest on an investment that had no income other than new investor money;

(b) artificially increasing the value of its cryptocurrency by having new investors in the Ponzi scheme purchase BCC to invest;

(c) obfuscating the identities of BitConnect's owners by using an offshore company created through a company called Companies Made Simple; and

(d) expanding the amount of people in this Ponzi scheme by implementing a Pyramid scheme that paid a commission 7-levels deep for recruits.

**B.    BCCs and the BitConnect Investment Programs were Investment Contract Securities**

178.    This Action alleges claims under Sections 12(a)(1) and 15(a) of the Securities Act [15 U.S.C. §§ 77l(a)(1) and 77o(a)], and are based solely on allegations of strict liability.

179.    Neither the BCCs nor the BitConnect Investment Programs were registered with the Securities and Exchange Commission ("SEC"); and thus, the BitConnect Defendants engaged in the offer and sale of unregistered securities.

180.    Under the Securities Act, a "security" is defined as including any "note," "investment contract," or "instrument commonly known as a 'security.'" *See* 15 U.S.C. §§ 77b(a)(1). Here, the BCCs, the BitConnect Lending Program, and the BitConnect Staking Program each constitute an investment contract.   In *SEC v. W.J. Howey Co.*, the United States Supreme Court established a three-part test to determine whether an offering, contract, transaction, or scheme constitutes an investment contract.[13]   Under the test articulated in *Howey*, a contract, transaction, or scheme is an "investment contract" if it involves: (i) the investment of money; (ii) in a common enterprise; (iii) with the expectation of profits to come solely from the efforts of others.

181.    When determining whether a security has been offered and sold, the focus must be on the economic realities underlying the transaction.  Here, the economic realities are that Plaintiffs and the Class invested funds to trade BCCs, "lend" BCCs and/or "stake" BCCs -- each of which they expected would lead to "financial freedom" and "guaranteed" lucrative returns.  Investors in the BitConnect Investment Programs used BTC or fiat currency to purchase the BCC required to make their investments.  Accordingly, Plaintiffs' and the Class' investment of BTC or fiat currency constitutes an investment of money for the purposes of determining whether an investment involved a security.

182.    Plaintiffs and the Class were investing in a common enterprise with the BITCONNECT Defendants, as the BTC and fiat currency were pooled under the control of Defendant BITCONNECT, and the success of the BitConnect platform -- and thus potential profits stemming from the future valuation of the BCC -- was entirely reliant on the BITCONNECT

---

[13]    *See SEC v. W.J. Howey, Co.*, 328 U.S. 293 (1946); *see also Intern. Bhd. of Teamsters v. Daniel*, 421 U.S. 837, 852 (1979) (noting that the *Howey* test is not the only test for determining a security, but has been held to embody "all the attributes that run through all of the Court's decisions defining a security").

Defendants' actions, primarily BITCONNECT's implementation of its proprietary, secret trading system, which BITCONNECT claimed would produce returns sufficient to cover interest payments to the BCC holders.  With respect to the Promoter Defendants, their anticipated success at soliciting additional purchases of BCC or luring additional victims to participate in the BitConnect Investment Programs was vital to increasing the value of BCC.

183.    As relates to the BitConnect Lending Program, investors were promised substantial fixed returns and a complete return of principal at a fixed time in the future.[14]  BITCONNECT provided a Daily Interest Chart on its websites that showed the daily interest that it purported to have paid to its investors in the three months prior to that date.  Although the daily interest rate for BITCONNECT investments varied on a daily basis, on average BITCONNECT guaranteed a return of 1% per day.[15]

---

[14]    As relates to the BitConnect Staking Program, BITCONNECT failed to ever explain where the funds would come from to provide up to "120%" returns per year; thus, it can only be presumed that such funds were meant to also result from the BITCONNECT Defendants' actions, through the trading bots, or otherwise.

[15]    Theoretically, if investors chose to reinvest the interest earned, this daily interest would potentially add up to significant returns as a result of daily compounding. For example, a one-hundred-dollar investment compounded at 1% daily interest would be worth $134.77 after one month, $599.58 after six months, and $3,778.02 by the end of the year – representing an outlandish 3,678.02% net profit.



184.   In short, it is indisputable that the BITCONNECT Defendants were selling investment contracts and that any success from BITCONNECT's implementation of its Volatility Software – enabling payment of the interests and bonuses that were to be distributed – as well as any future potential increases to the value of the BCCs were entirely dependent on the BITCONNECT Defendants' actions.

**C.**      **The BitConnect Defendants Were "Sellers" Under the Federal Securities Laws**

185.   Liability for selling unregistered securities extends to "the person who successfully solicits the purchase [of an unregistered security], motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 643 (1988).

186.   As noted above, Plaintiffs and the Class were actively involved in researching BITCONNECT and the BitConnect Investment Programs prior to purchasing their BCCs or investing with BITCONNECT.  Such research included reviewing virtual currency online forums, reading BITCONNECT's publications and viewing its promotional videos.  Accordingly, each of the solicitations outlined below were successful in soliciting Plaintiffs and the Class to invest with BITCONNECT.

187.    Each of the BITCONNECT Defendants are considered "sellers," as each successfully solicited investments in BCCs and/or the BitConnect Investment Programs for their own or BITCONNECT's financial benefit.

188.    It is indisputable that BITCONNECT participated in the offer and sale of BCCs and the BitConnect Investment Program's investment contracts.  More specifically, BITCONNECT -- as the direct issuer of BCCs and the creator, and host, of the BitConnect Investment Programs -- directly offered and sold such investment contract securities.  Similarly, Defendants JEPPESEN and ARCARO -- as directors of BITCONNECT -- controlled its actions and are thus equally deemed "sellers."

189.    With respect to the Developer Defendants, they created the BITCONNECT platform enabling the unlawful scheme to begin.

190.    With respect to the Promoter Defendants, each actively solicited investments in BCCs and the BitConnect Investment Programs -- largely through YouTube -- for the sole purpose of receiving compensation.  Such activity falls squarely under the definition of "seller."

191.    Indeed, Plaintiff MARRYSHOW was personally and successfully solicited to invest in the BitConnect Investment Programs by Defendant ARCARO because she completed the "training program" on Defendant ARCARO's website (futuremoney.io), after which she invested in BITCONNECT.

192.    Similarly, Plaintiff YOO was personally and successfully solicited to invest in the BitConnect Investment Programs by Defendants ARCARO and MAASEN after viewing their YouTube promotional videos and signing up through their affiliate programs.

193.    Moreover, Defendant GRANT is believed to have posted approximately 2,500 videos of varying length on YouTube promoting the BitConnect Investment Programs and the

BitConnect Investments. His 100,000+ YouTube subscribers and others members of the general public registered nearly 33,000,000 independent views of his videos. Additionally, he is believed to have generated for himself approximately $5,000,000.00 of income as a direct result of sponsoring over 12,000 investors -- who provided $52,000,000.00 of investment capital to BITCONNECT -- the majority of whom were recruited for "sponsorship" through his videos on YouTube.

194.    Defendant JAMES is believed to have had no fewer than 136,000 YouTube subscribers registering 8,000,000 views of one or more of his 600+ BITCONNECT promotional videos on one of his many YouTube channels, and he is believed to have earned for himself around $2,000,000.00 as a result of the approximately 3,000 investors (and nearly $12,000,000.00 of investment capital to BITCONNECT) he sponsored -- the majority of whom were recruited for "sponsorship" through his videos on YouTube.

195.    Defendant CRYPTONICK is believed to have had nearly 200,000 YouTube subscribers to his 400+ BITCONNECT promotional videos on YouTube, generating over $10,000,000.00 of investment capital from nearly 3,000 investors for BITCONNECT -- the majority of whom were recruited for "sponsorship" through his videos on YouTube. Such recruitment activities are believed to have resulted in CRYPTONICK earning approximately $900,000.00.

196.    At the height of the BITCONNECT frenzy, Defendant HILDRETH is believed to have had at least 106,000 YouTube subscribers and nearly 3,500,000 views in total across the 250+ BITCONNECT videos he posted on YouTube -- efforts that produced over $20,000,000.00 of investment capital to BITCONNECT from over 5,000 investors.

197.    Defendant MAASEN is believed to have had 20,000+ YouTube subscribers, and over 850,000 views, of the nearly 100 BITCONNECT videos on YouTube.

198.    Defendant FOX is believed to have published 350+ BITCONNECT promotional videos on YouTube, where he garnered approximately 100,000 subscribers to his YouTube channels and approximately 4,000,000 independent views of his videos.  His recruitment activities are believed to have generated over $5,200,000.00 of investment capital to BITCONNECT from nearly 1,500 investors, which resulted in approximately $400,000.00 in earnings for FOX.

199.    Even Defendant ARCARO posted more than 150 videos of varying length on YouTube promoting the BitConnect Investment Programs and the BitConnect Investments.

200.    Based on the foregoing, each of the BITCONNECT Defendants were "sellers" of unregistered securities (in the form of BCCs and/or contracts resulting from participation in the BitConnect Investment Programs) under the federal securities laws.

### D.    BitConnect Led Class Members to Incur Substantial Losses

201.    While the SEC has yet to involve itself – at least publicly – in the present matter, state regulators have displayed no such hesitancy.  By late-2017, it was apparent to BITCONNECT that the Ponzi scheme it had constructed was on the verge of toppling.  Not content with riding off into the sunset with its ill-gotten gains, BITCONNECT decided to take another bite at the apple and orchestrated a second BITCONNECT ICO to take place in January 2018 (the "BitConnectx ICO").  The Bitconnectx.co domain was registered in late-December 2017, and a crowdsale commenced less than two weeks later.  The company was seeking to sell 11.76 million of a new virtual currency ("BCCX"), which would earn BITCONNECT $588 million.  Additionally, BITCONNECT planned to retain another $145 million in BCCXs for itself, bringing its total expected income from the BitConnectx ICO to $733 million.

202.   On January 4, 2018, the Texas State Securities Board issued an Emergency Cease And Desist Order against BITCONNECT in which the Securities Commissioner of the State of Texas presented his office's conclusion that, *inter alia*:

(a) the BitConnect Investments are securities;

(b) BITCONNECT had violated numerous securities regulations by offering the BitConnect Investments for sale in Texas;

(c) BITCONNECT had engaged in fraud and made materially misleading statements about the BitConnect Investments that were likely to deceive the public; and

(d) BITCONNECT's conduct, acts, and practices threaten an immediate and irreparable public harm.

203.   Soon thereafter, on January 9, 2018, the Secretary of State of North Carolina - Securities Division issued Temporary Cease and Desist Order against BITCONNECT to prevent BITCONNECT from further violating state securities laws and restrain it from conducting the second ICO, because the State had concluded that the BITCONNECT's investment offerings were unregistered securities being offered to the residents of the State and that those investments posed an immediate and irreparable harm to the residents of North Carolina.

204.   On January 13, 2018, BITCONNECT's website went down.  Although the website was back up just a few days later, on January 16, 2018, BITCONNECT posted an anonymous announcement declaring that BITCONNECT had closed the trading platform:

> This is to inform all community members that we are closing the BitConnect lending and exchange platform. We are closing the lending operation immediately with the release of all outstanding loans. With release of your entire active loan in the lending wallet we are transferring all your lending wallet balance to your BitConnect wallet balance at 363.62 USD. This rate has been calculated based on last 15 days averages of the closing price registered on coinmarketcap.com. You are free to withdraw your BitConnect coin currently in QT wallets that was used for staking as well. We are also closing BCC exchange platform in 5 days.  In short, we are closing lending service and exchange service while BitConnect.co website will operate for wallet service, news and educational purposes.

The reason for halt of lending and exchange platform has many reasons as follow:

The continuous bad press has made community members uneasy and created a lack of confidence in the platform.

We have received two Cease and Desist letters, one from the Texas State Securities Board, and one from the North Carolina Secretary of State Securities Division. These actions have become a hindrance for the legal continuation of the platform.

Outside forces have performed DDoS attacks on platform several times and have made it clear that these will continue. These interruptions in service have made the platform unstable and have created more panic inside the community.

Closing the lending and exchange platform doesn't mean that we will stop supporting BitConnect coin. Closing the lending platform will allow Bitconnect to be listed on outside exchanges giving more options for trading.

We will keep working to make BitConnect coin available to merchant websites providing them API access to accept BitConnect Coins on their platforms.

BitConnect X ICO is still functional and we are building an exchange platform on the BitConnect X website. With BitConnect X operating as an exchange platform, BitConnect Coin (BCC) will be listed there.

This is not the end of this community, but we are closing some of the services on the website platform and we will continue offering other cyptocurrency services in the future.

205.    Evidently, the lending program was shut down entirely; and BITCONNECT no longer honored its promise to pay interest thereon nor return the principal investments made into the lending program.   Moreover, BITCONNECT determined to move forward with the BitConnectx ICO – which is still ongoing as of February 27, 2018.

206.    Within moments of BITCONNECT shutting down its trading and lending platforms, the price of BCC plummeted nearly ninety percent (90%) in value; and the token is believed to be effectively useless now.

207.    As a result of the BITCONNECT Defendants' fraudulent and misleading activities -- as well as their violation of multiple securities laws -- Plaintiffs and the Class have suffered damages believed to be greater than $2 billion.

## VI.    Necessity for Judicial Intervention

208.    In 2013, the SEC issued an investor alert on "Ponzi Schemes Using Virtual Currencies," warning investors to be wary of investment opportunities offering "high investment returns with little or no risk" and explaining that "Ponzi schemes typically involve investments that have not been registered with the SEC or with state securities regulators."   Here, the BITCONNECT Defendants have conducted and propagated precisely such a scheme.

209.    On July 25, 2017, the SEC issued a report on "the DAO," which offered tokens for sale online, in which the SEC advised those using "distributed ledger or blockchain-enabled means for capital raising to take appropriate steps to ensure compliance" with the federal securities laws, and stated that "[a]ll securities offered and sold in the United States must be registered with the Commission . . ." or qualify for an exemption from registration.  On the same day, the SEC issued an investor bulletin urging caution when investing in ICOs and urging investors to be mindful that promoters and initial sellers that lead buyers of tokens to expect a return on their investment or participate in shared returns provided by the project may be offering a security for sale.

210.    Virtual currencies are a relatively new phenomenon, and numerous individuals and entities -- by engaging in unlawful conduct with near impunity -- are taking advantage of the time it takes for regulatory agencies to address new investment developments, as the BITCONNECT Defendants have here by raising hundreds of millions of dollars if not billions of dollars with promises of profits to be made from trading BCCs and/or the BitConnect Investment Programs.

211.    It is clear from recent events that the rampant disregard of state and federal securities laws and consequently, abuse of investors, taking place in connection with BITCONNECT's unlawful and fraudulent conduct has been noted by state regulatory agencies.

212.    While BCCs and the BitConnect Investment Programs plainly constitute investment contract securities, at no time was a registration statement ever filed or in effect with the SEC for the securities being offered.  As such, the unlawful, unregistered offering of securities by the BITCONNECT Defendants to Plaintiffs and the Class violated Sections 5, 12(a)(1) and 15(a) of the Securities Act; and the private right of action provided by Section 12(a)(1) of the Securities Act, created for just this type of situation, provides strict liability for the BITCONNECT Defendants' sale of such unregistered securities.

213.    Additionally, due to the fraudulent and deceitful conduct involved and necessary to propagate the BitConnect Investment Programs – particularly as relates to the Referral/Affiliate Program -- the BITCONNECT Defendants are liable for violating Florida's Deceptive and Unfair Trade Practices Act, breach of contract (with respect to Defendant BITCONNECT), unjust enrichment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, conversion, and civil conspiracy at the expense of unsuspecting public investors.

214.    Plaintiffs have duly performed all of their duties and obligations, and any conditions precedent to Plaintiffs bringing this action have occurred, have been performed, or else have been excused or waived.

215.    To enforce their rights and those of the Class, Plaintiffs have retained undersigned counsel and are obligated to pay counsel a reasonable fee for its services, for which Defendants are liable as a result of their bad faith and otherwise.

## COUNT I - VIOLATION OF SECTION 12(a) OF THE SECURITIES ACT
### [AGAINST THE BITCONNECT DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–215 above, and further allege:

216.    Section 12(a)(1) grants Plaintiffs a private right of action against any person who offers or sells a security in violation of Section 5, and states that such person,

> Shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

217.    From January 2017 through January 2018, in connection with the BitConnect Investment Programs and offer and sale of BCCs, Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails for the purposes of offering, selling, or delivering unregistered securities in direct violation of the Securities Act.

218.    The offer and sale of BCCs and solicitation of investments in the BitConnect Investment Programs constituted the offer and sale of unregistered securities under controlling federal law.  BCCs and the BitConnect Investment Programs exhibit the following particular hallmarks of a security under the *Howey* test: (a) to receive any BCCs (and invest in the BitConnect Investment Programs), an investment of money, in the form of BTC and/or other currencies was required; (b) the investment of money was made into the common enterprise that is Defendant BITCONNECT and its ability to provide "guaranteed" returns using its trading algorithm or otherwise; and (c) the success of the investment opportunities and any potential returns thereon were entirely reliant on Defendants' ability to continuously provide such "guaranteed" returns to investors.

219.   Each of the individual Developer Defendants and Promoter Defendants constitute "seller[s]" under the Securities Act and are thus equally liable for selling unregistered securities in connection with BITCONNECT.

220.   The Developer Defendants created and maintained BITCONNECT and profited handsomely from investments in the BitConnect Investment Programs.

221.   Similarly, the individual Promoter Defendants personally profited by soliciting investors to use their "referral" links to participate in the BitConnect Investment Programs.

222.   As such, the BITCONNECT Defendants have participated in the offer and sale of unregistered securities in violation of the Securities Act, and are liable to Plaintiffs and the Class for rescission and/or compensatory damages.

## COUNT II - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT
### [AGAINST DEFENDANT NALIN]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–215 above, and further allege:

223.   Due to his ownership in and/or control over BITCONNECT's organization, Defendant NALIN acted as controlling person of BITCONNECT within the meaning of Section 15(a) of the Securities Act as alleged herein.

224.   By virtue of his positions as a behind the scenes owner/developer and/or based on his awareness of Defendant BITCONNECT's operations, Defendant NALIN had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the BitConnect Investment Programs, including the decision to engage in the sale of unregistered securities in furtherance thereof.

225.   By virtue of the foregoing, Defendant NALIN is liable to Plaintiffs and the Class as a control person of Defendant BITCONNECT under Section 15(a) of the Securities Act.

## COUNT III - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT
### [AGAINST DEFENDANT GORASIYA]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–215 above, and further allege:

226.     Due to his ownership in and/or control over BITCONNECT's organization, Defendant GORASIYA acted as controlling person of BITCONNECT within the meaning of Section 15(a) of the Securities Act as alleged herein.

227.     By virtue of his positions as a behind the scenes owner/developer and/or based on his awareness of Defendant BITCONNECT's operations, Defendant GORASIYA had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the BitConnect Investment Programs, including the decision to engage in the sale of unregistered securities in furtherance thereof.

228.     By virtue of the foregoing, Defendant GORASIYA is liable to Plaintiffs and the Class as a control person of Defendant BITCONNECT under Section 15(a) of the Securities Act.

## COUNT IV - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT
### [AGAINST DEFENDANT CHAUDHARI]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–215 above, and further allege:

229.     Due to his ownership in and/or control over BITCONNECT's organization, Defendant CHAUDHARI acted as controlling person of BITCONNECT within the meaning of Section 15(a) of the Securities Act as alleged herein.

230.     By virtue of his positions as a behind the scenes owner/developer and/or based on his awareness of Defendant BITCONNECT's operations, Defendant CHAUDHARI had the power to influence and control and did influence and control, directly or indirectly, the decision making

relating to the BitConnect Investment Programs, including the decision to engage in the sale of unregistered securities in furtherance thereof.

231.    By virtue of the foregoing, Defendant CHAUDHARI is liable to Plaintiffs and the Class as a control person of Defendant BITCONNECT under Section 15(a) of the Securities Act.

## COUNT V - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT
### [AGAINST DEFENDANT LATHIYA]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–215 above, and further allege:

232.    Due to his ownership in and/or control over BITCONNECT's organization, Defendant LATHIYA acted as controlling person of BITCONNECT within the meaning of Section 15(a) of the Securities Act as alleged herein.

233.    By virtue of his positions as a behind the scenes owner/developer and/or based on his awareness of Defendant BITCONNECT's operations, Defendant LATHIYA had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the BitConnect Investment Programs, including the decision to engage in the sale of unregistered securities in furtherance thereof.

234.    By virtue of the foregoing, Defendant LATHIYA is liable to Plaintiffs and the Class as a control person of Defendant BITCONNECT under Section 15(a) of the Securities Act.

## COUNT VI - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT
### [AGAINST DEFENDANT MAVANI]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–215 above, and further allege:

235.    Due to his ownership in and/or control over BITCONNECT's organization, Defendant MAVANI acted as controlling person of BITCONNECT within the meaning of Section 15(a) of the Securities Act as alleged herein.

236.    By virtue of his positions as a behind the scenes owner/developer and/or based on his awareness of Defendant BITCONNECT's operations, Defendant MAVANI had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the BitConnect Investment Programs, including the decision to engage in the sale of unregistered securities in furtherance thereof.

237.    By virtue of the foregoing, Defendant MAVANI is liable to Plaintiffs and the Class as a control person of Defendant BITCONNECT under Section 15(a) of the Securities Act.

## COUNT VII - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT
### [AGAINST DEFENDANT PUROHIT]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–215 above, and further allege:

238.    Due to his ownership in and/or control over BITCONNECT's organization, Defendant PUROHIT acted as controlling person of BITCONNECT within the meaning of Section 15(a) of the Securities Act as alleged herein.

239.    By virtue of his positions as a behind the scenes owner/developer and/or based on his awareness of Defendant BITCONNECT's operations, Defendant PUROHIT had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the BitConnect Investment Programs, including the decision to engage in the sale of unregistered securities in furtherance thereof.

240.    By virtue of the foregoing, Defendant PUROHIT is liable to Plaintiffs and the Class as a control person of Defendant BITCONNECT under Section 15(a) of the Securities Act.

## COUNT VIII - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT
### [AGAINST DEFENDANT SAXENA]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–215 above, and further allege:

241.    Due to his ownership in and/or control over BITCONNECT's organization, Defendant SAXENA acted as controlling person of BITCONNECT within the meaning of Section 15(a) of the Securities Act as alleged herein.

242.    By virtue of his positions as a behind the scenes owner/developer and/or based on his awareness of Defendant BITCONNECT's operations, Defendant SAXENA had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the BitConnect Investment Programs, including the decision to engage in the sale of unregistered securities in furtherance thereof.

243.    By virtue of the foregoing, Defendant SAXENA is liable to Plaintiffs and the Class as a control person of Defendant BITCONNECT under Section 15(a) of the Securities Act.

## COUNT IX - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT
### [AGAINST THE NAIKS DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–215 above, and further allege:

244.    Due to their ownership in and/or control over BITCONNECT's organization, the NAIKS acted as controlling persons of BITCONNECT within the meaning of Section 15(a) of the Securities Act as alleged herein.

245.    By virtue of their positions as behind the scenes owners/developers and/or based on their awareness of Defendant BITCONNECT's operations, the NAIKS Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision

making relating to the BitConnect Investment Programs, including the decision to engage in the sale of unregistered securities in furtherance thereof.

246.    By virtue of the foregoing, the NAIKS are liable to Plaintiffs and the Class as control persons of Defendant BITCONNECT under Section 15(a) of the Securities Act.

## COUNT X - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT
### [AGAINST DEFENDANT SATISH]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–215 above, and further allege:

247.    Due to his ownership in and/or control over Defendant BITCONNECT, Defendant SATISH acted as controlling person of BITCONNECT within the meaning of Section 15(a) of the Securities Act as alleged herein.

248.    By virtue of his positions as an affiliate manager and/or director and participation in and/or based on his awareness of Defendant BITCONNECT's operations, Defendant SATISH had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the BitConnect Investment Programs, including the decision to engage in the sale of unregistered securities in furtherance thereof.

249.    By virtue of the foregoing, Defendant SATISH is liable to Plaintiffs and the Class as a control person of Defendant BITCONNECT's under Section 15(a) of the Securities Act.

## COUNT XI - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT
### [AGAINST DEFENDANT DARJI]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–215 above, and further allege:

250.    Due to his ownership in and/or control over Defendant BITCONNECT, Defendant DARJI acted as controlling person of BITCONNECT within the meaning of Section 15(a) of the Securities Act as alleged herein.

251.    By virtue of his positions as an affiliate manager and/or director and participation in and/or based on his awareness of Defendant BITCONNECT's operations, Defendant DARJI had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the BitConnect Investment Programs, including the decision to engage in the sale of unregistered securities in furtherance thereof.

252.    By virtue of the foregoing, Defendant DARJI is liable to Plaintiffs and the Class as a control person of Defendant BITCONNECT's under Section 15(a) of the Securities Act.

## COUNT XII - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT
### [AGAINST DEFENDANT ARCARO]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–215 above, and further allege:

253.    Due to his ownership in and/or control over, *inter alia*, Defendants JAMES, GRANT, HILDRETH, MAASEN and/or FOX, Defendant ARCARO acted as controlling person of each top-level promoter within the meaning of Section 15(a) of the Securities Act as alleged herein.

254.    By virtue of his positions as an affiliate manager and/or director and participation in and/or awareness of Defendant BITCONNECT INTERNATIONAL PLC's operations, Defendant ARCARO had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the BitConnect Investment Programs, including the decision to engage in the sale of unregistered securities in furtherance thereof.

255.    By virtue of the foregoing, Defendant ARCARO is liable to Plaintiffs and the Class as a control person of Defendant BITCONNECT INTERNATIONAL PLC under Section 15(a) of the Securities Act.

## COUNT XIII - VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT
### [AGAINST DEFENDANT JEPPESEN]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–215 above, and further allege:

256.    Defendant JEPPESEN is subject to liability by virtue of his top-level executive position with BITCONNECT and his influence over the enterprise, which provided him the power to control or influence BITCONNECT's actions.   For example, Defendant JEPPESEN is reportedly a Director of BITCONNECT -- serving as the Director of Development for BITCONNECT's operations in the United States and Europe -- and is responsible for overseeing and contributing to development of the websites used by BITCONNECT to fraudulently offer and sell its BitConnect Investment Programs and BCCs to investors, including its operations vis-à-vis Plaintiffs and the Class Members.

257.    As a top-level executive and controlling person of BITCONNECT, Defendant JEPPESEN knew of, or recklessly disregarded, the alleged misrepresentations made by BITCONNECT on the BitConnect Websites in connection with the sale of the BitConnect Investment Programs and the BCCs.

258.    Defendant JEPPESEN had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the BitConnect Investment Programs, including the decision to engage in the sale of unregistered securities in furtherance thereof.

259.    Defendant JEPPESEN is a culpable participant in the fraudulent scheme described herein and caused BITCONNECT to engage in the acts and omissions described herein.

260.    Accordingly, Defendant JEPPESEN is liable to Plaintiffs and the Class as a "controlling person" of BITCONNECT within the meaning of Section 15(a) of the Securities Act.

## COUNT XIV - BREACH OF CONTRACT
### [AGAINST DEFENDANT BITCONNECT, THE DEVELOPER DEFENDANTS, DEFENDANT SATISH, AND DEFENDANT DARJI]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–215 above, and further allege:

261.    The terms of the BitConnect Investment Programs constitute a contract between: (1) Plaintiffs and the Class Members, and (2) BITCONNECT.

262.    The contract was entered into by and between BITCONNECT -- which was an alter ego for the Developer Defendants, Defendant SATISH, and Defendant DARJI -- and each Class Member between November 15, 2016 and January 17, 2018.

263.    The terms of the BitConnect Investment Programs called for an investment of fiat currency or cryptocurrency by Plaintiffs and the Class Members.

264.    The funds paid by Plaintiffs and the Class Members pursuant to the BitConnect Investment Programs were pooled by BITCONNECT in an effort by BITCONNECT to secure a profit for itself and the investors.  As a result, the investors, including Plaintiffs and the Class, shared in the risks and benefits of the investment.

265.    Plaintiffs and the Class Members relied on, and are dependent upon, the expertise and efforts of BITCONNECT for their investment returns.

266.    The terms of the BitConnect Investment Programs constitute an investment contract and are therefore subject to federal and state securities laws, including the registration requirements promulgated thereunder.

267.    BITCONNECT breached its contracts with Plaintiffs and the Class by failing to provide the "guaranteed" returns, daily interest, bonus interests, and return the initial investments pursuant to the terms of the BitConnect Lending Program.  Rather than adhere to the express,

unequivocal terms of the contracts, BITCONNECT converted Plaintiffs' and the Class' investments into near worthless BCCs and shut down its operations.

268.    Moreover, no registration statement was filed or in effect with any federal or state regulatory body, and no exemption from registration exists with respect to the BitConnect Investment Programs.

269.    By virtue of the foregoing, BITCONNECT is liable to Plaintiffs and the Class for damages resulting from BITCONNECT's breaches of contract.

270.    To the extent that Plaintiffs have received from BITCONNECT any benefits through the contract -- though none are known to them at this time -- Plaintiffs hereby offers to restore to BITCONNECT those benefits, once they are identified and can be quantified.

### COUNT XV - UNJUST ENRICHMENT
### [AGAINST THE BITCONNECT DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–215 above, and further allege:

271.    The BITCONNECT Defendants have reaped the benefits of operating and/or personally benefiting from inducing Plaintiffs and the Class to invest in fraudulent Ponzi/pyramid schemes (BCC and/or the BitConnect Investment Programs), thereby causing actual harm to thousands of investors.

272.    It would be unconscionable and against the fundamental principles of justice, equity, and good conscience for the BITCONNECT Defendants to retain the substantial monetary benefits they have received as a result of their misconduct.

273.    To remedy the BITCONNECT Defendants' unjust enrichment, the Court should order the BITCONNECT Defendants to immediately return Plaintiffs' and the Class' investments

and disgorge any amounts received by the BITCONNECT Defendants as a result of their misconduct alleged herein.

### COUNT XVI - VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA")
[AGAINST THE BITCONNECT DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–215 above, and further allege:

274.    Chapter 501, Fla. Stat., Florida's Deceptive and Unfair Trade Practices Act is to be liberally construed to protect the consuming public, such as Plaintiffs and the Class Members in this case, from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce.

275.    Plaintiffs and the Class Members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

276.    By soliciting investor funds in the manner in which they did, the BITCONNECT Defendants engaged in "trade and commerce" within the meaning of Fla. Stat. §501.203(8).

277.    While FDUTPA does not define "deceptive" and "unfair," it incorporates by reference the Federal Trade Commission's interpretations of these terms.  The FTC has found that a "deceptive act or practice" encompasses "a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."

278.    The federal courts have defined a "deceptive trade practice" as any act or practice that has the tendency or capacity to deceive consumers and have defined an "unfair trade practice" as any act or practice that offends public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

279.    Moreover, as the securities laws are designed for consumer protection and "proscribe[] unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices," a violation of the securities laws is a *per se* violation of FDUTPA

280.    The BITCONNECT Defendants have reaped monetary rewards from operating and/or personally benefiting from inducing Plaintiffs and the Class to invest in fraudulent Ponzi/pyramid schemes (BCC and/or the BitConnect Investment Programs), thereby causing actual harm to thousands of investors.

281.    The BITCONNECT Defendants' acts and omissions of representing to Plaintiffs and the Class Members that, among other things:

(a) BITCONNECT utilized a proprietary, secret trading system (the "Volatility Software") that helped its investors generate far-greater-than-average returns on their investments;

(b) BITCONNECT's representation that a one percent (1%) daily return on investments was readily achievable regardless of market performance or the fluctuating value of bitcoin;

(c) Investment returns were legitimately generated and were not simply a reallocation of new BITCONNECT investors' money used to pay the promised returns on outstanding BITCONNECT investors' investments in classic Ponzi scheme fashion;

(d) The BitConnect Investment Programs complied with all applicable securities laws; and

(e) The BitConnect affiliates who were paid commissions for their sale of BitConnect Investment Programs were properly registered to procure those sales

constitute both deceptive and unfair trade practices because the false representations and omissions made by the BITCONNECT Defendants have a tendency or capacity to deceive consumers, such as Plaintiffs and the Class Members, into investing in BITCONNECT's falsely-touted business and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

282.     As a result of the BITCONNECT Defendants' deceptive trade practices, Plaintiffs and the Class Members were deceived into investing their money with a company that functioned solely as an engine of fraud -- thus causing significant economic damage to Plaintiffs and the Class Members.

283.     The materially false statements and omissions as described above, and the fact that this was a misleading investment, were unfair, unconscionable, and deceptive practices perpetrated on Plaintiffs and the Class Members which would have likely deceived a reasonable person under the circumstances.

284.     The BITCONNECT Defendants were on notice at all relevant times that the false representations of material facts described above were being communicated to prospective investors (such as Plaintiffs and the Class Members) by their authorized agents.

285.     As a result of the false representations and violations of the securities laws described above, Plaintiffs and the Class Members have been damaged by, among other things losing their invested capital.

286.     Plaintiffs and the Class Members have also been damaged in other and further ways subject to proof at trial.

287.     Therefore, the BITCONNECT Defendants engaged in unfair and deceptive trade practices in violation of Section 501.201 *et seq.*, Fla. Stat.

288.     Pursuant to Sections 501.211(1) and 501.2105, Fla. Stat., Plaintiffs and the Class Members are entitled to recover from the BITCONNECT Defendants the reasonable amount of attorneys' fees Plaintiffs and the Class Members have had to incur in representing their interests in this matter.

## COUNT XVII - FRAUDULENT INDUCEMENT
### [AGAINST THE BITCONNECT DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–215 above, and further allege:

289.    The BITCONNECT Defendants, by acts of both omission and commission, made to Plaintiffs and the Class Members false statements of material facts about the services Plaintiffs and the Class Members would receive from BITCONNECT upon opening a BITCONNECT account and investing in the BitConnect Investment Programs.

290.    Specifically, the BITCONNECT Defendants' representations to Plaintiffs and the Class Members that, among other things:

(a)    BITCONNECT utilized a proprietary, secret trading system (the "Volatility Software") that helped its investors generate far-greater-than-average returns on their investments;

(b)    BITCONNECT's representation that a one percent (1%) daily return on investments was readily achievable regardless of market performance or the fluctuating value of bitcoin;

(c)    Investment returns were legitimately generated and were not simply a reallocation of new BITCONNECT investors' money used to pay the promised returns on outstanding BITCONNECT investors' investments in classic Ponzi scheme fashion;

(d)    The BitConnect Investment Programs complied with all applicable securities laws; and

(e)    The BitConnect affiliates who were paid commissions for their sale of BitConnect Investment Programs were properly registered to procure those sales

were false, and the BITCONNECT Defendants knew at the time the statements were made that the statements were false.

291.    The BITCONNECT Defendants intended that Plaintiffs and the Class Members would be induced into action by relying upon the statements of fact made to them by and on behalf of the BITCONNECT Defendants.

292.    In considering whether to open accounts at BITCONNECT, invest in the BitConnect Investment Programs, and entrust to BITCONNECT their valuable assets; Plaintiffs and the Class Members reasonably and justifiably relied on the statements of fact made to them by and on behalf of the BITCONNECT Defendants.

293.    As a direct and proximate result of Plaintiffs' and the Class Members' reliance on the statements made to them by the BITCONNECT Defendants, Plaintiffs and the Class Members have suffered damage.

## COUNT XVIII - FRAUDULENT MISREPRESENTATION
### [AGAINST THE BITCONNECT DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–215 above, and further allege:

294.    The BITCONNECT Defendants, by acts of both omission and commission, made to Plaintiffs and the Class Members false statements of material facts about the services Plaintiffs and the Class Members would receive from BITCONNECT upon opening a BITCONNECT account and investing in the BitConnect Investment Programs.

295.    Specifically, the BITCONNECT Defendants' representations to Plaintiffs and the Class Members that, among other things:

(a)    BITCONNECT utilized a proprietary, secret trading system (the "Volatility Software") that helped its investors generate far-greater-than-average returns on their investments;

(b)    A one percent (1%) daily return on investments was readily achievable regardless of market performance or the fluctuating value of bitcoin;

(c)    Investment returns were legitimately generated and were not simply a reallocation of new BITCONNECT investors' money used to pay the promised returns on outstanding BITCONNECT investors' investments in classic Ponzi scheme fashion;

(d)    The BitConnect Investment Programs complied with all applicable securities laws; and

(e)    The BitConnect affiliates who were paid commissions for their sale of BitConnect Investment Programs were properly registered to procure those sales

were false, and the BITCONNECT Defendants knew at the time the statements were made that the statements were false.

296.    The BITCONNECT Defendants' misrepresentations were made with reckless disregard for the truth.

297.    The BITCONNECT Defendants intended that Plaintiffs and the Class Members would be induced into action by relying upon the statements of fact made to them by and on behalf of the BITCONNECT Defendants.

298.    In considering whether to open accounts at BITCONNECT, invest in the BitConnect Investment Programs, and entrust to BITCONNECT their valuable assets; Plaintiffs and the Class Members reasonably and justifiably relied on the statements of fact made to them by and on behalf of the BITCONNECT Defendants.

299.    As a direct and proximate result of Plaintiffs' and the Class Members' reliance on the statements made to them by the BITCONNECT Defendants, Plaintiffs and the Class Members have suffered damage.

## COUNT XIX - NEGLIGENT MISREPRESENTATION
### [AGAINST THE BITCONNECT DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–215 above, and further allege:

300.    The BITCONNECT Defendants, by acts of both omission and commission, made to Plaintiffs and the Class Members false statements of material facts about the services Plaintiffs and the Class Members would receive from BITCONNECT upon opening a BITCONNECT account and investing in the BitConnect Investment Programs in exchange for the fees they were compelled to pay to maintain accounts at BITCONNECT.

301.    Specifically, the BITCONNECT Defendants' representations to Plaintiffs and the Class Members that, among other things:

(a)     BITCONNECT utilized a proprietary, secret trading system (the "Volatility Software") that helped its investors generate far-greater-than-average returns on their investments;

(b)     A one percent (1%) daily return on investments was readily achievable regardless of market performance or the fluctuating value of bitcoin;

(c)     Investment returns were legitimately generated and were not simply a reallocation of new BITCONNECT investors' money used to pay the promised returns on outstanding BITCONNECT investors' investments in classic Ponzi scheme fashion;

(d)     The BitConnect Investment Programs complied with all applicable securities laws; and

(e)     The BitConnect affiliates who were paid commissions for their sale of BitConnect Investment Programs were properly registered to procure those sales

were false, and the BITCONNECT Defendants knew at the time the statements were made that the statements were false.

302.    The BITCONNECT Defendants had no reasonable grounds upon which to believe the statements were true when made to Plaintiffs and the Class Members.

303.    The BITCONNECT Defendants intended that Plaintiffs and the Class Members would be induced into action by relying upon the statements of fact made to them by and on behalf of the BITCONNECT Defendants.

304.    In considering whether to open accounts at BITCONNECT, invest in the BitConnect Investment Programs, and entrust to BITCONNECT their valuable assets; Plaintiffs and the Class Members reasonably and justifiably relied on the statements of fact made to them by and on behalf of the BITCONNECT Defendants.

305.    As a direct and proximate result of Plaintiffs' and the Class Members' reliance on the statements made to them by the BITCONNECT Defendants, Plaintiffs and the Class Members have suffered damage.

## COUNT XX - CONVERSION
### [AGAINST THE BITCONNECT DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–215 above, and further allege:

306.    Plaintiffs transferred funds and assets to BITCONNECT for investment, and as a purported loan, to participate in the BitConnect Investment Programs.

307.    BITCONNECT has kept Plaintiffs' and the Class Members' funds and assets after Plaintiffs and the Class Members requested their return, despite BITCONNECT's lack of any ownership interest in the assets and despite BITCONNECT's agreement in writing to return to Plaintiffs and the Class Members -- in the form of fiat currency (*i.e.*, U.S. Dollars or Euros), not BCCs -- all of Plaintiffs' and the Class Members' holdings.

308.    By refusing to return to Plaintiffs and the Class Members their assets, BITCONNECT intended to interfere with, and indeed has interfered with, Plaintiffs' and the Class

Members' ownership and interest in those holdings and has deprived Plaintiffs and the Class Members of their property, permanently or temporarily.

309.    Upon information and belief, BITCONNECT has utilized Plaintiffs' and the Class Members' funds and assets to cover BITCONNECT's own business expenses and to enrich its Directors, shareholders, and affiliates, including Defendants JEPPESEN, ARCARO, JAMES, HILDRETH, GRANT, CRYPTONICK, MASSEN, FOX, and JOHN DOE NOS. 2-10.

310.    As a result of BITCONNECT's conversion of Plaintiffs' and the Class Members' funds and assets to its own corporate uses and the personal use of its Directors, shareholders, and affiliates; Plaintiffs and the Class Members have suffered damage.

## COUNT XXI - CIVIL CONSPIRACY
### [AGAINST THE BITCONNECT DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–215 above, and further allege:

311.    The BITCONNECT Defendants conspired with one another to perpetrate an unlawful act upon Plaintiffs and the Class Members or to perpetrate a lawful act by unlawful means, *to wit*: they made multiple misrepresentations of fact to Plaintiffs and the Class Members in an effort to extract from Plaintiffs and the Class Members funds, assets, and cryptocurrency to fund BITCONNECT's own business expenses and to enrich its Directors, shareholders, and affiliates, including Defendants JEPPESEN, ARCARO, JAMES, CRYPTO CLOVER, HILDRETH, GRANT, CRYPTONICK, MASSEN, FOX, and JOHN DOE NOS. 2-10, not to fund the purportedly legitimate purpose to which Plaintiffs and the Class Members were told by the BITCONNECT Defendants that their investment assets were being applied – all of which put the BITCONNECT Defendants' own pecuniary interest ahead of Plaintiffs' and the Class Members' welfare and economic safety.

312.     The BITCONNECT Defendants solicited and/or accepted from Plaintiffs and the Class Members large sums of funds, assets, and cryptocurrency while withholding from Plaintiffs and the Class Members certain material facts, including:

313.     BITCONNECT did not utilize a proprietary, secret trading system (the "Volatility Software") that helped its investors generate far-greater-than-average returns on their investments;

314.     BITCONNECT's representation that a one percent (1%) daily return on investments was readily achievable regardless of market performance or the fluctuating value of bitcoin;

315.     Investment returns were not legitimately generated and were simply a reallocation of new BITCONNECT investors' money used to pay the promised returns on outstanding BITCONNECT investors' investments in classic Ponzi scheme fashion;

316.     The BitConnect Investment Programs did not comply with all applicable securities laws; and

317.     The BitConnect affiliates who were paid commissions for their sale of BitConnect Investment Programs were not properly registered to procure those sales; and

318.     The "BCC School" orchestrated by Defendant GLENN ARCARO was not a "school" at all; rather, it was a mere conduit to get BCC School "graduates" to open up accounts at BITCONNECT, for which GLENN ARCARO and his team of affiliates reaped from BITCONNECT the riches of each client referral.

319.     Each of the BITCONNECT Defendants agreed to the illicit purpose for garnering investment monies from Plaintiffs and the Class Members so that BITCONNECT's Directors, shareholders, and affiliates could enjoy lavish lifestyles with Plaintiffs' and the Class Members' funds, assets, and cryptocurrency.

320.    The BITCONNECT Defendants were each aware of, and consented to, the misrepresentations detailed above and knew that the efforts to garner funds, assets, and cryptocurrency from Plaintiffs and the Class Members was all part of a fraud aimed solely at enriching BITCONNECT's Directors, shareholders, and affiliates without any intent to remunerate Plaintiffs and the Class Members in any legitimate way purported by the BitConnect Investment Programs.

321.    In furtherance of their conspiracy, the BITCONNECT Defendants made to Plaintiffs and the Class Members, or agreed to have someone make on their behalf, the false statements of fact detailed above and purposefully withheld from Plaintiffs and the Class Members certain material facts detailed above in a concerted effort to obtain Plaintiffs' and the Class Members' funds, assets, and cryptocurrency.

322.    To fulfill their role in the conspiracy, the BITCONNECT corporate parties operated the BitConnect Websites and pretended to be operating a legitimate, legally-compliant trading exchange and lending platform.

323.    To fulfill his role in the conspiracy, Defendant JEPPESEN oversaw and personally participated in developing the BitConnect Websites as well as BITCONNECT's business operations in the United States and Europe -- falsely representing that the operations were legitimate.

324.    To fulfill his role in the conspiracy, Defendant ARCARO managed, coached, and supported a United States-based team of BITCONNECT affiliates to sharpen their recruiting techniques and lure in BITCONNECT investors.   Defendant ARCARO also created and orchestrated the BCC School, which was little more than a conduit to get BCC School "graduates"

to open up accounts at BITCONNECT, for which ARCARO and his team of affiliates reaped from BITCONNECT the riches of each client referral.

325.    To fulfill their role in the conspiracy, Defendants JEPPESEN, ARCARO, JAMES, CRYPTO CLOVER, HILDRETH, GRANT, CRYPTONICK, MASSEN, FOX, and JOHN DOES NOS. 2-10 served as United States-based BITCONNECT affiliates who used social media channels such as YouTube, Twitter, Reddit, and Facebook to recruit unsuspecting investors in the United States and abroad to purchase BitConnect Investment Programs.  For their efforts, Defendants JEPPESEN, ARCARO, JAMES, CRYPTO CLOVER, HILDRETH, GRANT, CRYPTONICK, MASSEN, FOX, and DOES NOS. 2-10 were paid large commissions and participated in a lucrative bonus program that provided them sizeable incomes.

326.    BITCONNECT conducted no legitimate business -- something of which each of the Developer and Promoter Defendants were aware and which they accepted as part of the scheme to defraud BITCONNECT investors and accountholders, including Plaintiffs and the Class Members.

327.    As a direct and proximate result of the BITCONNECT Defendants' conspiracy, Plaintiffs and the Class Members have suffered damage.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, respectfully pray for relief as follows:

(a) Declaring that this action is properly maintainable as a class action and certifying Plaintiffs as the Class representatives and their counsel as Class counsel;

(b) Declaring that the BITCONNECT Defendants offered and sold unregistered securities in violation of the federal securities laws;

(c) Declaring the BITCONNECT Defendants are liable to Plaintiffs and the Class under Sections 12(a)(1) and/or 15(a) of the Securities Act;

Second Amended Consolidated Class Action Complaint
Lead Case No.: 9:18-cv-80086-DMM

(d) Declaring the BITCONNECT Defendants violated Florida's Deceptive and Unfair Trade Practices Act and are therefore required to provide rescissory and/or other equitable relief to Plaintiffs and the Class;

(e) Declaring that the BITCONNECT Defendants are liable to Plaintiffs and the Class due to their breach of contract, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, conversion, and civil conspiracy;

(f) Preliminarily enjoining the BITCONNECT Defendants from making further transfers or dissipations of the investments raised from the offer and sale of BCCs and in connection with the BitConnect Investment Programs, or using such funds in any further purchases or transactions;

(g) Requiring an accounting of the remaining funds and assets raised from Plaintiffs and the Class in connection with the offer and sale of BCCs and the BitConnect Investment Programs;

(h) Imposing a constructive trust over the funds and assets rightfully belonging to Plaintiffs and the Class;

(i) Ordering rescission of the investments made by Plaintiffs and the Class relating to the offer and sale of BCCs and the BitConnect Investment Programs and/or compensatory damages;

(j) Awarding Plaintiffs the costs of this action, including reasonable allowance for Plaintiffs' attorneys' and experts' fees; and

(k) Granting such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

Second Amended Consolidated Class Action Complaint
Lead Case No.: 9:18-cv-80086-DMM

Respectfully submitted,

**SILVER MILLER**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone:    (954) 516-6000

By: _____
   DAVID C. SILVER
   Florida Bar No. 572764
   E-mail: DSilver@SilverMillerLaw.com
   JASON S. MILLER
   Florida Bar No. 072206
   E-mail: JMiller@SilverMillerLaw.com

    - and -

**LEVI & KORSINSKY, LLP**
EDUARD KORSINSKY
E-mail: ek@zlk.com
30 Broad Street, 24th Floor
New York, New York 10004
Telephone:    (212) 363-7500
Facsimile:    (212) 636-7171

DONALD J. ENRIGHT
E-mail: denright@zlk.com
ELIZABETH K. TRIPODI
E-mail: etripodi@zlk.com
JOHN A. CARRIEL
E-mail: jcarriel@zlk.com
**LEVI & KORSINSKY, LLP**
1101 30th Street, N.W., Suite 115
Washington, DC 20007
Telephone:    (202) 524-4290
Facsimile:    (202) 333-2121

*Co-Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing was electronically filed with the Clerk of Court on this __13th__ day of September 2019 by using the CM/ECF system, which will thereby serve all registered users in this case a true and correct copy of the foregoing *via* electronic mail.

_____
DAVID C. SILVER